**ORAL ARGUMENT NOT YET SCHEDULED**

Nos. 25-5177, 25-5179, 25-5220, 25-5221, 25-5223, 25-5224, 25-5226

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

NOVARTIS PHARMACEUTICALS CORPORATION, *et al.*,

*Plaintiffs-Appellants-Cross-Appellees*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States Department of Health and Human Services, *et al.*,

*Defendants-Appellees-Cross-Appellees*,

340B HEALTH, *et al.*,

*Intervenors-Defendants-Appellees-Cross-Appellants*.

On Appeal from the United States District Court for the District of Columbia
Nos. 21-cv-2608, 24-cv-3220, 24-cv-3337, 25-cv-117
District Judge Dabney L. Friedrich

## BRIEF FOR PLAINTIFFS-APPELLANTS

JOHN C. O'QUINN
MEGAN MCGLYNN
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
john.oquinn@kirkland.com

*Counsel for Eli Lilly and
Company and Lilly USA, LLC*

June 18, 2025

SEAN MAROTTA
KEENAN ROARTY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com

*Counsel for Novartis Pharmaceuticals
Corporation, Bristol Myers Squibb
Company, Eli Lilly and Company, and
Lilly USA, LLC*

(Additional counsel on inside cover)

Additional counsel:

PAUL J. ZIDLICKY
MADELEINE JOSEPH
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
pzidlicky@sidley.com

TREVOR L. WEAR
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

*Counsel for Kalderos, Inc.*

JACKSON B. SKEEN
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110

*Counsel for Novartis Pharmaceuticals
Corporation, Bristol Myers Squibb
Company, Eli Lilly and Company, and
Lilly USA, LLC*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.     PARTIES

1.     The following are parties in this Court:

a.     <u>Plaintiffs-Appellants-Cross-Appellees</u>: Bristol Myers Squibb Company; Novartis Pharmaceuticals Corporation; Eli Lilly and Company; Lilly USA, LLC; and Kalderos, Inc.

b.     <u>Defendants-Appellees-Cross-Appellees</u>: Robert F. Kennedy, Jr., in his official capacity as Secretary of Health and Human Services; Thomas J. Engels, in his official capacity as Administrator of Health Resources and Services Administration; the United States of America; the U.S. Department of Health and Human Services; and the U.S. Health Resources and Services Administration.

c.     <u>Intervenors-Defendants-Appellees-Cross-Appellants</u>:     340B Health, University of Massachusetts Memorial Medical Center, Genesis Healthcare System.

### B.     CORPORATE DISCLOSURE STATEMENT

Bristol Myers Squibb Company (BMS) is a global biopharmaceutical company whose mission is to discover, develop and deliver innovative medicines that help patients prevail over serious diseases.  BMS has no parent corporation and no publicly held corporation holds more than 10% of its stock.

Novartis Pharmaceuticals Corporation (Novartis) is an innovative medicines company working to reimagine medicine to improve and extend people's lives and empower them in the face of serious disease. Novartis Pharmaceuticals Corporation is a direct, wholly owned subsidiary of Novartis Finance Corporation and an indirect, wholly owned subsidiary of Novartis AG.

Eli Lilly and Company is a medicine company turning science into healing to make life better for people around the world. It harnesses the power of biotechnology, chemistry, and genetic medicine to solve some of the world's most significant health challenges. Lilly USA, LLC is a wholly-owned subsidiary of Eli Lilly and Company. Eli Lilly and Company has no parent corporation and no publicly-held company or investment fund owns a 10 percent or more ownership interest in it.

Kalderos, Inc. is a technology company serving the healthcare industry that has developed an equitable, easy-to-use technology platform designed to implement the 340B Program on behalf of covered entities and manufacturers. Kalderos has no parent corporation and no publicly held corporation owns 10% or more of any stock in Kalderos.

## C.   RULING UNDER REVIEW

BMS, Novartis, Lilly, and Kalderos appeal the District Court's May 15, 2025 order denying their motions for summary judgment and granting Defendants' and

Intervenors' cross-motions for summary judgment. JA371-404; *Eli Lilly & Co. v. Kennedy*, No. 24-cv-03220-DLF, 2025 WL 1423630 (D.D.C. May 15, 2025) (Friedrich, J.).

### D.    RELATED CASES

*Johnson & Johnson Healthcare Systems Inc. v. Kennedy*, 1:24-cv-03188-RC (D.D.C.) is a related case within the meaning of Circuit Rule 28(a)(1)(C).

<u>*/s/* Sean Marotta</u>
Sean Marotta

## TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ...................................................................vi

GLOSSARY.......................................................................................xv

JURISDICTIONAL STATEMENT ........................................................1

INTRODUCTION ..............................................................................2

ISSUES PRESENTED.........................................................................6

PERTINENT STATUTES ....................................................................6

STATEMENT OF THE CASE..............................................................6

    A.    Statutory and Regulatory Background ...................................6

    B.    Covered Entities' Product-Replenishment Model Leads To
        Massive, Documented Abuse ...............................................11

    C.    Plaintiffs' Proposed Cash-Rebate Models ...........................16

    D.    HRSA's Nuclear Threat .......................................................19

    E.    The District Court Upholds HRSA's Preapproval Requirement ........20

STANDARD OF REVIEW ..................................................................23

SUMMARY OF ARGUMENT .............................................................24

ARGUMENT ....................................................................................26

I.    HRSA'S POWER TO "PROVIDE" FOR REBATES OR
    DISCOUNTS CAN ONLY BE EXERCISED THROUGH AN
    AMENDMENT TO A MANUFACTURER'S PHARMACEUTICAL
    PRICING AGREEMENT..............................................................26

II.    HRSA ARBITRARILY REQUIRED PREAPPROVAL FOR THE
    FIRST TIME IN ITS HISTORY, WITHOUT AN EXPLANATION .........37

iv

# TABLE OF CONTENTS—Continued

Page

A. HRSA Failed To Explain Why It Was Instituting A Preapproval Requirement For The First Time...........................................................38

B. HRSA's Decision To Require Preapproval Of Plaintiffs' Rebate Models, But Not The ADAP Cash-Rebate Model Or The Product-Replenishment Model, Was Arbitrary ..................................41

  1. *HRSA Has Not Explained Why Plaintiffs' Rebate Models Needed Preapproval But The ADAP Cash-Rebate Model Did Not* .....................................................................................41

  2. *HRSA Has Not Explained Why Plaintiffs' Rebate Models Needed Preapproval But The Product-Replenishment Model Did Not* ..........................................................................46

III. HRSA ARBITRARILY FAILED TO CONSIDER THE REBATE MODELS' BENEFITS AND THAT ARBITRARY ACTION IS RIPE FOR REVIEW ......................................................................49

A. These Claims Are Ripe Because HRSA's Position Is Clear And A Decision Is Needed Now.................................................49

B. HRSA Failed To Consider Plaintiffs' Cash-Rebate Models' Benefits Over The Current, Flawed Product-Replenishment Model................................................................................55

CONCLUSION .......................................................................................58

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

*ABM Onsite Servs.-W., Inc. v. NLRB*,
 849 F.3d 1137 (D.C. Cir. 2017)..........................................................38

*American Trucking Ass'ns, Inc. v. Federal Motor Carrier Safety
 Admin.*,
 724 F.3d 243 (D.C. Cir. 2013)............................................................41

*American Wild Horse Pres. Campaign v. Perdue*,
 873 F.3d 914 (D.C. Cir. 2017)............................................................39

*American Wildlands v. Kempthorne*,
 530 F.3d 991 (D.C. Cir. 2008)............................................................51

*Ark Initiative v. Tidwell*,
 816 F.3d 119 (D.C. Cir. 2016)............................................................49

*Astra USA, Inc. v. Santa Clara County*,
 563 U.S. 110 (2011)............................................................................34

*Ball, Ball & Brosamer, Inc. v. Reich*,
 24 F.3d 1447 (D.C. Cir. 1994)............................................................32

*Barrick Goldstrike Mines Inc. v. Browner*,
 215 F.3d 45 (D.C. Cir. 2000)..............................................................54

*Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*,
 597 U.S. 424 (2022)............................................................................28

*Bennett v. Spear*,
 520 U.S. 154 (1997)......................................................................49, 53

*California ex rel. Brown v. EPA*,
 940 F.3d 1342 (D.C. Cir. 2019)..........................................................50

\* Authorities upon which we chiefly rely are marked with an asterisk.

# TABLE OF AUTHORITIES—Continued

Page

*Center for Auto Safety v. National Highway Traffic Safety Admin.*,
452 F.3d 798 (D.C. Cir. 2006) ............................................................... 53

\*Chickasaw Nation v. United States,
534 U.S. 84 (2001) ................................................................................. 27

*Ciba-Geigy Corp. v. EPA*,
801 F.2d 430 (D.C. Cir. 1986) ............................................................... 33

*Cigar Ass'n of Am. v. FDA*,
964 F.3d 56 (D.C. Cir. 2020) ................................................................. 23

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ............................................................................... 51

*City & County of San Francisco v. FERC*,
24 F.4th 652 (D.C. Cir. 2022) ............................................................... 40

*Colorado Interstate Gas Co. v. FERC*,
850 F.2d 769 (D.C. Cir. 1988) ............................................................... 41

*Department of Homeland Sec. v. Regents of Univ. of Calif.*,
591 U.S. 1 (2020) ................................................................................... 44

*Doe v. Devine*,
703 F.2d 1319 (D.C. Cir. 1983) ............................................................. 33

*Dubin v. United States*,
599 U.S. 110 (2023) ............................................................................... 28

*Eagle Pharms., Inc. v. Azar*,
952 F.3d 323 (D.C. Cir. 2020) ............................................................... 29

\*Encino Motorcars, LLC v. Navarro,
579 U.S. 211 (2016) ......................................................................... 33, 39

*Environmental Def. Fund, Inc. v. Hardin*,
428 F.2d 1093 (D.C. Cir. 1970) ....................................................... 53, 54

## TABLE OF AUTHORITIES—Continued

Page

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021)..................................................23

*Federal Educ. Ass'n Stateside Region v. FLRA*,
104 F.4th 275 (D.C. Cir. 2024).................................29

*Financial Planning Ass'n v. SEC*,
482 F.3d 481 (D.C. Cir. 2007)..................................31

*Gonzales v. Oregon*,
546 U.S. 243 (2006)..................................................37

*Grand Canyon Tr. v. FAA*,
290 F.3d 339 (D.C. Cir. 2002)..................................27

*Grayscale Invs., LLC v. SEC*,
82 F.4th 1239 (D.C. Cir. 2023).................................41

*Greater Bos. Tel. Corp. v. FCC*,
444 F.2d 841 (D.C. Cir. 1970)..................................40

*Henson v. Santander Consumer USA Inc.*,
582 U.S. 79 (2017)....................................................48

*iTech U.S., Inc. v. Renaud*,
5 F.4th 59 (D.C. Cir. 2021)................................27, 33

*Jicarilla Apache Nation v. United States Dep't of Interior*,
613 F.3d 1112 (D.C. Cir. 2010).................................38

*Lone Mountain Processing, Inc. v. Secretary of Lab.*,
709 F.3d 1161 (D.C. Cir. 2013)............................23, 40

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..................................................24

*Loving v. IRS*,
742 F.3d 1013 (D.C. Cir. 2014)............................31, 36

## TABLE OF AUTHORITIES—Continued

Page

*Mexichem Fluor, Inc. v. EPA*,
    866 F.3d 451 (D.C. Cir. 2017)............................................................30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................55

*Nasdaq Stock Mkt. LLC v. SEC*,
    38 F.4th 1126 (D.C. Cir. 2022).........................................................57

*National Ass'n of Home Builders v. United States Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005).........................................................49

*Natural Res. Def. Council, Inc. v. EPA*,
    22 F.3d 1125 (D.C. Cir. 1994)...........................................................53

*Natural Res. Def. Council, Inc. v. Thomas*,
    845 F.2d 1088 (D.C. Cir. 1988).........................................................50

*\*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024)...........................8, 9, 13, 35, 37, 48

*Oregon Health & Sci. Univ. v. Johnson*,
    No. 1:24-cv-2184-RC (D.D.C. June 18, 2025)..................................10

*Orion Rsrvs. Ltd. P'ship v. Salazar*,
    553 F.3d 697 (D.C. Cir. 2009)...........................................................23

*Pharmaceutical Rsch. & Mfrs. of Am. v. HHS*,
    138 F. Supp. 3d 31 (D.D.C. 2015).....................................................52

*Physicians for Soc. Responsibility v. Wheeler*,
    956 F.3d 634 (D.C. Cir. 2020)...........................................................38

*PPL Wallingford Energy LLC v. FERC*,
    419 F.3d 1194 (D.C. Cir. 2005).........................................................56

ix

## TABLE OF AUTHORITIES—Continued

Page

*Republic Airline Inc. v. United States Dep't of Transp.*,
    669 F.3d 296 (D.C. Cir. 2012).........................................................43

*Robinson v. Shell Oil Co.*,
    519 U.S. 337 (1997)...................................................................27

*Safari Club Int'l v. Jewell*,
    842 F.3d 1280 (D.C. Cir. 2016)......................................................50

*Sanofi-Aventis U.S. LLC v. HHS*,
    58 F.4th 696 (3d Cir. 2023) ..........................................................32

*United Mine Workers of Am., Int'l Union v. Dole*,
    870 F.2d 662 (D.C. Cir. 1989)......................................................56

*United Parcel Serv., Inc. v. Postal Regul. Comm'n*,
    955 F.3d 1038 (D.C. Cir. 2020)......................................................55

*United States v. Shaw*,
    106 F. Supp. 2d 103 (D. Mass. 2000)..............................................46

*Women Involved in Farm Econs. v. United States Dep't of
    Agriculture*,
    876 F.2d 994 (D.C. Cir. 1989)......................................................44

*Yates v. United States*,
    574 U.S. 528 (2015)...................................................................28

*Zotos Int'l, Inc. v. Young*,
    830 F.2d 350 (D.C. Cir. 1987)......................................................24

