**ORAL ARGUMENT NOT YET SCHEDULED**
**Nos. 25-5177, 25-5179, 25-5220, 25-5221, 25-5223, 25-5224, 25-5226**

# United States Court of Appeals
# for the District of Columbia Circuit

NOVARTIS PHARMACEUTICALS CORPORATION, *ET AL.*,
*Plaintiffs-Appellants-Cross-Appellees*,

v.

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES, *ET AL.*,
*Defendants-Appellees-Cross-Appellees*,

340B HEALTH, *ET AL.*,
*Intervenors-Defendants-Appellees-
Cross-Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
COLUMBIA, NOS. 21-CV-2608, 24-CV-3220, 24-CV-3337, 25-CV-117
DISTRICT JUDGE DABNEY L. FRIEDRICH

**BRIEF FOR PHARMACEUTICAL RESEARCH AND MANUFACTURERS
OF AMERICA AND BIOTECHNOLOGY INNOVATION
ORGANIZATION AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-
APPELLANTS**

Philip J. Perry
Andrew D. Prins
Abid. R. Qureshi
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200
philip.perry@lw.com

*Counsel for* Amici Curiae
*Pharmaceutical Research and
Manufacturers of America and
Biotechnology Innovation
Organization*

June 25, 2025

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned counsel certifies the following:

## A.    Parties and *Amici*

Except for the following, all parties, intervenors, and *amici* appearing in this Court are listed in Plaintiffs-Appellants' Opening Brief:

- ADAP Advocacy; Act Now; Biotechnology Innovation Organization; CF United; Community Oncology Alliance, Inc.; Johnson & Johnson Health Care Systems Inc.; and Pharmaceutical Research and Manufacturers of America.

## B.    Ruling Under Review

Reference to the ruling at issue appears in Plaintiffs-Appellants' Opening Brief.

## C.    Related Cases

Reference to the related case, of which undersigned counsel is aware, appears in Plaintiffs-Appellants' Opening Brief.

_/s/ Philip J. Perry_

Philip J. Perry
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200
philip.perry@lw.com

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, *amici curiae* Pharmaceutical Research and Manufacturers of America and Biotechnology Innovation Organization submit the following corporate disclosure statement:

*Amicus curiae* Pharmaceutical Research and Manufacturers of America ("PhRMA") is a voluntary, nonprofit association that represents the country's leading innovative biopharmaceutical research companies and manufacturers. PhRMA is a non-profit "trade association" within the meaning of D.C. Circuit Rule 26.1(b). PhRMA has no parent corporation and no publicly traded company owns ten percent or more of its stock. PhRMA's membership includes companies that have issued stock or debt securities to the public. As a trade association as defined under Cir. R. 26.1, PhRMA is not required to list the names of its members. However, a list of PhRMA's members is available at https://phrma.org/about.

*Amicus curiae* Biotechnology Innovation Organization ("BIO") is the world's largest biotechnology trade organization, representing more than 1,000 member companies and research organizations who research and develop biotechnological products, including lifesaving medicines. BIO is a non-profit "trade association" within the meaning of D.C. Circuit Rule 26.1(b).

BIO has no parent corporation and no publicly traded company owns ten percent or more of its stock.  BIO's membership includes companies that have issued stock or debt securities to the public.  As a trade association as defined under Cir. R. 26.1, BIO is not required to list the names of its members.  However, a list of BIO's members is available at https://www.bio.org/member/bio-member-directory.

*/s/ Philip J. Perry*
Philip J. Perry
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200
philip.perry@lw.com

## RULE 29 STATEMENTS

All parties have consented to the filing of this *amicus curiae* brief.

This brief was not authored in whole or in part by a party or its counsel.  No party or party's counsel contributed money intended to fund the preparation or filing of this brief; and no person other than *amici curiae* and their members contributed money intended to fund the preparation or submission of this brief.  Novartis Pharmaceuticals Corporation, Bristol Myers Squibb Company, and Eli Lilly and Company are members of PhRMA and BIO but did not directly contribute financially to the preparation or submission of this brief.

Pursuant to Circuit Rule 29(d), *amici* certify that a separate brief is necessary to provide the perspective of PhRMA and BIO, whose members are directly impacted by the decision under review and who submitted letters to the agency addressing the issues presented in this brief.  *Amici* have extensive and unique knowledge on these issues and the balance required to maintain 340B's long-term sustainability.  Their in-depth knowledge of the contours of the 340B Program and its operation provides a unique perspective not otherwise fully reflected in the briefs submitted.

*/s/ Philip J. Perry*
Philip J. Perry
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200
philip.perry@lw.com

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ viii

STATUTES AND REGULATIONS ................................................... 2

INTRODUCTION AND SUMMARY OF ARGUMENT ..................... 3

ARGUMENT ..................................................................................... 5

I.   HRSA's Exercise Of Pre-Approval Authority Cannot Be
     Squared With The Statute ......................................................... 6

     A.   340B Does Not Contemplate A Pre-Approval Mechanism
          ........................................................................................ 6

     B.   This Court's *Novartis* Decision Confirms HRSA Lacks
          Pre-Approval Authority And That The Rebate Model Is
          Permissible ..................................................................... 8

II.  HRSA's Subjection Of The Rebate Model To Pre-Approval Was
     Arbitrary And Capricious ......................................................... 14

     A.   Statutory Restrictions Are Central To The Program's
          Balance ........................................................................... 16

     B.   Duplicate Discounting Remains An Unaddressed Issue
          And Will Likely Only Increase With The Inflation
          Reduction Act ................................................................. 19

     C.   HRSA Also Failed To Consider The Benefits Of The
          Model As To Other Statutory Violations ......................... 25

CONCLUSION ................................................................................. 29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## CASES

*Am. Library Ass'n v. FCC*,
   406 F.3d 689 (D.C. Cir. 2005) ................................................................6

*Am. Public Gas Ass'n v. U.S. Dep't of Energy*,
   22 F.4th 1018 (D.C. Cir. 2022) ............................................................15

*Astra USA, Inc. v. Santa Clara Cnty., Cal.*,
   563 U.S. 110 (2011) ........................................................................3, 4, 5

*Atl. City Elec. Co. v. FERC*,
   295 F.3d 1 (D.C. Cir. 2002) ..................................................................6

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ..............................................................................7

*Carlson v. Postal Regul. Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019) ............................................................14

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ...........................................................................6, 8

*Ivy Sports Medicine, LLC v. Burwell*,
   767 F.3d 81 (D.C. Cir. 2014) ................................................................6

*Ky. Mun. Energy Agency v. Fed. Energy Regul. Comm'n*,
   45 F.4th 162 (D.C. Cir. 2022) .............................................................15

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto.*
   *Ins. Co.*,
   463 U.S. 29 (1983) ..............................................................................15