**STATUTES:**

5 U.S.C. § 706(2)(A)...........................................................................23

7 U.S.C. § 6409(c)(3)..........................................................................33

21 U.S.C. § 355(a) ............................................................................32

# TABLE OF AUTHORITIES—Continued

Page

26 U.S.C. § 32(n)(1)(E) ................................................................33

26 U.S.C. § 5000B(c)(2) ..............................................................33

28 U.S.C. § 1291 ............................................................................1

28 U.S.C. § 1331 ............................................................................1

42 U.S.C. § 256b(a) ......................................................................27

42 U.S.C. § 256b(a)(1) ...................................................................2

42 U.S.C. § 256b(a)(4) .............................................................7, 48

42 U.S.C. § 256b(a)(5) .................................................................48

42 U.S.C. § 256b(a)(5)(A) .........................................................7, 9

42 U.S.C. § 256b(a)(5)(B) .............................................................9

42 U.S.C. § 256b(a)(5)(C) ...........................................................10

42 U.S.C. § 256b(b)(1) ...................................................................7

42 U.S.C. § 256b(d)(1)(B)(i)(1) ..................................................36

42 U.S.C. § 256b(d)(1)(B)(iv) .......................................................7

42 U.S.C. § 256b(d)(3)(A) ...........................................................10

42 U.S.C. § 1320f-2(a) .................................................................10

42 U.S.C. § 1320f-2(d) ...........................................................11, 54

42 U.S.C. § 1320f-6(a) .................................................................16

42 U.S.C. § 1320f-6(c) .................................................................16

42 U.S.C. § 1396a(b) ...................................................................32

# TABLE OF AUTHORITIES—Continued

Page

42 U.S.C. § 1396b(a) ...............................................................32

42 U.S.C. § 1396r-1a(b)(3)(A)(IV)...........................................32

42 U.S.C. § 1396u(a)(6)............................................................32

42 U.S.C. § 2297h-4(5).............................................................32

42 U.S.C. § 6506a(i)(1).............................................................32

**REGULATIONS:**

42 C.F.R. § 10.10(b) .................................................................36

42 C.F.R. § 10.10(c).................................................................36

42 C.F.R. § 10.21(a).................................................................10

340B Drug Pricing Program, 89 Fed. Reg. 28,643 (Apr. 19, 2024)........................10

340B Drug Pricing Program Ceiling Price and Manufacturer Civil
   Monetary Penalties Regulation, 82 Fed. Reg. 1210 (Jan. 5, 2017) ....................36

340B Drug Pricing Program Omnibus Guidance, 80 Fed. Reg. 52,300
   (Aug. 28, 2015) .....................................................................42

Agency Information Collection Activities, 80 Fed. Reg. 63,560 (Oct. 20,
   2015) ................................................................................8

Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed.
   Reg. 65,406 (Dec. 12, 1996)........................................................10

Notice Regarding Section 602 of the Veterans Health Care Act of 1992
   Rebate Option, 62 Fed. Reg. 45,823 (Aug. 29, 1997) (Rebate Notice) .......18, 45

Notice Regarding Section 602 of the Veterans Health Care Act of 1992—
   Rebate Option, 63 Fed. Reg. 35,239 (June 29, 1998) (Rebate Final
   Notice)........................................................................ 18, 38, 42-44

## TABLE OF AUTHORITIES—Continued

Page

**LEGISLATIVE MATERIALS:**

H.R. Rep. No. 102-384(II) (1992) ............................................................7, 9, 29, 35

Staff of S. Comm. on Health, Educ., Lab. & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* (2025) ....................................................................................................................13

**OTHER AUTHORITIES:**

340B Health, *Key Terms*, https://perma.cc/P6ZD-8W9H ......................................11

CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027* (Oct. 2, 2024), https://perma.cc/N8PK-UDBC (CMS 2027 IRA Guidance)..................11, 15, 16

CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026* (Aug. 2024), https://perma.cc/6FZZ-PMSA ............................................................................16

Adam J. Fein, Drug Channels, *The 340B Program Reached $66 Billion in 2023—Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions* (Oct. 22, 2024), https://perma.cc/QV3L-VX9J ..................9, 15

GAO, *GAO-11-836, Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* (Sept. 2011), https://perma.cc/274W-T9WJ................................14

GAO, *GAO-18-480, Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* (June 2018), https://perma.cc/TWH9-HG26 (2018 GAO Report)..........8, 14, 15

GAO, *GAO-21-107, HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements* (Dec. 2020), https://perma.cc/J9BE-XDQ2..............................................................................14

## TABLE OF AUTHORITIES—Continued

Page

HHS Off. of Inspector Gen., *Contract Pharmacy Arrangements in the 340B Program* (Feb. 4, 2014), https://perma.cc/5LPS-CS3Q (Contract Pharmacy Arrangements) ............................................................11, 12

HIV/AIDS Bureau, *AIDS Drug Assistance Program (ADAP) Manual* (June 2023) (ADAP Manual)........................................................ 43-45

HRSA, *Part B: Aids Drug Assistance Program (ADAP)* (last updated Dec. 2024), https://perma.cc/4KNG-AE8S .......................................................18

HRSA, *Program Integrity* (last updated May 2025), https://perma.cc/9BKV-J2KB ...............................................................20

IQVIA, *Unintended Consequences: How the Affordable Care Act Helped Grow the 340B Program* (Aug. 30, 2024), https://perma.cc/RU4S-DCBN ...............................................................8

Rory Martin & Harish Karne, IQVIA, *The Size and Growth of the 340B Program in 2024* (May 6, 2025), https://perma.cc/HT9A-JZAH .......................9

Minnesota Dep't of Health, *340B Covered Entity Report: Report to the Legislature* (Nov. 25, 2024), https://perma.cc/9ZZP-X36D .......................13, 14

Ashwin Mundra, Drug Channels, *The 340B Noncompliance Data Gap Leaves Drug Manufacturers in the Dark* (Mar. 18, 2022), https://perma.cc/QC3U-L67V...............................................................14

Sayeh Nikpay & Lucas Halvorson, *Growing Administrative Complexity in the 340B Program and the Rise of Third-Party Administrators*, 1 Health Affs. Scholar 1 (2023)..........................................................13

Off. of Info. and Regul. Affs. (OIRA), *Pending EO 12866 Regulatory Review*, Reginfo, https://perma.cc/D47N-RMKW ......................................23, 54

# GLOSSARY

| | |
|---|---|
| ADAP | AIDS Drug Assistance Program |
| CMS: | Centers for Medicare and Medicaid Services |
| HHS: | U.S. Department of Health and Human Services |
| HRSA: | Health Resources and Services Administration |
| IRA: | Inflation Reduction Act |
| MDRP: | Medicaid Drug Rebate Program |
| MFP: | Maximum fair price |
| OIRA: | Office of Information and Regulatory Affairs |
| PPA: | Pharmaceutical Pricing Agreement |

IN THE

# United States Court of Appeals for the District of Columbia Circuit

Nos. 25-5177, 25-5179, 25-5220, 25-5221, 25-5223, 25-5224, 25-5226

NOVARTIS PHARMACEUTICALS CORPORATION, *et al.*,

*Plaintiffs-Appellants-Cross-Appellees*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States Department of Health and Human Services, *et al.*,

*Defendants-Appellees-Cross-Appellees*,

340B HEALTH, *et al.*,

*Intervenors-Defendants-Appellees-Cross-Appellants.*

On Appeal from the United States District Court for the District of Columbia
Nos. 21-cv-2608, 24-cv-3220, 24-cv-3337, 25-cv-117
District Judge Dabney L. Friedrich

## BRIEF FOR PLAINTIFFS-APPELLANTS

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331. It entered judgment on May 15, 2025. JA368-370. BMS and Novartis timely appealed on May 20, 2025; Lilly and Kalderos timely appealed on June 12, 2025. JA405-408. This Court has jurisdiction under 28 U.S.C. § 1291.

1

## INTRODUCTION

This case concerns drug manufacturers' attempts to secure basic fairness and transparency in one of the largest federal health programs, which has long been plagued by massive levels of acknowledged fraud and abuse. The 340B Drug Pricing Program requires manufacturers to provide significantly reduced drug prices—as low as a penny—to qualifying clinics and hospitals known as "covered entities." Covered entities do not pass these savings on to their uninsured and under-resourced patients. They instead charge patients and insurers customary prices and pocket the spread. The Program has therefore become a huge arbitrage opportunity, with over $147 billion in 340B-eligible drugs purchased in 2024.

This case is about *how* these 340B price reductions are effectuated. The statute authorizes either an up-front "discount" or back-end "rebate." 42 U.S.C. § 256b(a)(1). The statute also authorizes the Secretary of Health and Human Services (HHS) to "provide[]," under his agreement with each drug manufacturer, how to "tak[e] into account" rebates or discounts. *Id.* To date, the Secretary has never done so. The agreements are silent. And the Health Resources and Services Administration (HRSA), which implements the Program, has *never* preapproved—or until now, claimed it had to preapprove—any particular rebate or discount model in the Program's three-plus decades.

Covered entities unilaterally imposed an abuse-riddled system known as the "product replenishment model" on manufacturers. That system is nothing more than an elaborate shell game. Covered entities or their for-profit vendors buy medicines at commercial prices and dispense them to anyone who shows up at the pharmacy counter. Weeks or even months later, third parties use proprietary algorithms to retroactively identify which prescriptions were purportedly 340B-eligible. Covered entities then "replenish" their inventory with medicines purchased at 340B prices, which they again dispense to anyone with a prescription. And the cycle repeats. How prescriptions are identified as 340B-eligible is a black box, and who reaps the "spread" between the market price and the 340B price is generally unknown, though available information shows for-profit third parties take billions of dollars as a cut.

The product-replenishment model makes determining compliance with the 340B statute impossible. Congress recognized that it would be punitive to force manufacturers to sell medicine at the 340B price *and* pay a Medicaid rebate for the same prescription, so it banned these "duplicate discounts." But because there is no way under the product-replenishment model to track the price concessions given on a particular prescription, manufacturers lose billions of dollars every year in duplicate discounts—despite the statute's express protection against them. The Inflation Reduction Act (IRA) will only make this problem worse by spawning a new type of unlawful duplicate price reduction. The IRA requires manufacturers to

3

offer a "maximum fair price" (MFP)—a mandatory, statutory price reduction—on certain medicines, but prohibits having to provide both MFP and 340B price concessions.  But HHS has failed to provide anti-duplication safeguards, instead telling manufacturers to figure out a solution.

That is what Plaintiffs did.  Plaintiffs identified a straightforward and transparent way to restore the statutory protections against duplicate discounts that Congress guaranteed them.  Instead of the broken product-replenishment model, Plaintiffs sought to implement a cash-rebate model, which is expressly authorized by statute.  Plaintiffs would promptly pay cash rebates to covered entities for 340B-eligible prescriptions after receiving basic claims data confirming 340B eligibility—data covered entities collect and keep in the ordinary course of business.

But HRSA said no.  For the first time, it claimed that manufacturers needed HRSA's preapproval before implementing rebates, even though HRSA has never required preapproval of any pricing model, *ever*, and even though no rule or guidance requires manufacturers to use a particular pricing model.  Worse still, HRSA threatened Plaintiffs with crushing civil monetary penalties and removal of all of their medicines from Medicare Part B and Medicaid, depriving millions of life-saving and life-sustaining treatments.

HRSA's actions were unlawful and arbitrary and capricious for three independent reasons.  *First*, the 340B statute does not give HRSA a freestanding

preapproval power over rebate models.  Any lawful regulation of how manufacturers provide rebates must be implemented through manufacturers' agreement with the government to participate in the 340B Program—a document known as a Pharmaceutical Pricing Agreement (PPA).  HRSA cannot block Plaintiffs' use of rebate models absent an amendment to their PPAs.

*Second*, HRSA failed to reasonably explain why it was instituting a preapproval requirement for the first time ever.  HRSA has never claimed preapproval authority or preapproved any 340B pricing mechanism—including the product-replenishment system—and even countenances a similar cash-rebate model for a subset of covered entities.  HRSA cannot insist on preapproval for Plaintiffs' cash-rebate models without unlawfully treating like cases differently.

*Finally*, in rendering its decisions, HRSA completely ignored the benefits Plaintiffs' models would provide.  The District Court agreed that HRSA did not address manufacturers' "valid concerns" about unlawful duplication and the lack of transparency in the 340B Program, granting summary judgment to a different manufacturer.  But the District Court did not grant similar relief to Plaintiffs, finding their claims unripe.  That was wrong:  HRSA has made plain its (incorrect) position that Plaintiffs' rebate models violate the 340B statute.  And HRSA has refused to otherwise act on Plaintiffs' requests to implement their models—even though

manufacturers are running out of time to implement plans to comply with the IRA's looming statutory obligations.

This Court should reverse.

## ISSUES PRESENTED

1.      Whether HRSA can—contrary to the statutory text—require manufacturers to obtain preapproval for rebate models without amending their PPAs.

2.      Whether HRSA arbitrarily exercised this supposed preapproval power for the first time ever to block Plaintiffs' rebate models while allowing similar models to proceed without preapproval.

3.      Whether Plaintiffs' other arbitrary-and-capricious claims are ripe.

4.      Whether HRSA adequately explained its decision to block Plaintiffs' cash-rebate models when it completely failed to consider their benefits over the existing product-replenishment model.

## PERTINENT STATUTES

Pertinent statutes are reprinted in the Addendum to this brief.

## STATEMENT OF THE CASE

### A.      Statutory and Regulatory Background

1.  Before the 340B Program, manufacturers voluntarily sold reduced-price medicines to safety-net providers like rural hospitals and community health centers. But Congress's 1990 Medicaid Drug Rebate Program (MDRP) inadvertently

interfered with that practice. *See* H.R. Rep. No. 102-384(II), at *9-10 (1992). The MDRP requires manufacturers to offer Medicaid discounts matching the lowest price offered to other buyers, meaning rebates owed to Medicaid would drastically increase if manufacturers continued selling discounted medicines to safety-net providers.

Congress sought to remedy that disincentive with the 340B Program. The Program conditions federal reimbursements under Medicaid and Medicare Part B on the HHS Secretary "enter[ing] into an agreement with [the] manufacturer." 42 U.S.C. § 256b(a)(1). Under that agreement (the PPA), manufacturers must offer a deeply reduced price—the "ceiling price"—on covered outpatient drugs to certain healthcare providers called covered entities. 42 U.S.C. § 256b(a)(1), (a)(4), (b)(1).

Section 340B gives manufacturers latitude in how to offer the required prices, allowing them to offer either a "rebate or discount." *Id.* § 256b(a)(1); *see also id.* § 256b(a)(5)(A) ("[p]rohibiting duplicate discounts *or* rebates") (emphasis added); *id.* § 256b(a)(2)(A) (defining ceiling price by providing for reduction of the "average manufacturer price" by the "rebate percentage"); *id.* § 256b(d)(1)(B)(iv) (creating "mechanism" for reporting "rebates and other discounts"). The statute does not further elaborate, except to say that "under" manufacturers' PPAs, the ceiling price may "(tak[e] into account any rebate or discount, as provided by the Secretary)." *Id.*

7

§ 256b(a)(1).   To date, the Secretary has not modified the PPA to regulate how manufacturers may take into account any rebate or discount.