*Novartis Pharms. Corp. v. Espinosa*,
   No. 21-cv-1479, 2021 WL 5161783 (D.D.C. Nov. 5, 2021) .............9, 10, 15, 27

*Novartis Pharms. Corp. v. Johnson*,
   102 F.4th 452 (D.C. Cir. 2024) ................... 3, 8, 9, 10, 11, 15, 16, 17, 18, 20, 21

*Or. Health & Sci. Univ. v. Engels*,
   No. 24-cv-2184, 2025 WL 1707630 (D.D.C. June 17, 2025) ...........................28

*Pharm. Rsch. & Mfrs. of Am. v. Morrisey*,
   760 F. Supp. 3d 439 (S.D. W. Va. Dec. 17, 2024) .........................................5, 14

*Sanofi Aventis U.S., LLC v. HHS*,
   58 F.4th 696 (3d Cir. 2023) ................................................................................15

*Vonage Holdings Corp. v. FCC*,
   489 F.3d 1232 (D.C. Cir. 2007) ..........................................................................16

## STATUTES

42 U.S.C.
   § 256b ....................................................................................................................3
   § 256b(a)(1) ....................................................................................................7, 8, 16
   § 256b(a)(1)-(2) ....................................................................................................7
   § 256b(a)(4) ........................................................................................................17
   § 256b(a)(5) ......................................................................................5, 11, 14, 17, 29
   § 256b(d) ...............................................................................................................5
   § 256b(d)(1) ......................................................................................................6, 7
   § 256b(d)(2) ........................................................................................................22
   § 256b(d)(3) .....................................................................................................7, 29
   § 1320f-2 .........................................................................................................13, 23
   § 1320f-3(a) ........................................................................................................23
   § 1395w-3a ..........................................................................................................13
   § 1395w-102(d) ...................................................................................................13
   § 1395w-114a ......................................................................................................12
   § 1395w-114b ......................................................................................................13
   § 1395w-114c ......................................................................................................12
   § 1396r-8 .............................................................................................................14
   § 1396r-8(a) .........................................................................................................16

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124
   Stat. 119 (2010) ..................................................................................................22

## REGULATIONS

42 C.F.R. § 423.2315 ...............................................................................................12

61 Fed. Reg. 43,549 (Aug. 23, 1996) ................................................................17, 18

61 Fed. Reg. 65,406 (Dec. 12, 1996) ............................................................27

62 Fed. Reg. 45,823 (Aug. 29, 1997) ...........................................................11

63 Fed. Reg. 35,239 (June 29, 1998) ............................................................12

89 Fed. Reg. 28,643 (Apr. 19, 2024) ...........................................................28

## OTHER AUTHORITIES

Minn. Dep't of Health, *340B Covered Entity Report* (Nov. 25, 2024),
  https://www.health.state.mn.us/data/340b/docs/2024report.pdf. .......................19

Centers for Medicare & Medicaid Services, Revised Medicare Part D
  Manufacturer Discount Program Final Guidance (Dec. 20, 2024),
  https://www.cms.gov/files/document/revised-manufacturer-
  discount-programfinal-guidance122024.pdf ..................................................12, 13

CMS, Medicare Drug Price Negotiation Program: Final Guidance,
  Implementation of Section 1191-1198 of the Social Security Act
  for Initial Price Applicability Year 2027 and Manufacturer
  Effectuation of the Maximum Fair Price in 2026 and 2027 (Oct. 2,
  2024) https://www.cms.gov/files/document/medicare-drug-price-
  negotiation-final-guidance-ipay-2027-and-manufacturer-
  effectuation-mfp-2026-2027.pdf. .......................................................13, 14, 24

*Examining HRSA's Oversight of the 340B Drug Pricing Program,*
  *Hearing Before the H. Subcomm. on Oversight & Investigations of*
  *the Comm. on Energy & Commerce*, 115 Cong. (July 18, 2017)......................26

GAO, GAO-11-836, Drug Pricing: Manufacturer Discounts in the
  340B Program Offer Benefits, But Federal Oversight Needs
  Improvement (Sept. 2011), https://www.gao.gov/assets/gao-11-
  836.pdf .................................................................................................26

GAO, GAO-18-480, Drug Discount Program: Federal Oversight of
  Compliance at 340B Contract Pharmacies Needs Improvement
  (2018),  https://www.gao.gov/assets/gao-18-480.pdf........................................18

GAO, GAO-19-364SP, HHS Priority Recommendations (2019),
  https://www.gao.gov/assets/gao-19-364sp.pdf................................................22

GAO, GAO-20-212, 340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement (2020), https://www.gao.gov/assets/gao-20-212.pdf...................17

GAO, GAO-20-552PR, HHS Priority Recommendations (2020), https://www.gao.gov/assets/gao-20-552pr.pdf;....................................22

GAO, GAO-21-527PR, HHS Priority Recommendations (2021), https://www.gao.gov/assets/gao-21-527pr.pdf;....................................22

GAO, GAO-22-105646, HHS Priority Recommendations (2022), https://www.gao.gov/assets/gao-22-105646.pdf;................................22

GAO, GAO-23-106467, HHS Priority Recommendations (2023), https://www.gao.gov/assets/gao-23-106467.pdf;................................22

GAO, GAO-24-107257, HHS Priority Recommendations (2024), https://www.gao.gov/assets/gao-24-107257.pdf;................................22

GAO, GAO-25-108032, HHS Priority Recommendations (2025), https://www.gao.gov/assets/gao-25-108032.pdf. ...............................22

H.R. Rep. No. 102-384, pt. 2 (1992) ................................................12, 16

HHS Inspector General, Memorandum Report: Contract Pharmacy Arrangements in the 340B Program (Feb. 2014), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.......................18, 21, 26, 27

House Comm. on Oversight & Accountability, *The Role of Pharmacy Benefit Managers in Prescription Drug Markets*, https://oversight.house.gov/wp-content/uploads/2024/07/PBM-Report-FINAL-with-Redactions.pd...................................................11

Karen Mulligan, *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments* (Oct. 14, 2021), https://healthpolicy.usc.edu/research/the-340b-drug-pricing-program-background-ongoing-challenges-and-recent-developments ......................................................................................25

Kathy Gifford, *State Approaches to Managing the Medicaid Pharmacy Benefit* (Aug. 20, 2024), https://www.healthmanagement.com/wp-content/uploads/2024-Medicaid-Rx-Survey-Rpt_FINAL.pdf ................................................20

Luke Greenwalt, *Uncover the Invisible Impacts of 340B Discounts*,
        IQVIA (Dec. 20, 2021), https://tinyurl.com/yyxusxum ....................................20

*Opportunities to Improve the 340B Drug Pricing Program*, *Hearing
        Before the H. Subcomm. on Health*, 115th Cong. (July 11, 2018) ....................26

White House Council of Economic Advisers, *Reforming
        Biopharmaceutical Pricing at Home and Abroad* (Feb. 2018),
        https://trumpwhitehouse.archives.gov/wp-
        content/uploads/2017/11/CEA-Rx-White-Paper-Final2.pdf ..............................19