PPAs are uniform and include provisions going beyond Section 340B's text. For example, PPAs require manufacturers to "retain all records that may be necessary" for certain reporting requirements, JA438-439, and to "hold audit information obtained from the covered entities confidential," JA441.  And HRSA has previously amended the PPAs through notice-and-comment procedures.  *See* Agency Information Collection Activities, 80 Fed. Reg. 63,560, 63,560-51 (Oct. 20, 2015).

340B ceiling prices are "strikingly generous to purchasers"—much lower than commercial prices and sometimes as low as a penny.  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024).  Congress intended covered entities to pass these savings on to the uninsured, low-income patients that manufacturers previously voluntarily supported.  IQVIA, *Unintended Consequences: How the Affordable Care Act Helped Grow the 340B Program* (Aug. 30, 2024), https://perma.cc/RU4S-DCBN.  But covered entities rarely do so.  Gov't Accountability Off. (GAO), *GAO-18-480, Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 15-16, 23-26 (June 2018), https://perma.cc/TWH9-HG26 (2018 GAO Report).  Covered entities instead regularly charge patients (or their insurers) market prices, pocketing

8

the spread as profit and capitalizing on the program's arbitrage opportunity. *Id.*; *Novartis*, 102 F.4th at 457-458.

The money at stake is massive. In 2024, over $147 billion in 340B drugs were purchased—almost 17% more than in 2023. Rory Martin & Harish Karne, IQVIA, *The Size and Growth of the 340B Program in 2024*, at 2 (May 6, 2025), https://perma.cc/HT9A-JZAH. Since 2018, 340B purchases have exploded by more than 174%, growing at three times the rate of purchases outside the 340B program. *Id.* And these 340B profits are going not to small providers serving needy patients, but to large, well-resourced U.S. hospitals that purchase nearly 80% of 340B medicines. Adam J. Fein, Drug Channels, *The 340B Program Reached $66 Billion in 2023—Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions* (Oct. 22, 2024), https://perma.cc/QV3L-VX9J.

2. Congress imposed important guardrails to "assure the integrity of the drug price limitation program." H.R. Rep. No. 102-384(II), *16 (1992). First, the statute prohibits duplicate 340B and Medicaid price concessions: Manufacturers are not required to provide a 340B price concession and a Medicaid drug rebate on the same prescription. 42 U.S.C. § 256b(a)(5)(A). Second, the statute prohibits the diversion of 340B-priced drugs: Covered entities cannot dispense 340B-priced units to individuals who are not patients of the covered entity. *Id.* § 256b(a)(5)(B). These provisions are critical to ensuring that the 340B Program hews to its purpose.

To police unlawful duplication and diversion, manufacturers may audit covered entity's records that "directly pertain to the entity's compliance" with those prohibitions. *Id.* § 256b(a)(5)(C). And to resolve disputed claims, the 340B statute includes an Administrative Dispute Resolution (ADR) process. *Id.* § 256b(d)(3)(A); *see* 340B Drug Pricing Program, 89 Fed. Reg. 28,643 (Apr. 19, 2024); 42 C.F.R. § 10.21(a). But HRSA has hindered manufacturers' access to ADR, requiring "reasonable cause"—which HRSA defines as "sufficient facts and evidence" suggesting unlawful behavior—before manufacturers may initiate an audit. Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996). That creates a Catch-22. To show reasonable cause, the manufacturer needs evidence it would obtain through an audit, but it can only audit once it has that evidence. And even when HRSA approves an audit, covered entities regularly refuse to comply and sue to block HRSA's approval.[1]

3. The IRA has brought a new required price concession—and a potential flood of new unlawful duplicates. The IRA created the "Drug Price Negotiation Program," which empowers HHS to set prices that Medicare will pay for certain medicines—the MFP. 42 U.S.C. § 1320f-2(a). The IRA provides that manufacturers must offer only the lower of the MFP or the 340B ceiling price—not

---

[1] *See, e.g.*, *Oregon Health & Sci. Univ. v. Johnson*, No. 1:24-cv-2184-RC (D.D.C. June 18, 2025) (dismissing five covered-entity suits challenging audit approvals for lack of final agency action).

10

both—on any particular prescription. *Id.* § 1320f-2(d). But CMS gives manufacturers only 14 days to pay if the manufacturer effectuates the MFP through a rebate, as all manufacturers effectively must because they do not know at the time of sale whether a covered unit will be dispensed in an MFP- or 340B-eligible transaction. CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027*, at 196 (Oct. 2, 2024), https://perma.cc/N8PK-UDBC (CMS 2027 IRA Guidance); JA260 (¶ 21). Under the prevailing product-replenishment model, most covered entities do not claim the 340B price reduction until well after that window. JA260 (¶ 23).

## B. Covered Entities' Product-Replenishment Model Leads To Massive, Documented Abuse

At the 340B Program's outset, most covered entities used a physical-inventory model. Under it, covered entities physically segregated 340B-priced medicines from commercial-priced medicines and determined whether a prescription was 340B-eligible before dispensing it. *See* 340B Health, *Key Terms*, https://perma.cc/P6ZD-8W9H; HHS Off. of Inspector Gen., *Contract Pharmacy Arrangements in the 340B Program* 5 (Feb. 4, 2014), https://perma.cc/5LPS-CS3Q (Contract Pharmacy Arrangements). If an individual with a prescription was a patient of the covered entity, the covered entity dispensed a 340B-priced unit; otherwise, it dispensed a

11

commercial-priced unit. The system resulted in a determination of whether a prescription was 340B-eligible at the time the medicine was dispensed and offered all parties confidence that a 340B-priced unit would be dispensed only when the prescription was 340B-eligible.

Covered entities abandoned this original model in favor of the far-more-malleable product-replenishment model. Under the product-replenishment model, a covered entity first purchases a product at the commercial price and places it in a common inventory. *See* JA126-129 (¶¶ 3-11); JA247 (¶¶ 8-9); JA257-258 (¶¶ 9-12). The covered entity then dispenses the product to anyone with a prescription and later attempts to determine—sometimes weeks or months later—how many prescriptions were dispensed to purportedly 340B-eligible patients and orders a corresponding number of replacement units at the 340B price. *Id.* No effort is made to determine if the prescription is 340B-eligible at the time it is dispensed. *Id.* The 340B-priced units are placed in the covered entity's common inventory, the medicine is dispensed to anyone with a prescription, and the cycle repeats. *Id.*

2. Compounding the problem, HRSA permits covered entities to use "contract pharmacies": for-profit commercial pharmacies like Walgreens or CVS that "dispens[e] 340B-purchased drugs on behalf of a covered entity." Contract Pharmacy Arrangements, *supra*, at 4. For-profit contract pharmacies administer the product-replenishment model in much the same way as covered entities.

12

Many covered entities and contract pharmacies bring in for-profit third-party administrators to manage the product-replenishment model. These administrators use black-box algorithms to determine which prior prescriptions they can claim as 340B-eligible and market their prowess in identifying as many supposedly 340B-eligible transactions as possible. *See* Sayeh Nikpay & Lucas Halvorson, *Growing Administrative Complexity in the 340B Program and the Rise of Third-Party Administrators*, 1 Health Affs. Scholar 1, 3-4 (2023). As this Court has explained, third-party administrators "often receive a larger fee for every prescription deemed eligible for the discount." *Novartis*, 102 F.4th at 457. Thus, covered entities, contract pharmacies, and third-party administrators alike have "a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Id.* at 457-458. The players all "divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Id.* at 457. According to one study, about 16 percent of *all* 340B "revenue" currently goes to for-profit third parties. Minnesota Dep't of Health, *340B Covered Entity Report: Report to the Legislature*, at 9 (Nov. 25, 2024), https://perma.cc/9ZZP-X36D; *see also* Staff of S. Comm. on Health, Educ., Lab. & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 26 (2025) (noting one third-party administrator made $1.6 billion between 2019-2023). That share is so significant that some covered entities

reported a "net loss" on 340B transactions "as a result of their high external operational costs." Minnesota Dep't of Health, *supra*, at 25.

Predictably, the algorithms sweep in customers who are not patients of the covered entity. *See, e.g.*, GAO, *GAO-11-836, Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 28 (Sept. 2011), https://perma.cc/274W-T9WJ. As the District Court acknowledged, the duplication and diversion abuses in the 340B Program have been "widely documented." JA397. From just 2012 to 2019, HHS audits revealed over 1,500 instances of 340B Program noncompliance, including 429 instances of unlawful MDRP duplication, 546 instances of diversion, and 561 instances of other violations of eligibility requirements. GAO, *GAO-21-107, HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements* 14 (Dec. 2020), https://perma.cc/J9BE-XDQ2; *see also* 2018 GAO Report at 15-16, 23-26 (noting "72 percent of the covered entities audited in fiscal years 2012 through 2017 had one or more findings of noncompliance").

In fact, an estimated three-to-five percent of *all* Medicaid rebates now duplicate 340B pricing. Ashwin Mundra, Drug Channels, *The 340B Noncompliance Data Gap Leaves Drug Manufacturers in the Dark* (Mar. 18, 2022), https://perma.cc/QC3U-L67V. In 2020, that meant between *$1.3 billion* and *$2.1 billion* in illegal duplicates. *Id.* That figure might be twice as high today, because

340B purchases nearly doubled between 2020 and 2023. Fein, *supra*. HRSA's ADR regulations—which require evidence manufacturers cannot readily obtain—have rendered the process toothless. And the Government Accountability Office has long "identified several areas of weakness in HRSA's oversight processes that impede its ability to ensure that duplicate discounts are prevented or remedied." 2018 GAO Report, *supra*, at 15-16, 23-26.

3. The product-replenishment model also gravely undermines the IRA's statutory protections against unlawful duplicate price concessions. The Drug Price Negotiation Program lacks plausible mechanisms for dealing with these concerns, and CMS refuses to "assume responsibility," telling manufacturers and covered entities to figure out a solution. CMS 2027 IRA Guidance, *supra*, at 231. But under the product-replenishment model, manufacturers have no way to identify units as 340B- or MFP-eligible, and covered entities themselves often will not "identify" a prescription as 340B eligible until well after the 14-day deadline. JA260 (¶ 23). Worse, the IRA does not allow manufacturers to audit covered entities to ensure they are not causing illegal MFP-340B duplication.

CMS has promised to provide a credit-debit ledger system to claw back duplicate rebates—but it requires manufacturers to link a particular prescription to particular claims for MFP and 340B pricing, data manufacturers lack under the product-replenishment model. *See* CMS 2027 IRA Guidance, *supra*, at 54-56, 220-

15

221; JA258-259 (¶ 14). And if manufacturers incorrectly deem rebates duplicative, they face millions in civil monetary penalties. *See* 42 U.S.C. § 1320f-6(a), (c).

BMS and Novartis will soon be subject to these unlawful duplicate discounts. HHS selected BMS's drug ELIQUIS® and Novartis's drug ENTRESTO® for the Drug Price Negotiation Program and imposed an MFP that the companies must begin offering on January 1, 2026. CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for Initial Price Applicability Year 2026*, at 2 (Aug. 2024), https://perma.cc/6FZZ-PMSA. And the September 1, 2025 deadline by which BMS and Novartis must provide CMS with a written "plan for making the MFP available" for ELIQUIS and ENTRESTO—called an MFP effectuation plan— is just around the corner. CMS 2027 IRA Guidance, *supra*, at 285.

### C.    Plaintiffs' Proposed Cash-Rebate Models

1. All of these program-integrity problems stem from one source: the product-replenishment model's opacity. The solution is simple—transparency. All parties should have the timely information they need to avoid duplicate discounts.

Plaintiffs have proposed cash-rebate models to tackle these problems. Under their models, Plaintiffs will make 340B prices available to covered entities through centralized data platforms. JA672-673; JA723; JA821. Covered entities will purchase medicine at commercial prices and dispense that medicine to anyone with a prescription, just as they currently do. *Id.* Once the covered entity dispenses

16

medicine and identifies a prescription as 340B-eligible, the covered entity submits standard utilization data to Plaintiffs through their respective platforms. *Id.* Covered entities already collect and keep this data in the ordinary course of business. JA821. Within 10 days, the manufacturer will pay the covered entity cash equaling the difference between the commercial price and the 340B ceiling price, which the covered entity can use to reduce the cost of a replacement unit. JA672; JA723, JA821. In some cases, covered entities will receive a rebate even *before* they need to pay their wholesaler. JA672.

Plaintiffs will use the data to identify 340B units for which state Medicaid programs have submitted claims under the MDRP. JA673; JA696; JA731; JA821. Plaintiffs would *not* deny covered entities' 340B rebate claims where there is MDRP-340B duplication. *Id.* Plaintiffs instead would use the data to dispute the duplicate price concessions claimed by state Medicaid programs under existing processes. *Id.* Plaintiffs' models thus ensure a consistent and reliable cash flow to covered entities and establish a mechanism for identifying and preventing duplicate discounts, all while complying with manufacturers' statutory obligations. JA696; JA710-711; JA722-723; JA731-732; JA821.

2. Plaintiffs' proposals are not just transparent and efficient; they are supported by longstanding practice within the 340B Program. Manufacturers have used a cash-rebate model successfully for decades with a type of covered entity

known as AIDS Drug Assistance Programs, or ADAPs.  An ADAP is a state- or territory-sponsored payor that "provides . . . medications to low-income people with HIV."  HRSA, *Part B: Aids Drug Assistance Program (ADAP)* (last updated Dec. 2024), https://perma.cc/4KNG-AE8S.  Under the cash-rebate model used for ADAPs, after the ADAP makes an initial market-price purchase, manufacturers give ADAPs cash in amounts that "equal or exceed the discount provided by the statutory ceiling price."  Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997) (Rebate Notice).

HRSA has not objected to ADAPs' cash-rebate arrangements.  Nor has it asserted that these cash-rebate arrangements required its preapproval.  Instead, after HRSA noticed the prevalence of these arrangements, the agency proposed to formally "recognize[]" the model as a legitimate "method of accessing the 340B program."  Rebate Notice, 62 Fed. Reg. at 45,824.  Then, after a public-comment period, HRSA "recognize[d] an ADAP rebate option" as "consistent with the section 340B rebate program" without purporting to impose "in-depth implementation strategies."  Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option, 63 Fed. Reg. 35,239, 35,240 (June 29, 1998) (Rebate Final Notice).  The agency simply recommended that ADAPs receiving cash rebates follow "[s]tandard business practices," including cash-flow-management practices

that would allow the ADAP to address the period between making a commercial-priced purchase and receiving the 340B rebate.  *Id.*

### D.    HRSA's Nuclear Threat

In 2019, Kalderos presented the details of its cash-rebate model to HRSA. JA848.  Then, throughout mid-to-late 2024, Novartis, BMS, and Lilly presented their cash-rebate models to HRSA, highlighting their benefits and requesting acknowledgement that they could implement the models.  JA656-691 (Lilly); JA463-464, JA709-734 (BMS); JA814-824 (Novartis).  HRSA refused, sending letters to Novartis, BMS, and Lilly warning that "the Secretary has not provided for . . . a rebate model" and that therefore "implementing such a proposal at this time would be inconsistent with the statutory requirements for the 340B Program." JA460; JA466; *see* JA473.