**GLOSSARY**

| | |
|---|---|
| 340B | The 340B Drug Pricing Program |
| ADAP | AIDS Drug Assistance Program |
| ADR | Administrative Dispute Resolution |
| CMS | Center for Medicare and Medicaid Services |
| GAO | U.S. Government Accountability Office |
| HHS | U.S. Department of Health and Human Services |
| HRSA | Health Resources and Services Administration |

## INTEREST OF *AMICI CURIAE*

*Amicus curiae* Pharmaceutical Research and Manufacturers of America ("PhRMA") is an association that represents the country's leading innovative biopharmaceutical research companies and manufacturers.  PhRMA devotes its resources to developing medicines that enable patients to live longer and healthier lives.  PhRMA's members participate in the 340B Drug Pricing Program ("340B"), and face direct harm from duplicate discounting (where a manufacturer is forced to provide 340B pricing and additional rebates under Medicaid), as well as the improper transfer and sale of 340B drugs.

*Amicus curiae* Biotechnology Innovation Organization ("BIO") is the world's largest biotechnology trade organization, representing more than 1,000 member companies and research organizations who research and develop biotechnological products, including lifesaving medicines.  BIO's members participate in 340B and, like PhRMA's members, suffer harm when the boundaries Congress placed on 340B are ignored.

*Amici*'s members share a commitment to innovation and the development of new drugs and products, which often requires a decade or more of research as well as millions or even billions of dollars in investment.  *Amici*'s members also share a commitment to 340B's long-term sustainability.  They believe that honoring the limits Congress chose to impose on 340B ensures fidelity to Congress's vision for

1

the Program, while also safeguarding the delicate balance essential to promote further innovation and research.

## STATUTES AND REGULATIONS

The relevant statutes and regulations are reproduced in Plaintiffs-Appellants' Opening Brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The U.S. Health Resources and Services Administration ("HRSA"), the federal agency that administers the 340B Drug Pricing Program, 42 U.S.C. § 256b, has put itself in an untenable position. This Court held in 2024 that drug manufacturers choosing to participate in the 340B Program can impose reasonable conditions on their "offers" to sell certain drugs at steeply reduced 340B prices so long as the offers remain "bona fide." *See Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460-64 (D.C. Cir. 2024). Nothing in *Novartis*, and nothing in the 340B statutory text, spells out any agency authority to require manufacturers to seek pre-clearance or pre-approval of such conditions. *See id.* at 463-64 (concluding that multiple such conditions are lawful notwithstanding that they were not pre-approved by HRSA). Indeed, when Congress amended the 340B statute in 2010 to delineate the agency's specific authorities, it provided very express processes for agency compliance review. Those processes provide for retrospective review of manufacturer compliance, and nowhere mention pre-approval authority. *See infra* at 6-8; *see also Astra USA, Inc. v. Santa Clara Cnty., Cal.*, 563 U.S. 110, 122 (2011).

The posture of this case demonstrates how untenable the agency's new position is. Over the past few years, the 340B Program has grown exponentially, as have instances of fraud and abuse. *See infra* at 17-19. Against that backdrop, Plaintiffs-Appellants submitted details regarding their sensible 340B rebate models

to HRSA long ago:  Kalderos, in 2019, JA848, and the others through mid-to-late 2024, JA656-91; JA463-64; JA709-34; JA814-24.  These submissions explained how a rebate process would gather the required information, navigate the statutory requirements regarding "duplicate discounts" and other abuses and very quickly effectuate the 340B price through a rebate process.  *Id.*  And yet, for all but one of the manufacturers who presented rebate models, the agency simply declined to act— apparently believing that it could exercise newfound pre-approval authority and thereby compel drug manufacturers to let the well-documented and serious problems with the 340B Program persist while it sat on its hands.  *See infra* at 19-25.  Indeed, as of this writing, the agency still purports to not have made an ultimate decision as to the merits of Appellants' rebate models.

In any case, even if the agency could exercise some form of pre-approval authority, it has not justified using it here:  The rebate model is a commonsense approach fully consistent with the text and purposes of the 340B statute; HRSA has not even begun to explain why its disapproval could be appropriate.  Indeed, the more recent Inflation Reduction Act underlines exactly why drug manufacturers need the type of prescription claims data required under the cash replenishment model and why urgent action from this Court is required now.

To the extent HRSA has offered a post-hoc rationalization for failing to approve the rebate model pursuant to its claimed pre-approval authority, it has

simply speculated about the purported impact to covered entities. But that position cannot be squared with how the model actually works, quickly providing 340B rebates within 7-10 days, while serving the requirements of other key portions of the statutory text. *See* 42 U.S.C. § 256b(a)(5) (prohibiting covered healthcare entities from seeking rebates under Medicaid for drugs already subject to 340B pricing, called "duplicate discounting," or selling or transferring 340B drugs to anyone other than their patients, known as "diversion"); *Pharm. Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 452 (S.D. W. Va. Dec. 17, 2024) (noting 340B's "twin federal purposes—providing discounts to covered entities only *and* prohibiting fraud through duplicate discounts"). HRSA's failure to consider the benefits of the rebate model, in light of 340B abuses, is arbitrary and capricious. *Amici* respectfully urge this Court to reverse.

## ARGUMENT

HRSA's exercise of purported pre-approval authority flunks review on two fronts. First, the agency's assertion of pre-approval authority is contrary to the statute, which contemplates backward looking remedies. *See* 42 U.S.C. § 256b(d); *Astra*, 563 U.S. at 119-20. Second, even if HRSA had pre-approval authority, HRSA's exercise of it here is arbitrary and capricious given the agency's failure to consider and address multiple important issues, including fraud and abuse.

5

# I.    HRSA'S EXERCISE OF PRE-APPROVAL AUTHORITY CANNOT BE SQUARED WITH THE STATUTE

HRSA's exercise of pre-approval authority is directly at odds with the statute. It is axiomatic that "administrative agencies may [act] only pursuant to authority delegated to them by Congress." *Am. Library Ass'n v. FCC*, 406 F.3d 689, 691 (D.C. Cir. 2005); *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (An agency has "*only* those authorities conferred upon it by Congress."). Thus, an agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). Because 340B nowhere grants HRSA pre-approval authority, its action here is contrary to law.

## A. 340B Does Not Contemplate A Pre-Approval Mechanism

Contrary to HRSA's position, the 340B statute does not provide it pre-approval authority. Review of the statute, as a whole, makes clear that there is no pre-approval authority lurking in the shadows of the plain text, given the statute's focus on tailored retrospective remedies rather than pre-approval authority. *Cf. Ivy Sports Medicine, LLC v. Burwell*, 767 F.3d 81, 87 (D.C. Cir. 2014) (holding that, where a statute includes a "carefully prescribed" regime, "it would be unreasonable … to infer that [the agency] retains inherent authority to short-circuit or end-run" that regime). Here, Congress amended the statute in 2010 in part, to further specify the agency's remedies, all of which are retrospective in nature. 42 U.S.C.