Other manufacturers made similar proposals around the same time; HRSA issued the same uniform response.  It threatened Johnson & Johnson with termination from the 340B Program—and thus expulsion from Medicaid and Medicare Part B—as well as crushing civil monetary penalties if Johnson & Johnson launched its rebate model without agency approval.  JA454-456; JA459.  And HRSA made clear that its threat applies to all manufacturers.  When Sanofi told covered entities it would begin using a cash-rebate model, HRSA sent it a letter containing the same threats: to terminate Sanofi's PPA and impose civil monetary penalties.

19

JA811-812.  HRSA published these threats prominently on its website, and made clear its position that "implementing a rebate proposal without Secretarial approval would violate Section 340B(a)(1)."  JA447; HRSA, *Program Integrity* (last updated May 2025), https://perma.cc/9BKV-J2KB.

Blocked from implementing their rebate models—and with the MFP-effectuation-plan deadline rapidly approaching—Novartis, BMS, Lilly, Kalderos, and Sanofi all sued HHS, seeking to set aside HRSA's letters and its general policy forbidding rebate models without HRSA preapproval.  JA88-124; JA130-158; JA203-244; *see also* Complaint, *Johnson & Johnson Healthcare Sys. Inc. v. Becerra*, No. 1:24-cv-03188-RC (D.D.C. Nov. 12, 2024), ECF No. 1.  Plaintiffs' suits explained that HRSA (1) acted beyond its statutory authority by requiring preapproval and without first amending their PPAs; (2) acted arbitrarily and capriciously in exercising this supposed power for the first time in its history; and (3) arbitrarily failed to consider the benefits of Plaintiffs' cash-rebate models over the product-replenishment model.  The District Court allowed two covered entities and their trade association to intervene.  JA264-269.

### E.    The District Court Upholds HRSA's Preapproval Requirement

The parties cross-moved for summary judgment, and the District Court granted the government's and Intervenors' motions.  JA368-370.  The court first held that the Secretary's ability to "provide[]" how to "tak[e] into account" any rebate or discount

gave him the authority to impose a preapproval requirement. JA388-392. The District Court believed legislative history referencing Secretary "discretion" supported its view, and discounted the fact HRSA had never required preapproval before. JA390-391. The court then rejected Plaintiffs' arguments that any rebate-model restrictions had to be contained in manufacturers' PPAs, holding that PPAs merely incorporate the statutory requirements and that this preapproval power was one of them. JA391-392.[2]

The District Court further held that HRSA did not arbitrarily exercise its purported preapproval authority. JA394-396. It agreed, however, that HRSA never preapproved the ADAP cash-rebate model and never approved—much less preapproved—the product-replenishment model. *Id.* The District Court also believed there were differences between Plaintiffs' cash-rebate models and the ADAP-cash-rebate and product-replenishment models that justified treating Plaintiffs' cash-rebate models differently for preapproval purposes. *Id.*

The District Court concluded that Plaintiffs' remaining arbitrary-and-capricious claims were not ripe, because it believed HRSA was still considering whether to approve the companies' models. JA398-399. The District Court

---

[2] The District Court correctly held that Kalderos had standing because Lilly "has contractually committed to using Kalderos's data platform." JA388.

acknowledged the problems created by the IRA's looming deadlines[3] and found it "concerning" that HHS has not identified a plausible de-duplication mechanism. JA397. But the District Court nevertheless credited HRSA's representation that it had not yet made a final decision on the proposed models, making any judicial decision now "premature," particularly because HRSA "expect[ed]" to provide new guidance for stakeholders by June 1. JA384, JA398-399; *see* JA367.

The District Court did, however, grant Sanofi summary judgment in part. HRSA's letter to Sanofi stated that Sanofi had violated Section 340B—an indication, the District Court said, that HRSA had reached a final decision disapproving of Sanofi's model and making its arbitrary-and-capricious claims ripe for decision. JA399-400; *see also* JA811-812. On the claims' merits, the District Court held that HRSA "provided no explanation for its failure to address [Plaintiffs'] valid concerns" about the program-integrity benefits of cash-rebate models over the existing product-replenishment model, and vacated and remanded HRSA's disapproval of Sanofi's model for HRSA to do so. JA400-401. But the District Court declined to impute that same failure of consideration to Plaintiffs' models, even though the government conceded that the reasoning in Sanofi's disapproval

---

[3] The District Court at times mistakenly stated these deadlines were related to the IRA's inflation-rebate obligations. JA380, 397. To be clear, the deadlines involve manufacturers' obligations to submit an MFP effectuation plan and make the MFP available. *Supra* p. 16.

letter applied to every other model—including Novartis's, BMS's, Lilly's, and Kalderos's. JA326-327.

HRSA's expected guidance never arrived. On June 1, HRSA provided a nonpublic draft of guidance to the Office of Management and Budget for review with no timeline for when that review will be completed. Off. of Info. and Regul. Affs. (OIRA), *Pending EO 12866 Regulatory Review*, Reginfo, https://perma.cc/D47N-RMKW.

## STANDARD OF REVIEW

"When a district court reviews agency action under the APA," this Court "review[s] the district court's decision de novo." *Cigar Ass'n of Am. v. FDA*, 964 F.3d 56, 61 (D.C. Cir. 2020). The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Agency actions are unlawful when they violate an agency's governing statute. *See Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009). They are arbitrary and capricious if they are not "reasonable and reasonably explained," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), or treat similar cases differently without adequate explanation, *Lone Mountain Processing, Inc. v. Secretary of Lab.*, 709 F.3d 1161, 1164 (D.C. Cir. 2013). This Court undertakes a

"searching and careful" inquiry into the basis of the agency's decision, *Zotos Int'l, Inc. v. Young*, 830 F.2d 350, 352 (D.C. Cir. 1987) (citation omitted), and "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 413 (2024).

## SUMMARY OF ARGUMENT

Three bedrock administrative-law principles decide this case.

*First*, an agency cannot act outside the bounds of its statutory authority. Congress gave the Secretary the power to "provide[]" how to "tak[e] into account any rebate or discount" for the 340B Program, but only in a specific manner. 42 U.S.C. § 256b(a)(1). It did not grant the Secretary free-standing preapproval authority; rather, any ability to restrict rebates can only be exercised "under" the Secretary's "agreement with each manufacturer"—that is, the manufacturer's PPA. The text, statutory structure, legislative history, and HRSA's prior 30-plus-year practice confirm this. And even within the PPA, the Secretary may only "provide[]" rules regarding how to "account" for rebates and discounts, and a preapproval requirement does not fall within that authority. By newly claiming a freestanding, absolute preapproval power untethered from the statutory text and the PPAs, HRSA acted unlawfully.

*Second*, an agency departing from prior policy, or treating similar cases differently, must acknowledge the departure and adequately explain why. HRSA

24

here failed to explain why it was instituting a preapproval requirement for the first time in its history. It instead acted as though this requirement always existed— contrary to the undisputed facts. By failing to give a reasoned explanation, HRSA acted arbitrarily and capriciously. Moreover, HRSA lacked any reasonable basis to require preapproval of Plaintiffs' models when HRSA had never done so for other models.

*Third*, an agency cannot fail to consider an important aspect of a problem. In blocking Plaintiffs' models, HRSA completely failed to consider the benefits the rebate models provided over the status quo. That blinders-on approach is classic arbitrary and capricious action, and the District Court already ruled against HRSA on these grounds for a similarly situated manufacturer. The District Court should have done the same for Plaintiffs and recognized that its vacatur of HRSA's denial letters also would vacate HRSA's insistence that Plaintiffs' models be preapproved. The District Court further erred in finding these claims were not ripe. In letters to Plaintiffs and other manufacturers who proposed near-identical rebate models, HRSA made clear its (misguided) position that rebate models categorically violate the 340B statute. And HRSA has otherwise sat on its hands for the ten months since manufacturers first came to the agency with their models, including failing to release publicly the guidance that the government said it would be in a position to provide

by June 1.  The IRA's MFP deadline is right around the corner, and stakeholders need a decision *now*.

The Court should reverse.

## ARGUMENT

## I.    HRSA'S POWER TO "PROVIDE" FOR REBATES OR DISCOUNTS CAN BE EXERCISED ONLY THROUGH AN AMENDMENT TO A MANUFACTURER'S PHARMACEUTICAL PRICING AGREEMENT.

1.  Under Section 340B, the Secretary of Health and Human Services "shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs . . . does not exceed" the ceiling price.  42 U.S.C. § 256b(a)(1).  Plaintiffs, HRSA, and the District Court all agree that Section 340B authorizes price reductions through either a rebate or discount.[4]  And everyone agrees that HRSA can regulate, to some extent, how rebates or discounts are taken into account.  The only statutory question is *how* that power can be exercised.

Section 340B provides the answer.  The amount paid to manufacturers should "tak[e] into account any rebate or discount, as provided by the Secretary."  *Id.*  But

---

[4]  Intervenors contended below that the 340B statute "categorically prohibits rebate models," but the District Court correctly held that the statute "explicitly contemplates a rebate mechanism."  JA389 n.11.

26

this power is textually linked to what precedes it: It occurs "under" the Secretary's "agreement with each manufacturer." *Id.* In other words, the Secretary must exercise his authority to regulate rebates or discounts, if at all, "under" the terms of that agreement—the PPA. *Id.*

HRSA and the District Court interpreted the set-off phrase "as provided by the Secretary" as granting the Secretary a freestanding, roving preapproval authority. JA390; JA460; JA466; JA473. "The difficulty with this position is it ignores the rest of the sentence." *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 346 (D.C. Cir. 2002). Courts "do not read snippets of statutory text in a vacuum," *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 63 (D.C. Cir. 2021), and here, "the language outside the parenthetical is unambiguous," *Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001). The Secretary's power to "tak[e] into account" and "provide" for rebates and discounts is exercised "under" the terms of the "agreement with each manufacturer." 42 U.S.C. § 256b(a)(1).

That conclusion also follows from "the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). HRSA's power to regulate discount and rebate models is located in the part of the statute devoted to establishing "requirements for agreement with Secretary." 42 U.S.C. § 256b(a) (capitalization altered). That statutory heading supplies a "cue[] that Congress did not intend" to give HRSA discretion to approve manufacturers' rebate models

outside of a PPA amendment. *Yates v. United States*, 574 U.S. 528, 540 (2015); *see Dubin v. United States*, 599 U.S. 110, 121 (2023) (explaining that "the title" of a statutory subsection "is a useful clue" of its meaning) (citation omitted).

The government's contrary theory makes a structural hash of the statute. The rest of subsection (a)(1) sets out the PPA's required contents: that a manufacturer offer covered outpatient drugs to covered entities; that the price the manufacturer charges covered entities not exceed the ceiling price; that the manufacturer furnish the Secretary with certain reports containing certain information quarterly; and so on. *See* 42 U.S.C. § 256b(a)(1). The District Court's and HRSA's interpretation of the statute posits that the parenthetical phrase "(taking into account any rebate or discount, as provided by the Secretary)" breaks this pattern, giving the Secretary a preapproval power completely unmoored from the PPA. That makes little sense. "If Congress does not alter the fundamental[s] of a statutory scheme in vague terms or ancillary provisions, then it ordinarily does not do so in parentheticals either." *Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 597 U.S. 424, 440 (2022) (internal quotation marks omitted).

The government's proposed theory is also inconsistent and unmanageable in practice. HRSA's argument suggests—and logic would dictate—that HRSA must preapprove *any* rebate or discount model before manufacturers or covered entities implement it. *E.g.*, JA466 (asserting that because "the Secretary has not provided

28

for such a rebate model," "implementing such a proposal at this time would be inconsistent with the statutory requirements"). But that's not actually HRSA's contention nor the District Court's holding. HRSA does not claim, for instance, that the product-replenishment model is unlawful, even though it was never preapproved and has never even been retroactively acknowledged like the ADAP cash-rebate model was. HRSA instead apparently intends to occasionally erect a preapproval barrier to some unidentified subset of rebate models through *ad hoc* cease-and-desist letters and opaque adjudications, using undisclosed standards and weighing unknown factors, on whatever timeline is convenient for the agency. That is not what Congress enacted.

Moreover, although the Court need not "resort to legislative history" to interpret "statutory text that is clear," *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 339 (D.C. Cir. 2020) (citation omitted), "[w]hat legislative history there is reinforces the text," *Federal Educ. Ass'n Stateside Region v. FLRA*, 104 F.4th 275, 284 (D.C. Cir. 2024). The key House Committee on Energy and Commerce report on Section 340B recognized that it "d[id] not specify" whether price reductions would take place through a rebate or discount, and that it "expects that the Secretary of HHS, *in developing these agreements*, will use the mechanism that is the most effective and efficient." H.R. Rep. No. 102-384(II), at *16 (emphasis added). Elsewhere, the report recognizes that "manufacturers, as a condition of receiving Federal Medicaid

29

matching funds on their covered outpatient drugs, would have to *enter into an agreement* with the Secretary of HHS to provide price reductions (whether through a discount, rebate, or other mechanism) to these 'covered entities' on covered outpatient drugs." *Id.* at *12 (emphasis added); *see also id.* at *18 (explaining " 'covered entities' . . . receive manufacturer discounts or rebates on covered outpatient drugs *under the terms of the agreement* with the Secretary of HHS") (emphasis added). These passages signal that Congress expected the Secretary to exercise his power to regulate models to effectuate the 340B ceiling price through manufacturers' PPAs, not *ad hoc* adjudications or generalized guidance. *See id.* at *12, *18.

HRSA's theory is also brand new. In the 340B Program's three-plus-decade existence, HRSA has never before asserted a power to preapprove manufacturers' discount or rebate models. This consistent past approach confirms that HRSA's late-breaking "novel reading" is "inconsistent with the statute as written." *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 454 (D.C. Cir. 2017).

When the 340B Program first emerged and covered entities implemented the physical-inventory model, HRSA never demanded preapproval. When the ADAP rebate model emerged, HRSA never demanded preapproval. And when the product-replenishment model emerged, HRSA never demanded preapproval—or approved

it at all.[5]  Manufacturers and covered entities implemented models for decades without facing cease-and-desist letters warning of PPA terminations and civil monetary penalties like the ones HRSA issued here.