§ 256b(d)(1)(B); *id.* § 256b(d)(3).  This remedial regime for compliance review nowhere mentions purported pre-approval authority.  Thus, manufacturers remain free to impose reasonable conditions without pre-approval, including the rebate model here.  *See Biden v. Nebraska*, 600 U.S. 477, 494-500 (2023) (rejecting argument that phrase "waive or modify any statutory or regulatory provision … as the Secretary deems necessary" allowed Secretary to essentially "draft a new section" and "red pencil[]" law).

HRSA purports to find its (never-before invoked) pre-approval power in a mere four words "as provided by the Secretary" nestled in a parenthetical within a lengthy paragraph.  42 U.S.C. § 256b(a)(1).  That is "a wafer-thin reed on which to rest such sweeping power."  *Nebraska*, 600 U.S. at 499.  And a proper reading of those words, in context, makes clear that the provision focuses on the *amount* to be paid, *i.e.*, ensuring that manufacturers ultimately provide the ceiling price, and is not a grant of freestanding pre-approval authority.  That accords with the rest of the statute, which makes clear that HHS sets the ceiling price, via calculations run according to statutory formula.  42 U.S.C. § 256b(a)(1)-(2); *id.* § 256b(d)(1)(B)(i)(I) (focusing on pricing by providing that HRSA should "develop[] and publish[] through an appropriate policy or regulatory issuance, precisely defined standards and methodology *for the calculation* of ceiling prices under [subsection (a)(1)]" (emphasis added)).  No language in the provision even remotely gestures at a pre-

approval requirement. *See* Appellants' Opening Br. 32-33 (identifying examples, by contrast, where Congress has given an agency pre-approval authority).

Because the statute does not include a clear grant of pre-approval authority, as underscored by the statute's focus on backward looking remedies, HRSA's purported exercise of such authority here was contrary to law. *Brown & Williamson*, 529 U.S. at 125.

### B. This Court's *Novartis* Decision Confirms HRSA Lacks Pre-Approval Authority And That The Rebate Model Is Permissible

HRSA's subjection of the rebate model to pre-approval is surprising given this Court's decision in *Novartis*, the leading appellate case addressing manufacturers' ability to impose conditions (specifically conditions that were *not* pre-approved) under 340B on their offers. In that case, this Court interpreted the key statutory provision at 42 U.S.C. § 256b(a)(1), which simply "requires manufacturers to 'offer each covered entity covered outpatient drugs for purchase' at or below a specified ceiling 'price.'" *Novartis*, 102 F.4th at 460. Applying 340B's plain text and looking to "background contract principles" inherent in that language, this Court concluded that a permissible 340B "offer" will "contain both price and non-price terms." *Id.* The only term mandated by Congress was the "price" term. *Id.* at 460-61. Congress's silence on non-price terms expressly "preserve[d]—rather than abrogate[d]—the ability" of manufacturers to impose other terms. *Id.* at 460. Because "statutory silence" about other terms "implies that private parties may act

freely," manufacturers *may* impose other conditions, so long as their offers remain "bona fide." *Id.* at 460, 462.

*Novartis*'s discussion of "free[]" action by manufacturers nowhere contemplates a HRSA pre-approval veto. In line with the statutory structure, manufacturers implemented conditions in 2020. *Id.* at 458. HRSA *subsequently* issued enforcement letters, asserting the companies' conditions were barred under 340B and ordering them to honor all contract-pharmacy relationships. *Id.* at 458-59. This Court upheld those same conditions, which were not pre-approved by HRSA. *Id.* at 463-64.

In doing so, this Court specifically addressed whether a manufacturer's policy requiring the submission of claims data was permissible under the federal statute. *Id.* at 463-64. As the Court noted, prior HRSA guidance stated that "drug manufacturers may require 'standard information' from covered entities" and that "covered entities must 'maintain auditable records sufficient to demonstrate continued compliance with 340B requirements." *Id.* And "nobody would say that this policy undermines the bona fides of any 'offer.'" *Id.* The Court thus concluded that a claims data requirement complied with 340B. *Id.* That policy also helped manufacturers access 340B's enforcement mechanisms where violations had occurred. *See Novartis Pharms. Corp. v. Espinosa*, No. 21-cv-1479, 2021

9

WL 5161783, at *8 (D.D.C. Nov. 5, 2021).  In short, this Court has already blessed a key component of the rebate model.

The only remaining question, then, is whether Appellants can implement their obligation to offer the 340B price through a rebate, as opposed to a prospective discount.  Nothing in 340B forecloses them from doing so.  *See id.* at *7 (recognizing that manufacturers may include conditions "that address customary business practice, request standard information, or include other appropriate contract provisions").  In fact, the statute expressly contemplates Appellants' chosen path.  Appellants' Opening Br. 48-49.

And it follows from *Novartis* itself that a rebate model is entirely appropriate.  Like the conditions in *Novartis*, 102 F.4th at 463-64, a cash-rebate mechanism does not affect the ultimate price paid by the covered entity for a 340B drug.  That condition, as *Novartis* made clear, is thus valid so long as Appellants' 340B offer remains "bona fide."  *Id.* at 460, 462.  And here, as Appellants explained in their opening brief (at 16-17, 41-43, 47-49), the bona fide offer requirement is met:  Covered entities remain free to purchase the same amount of 340B drugs at the same 340B price as under the product-replenishment model currently in use and will receive cash payment directly for those drugs.

As in *Novartis*, HRSA provided no explanation or analysis that the rebate condition renders the 340B offer illusory or fails to provide the 340B price.  HRSA

did not do so for good reason, given that retrospective payments using rebates and refunds are a common mechanism of providing discounted drug pricing. *Cf. Novartis*, 102 F.4th at 462 ("[A]ssessing the bona fides of an offer perhaps can take into account the historical context of section 340B[.]"). In the general commercial context, manufacturers routinely provide discounted pricing via post-sale rebates.[1] Indeed, manufacturer rebate mechanisms are ubiquitous where there are eligibility requirements for a discount to apply, as with rebates to payors that have reimbursed pharmacies for products dispensed to their insured populations. 340B prices are also subject to patient eligibility requirements, *see* 42 U.S.C. § 256b(a)(5)(B), making retrospective provision of statutory discounts the appropriate mechanism by which to provide 340B prices.