Under the government's reading, however, manufacturers may have been violating Section 340B until HRSA recognized the ADAP rebate model through notice and comment, and manufacturers are again violating Section 340B today in acquiescing to covered entities' use of the product-replenishment model.  Agencies need not pursue every statutory violation by regulated parties, but "in the circumstances of this case, . . . it [is] rather telling that [HRSA] ha[s] never before maintained that it possessed this [preapproval] authority."  *Loving v. IRS*, 742 F.3d 1013, 1021 (D.C. Cir. 2014) (Kavanaugh, J.); *see also Financial Planning Ass'n v. SEC*, 482 F.3d 481, 490 (D.C. Cir. 2007) (rejecting agency interpretation that "flouts six decades of consistent [agency] understanding of its authority under" the statute).  The best reading of the statute is the one that HRSA has adhered to until this case:  Manufacturers are authorized to use a rebate or discount model to effectuate the

---

[5]  Indeed, HRSA has emphasized in other litigation that the product-replenishment model is something that "covered entities began using . . . of their own volition," and "not because the Agency required them to use this model."  Defendants' Cross Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment at 16-17, 20, *Premier, Inc. v. HRSA*, No. 1:24-cv-3116-LLA (D.D.C.), ECF No. 16 (HRSA *Premier* Brief).

340B ceiling price unless the Secretary lawfully provides otherwise in manufacturers' PPAs.

Nor is the requirement to insert rebate conditions in the PPA a mere formality. It instead implicates the most fundamental precept of administrative law: Agencies cannot "exercise powers not delegated to [them] by Congress." *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447, 1450 (D.C. Cir. 1994). By requiring the Secretary to put the rules for rebate models into manufacturers' PPAs, Congress ensured that manufacturers would know exactly what the Secretary was requiring or forbidding rather than having to divine the rules from *ad hoc* preapproval adjudications on unknowable timelines.

That also explains why Congress chose to give the Secretary the power to "provide" rules for particular rebate practices, not a free-floating preapproval power. Congress "knew how" to draft preapproval requirements, *Sanofi-Aventis U.S. LLC v. HHS*, 58 F.4th 696, 704 (3d Cir. 2023), and the phrase "any discount or rebate, as provided by the Secretary" does not resemble them. The Secretary needs to grant "approval" for new drugs before they market, 21 U.S.C. § 355(a); "approve" state Medicaid plans, 42 U.S.C. §§ 1396a(b), 1396b(a); and "as approved by the Secretary" is regularly used in creating preauthorization regimes, *see, e.g.*, *id.* § 1396r-1a(b)(3)(A)(IV); *id.* § 1396u(a)(6); *id.* § 2297h-4(5); *id.* § 6506a(i)(1). When Congress uses "provided by" language, by contrast, it ordinarily signifies

agency authority over *how* something is done, not a preclearance requirement. *E.g.*, 7 U.S.C. § 6409(c)(3); 26 U.S.C. § 5000B(c)(2); *id.* § 32(n)(1)(E). That pattern holds true in Section 340B.

Moreover, the PPAs' current silence is no accident. HRSA could not amend Plaintiffs' PPAs to require any particular mechanism without articulating a reasoned basis for doing so. *See Doe v. Devine*, 703 F.2d 1319, 1326 (D.C. Cir. 1983) (applying the arbitrary-and-capricious standard to an agency's contracting behavior). And HRSA could not articulate any reasonable basis for enshrining the disastrous product-replenishment model as a legal requirement. Any attempt to do so would lay bare the myriad problems with that model and entangle the agency in a doomed attempt to "show that there are good reasons" for requiring a model that the government's own watchdog has acknowledged is prone to fraud and abuse. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citation omitted).

2. The District Court hardly engaged with any of this. It focused entirely on the parenthetical phrase that " 'any rebate or discount' taken into account shall be 'as provided by the Secretary.' " JA390 (quoting 42 U.S.C. § 256b(a)(1)). But the "language of the statute is too strong to bend" that way, because "the language outside the parenthetical" makes clear that "the [provision] applies to" manufacturers' PPAs. *Chickasaw Nation*, 534 U.S. at 89; *see iTech U.S.*, 5 F.4th at 63. The District Court's aperture was too narrow.

33

The District Court based its reading primarily on the Supreme Court's statement in *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 114, 118 (2011), that PPAs are "form contract[s] implementing the statute" that "simply incorporate statutory obligations and record the manufacturers' agreement to abide by them." JA391. True, PPAs implement Section 340B. But the statute explicitly allows the Secretary to use the PPAs to "provide[]" for how to "tak[e] into account" rebates and discounts. 42 U.S.C. § 256b(a)(1).

*Astra* involved an unrelated issue: whether, even though Section 340B lacks a private cause of action, covered entities could nevertheless sue manufacturers for allegedly breaching the PPAs as third-party beneficiaries of the agreements. 563 U.S. at 113. The Court said no, reasoning that because the "statutory and contractual obligations . . . are one and the same," allowing third-party suits to enforce the PPAs would be "in essence a suit to enforce the statute itself." *Id.* at 118. That, in turn, would be an impermissible circumvention of Congress's decision not to include a private right of action in Section 340B. *See id.*

That is beside the point here. This case concerns *how* HRSA may exercise its authority to regulate rebates and discounts—and Congress established it is through the PPAs. If anything, *Astra* supports that conclusion, pinpointing PPAs as the means by which statutory obligations are incorporated. *See id.* at 118. Nothing in *Astra*—or any other case—suggests the Secretary cannot insert statutorily

34

authorized details into the PPAs after following the proper procedures.  Indeed, PPAs already contain *extra*-statutory matters and do not merely parrot the statute. For instance, manufacturers must "retain all records that may be necessary" for certain reporting requirements.  JA438-439.  Manufacturers must also "hold audit information obtained from the covered entities confidential."  JA441.  And because the Secretary has not prohibited rebates or discounts in manufacturers' PPAs, Section 340B authorizes private parties to "act freely."  *Novartis*, 102 F.4th at 460.

The District Court also missed the mark in its analysis of the legislative history, pointing to a sentence in the House committee report that said the Secretary had "discretion" to set price reductions "either by a point-of-purchase discount, a rebate, or other mechanism."  JA390 (quoting H.R. Rep. No. 102-384(II), at 12). That is right as far as it goes.  But that snippet ignores *how* the Secretary's discretion is exercised.  *See* H.R. Rep. No. 102-384(II), at *12, *16, *19.  The other portions of the House committee report—and most importantly, Section 340B's text—give the answer: through the PPA.

The District Court acknowledged that HRSA had never "exercised its approval authority with respect to the product replenishment model" or the ADAP cash-rebate model.  JA391.  It nonetheless reasoned that HRSA has not "disclaimed that authority," that an agency may have "rule-making authority despite the agency's lack of historical exercise of that authority," and that HRSA's failure to exercise its

newly claimed power "does not suggest" anything. *Id.* (citation omitted).  But this Court has emphasized that it is "rather telling" when an agency has "never before maintained that it possessed [a certain] authority." *Loving*, 742 F.3d at 1021.

The District Court also cited two regulations where HRSA had given guidance on how to calculate the ceiling price in scenarios where using the normal formula would be impossible or nonsensical, viewing the regulations as proof that HRSA could exercise its authorities outside of PPA amendments.  *See* JA390-391.  One regulation, 42 C.F.R. § 10.10(c), addresses how to calculate a ceiling price for new medicines with no calculable rebate percentage.  The other, 42 C.F.R. § 10.10(b), sets the ceiling price at a penny for medicines where a manufacturer using the ordinary formula would receive a sub-zero price.

But the District Court misunderstood the regulations' import.  HRSA explained in enacting the two regulations that they are authorized by 42 U.S.C. § 256b(d)(1)(B)(i)(1), which allows the Secretary to "develop[] and publish[] through an appropriate policy or regulatory issuance, precisely defined standards and methodology for the calculation of ceiling prices."  340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1210, 1210-11 (Jan. 5, 2017).  The regulations have nothing to do with Section 340B(a)(1) and therefore are not evidence of the Secretary exercising his Section 340B(a)(1) powers outside of a PPA amendment.

In the end, Section 340B "gives [HRSA] limited powers, to be exercised in specific ways." *Gonzales v. Oregon*, 546 U.S. 243, 259 (2006).  HRSA's authority to regulate how rebates and discounts are taken into account must be asserted, if at all, through an amendment to manufacturers' PPAs.  Because HRSA did not do so, Plaintiffs were entitled to do what private parties may always do when faced with regulatory silence: "act freely" and implement statutorily authorized 340B cash-rebate models.  *Novartis*, 102 F.4th at 460.  The District Court wrongly allowed HRSA to block them.

## II.   HRSA ARBITRARILY REQUIRED PREAPPROVAL FOR THE FIRST TIME IN ITS HISTORY, WITHOUT AN EXPLANATION.

Even if HRSA had a preapproval power, the agency exercised it arbitrarily by using it for the first time in the Program's history to block Plaintiffs' cash-rebate models.  After all, HRSA never imposed a preapproval requirement for the physical-inventory, product-replenishment, or ADAP cash-rebate models.  If HRSA wanted to take a different approach here, it had to acknowledge it was doing so, explain why, and reconcile its decision to require preapproval of Plaintiffs' cash-rebate models and not any other model that has come before.  HRSA did not even attempt to meet those basic administrative-procedure requirements.

### A.    HRSA Failed To Explain Why It Was Instituting A Preapproval Requirement For The First Time.

"It is well-settled that" an agency "cannot turn[] its back on its own precedent and policy without reasoned explanation," *ABM Onsite Servs.-W., Inc. v. NLRB*, 849 F.3d 1137, 1146 (D.C. Cir. 2017), and this Court has "never approved an agency's decision to completely ignore relevant precedent," *Jicarilla Apache Nation v. United States Dep't of Interior*, 613 F.3d 1112, 1120 (D.C. Cir. 2010). "[A]n agency must offer a reason to distinguish" past "precedents or practices" or "explain its apparent rejection of their approach." *Physicians for Soc. Responsibility v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (quotation marks omitted).

Plaintiffs' cash-rebate models are not the first discount-or-rebate model to have been implemented. Even though the physical-inventory, ADAP cash-rebate, and product-replenishment models are all very different models for effectuating the 340B price, HRSA *never* purported to preapprove any of them and has not approved the product-replenishment model to this day. Nor did HRSA threaten crippling monetary sanctions and expulsion from the 340B Program for covered entities and manufacturers implementing them unilaterally.

The closest HRSA came to approving a discount or rebate model was in 1998, when HRSA issued guidelines applicable to the ADAP cash-rebate model, but only after it had already been in place. Rebate Final Notice, 63 Fed. Reg. at 35,239. These guidelines formally "recogniz[ed]" the ADAP rebate model and provided

38

broad guidance on how it could properly be implemented to conform with the rest of the statute. *Id.* But after-the-fact recognition is not the same as approval—much less *pre*approval. Indeed, the guidance explicitly disclaimed it was "proposing [any] specific mechanism" for a rebate—it just recognized a cash-rebate mechanism, writ large—and left manufacturers free to use cash-rebate mechanisms that differed meaningfully from each other. *Id.*; *see also id.* at 35,240 ("This notice only recognizes an ADAP rebate option and does not provide in-depth implementation strategies."). HRSA did not state that its approval was necessary for ADAPs and manufacturers to use the model or suggest that manufacturers and ADAPs using the model had been violating the law until HRSA gave its blessing. HRSA's insistence on preapproval for Plaintiffs' cash-rebate models was thus completely different than its approach for ADAPs.

The District Court side-stepped this history, reasoning that the ADAP cash-rebate and product-replenishment models are meaningfully different from Plaintiffs' cash-rebate models. JA394-396. That is incorrect. *Infra* pp. 41-49. It is also beside the point. The Supreme Court's and this Court's case law requires that HRSA "display awareness" that it had never before asserted a preapproval power. *Encino Motorcars*, 579 U.S. at 221-222 (quotation omitted); *see also American Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 928 (D.C. Cir. 2017) (agency that changes position "must at least 'display awareness that it *is* changing position'") (citation

39

omitted).  HRSA here acted as if its preapproval requirement had always existed, saying that because "the Secretary has not provided for such a rebate model[,] . . . implementing such a proposal at this time would be inconsistent with the statutory requirements for the 340B Program, which require the approval of a rebate model such as [Plaintiffs] ha[ve] proposed."  JA466; *see* JA460; JA473. HRSA's refusal to recognize that it had never claimed a preapproval power before warrants vacatur and remand all by itself.

The independent requirement that HRSA at least acknowledge it was departing from its previous policy of not requiring preapproval of manufacturers' rebate models is not an empty formality.  This Court has time and again explained that the requirement that an agency acknowledge it is departing from past practice ensures that "prior policies and standards are being deliberately changed, not casually ignored."  *Lone Mountain Processing*, 709 F.3d at 1164 (quoting *Greater Bos. Tel. Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)); *accord City & County of San Francisco v. FERC*, 24 F.4th 652, 663 (D.C. Cir. 2022).  HRSA's insistence that preapproval was *always* required—even though it has never made this claim once in the entire 30-plus-year history of the Program—suggests the agency might not have been aware that it has in the past allowed manufacturers' and covered entities' rebate models to go into effect without HRSA action.  HRSA must confront and address that reality before it blocks Plaintiffs' models.

**B. HRSA's Decision To Require Preapproval Of Plaintiffs' Rebate Models, But Not The ADAP Cash-Rebate Model Or The Product-Replenishment Model, Was Arbitrary.**

Even if HRSA had acknowledged that it was departing from its past practices, it still must "offer reasonable explanations and justifications for [its] departure." *American Trucking Ass'ns, Inc. v. Federal Motor Carrier Safety Admin.*, 724 F.3d 243, 250 (D.C. Cir. 2013). In developing its reasons for a departure, an agency must respect the "fundamental principle of administrative law" that it "treat like cases alike." *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1242 (D.C. Cir. 2023). To reasonably treat two situations differently, an agency must "identify the features of" each situation "that point toward one [decision] or another" and "offer sensible distinctions between" them. *Colorado Interstate Gas Co. v. FERC*, 850 F.2d 769, 775 (D.C. Cir. 1988). And the distinctions the agency draws must be rooted in "the relevant regulatory factors." *Grayscale Invs.*, 82 F.4th at 1245. HRSA's attempts to distinguish the ADAP cash-rebate model and the product-replenishment model flunk these standards.