In the 340B context as well, for almost 30 years, HRSA has permitted the use of the rebate model for AIDS Drug Assistance Programs ("ADAP") covered entities—*without requiring it to be pre-approved*. 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997) (stating that "Section 340B has no explicit language as to whether the required reduction in price should be obtained by an initial reduction in the purchase price (*i.e.*, a discount mechanism) or received as a required reduction in

---

[1] *See, e.g.*, House Comm. on Oversight & Accountability, *The Role of Pharmacy Benefit Managers in Prescription Drug Markets* at 51, https://oversight.house.gov/wp-content/uploads/2024/07/PBM-Report-FINAL-with-Redactions.pdf (noting that pharmacy benefit managers, for example, often require high rebates post-sales from drug manufacturers).

cost rebated after purchase, dispensing, and payment are completed (*i.e.*, a rebate option)"); 63 Fed. Reg. 35,239, 35,240 (June 29, 1998) (recognizing rebate model was "consistent with the section 340B rebate program").  That accords with the legislative history, which states 340B "*does not specify* whether 'covered entities' would receive these favorable prices through a point-of-purchase discount, *through a manufacturer rebate*, or through some other mechanism."  H.R. Rep. No. 102-384, pt. 2, at 16 (1992) (emphases added).

That the 340B statute specifies the use of rebates is no surprise:  Rebates and refunds, as well as claims data requirements, are used in numerous other federal drug programs.  For example, under the Coverage Gap Discount Program (Medicare Part D) and the program replacing it, the Manufacturer Discount Program (Medicare Part D), manufacturers pay retrospective rebates "within 38 calendar days of receipt of invoice" for qualifying prescriptions.  42 U.S.C. §§ 1395w-114a, 1395w-114c; 42 C.F.R. § 423.2315; Centers for Medicare & Medicaid Services, Revised Medicare Part D Manufacturer Discount Program Final Guidance (Dec. 20, 2024) ("Medicare Discount Final Guidance"), https://www.cms.gov/files/document/revised-manufacturer-discount-programfinal-guidance122024.pdf.

In particular, the Centers for Medicare & Medicaid Services ("CMS") has recognized the value of providing claims level data in the context of the Manufacturer Discount Program.  In response to manufacturer comments, CMS

stated that it "will provide additional detail on manufacturer invoices … including new data elements and certain data elements that are currently available only on audit under the Coverage Gap Discount Program."  Medicare Discount Final Guidance at 39.  This additional information would "increase transparency and help manufacturers better understand the basis and accuracy of the reported discounts." *Id.*  Upon receiving invoices with that claims data information, manufacturers then provide retrospective payments within 38 calendar days.  *Id.* at 40.

Other examples include the following:

- Medicare Part D voluntary manufacturer rebates.  42 U.S.C. § 1395w-102(d)(1)(B).

- Medicare Part B and Part D inflation rebates.  *Id.* §§ 1395w-3a(i)(1)(B), 1395w-114b(a)(2).

- Medicare Part B discarded drug refunds.  *Id.* § 1395w-3a(h)(2).

- Medicare Drug Negotiation Program.  *Id.* § 1320f-2(a)(3); CMS, Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Section 1191-1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the Maximum Fair Price in 2026 and 2027 (Oct. 2, 2024), ("MDPNP Final Guidance"), https://www.cms.gov/

files/document/medicare-drug-price-negotiation-final-guidance-ipay-

2027-and-manufacturer-effectuation-mfp-2026-2027.pdf.

- Medicaid Drug Rebate Program.  42 U.S.C. § 1396r-8.

The widespread use of rebate models confirms that HRSA could not take the position that imposing such a commonplace condition renders an offer non-bona fide.  And, like the rebate mechanisms in those other programs, the rebate model equally facilitates access to 340B pricing while allowing for transparency.  Medicare Discount Final Guidance at 39.  HRSA's attempt to escape those conclusions by exercising purported pre-approval authority is contrary to law.

## II.    HRSA'S SUBJECTION OF THE REBATE MODEL TO PRE-APPROVAL WAS ARBITRARY AND CAPRICIOUS

Even if the statute *allowed* HRSA to impose a pre-approval requirement, the statute certainly does not *mandate* it.  Accordingly, the decision to impose a pre-approval requirement for the rebate model, effectively denying its implementation, is subject to the requirements for reasoned decisionmaking.  Given the 340B statute itself provides that avoiding duplicate discounts and other statutory violations are central aims of the Program, HRSA was required to consider those objectives when deciding to exercise its purported pre-approval authority.  *See* 42 U.S.C. § 256b(a)(5)(A), (B); *Morrisey*, 760 F. Supp. 3d at 452 (noting 340B's "twin federal purposes—providing discounts to covered entities only *and* prohibiting fraud through duplicate discounts"); *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 343-

14

44 (D.C. Cir. 2019) ("statutory objectives and factors" setting bounds for an agency program are an important aspect of the regulatory problem).

But HRSA did not. In fact, HRSA wholly failed to address the benefits of the model in reducing or preventing 340B abuses or to explain why pre-approval was required here in the face of those issues. That renders its decision arbitrary and capricious. *See Am. Public Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1025 (D.C. Cir. 2022) ("An agency has not engaged in reasoned decision making if it entirely failed to consider an important aspect of the problem, or if it didn't engage the arguments raised before it." (citation modified)); *Ky. Mun. Energy Agency v. Fed. Energy Regul. Comm'n*, 45 F.4th 162, 177 (D.C. Cir. 2022) (vacating agency decision for failing to consider the effect on customer rates and holding agency's "'ostrich-like approach' will not do"); *see also Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).[2]

---

[2] To the extent HRSA offered a post-hoc rationalization in litigation (which cannot be considered), it focused solely on the purported impact to covered entities. That position runs counter to the statute and precedent. As this and other courts have made clear, 340B is not solely focused on providing 340B drugs to covered entities, but instead also incorporates key limitations. *See Novartis*, 102 F.4th at 462 (recognizing "no legislation [including 340B] pursues its purposes at all costs"); *Sanofi Aventis U.S., LLC v. HHS*, 58 F.4th 696, 704 (3d Cir. 2023) (noting that "drug makers need not help [covered entities] maximize their 340B profits"); *Novartis*, 2021 WL 5161783, at *7 (discussing restrictions on duplicate discounting, diversion, and the audit mechanism and holding 340B's "structure suggests that Congress did not intend Section 340B's purpose to be pursued at all costs"). And precedent makes clear that an agency cannot impose a pre-approval requirement on

## A. Statutory Restrictions Are Central To The Program's Balance

Congress's objectives of preventing duplicate discounting and fraud are clear from the statutory text.  Under 340B, participating manufacturers must "enter into an agreement" with the "Secretary" (the "Pharmaceutical Pricing Agreement").  42 U.S.C. § 256b(a)(1).  That agreement "shall require that the manufacturer offer each covered entity [certain enumerated healthcare providers] covered outpatient drugs for purchase" at a ceiling price set by a formula.  *Id.*; *Novartis*, 102 F.4th at 460-62.  The 340B ceiling price is "strikingly generous" and "can be as low as a penny per unit."  *Novartis*, 102 F.4th at 456.  At 340B's inception, Congress thought the Program would be small.  H.R. Rep. No. 102-384, pt. 2, at 13 (anticipating only 90 hospitals, and a range of clinics and health centers would participate).  In return for providing this circumscribed benefit to a limited number of entities, manufacturers are eligible for their drugs to receive reimbursement under Medicare Part B and the federal share of Medicaid.  42 U.S.C. § 1396r-8(a)(1), (5).