> *1. HRSA Has Not Explained Why Plaintiffs' Rebate Models Needed Preapproval But The ADAP Cash-Rebate Model Did Not.*

Start with the obvious example: The ADAP cash-rebate model is a model *exactly like* Plaintiffs'. Like the ADAP cash-rebate model, Plaintiffs' models have covered entities purchase medicines at commercial prices and later receive a cash

41

rebate representing the difference between the commercial purchase price and the 340B ceiling price. *Compare* JA672-673; JA723; JA821, *with* 340B Drug Pricing Program Omnibus Guidance, 80 Fed. Reg. 52,300, 52,313 (Aug. 28, 2015). But, after considering comments, HRSA concluded that cash rebates for ADAPs were "consistent with the section 340B rebate program." Rebate Final Notice, 63 Fed. Reg. at 35,240. HRSA explained a cash-rebate model does not constitute an overcharge so long as the rebates "provide at least the minimum statutory discount and do not contain requirements inconsistent with section 340B and published program guidelines." *Id.* Nor do cash rebates offend the statutory text, HRSA observed, because "Section 340B has no explicit language as to whether the required reduction in price should be obtained by an initial reduction in the purchase price (i.e., a discount mechanism) or received as a required reduction in cost rebated after purchase, dispensing, and payment are completed (i.e., a rebate option)." Rebate Notice, 62 Fed. Reg. at 45,824.

HRSA also concluded that the ADAP cash-rebate model *works*. HRSA recommended to ADAPs that they pursue 340B rebates using "standard business practices," including data-sharing requirements inherent in rebate models that HRSA thereby recognized as lawful. Rebate Final Notice, 63 Fed. Reg. at 35,239-41. HRSA encouraged ADAPs to provide "detailed and accurate . . . initial claim data," *id.* at 35,241, and to "engage in a thorough cash flow analysis," which would allow

42

ADAPs to "ensure a continuous cash flow" and "prevent the potential for cash shortages and program service delivery disruption." HIV/AIDS Bureau, *AIDS Drug Assistance Program (ADAP) Manual* 43 (June 2023) (ADAP Manual).

All of these explanations should have applied equally to Plaintiffs' cash-rebate models. But in its letter to Johnson & Johnson, HRSA asserted that a cash-rebate model could violate the 340B statute because a covered entity will pay the commercial price before receiving a rebate for the difference between the commercial price and the 340B ceiling price. JA454-456. HRSA's newfound position cannot be squared with its prior stance that post-purchase rebates may be paid "as a method" of furnishing "the 340B discount provided by the statutory ceiling price" without violating the 340B statute. Rebate Final Notice, 63 Fed. Reg. at 35,242; *see also* Rebate Notice, 62 Fed. Reg. at 45,824.

Drawing on the government's briefing, the District Court attempted to distinguish Plaintiffs' models on the ground that ADAPs' "purchasing systems differ from other covered entities, so they have trouble accessing statutorily mandated price reductions through up-front discounts." JA394. But the rationale the District Court seized on is a "*post hoc* rationalization" that "cannot support [agency] action." *Republic Airline Inc. v. United States Dep't of Transp.*, 669 F.3d 296, 302 (D.C. Cir. 2012). Nowhere in any of the letters to any of the manufacturers did HRSA suggest that the ADAP cash-rebate model was distinguishable because ADAPs in particular

43

cannot access the 340B ceiling price through up-front discounts. Indeed, those letters did not mention the ADAP cash-rebate models at all. And this Court can only affirm, if at all, on "the grounds that the agency invoked when it took the action." *Department of Homeland Sec. v. Regents of Univ. of Calif.*, 591 U.S. 1, 20 (2020) (citation omitted). Litigation counsel cannot paper over the gaps in HRSA's letters. *See Women Involved in Farm Econs. v. United States Dep't of Agriculture*, 876 F.2d 994, 999 (D.C. Cir. 1989) (confirming that "*post-hoc* rationalizations of counsel may not be relied upon by a reviewing court").

HRSA's briefing position fails on its own terms, anyway. ADAPs may have *especially* needed a rebate system due to their particular business model. ADAP Manual, *supra*, at 47. But that does not explain why a cash-rebate model is categorically off limits for other types of covered entities. And ADAPs are able to thrive with a cash-rebate model by using "standard business practices" to manage their cashflows. Rebate Final Notice, 63 Fed. Reg. at 35,239-42. That logic likewise applies to other covered entities. HRSA never explained why ADAPs can accommodate short windows between commercial purchases and rebates, but not major disproportionate share hospitals—some of the largest, most-profitable, and most-sophisticated hospitals in the country. *See* HRSA *Premier* Br. 16 (agreeing there is a similar float in the product-replenishment model).

Nor does anything in Section 340B say that discounts are the preferred form of effectuating the 340B ceiling price and that rebates are a special exception for covered entities that cannot use discounts. To the contrary, HRSA stated in acknowledging the ADAP cash-rebate model that "Section 340B has no explicit language as to whether the required reduction in price should be obtained by" a rebate or discount. Rebate Notice, 62 Fed. Reg. at 45,824. That principle is true for *all* covered entities, not just ADAPs.

Finally—and more to the point—nothing about any difference between ADAPs and other covered entities explains why HRSA was justified in imposing a *preapproval* requirement for the first time. For ADAPs, HRSA was content to allow the model to go into effect and then evaluate it after it was already being widely used by manufacturers and ADAPs. And what HRSA learned from that experience is that a cash-rebate model for ADAPs was a success: ADAPs were able to "ensure a continuous cash flow," and "prevent . . . cash shortages and program service delivery disruption." ADAP Manual, *supra*, at 43. Not even government counsel has explained why other covered entities cannot do the same, such that HRSA had to stop Plaintiffs' cash-rebate models before they launched.

45

2. *HRSA Has Not Explained Why Plaintiffs' Rebate Models Needed Preapproval But The Product-Replenishment Model Did Not.*

HRSA also never preapproved the product-replenishment model. HRSA never even *post*-approved the product-replenishment model, and manufacturers are under no statutory or contractual obligation to use it. *E.g.*, HRSA *Premier* Br. 10 (explaining that HRSA "never mandated" the product-replenishment system). HRSA's unexplained differential treatment is therefore arbitrary here, too, because there is no legal distinction between the two models. Like the ADAP cash-rebate model, there is no statutory basis to treat discounts as presumptive and rebates as requiring special justification. By allowing for a "rebate *or* discount," Section 340B placed the two mechanisms of effectuating the 340B price on equal footing. 42 U.S.C. § 256b(a)(1) (emphasis added).

The problem runs even deeper for the product-replenishment model, because the product-replenishment model is a type of rebate model.[6] In the product-replenishment model, a covered entity first pays the commercial price for covered outpatient medicines. *See* JA247 (¶¶ 8-9). It is only after that initial commercial-

---

[6] Because the product-replenishment model requires an initial purchase at the commercial price, it cannot be a discount. *See, e.g.*, *United States v. Shaw*, 106 F. Supp. 2d 103, 116 (D. Mass. 2000) ("A rebate is typically given after sale and discounts are effected at the time of sale."). And if the product-replenishment model is neither a discount nor rebate, it would be unlawful and unauthorized by the statute. 42 U.S.C. § 256b(a)(1).

price purchase that a covered entity places an order for a full package at the 340B price as a "replacement package," retroactively effectuating the ceiling price. *Id.* That is a rebate, albeit one paid in kind rather than in cash. As the government itself has explained, "the product replenishment model" is not a system of "upfront discounts." HRSA *Premier* Br. 16-17.

The District Court focused on the fact that Plaintiffs' cash-rebate models nominally require more commercial-price purchases than the product-replenishment model to distinguish the two. *See* JA395. But there is no *financial* difference between the two models, because covered entities would promptly receive the rebates they are owed under Plaintiffs' cash-rebate models.

Suppose a manufacturer sells a medicine for $100 a unit and the 340B ceiling price on the unit is $50. Under Plaintiffs' models, a covered entity purchases its first unit for $100, uses the unit to fill its eligible patients' prescriptions, and within 10 days receives a $50 cash rebate. The covered entity can then immediately put the $50 rebate towards a replacement unit of medicine, such that the covered entity only pays $50 out of pocket for the replacement unit. The covered entity then dispenses the replacement unit to 340B-eligible patients, receives another $50 rebate, and the cycle continues. Just like the product-replenishment model, there is an initial commercial-price purchase that begins a flywheel of later discounted purchases; even HRSA agrees that the product-replenishment model requires covered entities

to first "make some purchases without the 340B discount" and wait before being reimbursed. HRSA *Premier* Br. 16. The main difference is a cash-rebate model will combat billions of dollars in unlawful duplicate discounts, whereas the product-replenishment model facilitates them.

The District Court suggested that differential treatment was appropriate because covered entities "voiced strong opposition to the proposed cash rebate models." JA396. HRSA, the District Court believed, "was entitled to consider [covered entities'] preferences as a relevant factor." *Id.* But although one goal of the 340B Program is to give covered entities access to medicines at reduced prices, "[l]egislation is . . . the art of compromise, the limitations expressed in statutory terms often the price of passage, and no statute yet known pursues its stated purpose at all costs." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017) (cleaned up). Section 340B conditions covered entities' access to reduced-price medicines on covered entities complying with the statute's duplicate-discount prohibitions. *See* 42 U.S.C. § 256b(a)(4), (a)(5). In striking the balance between reduced prices and statutory safeguards, Section 340B does not privilege covered entities over manufacturers.

To the contrary, this Court has held that manufacturers may impose conditions on covered entities' access to the 340B price absent a statutory prohibition. *See Novartis*, 102 F.4th at 460. And here, there is not even statutory silence; Section

340B(a)(1) affirmatively authorizes manufacturers to use rebates to effectuate the 340B price. 42 U.S.C. § 256b(a)(1). HRSA therefore acted arbitrarily and capriciously in treating Plaintiffs' cash-rebate models differently from the product-replenishment model based on covered entities' tolerance for them, a "factor[] which Congress has not intended [HRSA] to consider." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (citation omitted).

## III. HRSA ARBITRARILY FAILED TO CONSIDER THE REBATE MODELS' BENEFITS AND THAT ARBITRARY ACTION IS RIPE FOR REVIEW.

### A. These Claims Are Ripe Because HRSA's Position Is Clear And A Decision Is Needed Now.

Ripeness requires a court to analyze "the fitness of the issues for judicial review and the hardship to the parties of withholding court consideration." *National Ass'n of Home Builders v. United States Army Corps of Eng'rs*, 417 F.3d 1272, 1281 (D.C. Cir. 2005). The "fitness of an issue for judicial review depends on whether it is purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Id.* (internal quotation marks and citation omitted). Agency action is final, in turn, when (1) "the action . . . mark[s] the consummation of the agency's decisionmaking process" and (2) the action is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-178 (1997) (internal quotation marks and citations omitted). "The finality inquiry is a

49

pragmatic and flexible one," *Safari Club Int'l v. Jewell*, 842 F.3d 1280, 1289 (D.C. Cir. 2016) (internal quotation marks and citation omitted), that is met where the "writing is on the wall about how the agency will act in the future," *California ex rel. Brown v. EPA*, 940 F.3d 1342, 1352 (D.C. Cir. 2019).

The District Court rejected Plaintiffs' failure-to-consider argument on the ground that HHS was still supposedly considering whether to preapprove Plaintiffs' models, rendering any challenge "premature." JA399. That holding was wrong for two distinct reasons.

*First*, HRSA's position on Plaintiffs' models is fully final, and thus ripe, once the full administrative record is considered. Even as it claimed that HRSA was still considering the issue, the government below *agreed* that its letters were "final agency action[s] reviewable under the Administrative Procedure Act." Government Reply Brief In Support of Cross Motion For Summary Judgment at 10, *Eli Lilly & Co. v. Kennedy*, No. 24-3337 (DLF), 2025 WL 1423630 (D.D.C. May 15, 2025), ECF No. 50; *see also Natural Res. Def. Council, Inc. v. Thomas*, 845 F.2d 1088, 1091 (D.C. Cir. 1988) (noting "questions of ripeness and final agency action are inextricably intertwined").

The Government was correct. In the lead-up to this litigation, five manufacturers all proposed substantially similar models and HRSA refused to preapprove any of them in similar, albeit not identical, letters. *See* JA460-462

(Lilly); JA454-456 (Johnson & Johnson); JA466-468 (BMS); JA473-475 (Novartis); JA767-769 (Sanofi). Against this backdrop, HRSA's actions and statements regarding *each* model are applicable to *all* of them. As the government told the District Court, HRSA's communications with all manufacturers, in the aggregate, are what "the agency considered" "when it made its decision," and the court "should consider [them] . . . as fair game in . . . evaluating the agency's decision." JA327. That is why HRSA produced its documents for all five manufacturers in a single administrative record in each case; those documents are, together, the "findings or reports on which" HRSA's determinations were based. *American Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (explaining that "review is to be based on the full administrative record that was before the Secretary at the time he made his decision").

HRSA here told Sanofi that its cash-rebate model "violate[d]" the 340B statute because, supposedly, its model "would require certain covered entity types to purchase certain Sanofi products at prices that exceed 'the maximum price[s] that covered entities may permissibly be required to pay' for those drugs." JA812 (Sanofi letter); *see also* JA455 (Johnson & Johnson letter). As the District Court recognized, this statement made Sanofi's failure-to-consider claim ripe because HRSA's letter was "fairly read as a determinative legal finding and final rejection."

51

JA399.  And because the government conceded that the same reasoning applied equally to Plaintiffs' models, the District Court should have likewise found Plaintiffs' failure-to-consider claims ripe.

The District Court disagreed, citing language in Plaintiffs' letters that the Secretary had "not provided for" Plaintiffs' rebate models "[t]o date"—language that the District Court believed showed that HRSA was still considering whether to preapprove Plaintiffs' models.  JA398-399 & n.13 (quoting JA460; JA471; JA473).  But HRSA included that same phrase in Sanofi's letter, too.  JA767.  The District Court never explained why Sanofi's failure-to-consider claims were ripe and Plaintiffs' were not, even though all four letters had identical language about how the Secretary "has not provided for" their cash-rebate models.  JA466.  And HRSA has not identified any consideration it is giving Plaintiffs' models that it has not given Sanofi's.