Congress embedded prohibitions within 340B's framework to limit the Program's scope.  Congress defined, with specificity, the types of healthcare

---

one set of regulated entities, while declining to do so on another, simply because it believes the favored set of regulated entities might suffer some detriment.  *See Vonage Holdings Corp. v. FCC*, 489 F.3d 1232, 1243-44 (D.C. Cir. 2007) (invalidating FCC's pre-approval requirement for VoIP traffic studies where agency did not require pre-approval of wireless traffic studies despite agency explanation that "a pre-approval requirement for wireless traffic studies would be disruptive to wireless contributors who … are already relying on the current regime").

providers eligible to participate. *See id.* § 256b(a)(4). Congress then barred covered entities from reselling or transferring 340B drugs to anyone other than their patients, a practice known as "diversion." *Id*. § 256b(a)(5)(B). It also prohibited covered entities from exploiting "duplicate discounts or rebates." *Id.* § 256b(a)(5)(A)(i). A "duplicate discount" occurs where a covered entity obtains and prescribes a 340B discounted drug, a claim for payment is submitted to Medicaid for the drug, and the state Medicaid agency then seeks a rebate from the manufacturer for the same, already-discounted drug. *See* U.S. Gov't Accountability Off. ("GAO"), GAO-20-212, 340B Drug Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement at 1 (2020) ("2020 GAO Medicaid Rep."), https://www.gao.gov/assets/gao-20-212.pdf. To prevent this, covered entities are statutorily directed to not allow duplicate discounting to occur, 42 U.S.C. § 256b(a)(5)(A)(i), and Congress directed HHS to "establish a mechanism" to defeat the possibility of duplicate discounts, *id.* § 256b(a)(5)(A)(ii).

In recent years, the Program has grown exponentially, due in large part to agency guidance ushering in outside pharmacies into the Program. Although HRSA issued guidance in 1996 allowing certain covered entities (those without their own in-house pharmacy) to identify one "contract pharmacy" to receive 340B drugs, its guidance set strict limits on the relationship's nature and the pharmacy's conduct. *See Novartis*, 102 F.4th at 456-57; 61 Fed. Reg. 43,549, 43,550, 43,555 (Aug. 23,

1996). Specifically, the pharmacy was to act as the covered entity's agent, and the limit of one pharmacy practically ensured that the pharmacy would act like an in-house pharmacy. *Novartis*, 102 F.4th at 457; 61 Fed. Reg. at 43,551-53. In 2010, HRSA "swerved," purporting to expand the "one contract pharmacy policy" to permit an unlimited number of contract pharmacies. *Novartis*, 102 F.4th at 457. As the GAO and the HHS Inspector General explained, this change opened the floodgates. *See* GAO, GAO-18-480, Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement at 20, 26-28 (2018) ("2018 GAO Rep."), https://www.gao.gov/assets/gao-18-480.pdf; HHS Inspector General, Memorandum Report: Contract Pharmacy Arrangements in the 340B Program at 9-10, 16 (Feb. 2014), https://oig.hhs.gov/oei/reports/oei-05-13-00431.pdf.

Predictably, contract pharmacy usage exploded. Sophisticated for-profit pharmacies, including the Nation's largest pharmacy chains, recognized that if they could insert themselves into the 340B Program supply chain, they could sell 340B drugs at or near full price and pocket a portion of the difference as profit. *See* 2018 GAO Rep. at 26-28.[3] In the intervening years, covered entities and contract

---

[3] CVS and Walgreens, two of the largest for-profit pharmacy retailers, have publicly disclosed that 340B profits are material to their finances. SEC Form 10-K at 23 (2024), https://tinyurl.com/4pbtt9x8; Walgreens, SEC Form 10-K at 30 (2024), https://tinyurl.com/zp9vv465.

pharmacies have maximized their arbitrage profits, while often failing to deliver on the patient benefits Congress intended.[4]  All of these incentives have heightened the risk of duplicate discounting and other statutory violations, contrary to statutory aims.  HRSA was accordingly required to acknowledge these issues and consider the benefits of the rebate model in addressing them when exercising purported pre-approval authority.

### B. Duplicate Discounting Remains An Unaddressed Issue And Will Likely Only Increase With The Inflation Reduction Act

Despite the deleterious effects of duplicate discounting, HRSA has failed to ensure that it does not occur, leaving manufacturers in a bind.  Duplicate discounting has long been a recurring issue, but it sharply increased in 2010 with the new requirement that manufacturers pay Medicaid rebates on drugs dispensed through Medicaid managed care organizations, which  provide pharmacy benefits to 50% of

---

[4]  Commercial entities such as for-profit pharmacies and third-party administrators are now reaping sizeable profits from 340B without any concurrent benefit to patients.  A recent study conducted by the Minnesota Department of Health found that $1 out of $6 dollars of Minnesota covered entity revenue from 340B went to contract pharmacies and third-party administrators.  *340B Covered Entity Report* at 4, 7-8 (Nov. 25, 2024), https://www.health.state.mn.us/data/340b/docs/2024report.pdf.

Even where funds make it to covered entities, many fail to use that revenue for charity care.  White House Council of Economic Advisers, *Reforming Biopharmaceutical Pricing at Home and Abroad* at 15 (Feb. 2018), https://trumpwhitehouse.archives.gov/wp-content/uploads/2017/11/CEA-Rx-White-Paper-Final2.pdf ("An unintended consequence of the 340B program has been that covered entities receive guaranteed profits while low-income patients who are the purported target of the program may receive little to no benefit.").

Medicaid beneficiaries.[5]  A 2021 study estimated that about *one-quarter* of 340B drugs are potentially subject to illegal duplicate discounts.  Luke Greenwalt, *Uncover the Invisible Impacts of 340B Discounts*, IQVIA (Dec. 20, 2021), https://tinyurl.com/yyxusxum.