To put it in terms of the ripeness factors, HRSA "publicly articulate[d]" its "unequivocal position" regarding the legality of Plaintiffs' models, *Ciba-Geigy Corp.*, 801 F.2d at 436, and expected Plaintiffs' to "change their behavior" by not launching their cash-rebate models, *Pharmaceutical Rsch. & Mfrs. of Am. v. HHS*, 138 F. Supp. 3d 31, 44 (D.D.C. 2015).  That is, HRSA has determined Plaintiffs' "rights or obligations" under the 340B Program, and there are "legal consequences"—civil monetary penalties and termination from the Program—that

"will flow" if they do not abide by HRSA's determination. *Bennett*, 520 U.S. at 177-178 (citation omitted). And HRSA "may not . . . avoid judicial review 'merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation.' " *Natural Res. Def. Council*, 22 F.3d at 1132-33 (quoting *Ciba-Geigy*, 801 F.2d at 438 n.9). Thus, "even when an agency merely threatens enforcement of a guideline," any challenge against the agency's action is not premature so long as "the guideline is binding on its face or in practice." *Center for Auto Safety v. National Highway Traffic Safety Admin.*, 452 F.3d 798, 807 (D.C. Cir. 2006).

*Second*, "[w]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Environmental Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970). Yet that is precisely what HRSA has done.

HRSA has been on notice of manufacturers' proposed rebate models since July 2024, JA387, and Kalderos presented the model to HRSA for its consideration more than six years ago, JA848. HRSA has had ample time to "complete its review" of Plaintiffs' proposed models. JA386-387. But Plaintiffs' proposals have languished while the agency has sat on its hands. At the District Court's request, the government filed a notice that it "expects to be in a position to provide guidance for

stakeholders" by June 1, 2025. JA367. But when that date came, stakeholders did not get guidance; the Office of Information and Regulatory Affairs got a nonpublic copy of guidance to review for compliance with Executive Order 12866. *See* OIRA, *Pending EO 12866 Regulatory Review*, Reginfo, https://perma.cc/D47N-RMKW. The guidance still has not been released, and neither OIRA nor HRSA has given any indication when that review will be complete or what its result will be.

Plaintiffs cannot afford to wait any longer. The IRA's MFP deadline is just around the corner, and Plaintiffs face massive, unchecked unlawful rebates if they are forced to make the MFP available without any safeguards against 340B-MFP duplicate discounts. JA260-262 (¶¶ 23-25, 31); JA723. HRSA's "inaction has precisely the same impact on the rights of [Plaintiffs] as denial of relief," *Environmental Def. Fund*, 428 F.2d at 1099, because HRSA's position thwarts Plaintiffs' rebate models while CMS simultaneously refuses to honor the IRA's promise of "[n]onduplication with 340B ceiling price[s]," 42 U.S.C. § 1320f-2(d). Plaintiffs have no choice other than these lawsuits. *See Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 49 (D.C. Cir. 2000) (finding claim ripe where challenger's "only alternative to obtaining judicial review . . . [was] to violate [the agency's] directives, . . . and then defend an enforcement proceeding on the [same] grounds").

**B.    HRSA Failed To Consider Plaintiffs' Cash-Rebate Models' Benefits Over The Current, Flawed Product-Replenishment Model.**

The District Court vacated HRSA's disapproval of Sanofi's model because it held that HRSA arbitrarily failed to consider the benefits of cash-rebate models over the existing product-replenishment model.    JA397-400.    HRSA's refusal to preapprove Plaintiffs' models was equally arbitrary because HRSA "fail[ed] to consider an important aspect of the problem" before it.    *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).    A factor the governing statute requires the agency to consider is, "by definition," important.    *United Parcel Serv., Inc. v. Postal Regul. Comm'n*, 955 F.3d 1038, 1050-51 (D.C. Cir. 2020).

Plaintiffs' cash-rebate models would fulfill many of the 340B Program's statutory safeguards, making these benefits relevant factors for HRSA's consideration.    The models would prevent unlawful MDRP-340B and MFP-340B duplicate rebates.    JA672-673; JA722-723; JA820-821 (rebate-model benefits).    The models would also allow Plaintiffs to meaningfully access the ADR process by giving them the information necessary to show reasonable cause for audits.    *See id.*; *see also* JA261-262 (¶ 28).    But HRSA did not mention these features at all or explain why it preferred the current flawed product-replenishment model over Plaintiffs' superior cash-rebate models.    *See, e.g.*, JA460-462 (Lilly); JA454-456

(Johnson & Johnson); JA466-468 (BMS); JA473-475 (Novartis); JA767-769 (Sanofi).

HRSA's non-response violated the Administrative Procedure Act twice over. For one, a "complete absence of any discussion" of an important factor is proof that an agency "simply failed to take account of . . . statutory limitation[s] on [its] authority." *United Mine Workers of Am., Int'l Union v. Dole*, 870 F.2d 662, 673 (D.C. Cir. 1989). For another, HRSA failed to "respond meaningfully" to Plaintiffs' legitimate concerns about duplicate rebates and accessing ADR proceedings. *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quotation omitted). HRSA's disapprovals of Plaintiffs' cash-rebate models therefore were not adequately explained.

The District Court *agreed* with Plaintiffs' arguments on this score. It highlighted the imminent problem of 340B-MFP duplication created by the IRA's upcoming deadlines and found it "concerning" that HHS had not identified a plausible de-duplication mechanism. JA397. The District Court similarly emphasized that curbing duplication and diversion "are important and relevant factors for HRSA to consider." JA398. And the District Court acknowledged that HRSA had "conceded" at oral argument that "the administrative record does not address concerns that . . . [manufacturers] raised about unlawful duplications and diversions," and that "the agency provided no explanation for its failure to address

these valid concerns." JA400; *see also* JA330 ("[F]rom the agency, there isn't a specific spot [in the administrative record] where we talk about that."). The District Court was exactly right to rule for Sanofi on these grounds. The court just should have done the same for Plaintiffs.

But the District Court should have gone further in one respect. The District Court vacated and remanded after finding for Sanofi on this claim, but nonetheless forbade Sanofi from proceeding with its rebate model without preapproval. *See* JA401. That was error twice over. First, the District Court's reasoning rests on the preapproval requirement being lawful and non-arbitrarily applied, which is wrong for all the reasons Plaintiffs have explained. *See supra* pp. 26-49. And second, the District Court apparently severed the portion of HRSA's letter asserting rebate models violate Section 340B from the portion stating Plaintiffs' rebate models require HRSA's preapproval. *See* JA401. But the two portions are "intertwined" and fall together. *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1145 (D.C. Cir. 2022). HRSA is not requiring that *every* model be preapproved—otherwise, the product-replenishment model would be unlawful. HRSA instead has imposed its preapproval requirement because HRSA believed that there are unique issues with Plaintiffs' rebate models. But because HRSA's latter reasoning is arbitrary, the former falls as well. The Court should therefore vacate HRSA's decision "in [its]

57

entirety," *id.* at 1144, and allow Plaintiffs to proceed until HRSA provides a reasoned explanation for its refusal to approve Plaintiffs' models.

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be reversed and the case remanded with instructions to vacate HRSA's disapprovals of Plaintiffs' cash-rebate models.

Respectfully submitted,

JOHN C. O'QUINN
MEGAN MCGLYNN
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

*Counsel for Eli Lilly and Company and Lilly USA, LLC*

PAUL J. ZIDLICKY
MADELEINE JOSEPH
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
pzidlicky@sidley.com

TREVOR L. WEAR
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

*Counsel for Kalderos, Inc.*

June 18, 2025

/s/ Sean Marotta
SEAN MAROTTA
KEENAN ROARTY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-4881
sean.marotta@hoganlovells.com

JACKSON B. SKEEN
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110

*Counsel for Novartis Pharmaceuticals Corporation, Bristol Myers Squibb Company, Eli Lilly and Company, and Lilly USA, LLC*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App.

P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed.

R. App. P. 32(f), this document contains 12,615 words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface using

Microsoft Word for Office 365 in 14-point Times New Roman.

/s/ Sean Marotta
Sean Marotta

**ADDENDUM**

# TABLE OF CONTENTS

Page

42 U.S.C. § 256b ............................................................................. Add. 1

42 U.S.C. § 1320f-2 ....................................................................... Add. 13

i

## 42 U.S.C. § 256b

## § 256b. Limitation on prices of drugs purchased by covered entities

### (a) Requirements for agreement with Secretary

#### (1) In general

The Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs (other than drugs described in paragraph (3)) purchased by a covered entity on or after the first day of the first month that begins after November 4, 1992, does not exceed an amount equal to the average manufacturer price for the drug under title XIX of the Social Security Act in the preceding calendar quarter, reduced by the rebate percentage described in paragraph (2). Each such agreement shall require that the manufacturer furnish the Secretary with reports, on a quarterly basis, of the price for each covered outpatient drug subject to the agreement that, according to the manufacturer, represents the maximum price that covered entities may permissibly be required to pay for the drug (referred to in this section as the "ceiling price"), and shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price.

#### (2) "Rebate percentage" defined

##### (A) In general

For a covered outpatient drug purchased in a calendar quarter, the "rebate percentage" is the amount (expressed as a percentage) equal to--

(i) the average total rebate required under section 1927(c) of the Social Security Act with respect to the drug (for a unit of the dosage form and strength involved) during the preceding calendar quarter; divided by

(ii) the average manufacturer price for such a unit of the drug during such quarter.

##### (B) Over the counter drugs

###### (i) In general

For purposes of subparagraph (A), in the case of over the counter drugs, the "rebate percentage" shall be determined as if the rebate required under section 1927(c) of the Social Security Act is based on the applicable percentage provided under section 1927(c)(3) of such Act.

### (ii) "Over the counter drug" defined

The term "over the counter drug" means a drug that may be sold without a prescription and which is prescribed by a physician (or other persons authorized to prescribe such drug under State law).

## (3) Drugs provided under State Medicaid plans

Drugs described in this paragraph are drugs purchased by the entity for which payment is made by the State under the State plan for medical assistance under title XIX of the Social Security Act.

## (4) "Covered entity" defined

In this section, the term "covered entity" means an entity that meets the requirements described in paragraph (5) and is one of the following:

(A) A Federally-qualified health center (as defined in section 1905(l)(2)(B) of the Social Security Act).

(B) An entity receiving a grant under section 256a of this title.

(C) A family planning project receiving a grant or contract under section 300 of this title.

(D) An entity receiving a grant under subpart II of part C of subchapter XXIV (relating to categorical grants for outpatient early intervention services for HIV disease).

(E) A State-operated AIDS drug purchasing assistance program receiving financial assistance under subchapter XXIV.

(F) A black lung clinic receiving funds under section 937(a) of title 30.

(G) A comprehensive hemophilia diagnostic treatment center receiving a grant under section 501(a)(2) of the Social Security Act.

(H) A Native Hawaiian Health Center receiving funds under the Native

Add. 2

Hawaiian Health Care Act of 1988.

(**I**) An urban Indian organization receiving funds under title V of the Indian Health Care Improvement Act.

(**J**) Any entity receiving assistance under subchapter XXIV (other than a State or unit of local government or an entity described in subparagraph (D)), but only if the entity is certified by the Secretary pursuant to paragraph (7).

(**K**) An entity receiving funds under section 247c of this title (relating to treatment of sexually transmitted diseases) or section 247b(j)(2) of this title (relating to treatment of tuberculosis) through a State or unit of local government, but only if the entity is certified by the Secretary pursuant to paragraph (7).

(**L**) A subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act) that--

> (**i**) is owned or operated by a unit of State or local government, is a public or private non-profit corporation which is formally granted governmental powers by a unit of State or local government, or is is a private non-profit hospital which has a contract with a State or local government to provide health care services to low income individuals who are not entitled to benefits under title XVIII of the Social Security Act or eligible for assistance under the State plan under this subchapter;

> (**ii**) for the most recent cost reporting period that ended before the calendar quarter involved, had a disproportionate share adjustment percentage (as determined under section 1886(d)(5)(F) of the Social Security Act) greater than 11.75 percent or was described in section 1886(d)(5)(F)(i)(II) of such Act; and

> (**iii**) does not obtain covered outpatient drugs through a group purchasing organization or other group purchasing arrangement.

(**M**) A children's hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(iii) of the Social Security Act, or a free-standing cancer hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(v) of the Social Security Act, that would meet the requirements of subparagraph (L), including the disproportionate share adjustment percentage requirement under clause (ii)

of such subparagraph, if the hospital were a subsection (d) hospital as defined by section 1886(d)(1)(B) of the Social Security Act.

**(N)** An entity that is a critical access hospital (as determined under section 1820(c)(2) of the Social Security Act), and that meets the requirements of subparagraph (L)(i).

**(O)** An entity that is a rural referral center, as defined by section 1886(d)(5)(C)(i) of the Social Security Act, or a sole community hospital, as defined by section 1886(d)(5)(C)(iii) of such Act, and that both meets the requirements of subparagraph (L)(i) and has a disproportionate share adjustment percentage equal to or greater than 8 percent.

## (5) Requirements for covered entities

### (A) Prohibiting duplicate discounts or rebates

#### (i) In general

A covered entity shall not request payment under title XIX of the Social Security Act for medical assistance described in section 1905(a)(12) of such Act with respect to a drug that is subject to an agreement under this section if the drug is subject to the payment of a rebate to the State under section 1927 of such Act.

#### (ii) Establishment of mechanism

The Secretary shall establish a mechanism to ensure that covered entities comply with clause (i). If the Secretary does not establish a mechanism within 12 months under the previous sentence, the requirements of section 1927(a)(5)(C) of the Social Security Act shall apply.

### (B) Prohibiting resale of drugs

With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.

### (C) Auditing

A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the

Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements described in subparagraphs 1 (A) or (B) with respect to drugs of the manufacturer.

**(D) Additional sanction for noncompliance**

If the Secretary finds, after audit as described in subparagraph (C) and after notice and hearing, that a covered entity is in violation of a requirement described in subparagraphs (A) or (B), the covered entity shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug (as described in subparagraph (A)) provided under the agreement between the entity and the manufacturer under this paragraph.

**(6) Treatment of distinct units of hospitals**

In the case of a covered entity that is a distinct part of a hospital, the hospital shall not be considered a covered entity under this paragraph unless the hospital is otherwise a covered entity under this subsection.

**(7) Certification of certain covered entities**

**(A) Development of process**

Not later than 60 days after November 4, 1992, the Secretary shall develop and implement a process for the certification of entities described in subparagraphs (J) and (K) of paragraph (4).

**(B) Inclusion of purchase information**

The process developed under subparagraph (A) shall include a requirement that an entity applying for certification under this paragraph submit information to the Secretary concerning the amount such entity expended for covered outpatient drugs in the preceding year so as to assist the Secretary in evaluating the validity of the entity's subsequent purchases of covered outpatient drugs at discounted prices.

**(C) Criteria**

The Secretary shall make available to all manufacturers of covered outpatient drugs a description of the criteria for certification under this paragraph.

### (D) List of purchasers and dispensers

The certification process developed by the Secretary under subparagraph (A) shall include procedures under which each State shall, not later than 30 days after the submission of the descriptions under subparagraph (C), prepare and submit a report to the Secretary that contains a list of entities described in subparagraphs (J) and (K) of paragraph (4) that are located in the State.