Notwithstanding those issues, HRSA has failed to adequately curtail duplicate discounting.  *See generally* 2020 GAO Medicaid Rep.  On the Medicaid side, CMS "conducts limited oversight of state Medicaid programs' efforts to prevent duplicate discounts[]" and "does not have the information needed to effectively ensure that states exclude 340B drugs from Medicaid rebate requests."  *Id.* at GAO Highlights. As for 340B, HRSA "audits are unable to determine whether covered entities are following state [duplicate discount] requirements, and taking the necessary steps to comply" with the duplicate discount prohibition.  *Id.*

As the web of players in 340B has grown, so too has the risk of duplicate discounting.  With profits on the line, covered entities and contract pharmacies have clear incentive to "catalog as many prescriptions as possible."  *Novartis*, 102 F.4th at 457-58.  And, even where there is no intention to game the system, covered entities may inadvertently seek invalid or duplicate discounts given the difficulty of policing compliance when drugs are not dispensed by the covered entity and records are kept,

---

[5] *See* Kathy Gifford, *State Approaches to Managing the Medicaid Pharmacy Benefit* (Aug. 20, 2024), https://www.healthmanagement.com/wp-content/uploads/2024-Medicaid-Rx-Survey-Rpt_FINAL.pdf.

in part, by third parties. 2018 GAO Rep. at 44-45 ("The expansion of contract pharmacies … increases potential risks to the 340B Program, such as risks related to diversion and duplicate discounts."). Indeed, GAO has noted the difficulty of auditing and obtaining reliable data for covered entities with "complex" networks. *Id.* at 45.

Even where violations are discovered, they typically do not result in sanctions that meaningfully deter and penalize covered entities. A common finding in the limited number of audits HRSA undertakes is that covered entities have not met the requirements to prevent duplicate discounting in the fee-for-service Medicaid context. Where such a violation is found, typically the covered entity is only required to make a repayment to manufacturers without monetary penalty. *See* HRSA, Program Integrity: FY23 Audit Results, https://www.hrsa.gov/opa/program-integrity/fy-23-audit-results; HRSA, Program Integrity: FY24 Audit Results, https://www.hrsa.gov/opa/program-integrity/fy-24-audit-results. And in many instances, manufacturers report that HRSA does not enforce repayment, even when there is no dispute that the covered entity owes it. *See* 2020 GAO Medicaid Rep. at 26. Given 340B pricing alone can be as low as "as a penny per unit," *Novartis*, 102 F.4th at 456, these unrecoverable losses can be staggering. And, all the while, manufacturers continue to receive demands for duplicate discounts.

Nor has HRSA issued the duplicate discounting guidance that Congress explicitly required. In 2010, when Congress extended manufacturer Medicaid rebate liability to Medicaid managed care organizations utilization, it sought to curtail duplicate discounting by requiring HRSA to issue guidance on preventing such discounts. *See* Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, 308, 821 (2010); 42 U.S.C. § 256b(d)(2)(B)(iii), (d)(2)(B) (requiring HRSA to "develop[] … more detailed guidance describing methodologies and options available to covered entities for billing covered outpatient drugs to State Medicaid agencies in a manner that avoids duplicate discounts"). HRSA, however, has not.

In every year since 2018, GAO has urged HRSA to remedy its failure to provide guidance on avoiding duplicate discounting, particularly in the managed care context.[6] In 2019, GAO warned that "[w]ithout addressing [these

---

[6] GAO, GAO-19-364SP, HHS Priority Recommendations (2019) ("2019 GAO Priority Recommendations"), https://www.gao.gov/assets/gao-19-364sp.pdf; GAO, GAO-20-552PR, HHS Priority Recommendations (2020), https://www.gao.gov/assets/gao-20-552pr.pdf; GAO, GAO-21-527PR, HHS Priority Recommendations (2021), https://www.gao.gov/assets/gao-21-527pr.pdf; GAO, GAO-22-105646, HHS Priority Recommendations (2022), https://www.gao.gov/assets/gao-22-105646.pdf; GAO, GAO-23-106467, HHS Priority Recommendations (2023), https://www.gao.gov/assets/gao-23-106467.pdf; GAO, GAO-24-107257, HHS Priority Recommendations (2024), https://www.gao.gov/assets/gao-24-107257.pdf; GAO, GAO-25-108032, HHS Priority Recommendations (2025) ("2025 GAO Priority Recommendations"), https://www.gao.gov/assets/gao-25-108032.pdf.

recommendations …, HHS does not have assurance that covered entities are complying with program requirements, which puts manufacturers at risk of being required to erroneously provide duplicate discounts for Medicaid prescriptions." 2019 GAO Priority Recommendations at 6-7.  GAO's 2025 recommendations echo this:  "Until [GAO's] recommendations are fully implemented, HRSA will not have assurance that covered entities are effectively preventing noncompliance" and "manufacturers will continue to be at risk of being required to erroneously provide duplicate discounts for Medicaid prescriptions."    2025 GAO Priority Recommendations at 15-16.

Ensuring the prevention of duplicate discounts has become increasingly urgent following the recent passage of the Inflation Reduction Act.  That law establishes the Medicare Drug Price Negotiation Program, under which HHS "negotiate[s]" with manufacturers "maximum fair price[s]" for selected drugs.  42 U.S.C. § 1320f-3(a).  Manufacturers must provide access to selected drugs at the so-called "maximum fair prices," established by HHS, except that they need not provide access to the "maximum fair prices" when such selected drugs are 340B-eligible and the 340B price is lower than the "maximum fair price."  That is, manufacturers must only provide a "nonduplicated" amount if the maximum fair price is lower than the 340B ceiling price for the selected drug.  *Id*. § 1320f-2(d).  To avoid duplicate

discounting, this scheme necessarily requires identifying when a drug subject to the "maximum fair price" is dispensed as a 340B drug.

CMS has issued final Inflation Reduction Act guidance that discusses duplicate discounting but failed to create a mechanism to address it. Under the guidance, a *manufacturer* bears the burden of determining and verifying whether a "claim for the selected drug is a 340B-eligible claim." MDPNP Final Guidance at 60. But CMS refused to *require* that dispensing entities use claim codes or provide prescriber identification information that would facilitate identification of 340B drugs. *Id.* at 57-58.

As a result, manufacturers with drugs subject to "maximum fair prices" under the Inflation Reduction Act and 340B discounts face an impossible task. Absent the rebate model, manufacturers have no clear way to identify units subject to the 340B discount when forced to provide the "maximum fair price" rebate, because that information is held by covered entities—not manufacturers. And without that information, manufacturers have no way to avoid providing duplicative Inflation Reduction Act and 340B discounts for a given unit. HHS, through CMS, had notice of these concerns, "acknowledge[d]" them, and then stated it "will not, at this time, assume responsibility for deduplicating discounts between the 340B ceiling price and [the 'maximum fair price']." *Id.* at 55. Now, through HRSA, HHS is

24

simultaneously forbidding manufacturers from taking action that would allow them to receive the non-duplication protection Congress explicitly afforded.

Despite the quickly approaching September 1, 2025 deadline for Appellants BMS and Novartis to submit a written "plan for making the" "maximum fair price" available, HRSA has continued to fail to act to address longstanding duplicate discounting issues. And, when presented with Appellants' proposed answer to the issue, in the form of the rebate model, HRSA refused to permit its implementation without ever evaluating the model's benefits. That was arbitrary and capricious.