### (E) Recertification

The Secretary shall require the recertification of entities certified pursuant to this paragraph on a not more frequent than annual basis, and shall require that such entities submit information to the Secretary to permit the Secretary to evaluate the validity of subsequent purchases by such entities in the same manner as that required under subparagraph (B).

### (8) Development of prime vendor program

The Secretary shall establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of covered outpatient drugs. If a covered entity obtains drugs directly from a manufacturer, the manufacturer shall be responsible for the costs of distribution.

### (9) Notice to manufacturers

The Secretary shall notify manufacturers of covered outpatient drugs and single State agencies under section 1902(a)(5) of the Social Security Act of the identities of covered entities under this paragraph, and of entities that no longer meet the requirements of paragraph (5) or that are no longer certified pursuant to paragraph (7).

### (10) No prohibition on larger discount

Nothing in this subsection shall prohibit a manufacturer from charging a price for a drug that is lower than the maximum price that may be charged under paragraph (1).

## (b) Other definitions

### (1) In general

In this section, the terms "average manufacturer price", "covered outpatient drug", and "manufacturer" have the meaning given such terms in section

1927(k) of the Social Security Act.

**(2) Covered drug**

In this section, the term "covered drug"--

(**A**) means a covered outpatient drug (as defined in section 1927(k) (2) of the Social Security Act); and

(**B**) includes, notwithstanding paragraph (3)(A) of section 1927(k) of such Act, a drug used in connection with an inpatient or outpatient service provided by a hospital described in subparagraph (L), (M), (N), or (O) of subsection (a)(4) that is enrolled to participate in the drug discount program under this section.

**(c) Repealed. Pub.L. 111-152, Title II, § 2302(2), Mar. 30, 2010, 124 Stat. 1083**

**(d) Improvements in program integrity**

**(1) Manufacturer compliance**

**(A) In general**

From amounts appropriated under paragraph (4), the Secretary shall provide for improvements in compliance by manufacturers with the requirements of this section in order to prevent overcharges and other violations of the discounted pricing requirements specified in this section.

**(B) Improvements**

The improvements described in subparagraph (A) shall include the following:

(**i**) The development of a system to enable the Secretary to verify the accuracy of ceiling prices calculated by manufacturers under subsection (a)(1) and charged to covered entities, which shall include the following:

(**I**) Developing and publishing through an appropriate policy or regulatory issuance, precisely defined standards and methodology for the calculation of ceiling prices under such subsection.

(**II**) Comparing regularly the ceiling prices calculated by the Secretary with the quarterly pricing data that is reported by manufacturers to the

Secretary.

**(III)** Performing spot checks of sales transactions by covered entities.

**(IV)** Inquiring into the cause of any pricing discrepancies that may be identified and either taking, or requiring manufacturers to take, such corrective action as is appropriate in response to such price discrepancies.

**(ii)** The establishment of procedures for manufacturers to issue refunds to covered entities in the event that there is an overcharge by the manufacturers, including the following:

**(I)** Providing the Secretary with an explanation of why and how the overcharge occurred, how the refunds will be calculated, and to whom the refunds will be issued.

**(II)** Oversight by the Secretary to ensure that the refunds are issued accurately and within a reasonable period of time, both in routine instances of retroactive adjustment to relevant pricing data and exceptional circumstances such as erroneous or intentional overcharging for covered outpatient drugs.

**(iii)** The provision of access through the Internet website of the Department of Health and Human Services to the applicable ceiling prices for covered outpatient drugs as calculated and verified by the Secretary in accordance with this section, in a manner (such as through the use of password protection) that limits such access to covered entities and adequately assures security and protection of privileged pricing data from unauthorized re-disclosure.

**(iv)** The development of a mechanism by which--

**(I)** rebates and other discounts provided by manufacturers to other purchasers subsequent to the sale of covered outpatient drugs to covered entities are reported to the Secretary; and

**(II)** appropriate credits and refunds are issued to covered entities if such discounts or rebates have the effect of lowering the applicable ceiling price for the relevant quarter for the drugs involved.

**(v)** Selective auditing of manufacturers and wholesalers to ensure the

Add. 8

integrity of the drug discount program under this section.

**(vi)** The imposition of sanctions in the form of civil monetary penalties, which--

**(I)** shall be assessed according to standards established in regulations to be promulgated by the Secretary not later than 180 days after March 23, 2010;

**(II)** shall not exceed $5,000 for each instance of overcharging a covered entity that may have occurred; and

**(III)** shall apply to any manufacturer with an agreement under this section that knowingly and intentionally charges a covered entity a price for purchase of a drug that exceeds the maximum applicable price under subsection (a)(1).

## (2) Covered entity compliance

### (A) In general

From amounts appropriated under paragraph (4), the Secretary shall provide for improvements in compliance by covered entities with the requirements of this section in order to prevent diversion and violations of the duplicate discount provision and other requirements specified under subsection (a)(5).

### (B) Improvements

The improvements described in subparagraph (A) shall include the following:

**(i)** The development of procedures to enable and require covered entities to regularly update (at least annually) the information on the Internet website of the Department of Health and Human Services relating to this section.

**(ii)** The development of a system for the Secretary to verify the accuracy of information regarding covered entities that is listed on the website described in clause (i).

**(iii)** The development of more detailed guidance describing methodologies and options available to covered entities for billing covered outpatient drugs to State Medicaid agencies in a manner that

avoids duplicate discounts pursuant to subsection (a)(5)(A).

**(iv)** The establishment of a single, universal, and standardized identification system by which each covered entity site can be identified by manufacturers, distributors, covered entities, and the Secretary for purposes of facilitating the ordering, purchasing, and delivery of covered outpatient drugs under this section, including the processing of chargebacks for such drugs.

**(v)** The imposition of sanctions, in appropriate cases as determined by the Secretary, additional to those to which covered entities are subject under subsection (a)(5)(D), through one or more of the following actions:

**(I)** Where a covered entity knowingly and intentionally violates subsection (a)(5)(B), the covered entity shall be required to pay a monetary penalty to a manufacturer or manufacturers in the form of interest on sums for which the covered entity is found liable under subsection (a)(5)(D), such interest to be compounded monthly and equal to the current short term interest rate as determined by the Federal Reserve for the time period for which the covered entity is liable.

**(II)** Where the Secretary determines a violation of subsection (a)(5)(B) was systematic and egregious as well as knowing and intentional, removing the covered entity from the drug discount program under this section and disqualifying the entity from re-entry into such program for a reasonable period of time to be determined by the Secretary.

**(III)** Referring matters to appropriate Federal authorities within the Food and Drug Administration, the Office of Inspector General of Department of Health and Human Services, or other Federal agencies for consideration of appropriate action under other Federal statutes, such as the Prescription Drug Marketing Act (21 U.S.C. 353).

### (3) Administrative dispute resolution process

### (A) In general

Not later than 180 days after March 23, 2010, the Secretary shall promulgate regulations to establish and implement an administrative process for the resolution of claims by covered entities that they have been overcharged for

drugs purchased under this section, and claims by manufacturers, after the conduct of audits as authorized by subsection (a)(5)(C), of violations of subsections (a)(5)(A) or (a)(5)(B), including appropriate procedures for the provision of remedies and enforcement of determinations made pursuant to such process through mechanisms and sanctions described in paragraphs (1)(B) and (2)(B).

**(B) Deadlines and procedures**

Regulations promulgated by the Secretary under subparagraph (A) shall--

**(i)** designate or establish a decision-making official or decision-making body within the Department of Health and Human Services to be responsible for reviewing and finally resolving claims by covered entities that they have been charged prices for covered outpatient drugs in excess of the ceiling price described in subsection (a)(1), and claims by manufacturers that violations of subsection (a)(5)(A) or (a)(5)(B) have occurred;

**(ii)** establish such deadlines and procedures as may be necessary to ensure that claims shall be resolved fairly, efficiently, and expeditiously;

**(iii)** establish procedures by which a covered entity may discover and obtain such information and documents from manufacturers and third parties as may be relevant to demonstrate the merits of a claim that charges for a manufacturer's product have exceeded the applicable ceiling price under this section, and may submit such documents and information to the administrative official or body responsible for adjudicating such claim;

**(iv)** require that a manufacturer conduct an audit of a covered entity pursuant to subsection (a)(5)(C) as a prerequisite to initiating administrative dispute resolution proceedings against a covered entity;

**(v)** permit the official or body designated under clause (i), at the request of a manufacturer or manufacturers, to consolidate claims brought by more than one manufacturer against the same covered entity where, in the judgment of such official or body, consolidation is appropriate and consistent with the goals of fairness and economy of resources; and

**(vi)** include provisions and procedures to permit multiple covered entities to jointly assert claims of overcharges by the same manufacturer for the

same drug or drugs in one administrative proceeding, and permit such claims to be asserted on behalf of covered entities by associations or organizations representing the interests of such covered entities and of which the covered entities are members.

### (C) Finality of administrative resolution

The administrative resolution of a claim or claims under the regulations promulgated under subparagraph (A) shall be a final agency decision and shall be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction.

### (4) Authorization of appropriations

There are authorized to be appropriated to carry out this subsection, such sums as may be necessary for fiscal year 2010 and each succeeding fiscal year.

### (e) Exclusion of orphan drugs for certain covered entities

For covered entities described in subparagraph (M) (other than a children's hospital described in subparagraph (M)), (N), or (O) of subsection (a)(4), the term "covered outpatient drug" shall not include a drug designated by the Secretary under section 360bb of Title 21 for a rare disease or condition.

## 42 U.S.C. § 1320f-2

### § 1320f-2. Manufacturer agreements

#### (a) In general

For purposes of section 1320f(a)(2) of this title, the Secretary shall enter into agreements with manufacturers of selected drugs with respect to a price applicability period, by not later than February 28 following the selected drug publication date with respect to such selected drug, under which--

**(1)** during the negotiation period for the initial price applicability year for the selected drug, the Secretary and the manufacturer, in accordance with section 1320f-3 of this title, negotiate to determine (and, by not later than the last date of such period, agree to) a maximum fair price for such selected drug of the manufacturer in order for the manufacturer to provide access to such price--

**(A)** to maximum fair price eligible individuals who with respect to such drug are described in subparagraph (A) of section 1320f(c)(2) of this title and are dispensed such drug (and to pharmacies, mail order services, and other dispensers, with respect to such maximum fair price eligible individuals who are dispensed such drugs) during, subject to paragraph (2), the price applicability period; and

**(B)** to hospitals, physicians, and other providers of services and suppliers with respect to maximum fair price eligible individuals who with respect to such drug are described in subparagraph (B) of such section and are furnished or administered such drug during, subject to paragraph (2), the price applicability period;

**(2)** the Secretary and the manufacturer shall, in accordance with section 1320f-3 of this title, renegotiate (and, by not later than the last date of the period of renegotiation, agree to) the maximum fair price for such drug, in order for the manufacturer to provide access to such maximum fair price (as so renegotiated)--

**(A)** to maximum fair price eligible individuals who with respect to such drug are described in subparagraph (A) of section 1320f(c)(2) of this title and are dispensed such drug (and to pharmacies, mail order services, and other dispensers, with respect to such maximum fair price eligible individuals who are dispensed such drugs) during any year during the price applicability

period (beginning after such renegotiation) with respect to such selected drug; and

**(B)** to hospitals, physicians, and other providers of services and suppliers with respect to maximum fair price eligible individuals who with respect to such drug are described in subparagraph (B) of such section and are furnished or administered such drug during any year described in subparagraph (A);

**(3)** subject to subsection (d), access to the maximum fair price (including as renegotiated pursuant to paragraph (2)), with respect to such a selected drug, shall be provided by the manufacturer to--

**(A)** maximum fair price eligible individuals, who with respect to such drug are described in subparagraph (A) of section 1320f(c)(2) of this title, at the pharmacy, mail order service, or other dispenser at the point-of-sale of such drug (and shall be provided by the manufacturer to the pharmacy, mail order service, or other dispenser, with respect to such maximum fair price eligible individuals who are dispensed such drugs), as described in paragraph (1)(A) or (2)(A), as applicable; and

**(B)** hospitals, physicians, and other providers of services and suppliers with respect to maximum fair price eligible individuals who with respect to such drug are described in subparagraph (B) of such section and are furnished or administered such drug, as described in paragraph (1)(B) or (2)(B), as applicable;

**(4)** the manufacturer submits to the Secretary, in a form and manner specified by the Secretary, for the negotiation period for the price applicability period (and, if applicable, before any period of renegotiation pursuant to section 1320f-3(f) of this title), and for section 1320f-1(f) of this title, with respect to such drug--

**(A)** information on the non-Federal average manufacturer price (as defined in section 8126(h)(5) of Title 38) for the drug for the applicable year or period;

**(B)** information that the Secretary requires to carry out the negotiation (or renegotiation process) under this part; and

**(C)** information that the Secretary requires to carry out section 1320f-1(f) of this title, including rebates under paragraph (4) of such section; and

**(5)** the manufacturer complies with requirements determined by the Secretary to be necessary for purposes of administering the program and monitoring compliance with the program.

**(b) Agreement in effect until drug is no longer a selected drug**

An agreement entered into under this section shall be effective, with respect to a selected drug, until such drug is no longer considered a selected drug under section 1320f-1(c) of this title.

**(c) Confidentiality of information**

Information submitted to the Secretary under this part by a manufacturer of a selected drug that is proprietary information of such manufacturer (as determined by the Secretary) shall be used only by the Secretary or disclosed to and used by the Comptroller General of the United States for purposes of carrying out this part.

**(d) Nonduplication with 340B ceiling price**

Under an agreement entered into under this section, the manufacturer of a selected drug--

**(1)** shall not be required to provide access to the maximum fair price under subsection (a)(3), with respect to such selected drug and maximum fair price eligible individuals who are eligible to be furnished, administered, or dispensed such selected drug at a covered entity described in section 340B(a)(4) of the Public Health Service Act, to such covered entity if such selected drug is subject to an agreement described in section 340B(a)(1) of such Act and the ceiling price (defined in section 340B(a)(1) of such Act) is lower than the maximum fair price for such selected drug; and

**(2)** shall be required to provide access to the maximum fair price to such covered entity with respect to maximum fair price eligible individuals who are eligible to be furnished, administered, or dispensed such selected drug at such entity at such ceiling price in a nonduplicated amount to the ceiling price if such maximum fair price is below the ceiling price for such selected drug.

## CERTIFICATE OF SERVICE

I certify that on June 18, 2025, the foregoing brief was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Sean Marotta
Sean Marotta