### C. HRSA Also Failed To Consider The Benefits Of The Model As To Other Statutory Violations

Similar is true of HRSA's failure to consider the benefits of the model for detecting statutory violations—violations HRSA has largely left unremedied. Only a limited number of covered entities are audited each year by HRSA. For example, as of June 2025, there were 175 completed covered entity audits for the 2023 fiscal year and 163 completed for the 2024 fiscal year. *See* HRSA, Program Integrity: FY23 Audit Results; HRSA, Program Integrity: FY24 Audit Results. To put that in context, there are over 50,000 covered entity sites. Karen Mulligan, *The 340B Drug Pricing Program: Background, Ongoing Challenges and Recent Developments* (Oct. 14, 2021), https://healthpolicy.usc.edu/research/the-340b-drug-pricing-program-background-ongoing-challenges-and-recent-developments.

And HRSA concedes it does not directly police the contractual relationships between covered entities and contract pharmacies to ensure that statutory violations do not occur. *See Examining HRSA's Oversight of the 340B Drug Pricing Program, Hearing Before the H. Subcomm. on Oversight & Investigations of the Comm. on Energy & Commerce*, 115 Cong. at 79 (July 18, 2017) ("2017 H. Subcomm. Hr'g") (testimony of Krista M. Pedley, then Director of HRSA's Office of Pharmacy Affairs, that contract pharmacy arrangements are "a business matter between the parties and their contract"); Pedley Declaration ¶ 3, *Sanofi-Aventis U.S., LLC v. HHS*, No. 21-cv-634 (D.N.J. June 24, 2021), ECF No. 93-2.

Notwithstanding that it exercises very limited oversight, HRSA has identified hundreds of instances of statutory violations. *See* 2018 GAO Rep. at 37, 44; *see also* GAO, GAO-11-836, Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, But Federal Oversight Needs Improvement at 28 (Sept. 2011), https://www.gao.gov/assets/gao-11-836.pdf. Congress has recognized that the number of audits finding violations is "staggering"—with over 80 percent of audited covered entities showing non-compliance in certain audit years. *See* 2017 H. Subcomm. Hr'g at 69.

Even where HRSA discovers violations, it does "not require all covered entities to provide evidence that they have taken corrective action and are in compliance with program requirements prior to closing an audit." *Opportunities to*

*Improve the 340B Drug Pricing Program*, *Hearing Before the H. Subcomm. on Health*, 115th Cong. at 54 (July 11, 2018).  In the very limited cases where HRSA conducted re-audits of covered entities that had compliance issues, it found repeated instances of similar noncompliance.  *See id.* at 55; 2018 GAO Rep. at GAO Highlights.  HRSA also almost never terminates a covered entity's ability to participate in 340B for non-compliance.  *See* 2017 H. Subcomm. Hr'g at 63 (indicating HRSA had "terminated one covered entity" as of 2017).

Nor are the *ex post* remedies of audits and administrative dispute resolution ("ADR") sufficient, given they are exceedingly difficult for manufacturers to invoke under HRSA's current regime.  While manufacturer audits of covered entities could help manufacturers detect 340B violations, HRSA has established significant barriers to manufacturers' ability to audit.  Guidelines issued in 1996 require manufacturers to use a third-party auditor and limit the types and frequency of audits conducted.  And HRSA permits manufacturers to conduct an audit only where they "ha[ve] documentation which indicates there is reasonable cause" to believe a covered entity violated 340B's prohibitions.  61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996); *see Novartis*, 2021 WL 5161783, at *7.  "Reasonable cause" is defined to mean "that a reasonable person could believe that a covered entity may have violated" the prohibition on duplicate discounting or transfer or sale.  61 Fed. Reg. at 65,409-10 (requiring "clear description of why [manufacturer] has reasonable

cause … , along with sufficient facts and evidence in support of the belief").  Because manufacturers do not have access to data regarding prescriptions, they are routinely unable to gather documentation to establish reasonable cause.  As a result, there have been limited manufacturer audits of covered entities.  *See* 89 Fed. Reg. 28,643, 28,646 (Apr. 19, 2024) ("In the last 5 years, six [manufacturers] have followed the guidelines to request audits of covered entities").

In the rare cases where manufacturers have been able to obtain the right to audit, covered entities have fiercely resisted.  *See Or. Health & Sci. Univ. v. Engels*, No. 24-cv-2184, 2025 WL 1707630, at *3-4 (D.D.C. June 17, 2025) (recent suits by five covered entities where manufacturer had obtained right to audit).[7]  As HRSA put it:  "Rather than attempt to reach a compromise with [the manufacturer], or simply produce records to [the manufacturer] demonstrating that [the manufacturer's] suspicion about diversion and duplication is unfounded, [the covered entity plaintiff] filed a lawsuit to stop the audit[.]"  Fed. Gov't Reply at 6-7, *Univ. of Rochester*, No. 1:24-cv-02268 (D.D.C. Jan. 21, 2025), ECF No. 25.

These limitations on audits by manufacturers, imposed by HRSA and through covered entities' conduct in the rare cases where manufacturers are granted permission to audit, also materially limit manufacturers' ability to access the ADR process provided by Congress.  Prior to bringing an ADR claim, manufacturers are

---

[7] These cases were recently dismissed for lack of final agency action.  *Id.* at *4.

required to first audit a covered entity.  *See* 42 U.S.C. § 256b(a)(5)(C), (d)(3).  Given the burdensome 1996 Audit Guidelines, including HRSA's high bar for securing an audit, manufacturers are effectively foreclosed from the ADR process.

Against that backdrop and with HRSA idle, manufacturers were left without recourse.  The rebate model adopted by Appellants will alleviate some of these challenges by providing manufacturers with claims data to keep statutory violations from recurring.  HRSA's exercise of purported pre-approval authority addressed none of that, however, instead choosing to ignore the longstanding issues of fraud and abuse in the Program.  The agency's failure to consider the issue of statutory violations—much less evaluate the benefits of the model as to those issues—was arbitrary and capricious.

## CONCLUSION

*Amici* respectfully urge the Court to reverse.

June 25, 2025                     Respectfully submitted,

                                 */s/ Philip J. Perry*
                                 Philip J. Perry
                                 Andrew D. Prins
                                 Abid. R. Qureshi
                                 LATHAM & WATKINS LLP
                                 555 Eleventh Street, NW
                                 Suite 1000
                                 Washington, DC  20004
                                 (202) 637-2200
                                 philip.perry@lw.com

                                 *Counsel for* Amici Curiae
                                 *Pharmaceutical Research and*
                                 *Manufacturers of America and*
                                 *Biotechnology Innovation*
                                 *Organization*

## CERTIFICATE OF COMPLIANCE WITH RULE 32

1.     This document complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because this document contains 6,262 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e)(1).

2.     This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman Font.

*/s/ Philip J. Perry*
Philip J. Perry

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2025, I caused the foregoing brief to be filed electronically with the Clerk of Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

*/s/ Philip J. Perry*
Philip J. Perry