**[ORAL ARGUMENT NOT SCHEDULED]**
**Nos. 25-5177, -5179, -5220, -5221, -5236**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

**No. 25-5177**

NOVARTIS PHARMACEUTICALS CORPORATION,
*Plaintiff-Appellant*,

v.

ROBERT F. KENNEDY, JR., *et al.*,
*Defendants-Appellees*,

and

340B HEALTH, *et al.*,
*Intervenors-Appellees.*

(caption continued on inside cover)

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR FEDERAL APPELLEES**

———————————

*Of Counsel:*

SEAN R. KEVENEY
*Acting General Counsel*

MICHAEL H. IMBACUAN
WILLIAM BURGESS
SHERINE HARGROVE
*Attorneys*

*U.S. Department of Health and
Human Services*

ERIC J. HAMILTON
*Deputy Assistant
Attorney General*

MICHAEL S. RAAB
LINDSEY POWELL
MAXWELL A. BALDI
*Attorneys, Appellate Staff
Civil Division, Room 7513
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 532-0211*

**No. 25-5179**

BRISTOL MYERS SQUIBB COMPANY,

*Plaintiff-Appellant*,

v.

ROBERT F. KENNEDY, JR., *et al.*,

*Defendants-Appellees*,

and

340B HEALTH, *et al.*,

*Intervenors-Appellees*.

**No. 25-5220**

KALDEROS, INC.,

*Plaintiff-Appellant*,

v.

UNITED STATES OF AMERICA, *et al.*,

*Defendants-Appellees*.

**No. 25-5221**

ELI LILLY AND COMPANY, *et al.*,

*Plaintiffs-Appellants*,

v.

ROBERT F. KENNEDY, JR., *et al.*,

*Defendants-Appellees*,

and

340B HEALTH, *et al.*,

*Intervenors-Appellees*.

**No. 25-5236**

JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC.,

*Plaintiff-Appellant*,

v.

ROBERT F. KENNEDY, JR., *et al.*,

*Defendants-Appellees*.

and

340B HEALTH, *et al.*,

*Intervenors-Appellees*.

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

**A.     Parties and Amici**

Plaintiff-appellant in No. 25-5177 is Novartis Pharmaceuticals Corporation.  Plaintiff-appellant in No. 25-5179 is Bristol Myers Squibb Company.  Plaintiff-appellant in No. 25-5220 is Kalderos, Inc.  Plaintiffs-appellants in No. 25-5221 are Eli Lily and Company and Lilly USA, LLC.  Plaintiff-appellant in No. 25-5236 is Johnson & Johnson Health Care Systems Inc.

Defendants-appellees in all five appeals are Robert F. Kennedy, Jr., in his official capacity as Secretary, United States Department of Health and Human Services, and Thomas J. Engels, in his official capacity as Administrator, Health Resources and Services Administration.  Additionally, the United States Department of Health and Human Services and the Health Resources and Services Administration are defendants-appellees in Nos. 25-5220, 25-5221, and 25-5236, and the United States is defendant-appellee in No. 25-5220.

Intervenors-appellees in Nos. 25-5177, 25-5179, 25-5221 and 25-5236 are 340B Health, the University of Massachusetts Memorial Medical Center, and Genesis Healthcare System.

The following amici appeared in the district court: ADAP Advocacy; America's Essential Hospitals; American Hospital Association; Arizona Hospital and Healthcare Association; Arkansas Hospital Association; Association of American Medical Colleges; Biotechnology Innovation Organization; California Hospital Association; CF United; Colorado Hospital Association; Community Oncology Alliance, Inc.; Connecticut Hospital Association; Delaware Healthcare Association; Florida Hospital Association; Georgia Hospital Association; Greater New York Hospital Association; Healthcare Association of Hawaii; Healthcare Association of New York State; Hospital and Healthsystem Association of Pennsylvania; Hospital Association of Oregon; Idaho Hospital Association; Illinois Health and Hospital Association; Indiana Hospital Association; Iowa Hospital Association; Kentucky Hospital Association; Louisiana Hospital Association; Massachusetts Health & Hospital Association; Michigan Health & Hospital Association; Mississippi Hospital Association; Missouri Hospital Association; National Alliance for Healthcare Purchaser Coalitions; National Association

of Children's Hospitals, Inc. d/b/a Children's Hospital Association;

New Jersey Hospital Association; New Mexico Hospital Association;

North Carolina Healthcare Association; North Dakota Hospital Association;

Ohio Hospital Association; Oklahoma Hospital Association; Pharmaceutical

Research and Manufacturers of America; Tennessee Hospital Association;

Texas Hospital Association; Vermont Association of Hospitals and Health

Systems; Virginia Hospital & Healthcare Association; Washington Legal

Foundation; Washington State Hospital Association; West Virginia Hospital

Association; Wisconsin Hospital Association; and Wyoming Hospital

Association.

    To date, the following amici have appeared in this Court:  ADAP

Advocacy Association, Inc.; Advocates for Compassionate Therapy Now

(ACT Now); Biotechnology Innovation Organization; CF United; Community

Oncology Alliance, Inc.; Johnson & Johnson Health Care Systems Inc.; and

Pharmaceutical Research and Manufacturers of America.

### B.    Rulings Under Review

    In Nos. 25-5177, 25-5179, 25-5220, and 25-5221, plaintiffs appeal from

the memorandum opinion (JA371-404) and judgment (JA368-70) issued by

the district court (Friedrich, J.) on May 15, 2025. The memorandum opinion is not published but is available at 2025 WL 1423630.

In No. 25-5236, plaintiff appeals from the memorandum opinion (JA1135-64) and judgment (JA1134) issued by the district court (Contreras, J.) on June 27, 2025. The memorandum opinion is not published but is available at 2025 WL 1783901.

### C.     Related Cases

This case has not previously been before this Court or any court other than the district court.

This case is related to *Sanofi-Aventis U.S. LLC v. HHS*, No. 24-cv-3496-DLF (D.D.C.). Counsel for defendants-appellees are unaware of any other related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

> */s/ Maxwell A. Baldi*
> Maxwell A. Baldi

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................... vii

GLOSSARY ............................................................................... xiii

INTRODUCTION ........................................................................... 1

STATEMENT OF JURISDICTION ................................................... 3

STATEMENT OF THE ISSUES ...................................................... 4

PERTINENT STATUTES AND REGULATIONS ............................. 4

STATEMENT OF THE CASE ......................................................... 4

    A.    Statutory Background .................................................... 4

    B.    Factual Background ...................................................... 10

    C.    Prior Proceedings ....................................................... 18

SUMMARY OF ARGUMENT ........................................................ 22

STANDARD OF REVIEW ............................................................. 23

ARGUMENT ................................................................................. 23

I.    340B manufacturers may not implement rebate models without the Secretary's approval. ........................................................ 23

    A.    The Secretary must provide for rebates before a manufacturer may take them into account in complying with the requirement to offer drugs at the 340B ceiling price. ........................................................................ 24

    B.    The Secretary's letters adequately explain that manufacturers need his approval before implementing rebates. ................................................ 31

C.    The Secretary may permit manufacturers to offer the 340B ceiling price through either an upfront discount or a back-end rebate. .......................................................................................38

II.    The Secretary is still considering whether to permit plaintiffs to implement their proposed rebate models.................................................41

CONCLUSION.......................................................................................50

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                              **Page(s)**

*Abbott Lab'ys v. Gardner,*
    387 U.S. 136 (1967) ............................................................42

*Amerijet Int'l, Inc. v. Pistole,*
    753 F.3d 1343 (D.C. Cir. 2014) ......................................... 41

*Astra USA, Inc. v. Santa Clara County,*
    563 U.S. 110 (2011) ........................................ 4, 5, 6, 8, 20, 25-26, 26, 28, 30, 45

*Barrick Goldstrike Mines Inc. v. Browner,*
    215 F.3d 45 (D.C. Cir. 2000) .............................................. 50

*Bauer v. Federal Deposit Ins. Corp.,*
    38 F.4th 1114 (D.C. Cir. 2022) ......................................... 23

*Becerra v. Empire Health Found.,*
    597 U.S. 424 (2022) .............................................. 29-30, 30

*Belbacha v. Bush,*
    520 F.3d 452 (D.C. Cir. 2008) ........................................... 50

*Bennett v. Spear,*
    520 U.S. 154 (1997) .............................................. 42, 49

*Carpenters Indus. Council v. Zinke,*
    854 F.3d 1 (D.C. Cir. 2017) .............................................. 19

*Ciba-Geigy Corp. v. EPA,*
    801 F.2d 430 (D.C. Cir. 1986) ........................................... 49

*City & County of San Francisco v. EPA,*
    145 S. Ct. 704 (2025) ...................................................... 28

*Department of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz,*
    601 U.S. 42 (2024) ..................................................... 38-39

*DHS v. Regents of the Univ. of Cal.,*
    591 U.S. 1 (2020) ......................................................... 32

*Environmental Def. Fund, Inc. v. Hardin*,
    428 F.2d 1093 (D.C. Cir. 1970) .......................................................... 49

*Feliciano v. Department of Transp.*,
    145 S. Ct. 1284 (2025) ...................................................................... 29

*Friedman v. FAA*,
    841 F.3d 537 (D.C. Cir. 2016) ............................................................ 49

*John Doe, Inc. v. DEA*,
    484 F.3d 561 (D.C. Cir. 2007) ............................................................ 42

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ........................................................................... 31

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020) ..................................................................... 38, 40

*Milhouse v. Levi*,
    548 F.2d 357 (D.C. Cir. 1976) ............................................................ 39

*National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
    417 F.3d 1272 (D.C. Cir. 2005) .......................................................... 21

*National Chicken Council v. EPA*,
    687 F.3d 393 (D.C. Cir. 2012) ............................................................ 44

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024) .......................................................... 40

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
    896 F.3d 520 (D.C. Cir. 2018) ............................................................ 46

*Ohio Forestry Ass'n v. Sierra Club*,
    523 U.S. 726 (1998) ........................................................................... 41

*Pfizer Inc. v. Shalala*,
    182 F.3d 975 (D.C. Cir. 1999) ............................................................ 43

*Public Citizen Health Rsch. Grp. v. FDA*
    740 F.2d 21 (D.C. Cir. 1984) .............................................................. 42

*Rotkiske v. Klemm*,
    589 U.S. 8 (2019) ............................................................................... 27

viii

*Russello v. United States,*
    464 U.S. 16 (1983) ........................................................................ 27

*Sackett v. EPA,*
    566 U.S. 120 (2012) ...................................................................... 50

*Sanchez v. Office of the State Superintendent of Educ.,*
    959 F.3d 1121 (D.C. Cir. 2020) ..................................................... 42

*Sanofi Aventis U.S. LLC v. HHS,*
    58 F.4th 696 (3d Cir. 2023) .......................................................... 40

*SAS Inst., Inc. v. Iancu,*
    584 U.S. 357 (2018) ...................................................................... 27

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) ........................................................................46

*Telecommunications Rsch. & Action Ctr. v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ......................................................... 48

*Texas v. United States,*
    523 U.S. 296 (1998) ...................................................................... 43

**Statutes:**

Inflation Reduction Act of 2022,
    Pub. L. No. 117-169, 136 Stat. 1818 .............................................8
    42 U.S.C. § 1320f (a) ..................................................................... 8
    42 U.S.C. § 1320f-1(b) ................................................................... 8
    42 U.S.C. § 1320f-1 (d) ................................................................. 8
    42 U.S.C. § 1320f-1(e) ................................................................... 8
    42 U.S.C. § 1320f-2(a) ................................................................... 9
    42 U.S.C. § 1320f-2(d) ................................................................... 9

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148, tit. VII, subtitle B,
    124 Stat. 119 (2010) ...................................................................5, 39

Public Health Service Act:
    42 U.S.C. § 256b ....................................................................... 1, 28
    42 U.S.C. § 256b(a) ....................................................................... 6

42 U.S.C. § 256b(a)(1) ............................ 3, 5, 16, 22, 24, 26, 27, 29, 31, 39, 40

42 U.S.C. § 256b(a)(1)-(2) ............................................................................ 7

42 U.S.C. § 256b(a)(3) .................................................................................. 5

42 U.S.C. § 256b(a)(4) ............................................................................... 5, 6

42 U.S.C. § 256b(a)(4)(L) ............................................................................ 13

42 U.S.C. § 256b(a)(4)(L)(iii) ...................................................................... 37

42 U.S.C. § 256b(a)(5) ............................................................................. 7, 28

42 U.S.C. § 256b(a)(5)(A) ............................................................................. 7

42 U.S.C. § 256b(a)(5)(B) ............................................................................. 7

42 U.S.C. § 256b(a)(5)(C) ............................................................................. 7

42 U.S.C. § 256b(a)(8) ................................................................................. 28

42 U.S.C. § 256b(d)(1)(B)(vi) ................................................................... 8, 45

42 U.S.C. § 256b(d)(2)(B)(v) ........................................................................ 8

42 U.S.C. § 256b(d)(3) .................................................................................. 8

Veterans Health Care Act of 1992,
    Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967
    (codified at 42 U.S.C. § 256b) ................................................................. 5

5 U.S.C. § 706 ........................................................................................... 23

7 U.S.C. § 1309(a) ..................................................................................... 24

26 U.S.C. § 5000B(c)(2) ............................................................................ 24

28 U.S.C. § 1291 .......................................................................................... 3

28 U.S.C. § 1331 .......................................................................................... 3

28 U.S.C. § 1346 .......................................................................................... 3

28 U.S.C. § 1361 .......................................................................................... 3

28 U.S.C. §§ 2201-2202 .............................................................................. 3

42 U.S.C. § 1396r-8 ..................................................................................... 4

42 U.S.C. § 1396r-8(b)(4)(B)(i) .................................................................... 8

42 U.S.C. § 1396r-8(b)(4)(B)(v) ................................................................... 8

42 U.S.C. § 1396r-8(c) ............................................................... 4

U.C.C. § 7-207 ...................................................................36

## Regulations:

42 C.F.R. § 10.10 ...................................................................... 7

42 C.F.R. §§ 10.20-10.24 ........................................................ 8

42 C.F.R. § 412.106 ................................................................ 13

42 C.F.R. pt. 447 ..................................................................... 4

## Legislative Material:

H.R. Rep. No. 102-384, pt. 2 (1992)..............................................5, 6, 25

## Rule:

Fed. R. App. P. 4(a)(1)(B) ....................................................... 3

## Other Authorities:

CMS, *Medicare Drug Price Negotiation Program:*
   *Final Guidance, Implementation of Sections 1191 –*
   *1198 of the Social Security Act for Initial Price*
   *Applicability Year 2027 and Manufacturer Effectuation*
   *of the Maximum Fair Price in 2026 and 2027*
   (Oct. 2, 2024), https://perma.cc/CST8-3AU6 ............................... 9-10

CMS, *Medicare Drug Price Negotiation Program: Negotiated Prices for*
   *Initial Price Applicability Year 2026* (Aug. 15, 2024),
   https://perma.cc/6MVG-BZP8 ........................................................42

CMS, *Medicare Drug Price Negotiation Program: Revised Guidance,*
   *Implementation of Sections 1191 – 1198 of the Social*
   *Security Act for Initial Price Applicability Year 2026*
   (June 30, 2023), https://perma.cc/K6QB-C3MM ...........................9

58 Fed. Reg. 27,289 (May 7, 1993) .................................................. 10

59 Fed. Reg. 25,110 (May 13, 1994) ........................................ 10, 34, 35

61 Fed. Reg. 43,549 (Aug. 23, 1996) ......................................... 6, 35

61 Fed. Reg. 55,156 (Oct. 24, 1996) ..................................... 33

62 Fed. Reg. 45,823 (Aug. 29, 1997) .......................... 10, 11, 12, 33

75 Fed. Reg. 10,272 (Mar. 5, 2010) ............................... 11, 32

90 Fed. Reg. 36,163 (Aug. 1, 2025) ............................. 17, 18, 42, 43, 49

HRSA, *HRSA Announces Application Process for
   the 340B Rebate Model Pilot Program and Request
   for Public Comment* (July 31, 2025),
   https://perma.cc/8DXQ-2BA5 .......................................... 17

HRSA, Release No. 2013-1, 340B Drug Pricing Program
   Notice (Feb. 7, 2013), https://perma.cc/2VVN-NGLP ................................. 37

Memorandum from June Gibbs Brown, Inspector Gen.,
   HHS, to Claude E. Fox, Acting Adm'r, HRSA
   (Jan. 2, 1998), https://perma.cc/T5JE-F44Q ............................... 32-33, 33, 34

*Provide*:
   The American Heritage Dictionary of the English
       Language  (3d ed. 1992) ............................................ 24
   XII The Oxford English Dictionary (2d ed. 1989) .................................. 24-25

Antonin Scalia & Bryan A. Garner, *Reading Law: The
   Interpretation of Legal Texts* (2012) ............................. 29

xii

## GLOSSARY

| | |
|---|---|
| CMS | Centers for Medicare and Medicaid Services |
| HHS | Health and Human Services |
| HRSA | Health Resources and Services Administration |
| JA | Joint Appendix |
| ADAP | AIDS Drug Assistance Program |

## INTRODUCTION

Section 340B of the Public Health Service Act, 42 U.S.C. § 256b, requires pharmaceutical manufacturers participating in Medicare Part B and Medicaid to sell drugs at reduced prices to certain safety-net healthcare providers known as "covered entities." The statute provides that "the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary [of Health and Human Services (HHS)]) to the manufacturer for covered outpatient drugs" may not exceed a ceiling price set by a statutory formula. Participating manufacturers sign a pricing agreement with the Secretary memorializing their obligation to offer covered entities drugs for purchase at or below the ceiling price.

During the 340B Program's early stages, covered entities maintained separate physical inventories of drugs—some purchased at the ceiling price and some purchased at higher commercial prices—for dispensing to covered and non-covered patients, respectively. Over time, providers shifted to a single physical inventory and used virtual inventory-management procedures to obtain 340B drugs at the ceiling price. Under this longstanding product-replenishment model, covered entities purchase, either directly or through their contract pharmacies, an initial package of drugs at the commercial

price.  After tracking sales and confirming that a certain quantity of a drug has been sold to eligible patients of the covered entity, the provider then purchases replacement quantities at the 340B price.  Under this approach, providers obtain an upfront discount for purchases allowing them to get the immediate benefit that the 340B Program is meant to provide.

Dissatisfied with this longstanding practice, plaintiffs asked the Secretary to approve their use of rebate models under which covered entities would purchase all drugs at the commercial price and then receive a rebate from plaintiffs sometime later after plaintiffs verify the eligible dispenses made by covered entities.  Unlike discounts, rebates require covered entities to spend more money upfront and put greater financial pressure on those safety-net programs.  The Secretary sent letters to plaintiffs explaining that he must approve rebate models before plaintiffs may implement them and requesting additional information to facilitate his determination whether to approve the proposals.  No such model has yet been approved or rejected by the Secretary. But the Secretary recently announced a pilot program to allow manufacturers to test rebate models for certain drugs starting next year.

Plaintiffs now contend that Section 340B provides no basis for requiring the Secretary's approval, urging instead that manufacturers should be able unilaterally to effect significant changes to how the 340B Program is run.  Plaintiffs also urge that the Secretary erred in rejecting their proposals without sufficient explanation.  The district court correctly rejected both arguments because the statute expressly contemplates Secretarial approval of discounts or rebates used to attain compliance with Program requirements, 42 U.S.C. § 256b(a)(1), and the Secretary's review of plaintiffs' proposals is not yet complete.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the jurisdiction of the district court under 28 U.S.C. §§ 1331, 1346, 1361, and 2201-2202.  JA95, 133-34, 168, 209-10, 1089.  The district court entered final judgments on May 15, 2025 (Friedrich, J.) and June 27, 2025 (Contreras, J.).  JA368-70, 1134.  Plaintiffs timely filed notices of appeal on May 20, 2025 (Novartis and Bristol Myers Squibb), June 12, 2025 (Eli Lilly and Kalderos), and June 27, 2025 (Johnson & Johnson).  JA405-09, 1165; *see* Fed. R. App. P. 4(a)(1)(B).  This Court has jurisdiction under 28 U.S.C. § 1291.

3

## STATEMENT OF THE ISSUES

1.  Whether the Secretary may require participating drug manufacturers to obtain approval before adopting a new rebate model for complying with the pricing requirements of the 340B Program.

2.  Whether the Secretary is still considering plaintiffs' proposals to use rebate models to provide 340B pricing, rendering unripe plaintiffs' challenge to the Secretary's purported disapproval of those proposals.

## PERTINENT STATUTES AND REGULATIONS

Section 340B is reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Statutory Background

1.  Since 1990, pharmaceutical manufacturers that participate in Medicaid have been required to "provide rebates to States on their Medicaid drug purchases." *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 114 (2011); *see* 42 U.S.C. § 1396r-8.  These rebates provide States with a discount, which for most "brand-name drugs" is equivalent to the difference between the average wholesale price and the lowest price at which the manufacturer sells the drug, known as the "best price."  *See* 42 U.S.C. § 1396r-8(c); 42 C.F.R. pt. 447.

4

The creation of this program gave rise to a concern that manufacturers had reduced the discounts they were giving to safety-net providers in order to raise the "best price" figures for their drugs under Medicaid and lower their rebate payments to States. *See* H.R. Rep. No. 102-384, pt. 2, at 10-12 (1992). Congress responded by creating the 340B Program to govern the prices that drug manufacturers may charge providers that offer health care to underserved individuals, Veterans Health Care Act of 1992, Pub. L. No. 102-585, § 602, 106 Stat. 4943, 4967 (codified at 42 U.S.C. § 256b), and it later expanded the scope of that program, Patient Protection and Affordable Care Act, Pub. L. No. 111-148, tit. VII, subtitle B, 124 Stat. 119, 821 (2010). Within the Department of HHS, the Health Resources and Services Administration (HRSA) administers the 340B Program on behalf of the Secretary.

Under Section 340B, pharmaceutical manufacturers participating in Medicaid and in Medicare Part B (which covers physician-administered drugs) "must offer discounted drugs to covered entities, dominantly, local facilities that provide medical care for the poor." *Astra USA,* 563 U.S. at 115; *see* 42 U.S.C. § 256b(a)(1), (3), (4). Covered entities include, for example, federally qualified health centers, certain children's hospitals and free-standing cancer hospitals, critical access hospitals, rural referral centers,

black lung clinics, and other federally funded health care entities.  42 U.S.C.

§ 256b(a)(4).  The discounts provided through the 340B Program enable

covered entities to "stretch scarce Federal resources as far as possible,

reaching more eligible patients and providing more comprehensive services."

H.R. Rep. No. 102-384, pt. 2, at 12.  Covered entities can use those cost

savings "to help subsidize prescriptions for their lower income patients,

increase the number of patients whom they can subsidize[,] and expand

services and formularies."  61 Fed. Reg. 43,549, 43,549 (Aug. 23, 1996).

Section 340B implements these discounted-pricing requirements

through "uniform agreements that recite the responsibilities [Section] 340B

imposes, respectively, on drug manufacturers and the Secretary of HHS."

*Astra USA*, 563 U.S. at 113.  These "are not transactional, bargained-for

contracts" but rather "simply incorporate statutory obligations and record

the manufacturers' agreement to abide by them."  *Id.* at 113, 118.  As

relevant here, Section 340B directs the Secretary to enter into pricing

agreements providing that "the amount required to be paid (taking into

account any rebate or discount, as provided by the Secretary) to the

manufacturer for covered outpatient drugs . . . purchased by a covered

entity" may not exceed a specified ceiling price.  42 U.S.C. § 256b(a); *accord*

6

JA438 ("Pursuant to requirements under section 340B of the Act, the Manufacturer agrees . . . to charge covered entities a price for each unit of the drug that does not exceed [the ceiling price].").  For covered outpatient drugs, the ceiling price is equivalent to the average manufacturer price less the rebate the manufacturer provides to States.  42 U.S.C. § 256b(a)(1)-(2); 42 C.F.R. § 10.10; *accord* JA438 (form pricing agreement).

Section 340B also imposes a pair of substantive requirements on covered entities, prohibiting (1) duplicate discounts and (2) the diversion of drugs purchased under the 340B Program.  42 U.S.C. § 256b(a)(5).  To prevent duplicate discounts, the statute specifies that a covered entity shall not request a discount for a drug that is already subject to a separate Medicaid rebate requirement.  *Id.* § 256b(a)(5)(A).  And to prevent diversion, the statute specifies that "a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity."  *Id.* § 256b(a)(5)(B).

To promote transparency, Section 340B requires a covered entity to permit both the Secretary and the manufacturer to audit the entity's records.  42 U.S.C. § 256b(a)(5)(C).  Congress authorized the Secretary to impose sanctions against covered entities—including monetary penalties, removal

from the 340B Program, and referral to other federal agencies for appropriate action—for diversion, duplicate discounts, or other violations of Program requirements. *Id.* § 256b(d)(2)(B)(v). Disputes between manufacturers and covered entities may be resolved through an administrative process. *See id.* § 256b(d)(3)); 42 C.F.R. §§ 10.20-10.24.

If a manufacturer fails to comply with its 340B requirements, the Secretary may terminate the manufacturer's pricing agreement, "which terminates as well the manufacturer's eligibility for Medicaid coverage of its drugs," and may impose civil penalties. *Astra USA*, 563 U.S. at 115-16; *see* 42 U.S.C. §§ 256b(d)(1)(B)(vi), 1396r-8(b)(4)(B)(i), (v).

2. In the Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818, Congress gave the Secretary authority to negotiate the prices that Medicare pays for pharmaceutical products that lack generic competition and that account for a disproportionate share of Medicare's expenses. 42 U.S.C. §§ 1320f(a), 1320f-1(b), (d), (e). The Negotiation Program applies only to manufacturers that choose to participate in Medicare and Medicaid and governs only the prices that Medicare pays for certain drugs. *See id.* § 1320f-1(b), (d). If negotiations for a selected drug are successful, the manufacturer memorializes its agreement to make the

8

drug available to Medicare beneficiaries at the negotiated price. *Id* § 1320f-2(a).

The pricing provisions of the Negotiation Program and the 340B Program are not cumulative. 42 U.S.C. § 1320f-2(d). Thus, if a manufacturer provides a drug to a Medicare beneficiary at the maximum price established by the Negotiation Program and if the negotiated price is lower than the 340B ceiling price, then the manufacturer need not also provide a 340B discount to the covered entity. *Id.*; *see* Ctrs. for Medicare & Medicaid Servs. (CMS), *Medicare Drug Price Negotiation Program: Revised Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2026*, at 127-28, 169 (June 30, 2023), https://perma.cc/K6QB-C3MM. Negotiated prices for the first year of the Negotiation Program take effect January 1, 2026. *Id.* at 92. Manufacturers participating in the first year of the Negotiation Program must explain how they will make the negotiated price available by September 1, 2025. CMS, *Medicare Drug Price Negotiation Program: Final Guidance, Implementation of Sections 1191 – 1198 of the Social Security Act for Initial Price Applicability Year 2027 and Manufacturer Effectuation of the*

9

*Maximum Fair Price in 2026 and 2027*, at 285 (Oct. 2, 2024),

https://perma.cc/CST8-3AU6.

### B.    Factual Background

1.  Shortly after Congress enacted Section 340B, the Secretary issued guidance explaining that manufacturers must agree "not to charge a covered entity a price for a covered outpatient drug exceeding [the ceiling price]." 58 Fed. Reg. 27,289, 27,291 (May 7, 1993); *see also* 59 Fed. Reg. 25,110 (May 13, 1994) (adopting draft guidance).  This guidance "described only a discount process."  62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997).  At first, covered entities purchased drugs for 340B patients at discounted prices and physically segregated their doses so that only 340B-eligible patients received the discounted drugs.  JA257.  While some covered entities still use that approach, *cf.* JA257, most now realize these upfront discounts through a product-replenishment system, JA257.  *See generally* JA126-29.  Under that approach, a covered entity that dispenses prescriptions "initially purchases a full 'package' of drug units at a commercial price; individual units are dispensed to both 340B and non-340B patients; and virtual inventory tracking software identifies how many units went to 340B patients."  JA376. After the covered entity dispenses a full package worth of the drug, it

purchases replacement packages at the 340B ceiling price and "continues to track prescriptions to 340B patients and to replenish its stock at 340B prices." JA376. "In other words, a provider dispensing prescriptions in-house pays the commercial drug price only once—for the initial purchase—and thereafter, pays 340B prices to replenish drugs dispensed to 340B patients." JA376.

For covered entities that contract with pharmacies to dispense prescriptions on their behalf, the contract pharmacies likewise initially purchase a "package" of drugs at a commercial price and track distribution to 340B patients. JA376-77. *See generally* 75 Fed. Reg. 10,272 (Mar. 5, 2010) (discussing contract pharmacies). After the pharmacy has accumulated enough eligible dispenses to deplete the initial package, the provider is able to replace it at the 340B price. JA377. Thus, "when dispensing through a contract pharmacy, a covered provider never pays commercial prices for 340B drugs—it only purchases replenishment packages at 340B prices." JA377.

After a few years of this approach, the agency observed that "the discount system is functioning successfully for most covered entities." 62 Fed. Reg. at 45,824. Among other reasons, "[c]overed entities generally

11

prefe[r] a discount system" because it requires "less initial outlay of drug purchasing money." *Id.* The agency found, however, that State AIDS Drug Assistance Programs (ADAPs) "have drug purchasing systems that have prevented their participation in the section 340B discount program." *Id.* To avoid that issue, some of these ADAPs began working with pharmaceutical manufacturers to reduce their costs through voluntary rebates. *See id.* The Secretary recognized the validity of that process, *id.*, and, after notice and comment, required all 340B manufacturers to offer rebates to ADAPs, JA412. The agency emphasized that it was "recogniz[ing] a rebate option" only for these providers and for no other covered entities. JA412-13. To date, this remains the only exception the agency has made to the upfront discount model. *See* JA275 (plaintiffs acknowledge no "other rebates").

2. In 2024, a number of pharmaceutical manufacturers approached the Secretary with proposals to implement a new model for complying with 340B pricing requirements. JA380-81. Each of plaintiffs' proposals for a rebate model works in a similar way: Covered entities (or contract pharmacies acting on their behalf) would initially purchase drugs at commercial prices and then, after dispensing the drugs to 340B patients, would submit claims to the manufacturers for a cash rebate "equal to the difference between the

acquisition cost and the 340B ceiling price." JA672 (Eli Lilly); *accord* JA495-96 (Johnson & Johnson); JA722-23 (Bristol Myers Squibb); JA821 (Novartis). The manufacturers would review claims and approve them or designate them for further review. JA381; *see* JA695 (Eli Lilly); JA723 (Bristol Myers Squibb); JA821 (Novartis). Each manufacturer represents that it will provide refunds for approved claims within 10 days. JA672 (weekly payments for Eli Lilly); JA496, 723, 821 (7-10 days for Johnson & Johnson, Bristol Myers Squibb, and Novartis).

In the fall of 2024, Johnson & Johnson, Eli Lilly, Bristol Myers Squibb, and Novartis all informed the Secretary that they intended to roll out rebate models.[1] Johnson & Johnson was the first to propose a rebate model on July 31, 2024. JA491-98. Johnson & Johnson informed the agency that it intended to implement the rebate model on October 15 for only two drugs that will be covered by the Medicare Drug Price Negotiation Program and only for purchases made by disproportionate share hospitals.[2] JA497.

---

[1] Additionally, pharmaceutical manufacturer Sanofi-Aventis U.S. LLC proposed a rebate model. It too sued to challenge the Secretary's response; that challenge resulted in a remand to the agency for further proceedings, JA400, which the government has not appealed.

[2] Disproportionate share hospitals are hospitals that treat a high percentage of low-income patients, *see* 42 C.F.R. § 412.106; they are one type of covered entity under Section 340B, 42 U.S.C. § 256b(a)(4)(L).

Eli Lilly proposed its rebate model for all its products on September 4, 2024.  JA672-77.  Eli Lilly informed the agency that it intended to announce its program on September 23 and implement it on November 1.  JA672.  The company asked the agency to "issue a statement endorsing" its proposal.  JA672.

Bristol Myers Squibb proposed its rebate model on October 22, 2024.  JA710-13, 722-23.  Bristol Myers Squibb proposed using the model initially only for sales of Eliquis, which was the only Bristol Myers Squibb drug in the Negotiation Program.  JA723.  Bristol Myers Squibb informed the agency that it intended to pilot the model "in early 2025," JA713, and sought the agency's "acknowledg[ment] in writing by November 4, 2024," of its "right to implement [its] intended 340B rebate model," JA710 (emphasis omitted).  Bristol Myers Squibb disputed that the agency needed to approve its use of the rebate model but also "request[ed] such approval" "to the extent the agency maintains that approval is needed."  JA710 n.1.

Novartis proposed its rebate model for all the drugs it sells to disproportionate share hospitals (but not other covered entities) on December 17, 2024.  JA814-24.  Novartis explained that it intended to implement rebates on June 1, 2025, and requested that the agency

14

acknowledge Novartis's right to implement the model by January 7, 2025. JA814.

The Secretary responded to all these proposals with similar letters. JA450-52 (Johnson & Johnson); JA460-62 (Eli Lilly); JA466-68 (Bristol Myers Squibb); JA473-75 (Novartis).  He expressed concern that "[s]hifting to the rebate model would disrupt how the 340B Program has operated for over thirty years" and sought clarification on how rebates would affect providers and patients.  JA450, 460, 466, 473.  To that end, the Secretary requested responses to a detailed list of questions to enable him to better evaluate the manufacturers' proposals.  *See* JA450-52 (11 questions for Johnson & Johnson); JA460-62 (10 questions for Eli Lilly); JA466-68 (11 questions for Bristol Myers Squibb); JA473-75 (9 questions for Novartis). The letters sought additional information about how the manufacturers would process and approve or reject claims.  JA450-52, 461, 466-67, 474. They inquired into data privacy practices.  JA450-51, 461, 467, 473.  And they sought assurances that in implementing rebates, the manufacturers would

comply with their obligations under Section 340B.  *E.g.*, JA451, 461, 467, 474. Each company responded to these questions.  JA502-14, 692-98; *see* JA469.[3]

As part of this correspondence, the Secretary underscored the requirement to "'enter into an agreement with each manufacturer . . . under which the amount required to be paid (taking into account any rebate or discount, as *provided by the Secretary*) to the manufacturer' shall not exceed the statutory ceiling price formula."  JA454 (quoting 42 U.S.C. § 256b(a)(1)); JA 460, 466; *accord* JA473.  And he explained that, because, "[t]o date, [he] has not provided for such rebate as proposed by [the manufacturers]," implementing the rebate model "at this time would be inconsistent with the statutory requirements for the 340B Program."  JA450, 460, 466; *accord* JA473.  After sending these letters, the Secretary stated that he "continues to be in the process of reviewing" the "varied inquiries" from pharmaceutical manufacturers on this subject.  JA469; *accord* JA447.

Johnson & Johnson, however, publicly announced its plans to implement a rebate model without the Secretary's approval, *see* JA608-19, so the Secretary sent follow-up correspondence to Johnson & Johnson.  JA454-

---

[3] Novartis responded on January 29, 2025.  Because Novartis submitted its response after it filed its complaint, the response is not included in the administrative record.

56, 459.  In those letters, the Secretary reiterated that he expected Johnson & Johnson "to cease implementation of" its "unapproved rebate proposal," JA454, and warned that the manufacturer would be subject to sanctions if it "proceeds with implementing its rebate proposal without Secretarial approval," JA459.

3.  On August 1, 2025 the Secretary issued guidance inviting manufacturers with Drug Price Negotiation Program Agreements with CMS for initial price applicability year 2026 to participate in a voluntary rebate model pilot program.  90 Fed. Reg. 36,163 (Aug. 1, 2025); *see also*  HRSA, *HRSA Announces Application Process for the 340B Rebate Model Pilot Program and Request for Public Comment* (July 31, 2025), https://perma.cc/8DXQ-2BA5.  The pilot sets criteria for a select group of drugs to effectuate the 340B ceiling price through rebates, rather than an up-front discount.  *Id.* at 36,164.  The pilot program is intended to test the rebate model on a group of drugs "in a methodical and thoughtful approach to ensure a fair and transparent 340B rebate model process for all stakeholders involved."  *Id.*  The Secretary is also piloting the rebate model "to better understand the merits and shortcomings of the rebate model from the stakeholders' perspective, and to inform the process on whether to approve

models in the future that are consistent with the 340B statute and the Administration's goals." *Id.*

To participate in the pilot program, an eligible manufacturer must submit a plan to the Secretary for approval. 90 Fed. Reg. at 36,164 ("Manufacturers may not implement plans without first receiving approval in accordance with section 340B(a)(1) . . . ."). Only drugs that have been selected for the Negotiation Program are eligible for the pilot program. *Id.* Plans must allow covered entities to "order the selected drugs under [their] existing distribution mechanisms" and must provide 60-days' notice before taking effect. *Id.* Manufacturers must pay rebates within 10 days of a covered entity's request and cannot deny a rebate "based on compliance concerns." *Id.* at 36,165. The criteria for the plans also require manufacturers to account for data security and reporting. *Id.* at at 36,164-65.

The Secretary intends to issue approvals before October 15, 2025. 90 Fed. Reg. at 36,164. Manufacturers may implement approved rebate models starting January 1, 2026. *Id.*

### C.    Prior Proceedings

1. Eli Lilly, Bristol Myers Squibb, and Novartis sued the Secretary. JA88-124, 130-58, 203-44. They were joined by Kalderos, LLC, JA159-202,

18

which contracted with Eli Lilly to provide a platform to manage rebates, JA161-64.  Although the district court (Friedrich, J.) did not formally consolidate the cases, it considered them together, along with a parallel claim brought by another drug manufacturer, Sanofi-Aventis.  The district court allowed a 340B advocacy organization and two hospitals that purchase 340B drugs to intervene as defendants in these suits.  JA269.

These plaintiffs brought claims under the Administrative Procedure Act, asserting that the Secretary had definitively rejected their proposed rebate models and had insufficiently explained his decision.  JA115, 121-23, 148-49, 155-57, 194-201, 228-30, 240-41.  Bristol Myers Squibb and Novartis also raised claims under the Due Process Clause of the Fifth Amendment.  JA157, 241-43.  Plaintiffs sought vacatur of the Secretary's purported denials as well as injunctive and declaratory relief.  JA123, 157-58, 202, 243-44.

The district court entered summary judgment in favor of the government.  JA368-70.  On the merits,[4] the district court first held that the Secretary validly required plaintiffs to obtain his approval before

---

[4] The district court first held that Kalderos has standing.  JA387-88. Because any relief granted to Eli Lilly (which undisputedly has standing) would provide effective relief to Kalderos, it is not necessary to address Kalderos's standing on appeal.  *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017).

implementing their rebate models.  JA388-92.  The district court explained

that both the plain text of Section 340B and the legislative history confirm

that the Secretary may "regulate the implementation of price reductions."

JA390.  And the district court rejected plaintiffs' argument that any

regulation of the manner of providing the ceiling price must be provided in

the text of a pricing agreement, JA391-92 (citing *Astra USA*, 563 U.S. at 114,

117-18), noting that the Secretary's position is consistent with past agency

practice, JA391, 393-96.  In holding that the agency may require

manufacturers to seek approval before switching to a rebate model, the

district court also rejected intervenors' argument that manufacturers may

never offer rebates under the 340B Program.  JA389 n.11.

    With respect to the Secretary's purported disapproval of plaintiffs'

proposals, the district court held that plaintiffs' challenges were not yet ripe.

JA398-99.  The district court explained that "the agency has not made any

final decision on Lilly, [Bristol Myers Squibb], or Novartis's proposals"

because it held open the possibility of approving the proposals after receiving

the information the Secretary requested.  JA398-99.  Accordingly, the

district court determined that "it would be premature for the Court to decide

at this juncture whether [the Secretary] has considered all relevant factors

with respect to the proposals." JA399 (citing *National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1281 (D.C. Cir. 2005)).

The district court additionally rejected the due process claims, which plaintiffs do not press on appeal. JA401-03.

2. Johnson & Johnson also sued the Secretary. JA1082-1132. Its action was assigned to a different district judge (Contreras, J.) and therefore was not considered together with the other cases. The district court allowed the same 340B advocacy organization and hospitals to intervene as defendants. JA1133.

Johnson & Johnson brought a single claim under the Administrative Procedure Act, asserting that the Secretary had acted unlawfully in preventing Johnson & Johnson from implementing its proposed rebate model. JA1129-30. It sought vacatur of the Secretary's purported denial as well as injunctive and declaratory relief. JA1130.

The district court rejected this claim. JA1135-64. The district court concluded that the Secretary may provide for either a rebate or a discount model to allow covered entities to access the 340B ceiling price and could require Johnson & Johnson to seek his approval before implementing its rebate proposal. JA1146-55. The district court proceeded to reject Johnson

& Johnson's arbitrary and capricious arguments, holding that the Secretary had adequately explained why Johnson & Johnson must obtain preapproval for its proposed rebate model.  JA1157-63.

## SUMMARY OF ARGUMENT

I.  The district court correctly held that the Secretary may require agency approval before a manufacturer unilaterally imposes a rebate model that upends several decades of practice.  That determination follows from the text of Section 340B, which specifies that the ceiling prices "tak[e] into account any rebate or discount, *as provided by the Secretary*."  42 U.S.C. § 256b(a)(1) (emphasis added).  The Secretary's letters to plaintiffs amply explained this requirement.  And this understanding of the statute is also consistent with past practice.

Plaintiffs' view that the Secretary may exercise this approval authority only through the terms of pricing agreements finds no support in the statute's text, structure, or history.  And, in any event, it admits too much:  The Secretary has not approved the use of these rebate models through pricing agreements or otherwise, and plaintiffs therefore may not implement them even under the terms of their own argument.  There is likewise no merit to intervenors' suggestion that rebates are never an option given that

22

Section 340B expressly permits the Secretary to provide for "rebate[s] or discount[s]" in administering the Program.

II.  Contrary to plaintiffs' contention, the Secretary has not yet reached a decision as to whether to approve their proposed rebate models. Rather, he sought additional information from plaintiffs to support that consideration, has stated that he continues to evaluate plaintiffs' proposals, and has announced a pilot program to approve some rebate models.  Thus, plaintiffs' challenges to the Secretary's "decisions" on their proposals are not subject to review at this juncture.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of summary judgment.  *Bauer v. Federal Deposit Ins. Corp.*, 38 F.4th 1114, 1121 (D.C. Cir. 2022).  An agency's action must be sustained unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706.

## ARGUMENT

### I.    340B manufacturers may not implement rebate models without the Secretary's approval.

Under the plain terms of Section 340B, discounts and rebates are accounted for in the 340B ceiling price "as provided by the Secretary."

42 U.S.C. § 256b(a)(1).  Accordingly, until the Secretary provides for rebates, manufacturers cannot use them to satisfy their 340B obligations.  That understanding is consistent with statutory text, structure, and history; it is consistent with the agency's practice over the past three decades; and it is consistent with the explanation the Secretary gave when he instructed plaintiffs not to unilaterally implement their plans.

### A. The Secretary must provide for rebates before a manufacturer may take them into account in complying with the requirement to offer drugs at the 340B ceiling price.

1.  Section 340B expressly states that the 340B ceiling price must "tak[e] into account any rebate or discount, *as provided by the Secretary*." 42 U.S.C. § 256b(a)(1) (emphasis added).  This formulation is a common way for Congress to instruct an agency to fill in the details of a regulatory scheme.  *See, e.g.*, 7 U.S.C. § 1309(a) (annual crop acreage limits "shall be determined as provided by the Secretary"); 26 U.S.C. § 5000B(c)(2) (taxes to be collected "at such time and in such manner as provided by the Secretary").  Any rebate or discount, therefore, must be accounted for in the manner the Secretary stipulates.  *See Provide*, The American Heritage Dictionary of the English Language 1458 (3d ed. 1992) ("To make a stipulation or condition . . . ."); *Provide*, XII The Oxford English Dictionary

24

713 (2d ed. 1989) ("To make it, or lay it down as, a provision or arrangement; to stipulate *that*.").  And the Secretary has not provided for a ceiling price that accounts for the rebates plaintiffs wish to offer.

The legislative history underscores the evident meaning of the statutory text.  The House Committee Report explained that the law "does not specify whether 'covered entities' would receive these favorable prices through a point-of-purchase discount, through a manufacturer rebate, or through some other mechanism."  H.R. Rep. No. 102-384, pt. 2, at 16. Because a mechanism that might be appropriate for one context might not work for another, the Committee "expect[ed] that the Secretary of HHS, in developing these [pricing] agreements, will use the mechanism that is the most effective and most efficient from the standpoint of each type of 'covered entity.'" *Id.*

2.  Plaintiffs concede that the Secretary may regulate "how rebates or discounts are taken into account."  Br. 26.  Their argument that he may do so only through the terms of pricing agreements misunderstands both the nature of pricing agreements and the statutory text.

a.  Pricing agreements "serve as the means by which drug manufacturers opt into the statutory scheme." *Astra USA, Inc. v. Santa*

25

*Clara County*, 563 U.S. 110, 118 (2011).  This "opt-in mechanism," *id.* at 115, "simply incorporate[s] statutory obligations," *id.* at 118.  It is not an individualized or negotiable contract, but rather a form agreement to which manufacturers must agree in full to opt into the statutory scheme.  *Id.*  The terms of the standard agreement are not modified for each manufacturer.  For example, the manufacturer responsibilities section lists statutory requirements for a variety of drug products, including "single source and innovator multiple source drugs," "multiple source, noninnovator multiple source [drugs], and over the counter drugs," JA438—many of which a particular manufacturer may not produce.

Paragraph (a)(1) of Section 340(B) supports the conclusion that the Secretary need not regulate rebates through the pricing agreement.  The first sentence of the paragraph directs the Secretary to "enter into an agreement with each manufacturer . . . under which" the manufacturer agrees not to charge covered entities more than the ceiling price.  42 U.S.C. § 256b(a)(1).  The parenthetical phrase "taking into account any rebate or discount, as provided by the Secretary" describes the "amount required to be paid."  *Id.*  But nothing in the sentence mandates *how* the Secretary shall provide for rebates or discounts.  That lack of specificity contrasts with other

26

portions of paragraph (a)(1), which expressly direct that the pricing agreement itself contain terms requiring the manufacturer to offer drugs at or below the ceiling price if the drug is made available for sale to any other purchaser and to submit quarterly reports. *See id.* (stating that "[e]ach such agreement shall require that the manufacturer" satisfy these terms).

Had Congress intended to require that the Secretary's regulation of rebates or discounts appear in the agreement, it would have said so, just as it did with the agreement's other requirements. *See Rotkiske v. Klemm*, 589 U.S. 8, 14 (2019) ("Atextual judicial supplementation is particularly inappropriate when, as here, Congress has shown that it knows how to adopt the omitted language or provision."); *see also Russello v. United States*, 464 U.S. 16, 23 (1983) (omission of language used in another part of a statute is presumed to be deliberate). The distinction between these provisions shows that Congress intended them to bear different meanings. *See SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 364 (2018) (Congress's "structural choices" are "presumed to be deliberate" (quotation marks omitted)). Here, Congress chose not to force the Secretary to provide for rebates or discounts in the pricing agreement.

b.  Plaintiffs seek refuge in the "broader context" of the statute, Br. 27 (quotation marks omitted), citing the header for subsection (a), which describes "Requirements for agreement with Secretary," 42 U.S.C. § 256b(a).  But while a statute's title "can inform its interpretation, . . . it is not conclusive."  *City & County of San Francisco v. EPA*, 145 S. Ct. 704, 714 (2025).  And here context cuts against plaintiffs' interpretation.

Subsection (a) contains many provisions that evidently do not belong in an agreement between a manufacturer and the Secretary.  For example, this subsection describes requirements for covered entities, 42 U.S.C. § 256b(a)(5), even though pricing agreements neither bind covered entities nor provide them with any enforceable rights, *see Astra USA*, 563 U.S. at 117.  This subsection also requires the Secretary to "establish a prime vendor program."  42 U.S.C. § 256b(a)(8).  Although that program is discussed in the manufacturer pricing agreement, JA439, it is not *established* by that agreement but rather through separate means, including a contract with the designated prime vendor.  These other directives located in subsection (a) confirm that the title is best viewed as "provid[ing] a rough description of the provision's general sweep" and "cannot be read as doing more than that." *San Francisco*, 145 S. Ct. at 714.

28

Plaintiffs have to "mak[e] a structural hash of the statute," Br. 28, to argue that the text supports them.  They assert that "[t]he Secretary's power to 'tak[e] into account' and 'provide' for rebates and discounts is exercised 'under' the terms of the 'agreement with each manufacturer.'"  Br. 27 (second alteration in original) (quoting 42 U.S.C. § 256b(a)(1)); *see* Suppl. Br. 12.  But that argument chops up and reorders the terms of the statute.  Read plainly, the text cannot bear plaintiffs' preferred meaning.  Missing from the text is any verb directing the Secretary to regulate rebates and discounts in the agreement or any preposition linking the agreement to the rebates and discounts.  Moreover, if rebates and discounts had to be regulated in the agreement, then the phrase "as provided by the Secretary" would be unnecessary because the Secretary is the one preparing the agreement in the first place.  Plaintiffs' reading, thus "may be presumed improbable."  *See Feliciano v. Department of Transp.*, 145 S. Ct. 1284, 1294 (2025) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012)) (discussing canon against surplusage).

Plaintiffs' assertion that "Congress does not alter the fundamental[s] of a statutory scheme" through a parenthetical does not advance their cause.  Br. 28 (alteration in original) (quoting *Becerra v. Empire Health Found.*,

597 U.S. 424, 440 (2022)); *see* Supp. Br. 11-12.  The Secretary has authority to approve rebates and discounts.  Whether the Secretary makes such decisions through pricing agreements, guidance documents, or one-off adjudications is not fundamental to a scheme where the "statutory and contractual obligations . . . are one and the same." *Astra USA*, 563 U.S. at 118.

Plaintiffs' reliance on *Empire Health* underscores how inconsequential the method by which the Secretary provides for discounts and rebates is to the statutory scheme.  In *Empire Health*, billions in funding for hospitals turned on whether Congress had used a parenthetical to substantively alter the meaning of a phrase, which otherwise was used consistently throughout the Medicare statute.  *See* 597 U.S. at 440.  The Court concluded that it had not, reasoning that Congress would not have "upend[ed] the settled meaning of that language, in this one place, through so subtle, indirect, and opaque a mechanism," when other more obvious mechanisms were available.  *Id.*

Here, by contrast, the parenthetical confirms the Secretary's authority to provide for rebates and discounts.  And the only thing "subtle, indirect, [or] opaque" in the parties' arguments is plaintiffs' inference that this authority may be exercised only in the pricing agreements themselves.

c.  Even if the pricing agreement were the appropriate place for taking rebates into account, plaintiffs still would not be able to implement their rebate models at this time.  The text of the pricing agreement reflects only that plaintiffs must "charge covered entities a price for each unit of the drug that does not exceed [the ceiling price]."  JA438.  It does not provide for the use of rebates in reaching that price.  Thus, if plaintiffs were right about the pricing agreement, it would only confirm that they may not implement their rebate models absent further action by the Secretary—namely, by amending the pricing agreement.

### B.    The Secretary's letters adequately explain that manufacturers need his approval before implementing rebates.

1.  The Secretary's letters to plaintiffs are premised on the understanding that Section 340B prohibits manufacturers from adopting a rebate model to satisfy the Program's pricing requirements without the Secretary's approval.  JA450 (citing 42 U.S.C. § 256b(a)(1)); JA455; JA466; *accord* JA643.  Because the statute dictates that conclusion, the Secretary's determination in the letters to plaintiffs did not "amount[t] to policymaking." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024).  And accordingly the Secretary was not required to give the same sort of detailed

31

explanation of his decision as he would for a pure policy judgment.  Beyond his legal conclusion, moreover, the Secretary raised a series of concerns about how plaintiffs' proposals would affect covered entities and patients.  *See* JA450-52, 460-62 466-68, 473-75.  Under the circumstances, the Secretary adequately explained why plaintiffs could not implement their rebate models without his approval.  *Cf. DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25, 33 (2020) (agency must consider reliance interests when implementing policy change based on legal analysis).

2.  No manufacturer has previously sought to unilaterally impose a 340B rebate model on covered entities, and the Secretary has not departed from past practice in requiring preapproval here.

a.  Contrary to plaintiffs' assertion (Br. 41-45), rebates obtained by ADAPs are not analogous to plaintiffs' efforts to unilaterally impose a rebate model on 340B providers.  Before 1998, all covered entities were limited to working with a single pharmacy—either contract or in-house—to make drug purchases.  75 Fed. Reg. at 10,272-73.  As a result, statewide organizations found that participating in the 340B Program would "severely limit patient access" by "requir[ing] patients to travel prohibitive distances" to fill their prescriptions at the single eligible pharmacy.  Memorandum from June

Gibbs Brown, Inspector Gen., HHS, to Claude E. Fox, Acting Adm'r, HRSA 7 (Jan. 2, 1998), https://perma.cc/T5JE-F44Q (1998 Audit).  For that reason, 34 of the 53 ADAPs chose not to participate in the 340B Program, 1998 Audit 5, even though every patient of an ADAP is categorically eligible for 340B pricing, 61 Fed. Reg. 55,156, 55,158 (Oct. 24, 1996) (establishing broader definition of patient for ADAPs).  And while some ADAPs were able to "negotiate with individual manufacturers for voluntary rebates," 1998 Audit 2, these rebates were not always enough to bring the amount paid below the 340B ceiling price, *see, e.g.*, 1998 Audit Exhibit 3.  To remedy this problem, the Secretary "recognize[d] rebates obtained by the State [ADAPs] that equal or exceed the discount provided by the statutory ceiling price as a method of accessing the 340B program."  62 Fed. Reg. at 45,824.

This background makes clear the critical difference between the rebates obtained by ADAPs and the rebates plaintiffs seek to impose unilaterally:  Before the Secretary acted, the ADAP rebates were totally voluntary.  Most ADAPs did not participate in the 340B Program, and manufacturers did not require that the ADAPs accept rebates in lieu of upfront discounts in order to satisfy the manufacturers' pricing obligations.  That some ADAPs continued to pay amounts in excess of the 340B ceiling

price even after they received voluntary rebates underscores that these transactions were occurring outside of the 340B Program as the statute does not allow prices to exceed the ceiling price. *See, e.g.*, 1998 Audit Exhibit 3 (five ADAPs paid $2.37 million more for drugs in 1996 after accounting for voluntary rebates than they would have if they paid the ceiling price). Plaintiffs' proposals are fundamentally different as they seek to satisfy their express obligations under Section 340B through rebates and to deny upfront discounts to covered entities.

b.  Plaintiffs argue (Br. 46-49) that the product replenishment model provides a form of rebate that the Secretary has never approved. *But see* JA275 (When asked "[a]side from the AIDS Drug Assistance Program, have there been any other rebates?", counsel responded "no, not to my knowledge."). Plaintiffs now claim that because some covered entities purchase their initial package of drugs at commercial prices and then get subsequent packages at the 340B price, they effectively get a "rebate . . . paid in kind." Br. 47. That reasoning does not withstand scrutiny.

At the most basic level, the Secretary has long confirmed that covered entities need not maintain separate inventories of 340B and non-340B drugs. *See* 59 Fed. Reg. at 25,111 ("There is no requirement for separate

inventories."); 61 Fed. Reg. at 43,554 ("There is no requirement for a separate (physical) inventory for drugs purchased at a 340B discount, because a separate data system will be used to verify appropriate dispensing."). These types of inventory-control systems, the Secretary has explained, "need no prior approval." 59 Fed. Reg. at 25,111. Johnson & Johnson, thus, acknowledges that the product-replenishment model "has been blessed by HRSA since at least 1996." JA1140 (citing 61 Fed. Reg. at 43,554).

Plaintiffs' theory works no better on a practical level. In the example of a covered entity that purchases its 340B drugs through a contract pharmacy, the covered entity "never pays commercial prices for 340B drugs—it only purchases replenishment packages at 340B prices." JA377. So for purchases made through contract pharmacies, plaintiffs' effort to recharacterize the prevailing discount mechanism as a rebate fails on its own terms.

For covered entities that dispense 340B drugs themselves, the entities pay market price for one package of drugs—which can be as small as a single unit, *e.g.*, JA821—and then pay the 340B price for subsequent orders. *See* JA455. The discount on subsequent packages is the same as for covered

35

entities that purchase drugs through a contract pharmacy.  In both cases, use of the product-replenishment system is an accounting method that aligns with virtual inventory-keeping to ensure that covered entities are not paying more than the ceiling price for drugs administered to 340B patients.  Unlike plaintiffs' proposals, the product-replenishment approach does not force covered entities "to pay a higher price point up front for every purchase" resulting in "significantly higher up-front costs."  JA455 (emphasis omitted).  Nor is this approach unusual.  As with other fungible goods, an inventory of prescription drugs may be comingled and later replaced without changing the nature of a commercial transaction for the goods.  *Cf.* U.C.C. § 7-207 (permitting comingling of fungible goods).  It is not a rebate system in any meaningful sense.

The product-replenishment system is also different from plaintiffs' proposals because it was not unilaterally imposed by manufacturers.  Rather, covered entities, which choose to participate in the 340B Program, voluntarily opted to use this accounting method to obtain the ceiling price. *See* JA455 ("[C]overed entities voluntarily choose to use replenishment processes; J&J's proposal is not voluntary for covered entities.").  A covered entity's free choice of accounting convention to receive a discount that it opts

36

into collecting is a world apart from a manufacturer's decision to impose a system on providers as a means of complying with its statutory obligations.

There is no merit to plaintiffs' effort to bolster their argument by taking out of context statements the government made in separate litigation. *See* Br. 47 (citing Defendants' Cross Motion for Summary Judgment 16-17, *Premier, Inc. v. HRSA,* No. 24-cv-3116 (D.D.C. May 9, 2025) (*Premier* Br.)). *Premier* involves a statutory prohibition against certain covered entities acquiring 340B drugs through group purchasing organizations. *Premier* Br. 1, 8; *see* 42 U.S.C. § 256b(a)(4)(L)(iii).[5] Responding to a policy argument, the government noted that, for covered entities using a product-replenishment model, the inability to make initial purchases through group purchasing organizations could require those entities to pay higher upfront costs for those initial purchases. *Premier* Br. 16. But the government explained that it did not follow that purchases from group purchasing organizations were permitted under Section 340B, noting that covered entities have alternatives to the product-replenishment model, including the option of purchasing all

---

[5] *See also* HRSA, Release No. 2013-1, 340B Drug Pricing Program Notice (Feb. 7, 2013), https://perma.cc/2VVN-NGLP (explaining that certain covered entities may not purchase drugs through a group purchasing organization and then replenish them from a supply of 340B drugs).

drugs it intends to dispense to 340B patients at the discounted price in the first instance.  *Id.*  The government's statements in distinguishing the operation of such discounts from the product-replenishment model in no way suggest that the product-replenishment model is properly viewed as a rebate model.

### C.  The Secretary may permit manufacturers to offer the 340B ceiling price through either an upfront discount or a back-end rebate.

1.  The foregoing discussion also resolves the issue raised by intervenors, confirming that Section 340B expressly allows the use of a "rebate or discount, as provided by the Secretary," in satisfying the pricing requirements of § 256b(a)(1).  In urging that rebates are nevertheless prohibited, intervenors contend that Congress implicitly repealed that language.  "But repeals by implication are not favored and are a rarity[.]" *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 315 (2020) (citation and quotation marks omitted).  Two statutes are presumed to be effective unless "Congress' intention to repeal is clear and manifest, or the two laws are irreconcilable."  *Id.* (quotation marks omitted).  "Only by carrying a heavy burden can a party convince [a court] that one statute displaces a second."  *Department of Agric. Rural Dev. Rural Hous. Serv. v.*

*Kirtz*, 601 U.S. 42, 63 (2024) (quotation marks omitted).  Intervenors come nowhere close to meeting that burden.

There is no indication—much less a "clear and manifest" one—that Congress intended to repeal the "rebate or discount" language.  Intervenors' argument depends on Congress's addition of a second sentence to paragraph (a)(1) requiring manufacturers to furnish the Secretary with quarterly reports and underscoring that manufacturers must "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price."  42 U.S.C. § 256b(a)(1).  By its terms, that sentence requires manufacturers to meet reporting requirements and to provide each covered entity with drugs at or below the ceiling price.  Congress described the addition of that sentence as a "conforming amendmen[t]" to help implement "improvements to 340B program integrity."  § 7102, 124 Stat. at 823, 827 (formatting altered).  That attention to the existing statutory text dispels any notion that Congress inadvertently failed to amend the other parts of the law.  *See Milhouse v. Levi*, 548 F.2d 357, 363 (D.C. Cir. 1976).  Nothing in the amendment's text or legislative history indicates that, by expressly adding

39

reporting and pricing obligations, Congress intended impliedly to change the substance of the "rebate or discount" provision.

Nor can intervenors show that the two provisions are "irreconcilable." *Maine Cmty. Health*, 590 U.S. at 315 (quotation marks omitted). As this Court has explained, the requirement that manufacturers "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price," 42 U.S.C. § 256b(a)(1), requires "manufacturers to propose to sell covered drugs to covered entities at or below a specified monetary amount," *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024); *accord Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703 (3d Cir. 2023). Contrary to intervenors' suggestion, that interpretation leaves the provision with obvious work to perform: It prevents manufacturers from avoiding their 340B obligations by refusing to sell drugs to covered entities. Nothing about the requirement to sell drugs at the 340B price is incompatible with offering that price through back-end rebates if the Secretary so provides.

40

## II. The Secretary is still considering whether to permit plaintiffs to implement their proposed rebate models.

1. Plaintiffs' argument (Br. 55-58; Suppl. Br. 13-15) that the Secretary did not adequately explain his rejection of their proposals rests on a flawed premise: The Secretary has made no such decision. Because the Secretary has not yet determined whether to allow plaintiffs' proposed rebate models, there is no agency decision on that issue subject to review at this juncture.

In evaluating ripeness, courts consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1353 (D.C. Cir. 2014) (quotation marks omitted). An issue is not fit for review when "judicial intervention would inappropriately interfere with further administrative action." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). "The ripeness doctrine thus protects the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting." *Amerijet Int'l*, 753 F.3d at 1353 (quotation marks omitted).

The approval or disapproval of plaintiffs' proposals is not ripe for review. Rather than rendering a decision on plaintiffs' proposals, the Secretary sought more information from plaintiffs. *See* JA450-52, 460-62,

466-68, 473-75.  He has since announced a pilot program that should allow

Johnson & Johnson, Novartis, and Bristol Myers Squibb to at least partially

implement rebate models.  *See* 90 Fed. Reg. at 36,164; *see also* CMS,

*Medicare Drug Price Negotiation Program: Negotiated Prices for Initial*

*Price Applicability Year 2026* (Aug. 15, 2024), https://perma.cc/6MVG-BZP8

(including Stelara, Xarelto, Eliquis, and Entresto).[6]  The government has

repeatedly advanced the same basic argument on this score:  The Secretary

has not made a final decision.  Whether viewed through the lens of finality or

ripeness, the same conclusion follows:  Courts do not resolve "substantive

issues that are the subject of an ongoing agency proceeding," like the issues

here.  *Public Citizen Health Rsch. Grp. v. FDA* 740 F.2d 21, 30 (D.C. Cir.

1984) (citing *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967)); *accord*

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  *See generally John Doe, Inc. v.*

*DEA*, 484 F.3d 561, 567 (D.C. Cir. 2007) ("Finality, ripeness, and exhaustion

---

[6] The announcement of the pilot program does not render this litigation moot because (1) the pilot program still requires plaintiffs to obtain secretarial approval before implementing any rebate model, (2) the Secretary has still not approved any of plaintiffs' proposed models, and (3) Eli Lilly and Novartis seek to implement rebate models for drugs that are not eligible for the pilot program, JA672, 821.  *See Sanchez v. Office of the State Superintendent of Educ.*, 959 F.3d 1121, 1125 (D.C. Cir. 2020).

of administrative remedies are related, overlapping doctrines that are analytically but not categorically distinct.").

Plaintiffs ask this court to shadow box with a decision that the Secretary has yet to make. The Secretary has not rejected plaintiffs' proposals. He will approve a proposal that meets the requirements of the pilot program, and he has explained that after piloting the rebate, he will consider "whether to approve models in the future that are consistent with the 340B statute and the Administration's goals." 90 Fed. Reg. at 36,164. Thus, "depending upon the agency's future actions[,] review now may turn out to [be] unnecessary." *Pfizer Inc. v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999) (quotation marks omitted). The contingency inherent in the Secretary's continued consideration of plaintiffs' proposals deprived the district court of jurisdiction to consider plaintiffs' challenge to the Secretary's purported rejection of their proposals. *See* JA399; *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipate[d] or indeed may not occur at all.") (quotation marks omitted).

The remedy plaintiffs would obtain if they prevail underscores the premature nature of their claims, as it would be entirely ineffectual. The

43

Secretary is presently considering plaintiffs' proposals, and when he reaches a determination, he will issue a reasoned decision.  If this Court agrees with plaintiffs that the Secretary has already rejected their proposals and provided insufficient reasoning in support of that decision, the correct result would be to remand to the Secretary.  The Secretary would then consider plaintiffs' proposals, and, when he reaches a determination, he would issue a reasoned decision.  The remedy plaintiffs seek, therefore, would leave them in exactly the same position they are in now.  *Cf. National Chicken Council v. EPA*, 687 F.3d 393, 396 (D.C. Cir. 2012) (plaintiff cannot invoke federal jurisdiction without showing a "'substantial probability'" that they could obtain effective relief).

Plaintiffs misunderstand the remedies available to them if the Secretary in fact rendered an arbitrary and capricious decision.  They assert that they should be allowed "to proceed until [the Secretary] provides a reasoned explanation for [his] refusal to approve [their] models."  Br. 58.  But plaintiffs' obligation to obtain the Secretary's approval arises from Section 340B itself, not from the letters the Secretary sent to plaintiffs.  Sending those letters was both a courtesy and a prudent step to avoid having to resort to harsher enforcement measures.  But "vacating" the letters would

44

not have any effect on the lawfulness of plaintiffs' unilateral implementation of their rebate models.  If a manufacturer implements a rebate model without the Secretary's approval and forces a covered entity to pay prices above the 340B ceiling price, the Secretary may terminate the manufacturer's 340B agreement and may impose other sanctions without prior warning.  *See Astra USA*, 563 U.S. at 115-16; JA441; 42 U.S.C. § 256b(d)(1)(B)(vi) (authorizing civil penalties).

2.  Plaintiffs' counterarguments are unavailing.

a.  In urging that the Secretary conceded the finality of a decision not to approve their proposals, Br. 50 (citing No. 24-cv-3337 Dkt. 50, at 10), plaintiffs vastly overread the government's briefing in the Sanofi-Aventis litigation in the district court.  The government has acknowledged the finality of the agency's position with respect to the need for pre-approval.  But with respect to the Secretary's ongoing consideration of plaintiffs' specific proposals, the government has maintained consistently that there is no final decision.  As the government confirmed at the motions hearing, for example, the Secretary did not say that plaintiffs "can never implement these rebates.  [H]e said not now."  JA330.  That type of response necessarily does not mark the consummation of the agency's decision-making.

45

The broader concession that plaintiffs attribute to the government is implausible and cannot be squared with the record.  It has consistently been the government's position that there is no final agency decision with respect to whether these rebate proposals should be approved.  The Secretary made no attempt to explain why he was finally denying plaintiffs' proposals when he sent them the letters because he did not believe he was making any such final decision.  Under the circumstances, conceding the finality of such a decision would essentially concede that the decision must be set aside and remanded to the agency.  *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 535 (D.C. Cir. 2018) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)).  There is no reason to mistake the agency's concession of an obvious point with respect to the first question presented in this case (the finality of the determination that approval is needed) for a concession on the second question presented that would be tantamount to throwing in the towel on that claim.

b.  The same conclusion about finality applies to all the proposals submitted to the Secretary.  Plaintiffs attempt to distinguish the Secretary's responses to Johnson & Johnson and Sanofi-Aventis and then to interpolate the Secretary's statements in those letters into all of his letters.  But the

Secretary has not made a final decision on approving or rejecting *any* of the rebate proposals.

As with the other manufacturers, the Secretary requested additional information to allow him to evaluate the Johnson & Johnson and Sanofi-Aventis proposals. *See* JA450-52; JA767-69. And he made clear that he "continues to be in the process of reviewing" the proposals they and other manufacturers had submitted. JA793.

While the letters the Secretary sent to Johnson & Johnson and Sanofi-Aventis were longer than those he sent to plaintiffs, the letters did not express any position on whether those manufacturers could implement rebates *with* the Secretary's approval. Plaintiffs can characterize the letters (Br. 51; Suppl. Br. 13-14) as a final rejection only by omitting the Secretary's focus on the unilateral nature of Johnson & Johnson and Sanofi-Aventis's plans to implement their rebate models.[7] The Secretary informed both companies that they could not proceed unilaterally because he "has not provided that the rebates described in [the company]'s notice should be taken into account in the amount required to be paid" under Section 340B.

---

[7] The district court (Freidrich, J.) misread the letter sent to Sanofi-Aventis in the same way. *See* JA399.

JA455 (cleaned up); JA812 (cleaned up).  Accordingly, he concluded that if

the companies implement their proposals "*without Secretarial approval*,

[they] will violate Section 340B(a)(1)."  JA455 (emphasis added); JA812

(emphasis added).  The Secretary further elaborated that Johnson &

Johnson and Sanofi-Aventis would violate Section 340B if they decided "to

*unilaterally* charge" covered entities the commercial price for drugs.  JA455

(emphasis added); *accord* JA812 (emphasis added).  The Secretary did not

decide that Johnson & Johnson and Sanofi-Aventis could never implement

their proposals, and those proposals continue to be under review.

c.  Plaintiffs additionally argue (Br. 53-54) that the agency's continued

review of their proposals is tantamount to a denial of them.  But the

circumstances in which an aggrieved party may rush to court before an

agency renders a decision are narrow and rarely met, and they are not

present here.

Mere delay is not enough to convert an agency's continued review into

a constructive denial of an application.  *Cf. Telecommunications Rsch. &

Action Ctr. v. FCC*, 750 F.2d 70, 75-76 (D.C. Cir. 1984).  Rather, the agency

must have, "in practical effect if not formal acknowledgement," reached a

point that "constitute[s] 'the consummation of the agency's decisionmaking

48

process' and determine[s] 'rights or obligations.'" *Friedman v. FAA*, 841 F.3d 537, 542 (D.C. Cir. 2016) (quoting *Bennett*, 520 U.S. at 178). This Court thus looks for signs that an agency has "clearly communicated it will not reach a determination." *Id.*; *see, e.g.*, *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436-37 (D.C. Cir. 1986) (letter "unequivocally stated EPA's position" on a purely legal question and "gave no indication that [its position] was subject to further agency consideration or possible modification"). There is no such indication here; to the contrary, the Secretary has repeatedly stated that he is open to approving rebate models. *E.g.*, JA469; *see also* 90 Fed. Reg. at 36,164-65 (contemplating approval of rebate models meeting specified criteria as well as other models in the future).

Plaintiffs rely on two precedents for their tantamount-to-denial argument. Neither helps them. In *Environmental Defense Fund, Inc. v. Hardin*, this Court concluded that an agency's failure to act on a request for a temporary suspension of a pesticide registration "results in a final disposition of such rights as the petitioners and the public may have to interim relief." 428 F.2d 1093, 1099-1100 (D.C. Cir. 1970). The agency's "decision," therefore, was reviewable because it could not be challenged in any future proceedings in the same way that a district court's failure to act

on a motion for a preliminary injunction may be reviewed on appeal when

that inaction constructively denies the preliminary relief sought. *See*

*Belbacha v. Bush*, 520 F.3d 452, 455 (D.C. Cir. 2008); *see also Sackett v. EPA*,

566 U.S. 120, 127 (2012) (judicial review may be had when regulated parties

have "no entitlement to further [a]gency review"). *Barrick Goldstrike Mines*

*Inc. v. Browner* offers even less support because the agency in that case

conceded that it had taken a final position on the meaning of a regulation and

that the plaintiff would be subject to an enforcement action if it did not

comply with a set of reporting requirements as interpreted by the agency.

215 F.3d 45, 47-48 (D.C. Cir. 2000).  There is no parallel to this case, where

the Secretary has not taken a final position on whether plaintiffs may

implement their plans.

## CONCLUSION

For the foregoing reasons, the judgments should be affirmed.

Respectfully submitted,

*Of Counsel:*

ERIC J. HAMILTON
   *Deputy Assistant*
     *Attorney General*[*]

SEAN R. KEVENEY
   *Acting General Counsel*

MICHAEL H. IMBACUAN
WILLIAM BURGESS
SHERINE HARGROVE
   *Attorneys*

MICHAEL S. RAAB
LINDSEY POWELL

   *U.S. Department of Health and*
     *Human Services*

  /s/ Maxwell A. Baldi

MAXWELL A. BALDI
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7513*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 532-0211*
   *maxwell.baldi@usdoj.gov*

AUGUST 2025

---

[*] The Assistant Attorney General is recused in this matter.

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,041 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Expanded BT 14-point font, a proportionally spaced typeface.

*/s/ Maxwell A. Baldi*
Maxwell A. Baldi

**ADDENDUM**

# TABLE OF CONTENTS

42  U.S.C. § 256b ....................................................................................................A1

**42 U.S.C. § 256b**

**§ 256b. Limitation on prices of drugs purchased by covered entities.**

**(a) Requirements for agreement with Secretary**

**(1) In general**

The Secretary shall enter into an agreement with each manufacturer of covered outpatient drugs under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer for covered outpatient drugs (other than drugs described in paragraph (3)) purchased by a covered entity on or after the first day of the first month that begins after November 4, 1992, does not exceed an amount equal to the average manufacturer price for the drug under title XIX of the Social Security Act in the preceding calendar quarter, reduced by the rebate percentage described in paragraph (2). Each such agreement shall require that the manufacturer furnish the Secretary with reports, on a quarterly basis, of the price for each covered outpatient drug subject to the agreement that, according to the manufacturer, represents the maximum price that covered entities may permissibly be required to pay for the drug (referred to in this section as the "ceiling price"), and shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price.

**(2) "Rebate percentage" defined**

**(A) In general**

For a covered outpatient drug purchased in a calendar quarter, the "rebate percentage" is the amount (expressed as a percentage) equal to--

**(i)** the average total rebate required under section 1927(c) of the Social Security Act with respect to the drug (for a unit of the dosage form and strength involved) during the preceding calendar quarter; divided by

A1

**(ii)** the average manufacturer price for such a unit of the drug during such quarter.

## (B) Over the counter drugs

### (i) In general

For purposes of subparagraph (A), in the case of over the counter drugs, the "rebate percentage" shall be determined as if the rebate required under section 1927(c) of the Social Security Act is based on the applicable percentage provided under section 1927(c)(3) of such Act.

### (ii) "Over the counter drug" defined

The term "over the counter drug" means a drug that may be sold without a prescription and which is prescribed by a physician (or other persons authorized to prescribe such drug under State law).

## (3) Drugs provided under State Medicaid plans

Drugs described in this paragraph are drugs purchased by the entity for which payment is made by the State under the State plan for medical assistance under title XIX of the Social Security Act.

## (4) "Covered entity" defined

In this section, the term "covered entity" means an entity that meets the requirements described in paragraph (5) and is one of the following:

**(A)** A Federally-qualified health center (as defined in section 1905(l)(2)(B) of the Social Security Act).

**(B)** An entity receiving a grant under section 256a of this title.

**(C)** A family planning project receiving a grant or contract under section 300 of this title.

**(D)** An entity receiving a grant under subpart II of part C of subchapter XXIV (relating to categorical grants for outpatient early intervention services for HIV disease).

**(E)** A State-operated AIDS drug purchasing assistance program receiving financial assistance under subchapter XXIV.

**(F)** A black lung clinic receiving funds under section 937(a) of title 30.

**(G)** A comprehensive hemophilia diagnostic treatment center receiving a grant under section 501(a)(2) of the Social Security Act.

**(H)** A Native Hawaiian Health Center receiving funds under the Native Hawaiian Health Care Act of 1988.

**(I)** An urban Indian organization receiving funds under title V of the Indian Health Care Improvement Act.

**(J)** Any entity receiving assistance under subchapter XXIV (other than a State or unit of local government or an entity described in subparagraph (D)), but only if the entity is certified by the Secretary pursuant to paragraph (7).

**(K)** An entity receiving funds under section 247c of this title (relating to treatment of sexually transmitted diseases) or section 247b(j)(2) of this title (relating to treatment of tuberculosis) through a State or unit of local government, but only if the entity is certified by the Secretary pursuant to paragraph (7).

**(L)** A subsection (d) hospital (as defined in section 1886(d)(1)(B) of the Social Security Act) that--

**(i)** is owned or operated by a unit of State or local government, is a public or private non-profit corporation which is formally granted governmental powers by a unit of State or local government, or is a private non-profit hospital which has a contract with a State or local government to provide health care services to low income individuals who are not entitled to benefits under title XVIII of the Social Security Act or eligible for assistance under the State plan under this subchapter;

**(ii)** for the most recent cost reporting period that ended before the calendar quarter involved, had a disproportionate share adjustment percentage (as determined under section 1886(d)(5)(F) of the Social

A3

Security Act) greater than 11.75 percent or was described in section 1886(d)(5)(F)(i)(II) of such Act; and

**(iii)** does not obtain covered outpatient drugs through a group purchasing organization or other group purchasing arrangement.

**(M)** A children's hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(iii) of the Social Security Act, or a free-standing cancer hospital excluded from the Medicare prospective payment system pursuant to section 1886(d)(1)(B)(v) of the Social Security Act, that would meet the requirements of subparagraph (L), including the disproportionate share adjustment percentage requirement under clause (ii) of such subparagraph, if the hospital were a subsection (d) hospital as defined by section 1886(d)(1)(B) of the Social Security Act.

**(N)** An entity that is a critical access hospital (as determined under section 1820(c)(2) of the Social Security Act), and that meets the requirements of subparagraph (L)(i).

**(O)** An entity that is a rural referral center, as defined by section 1886(d)(5)(C)(i) of the Social Security Act, or a sole community hospital, as defined by section 1886(d)(5)(C)(iii) of such Act, and that both meets the requirements of subparagraph (L)(i) and has a disproportionate share adjustment percentage equal to or greater than 8 percent.

**(5) Requirements for covered entities**

**(A) Prohibiting duplicate discounts or rebates**

**(i) In general**

A covered entity shall not request payment under title XIX of the Social Security Act for medical assistance described in section 1905(a)(12) of such Act with respect to a drug that is subject to an agreement under this section if the drug is subject to the payment of a rebate to the State under section 1927 of such Act.

**(ii) Establishment of mechanism**

The Secretary shall establish a mechanism to ensure that covered entities comply with clause (i). If the Secretary does not establish a mechanism within 12 months under the previous sentence, the requirements of section 1927(a)(5)(C) of the Social Security Act shall apply.

**(B) Prohibiting resale of drugs**

With respect to any covered outpatient drug that is subject to an agreement under this subsection, a covered entity shall not resell or otherwise transfer the drug to a person who is not a patient of the entity.

**(C) Auditing**

A covered entity shall permit the Secretary and the manufacturer of a covered outpatient drug that is subject to an agreement under this subsection with the entity (acting in accordance with procedures established by the Secretary relating to the number, duration, and scope of audits) to audit at the Secretary's or the manufacturer's expense the records of the entity that directly pertain to the entity's compliance with the requirements described in subparagraphs[1] (A) or (B) with respect to drugs of the manufacturer.

**(D) Additional sanction for noncompliance**

If the Secretary finds, after audit as described in subparagraph (C) and after notice and hearing, that a covered entity is in violation of a requirement described in subparagraphs[1] (A) or (B), the covered entity shall be liable to the manufacturer of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug (as described in subparagraph (A)) provided under the agreement between the entity and the manufacturer under this paragraph.

**(6) Treatment of distinct units of hospitals**

In the case of a covered entity that is a distinct part of a hospital, the hospital shall not be considered a covered entity under this paragraph unless the hospital is otherwise a covered entity under this subsection.

**(7) Certification of certain covered entities**

**(A) Development of process**

Not later than 60 days after November 4, 1992, the Secretary shall develop and implement a process for the certification of entities described in subparagraphs (J) and (K) of paragraph (4).

**(B) Inclusion of purchase information**

The process developed under subparagraph (A) shall include a requirement that an entity applying for certification under this paragraph submit information to the Secretary concerning the amount such entity expended for covered outpatient drugs in the preceding year so as to assist the Secretary in evaluating the validity of the entity's subsequent purchases of covered outpatient drugs at discounted prices.

**(C) Criteria**

The Secretary shall make available to all manufacturers of covered outpatient drugs a description of the criteria for certification under this paragraph.

**(D) List of purchasers and dispensers**

The certification process developed by the Secretary under subparagraph (A) shall include procedures under which each State shall, not later than 30 days after the submission of the descriptions under subparagraph (C), prepare and submit a report to the Secretary that contains a list of entities described in subparagraphs (J) and (K) of paragraph (4) that are located in the State.

**(E) Recertification**

The Secretary shall require the recertification of entities certified pursuant to this paragraph on a not more frequent than annual basis, and shall require that such entities submit information to the Secretary to permit the Secretary to evaluate the validity of subsequent purchases by such entities in the same manner as that required under subparagraph (B).

**(8) Development of prime vendor program**

The Secretary shall establish a prime vendor program under which covered entities may enter into contracts with prime vendors for the distribution of covered outpatient drugs. If a covered entity obtains drugs directly from a manufacturer, the manufacturer shall be responsible for the costs of distribution.

**(9) Notice to manufacturers**

The Secretary shall notify manufacturers of covered outpatient drugs and single State agencies under section 1902(a)(5) of the Social Security Act of the identities of covered entities under this paragraph, and of entities that no longer meet the requirements of paragraph (5) or that are no longer certified pursuant to paragraph (7).

**(10) No prohibition on larger discount**

Nothing in this subsection shall prohibit a manufacturer from charging a price for a drug that is lower than the maximum price that may be charged under paragraph (1).

**(b) Other definitions--**

**(1) In general**

In this section, the terms "average manufacturer price", "covered outpatient drug", and "manufacturer" have the meaning given such terms in section 1927(k) of the Social Security Act.

**(2) Covered drug**

In this section, the term "covered drug"--

**(A)** means a covered outpatient drug (as defined in section 1927(k) (2) of the Social Security Act); and

**(B)** includes, notwithstanding paragraph (3)(A) of section 1927(k) of such Act, a drug used in connection with an inpatient or outpatient service provided by a hospital described in subparagraph (L), (M), (N),

A7

or (O) of subsection (a)(4) that is enrolled to participate in the drug discount program under this section.

**(c) Repealed. Pub.L. 111-152, Title II, § 2302(2), Mar. 30, 2010, 124 Stat. 1083**

**(d) Improvements in program integrity**

**(1) Manufacturer compliance**

**(A) In general**

From amounts appropriated under paragraph (4), the Secretary shall provide for improvements in compliance by manufacturers with the requirements of this section in order to prevent overcharges and other violations of the discounted pricing requirements specified in this section.

**(B) Improvements**

The improvements described in subparagraph (A) shall include the following:

**(i)** The development of a system to enable the Secretary to verify the accuracy of ceiling prices calculated by manufacturers under subsection (a)(1) and charged to covered entities, which shall include the following:

**(I)** Developing and publishing through an appropriate policy or regulatory issuance, precisely defined standards and methodology for the calculation of ceiling prices under such subsection.

**(II)** Comparing regularly the ceiling prices calculated by the Secretary with the quarterly pricing data that is reported by manufacturers to the Secretary.

**(III)** Performing spot checks of sales transactions by covered entities.

A8

(IV) Inquiring into the cause of any pricing discrepancies that may be identified and either taking, or requiring manufacturers to take, such corrective action as is appropriate in response to such price discrepancies.

(ii) The establishment of procedures for manufacturers to issue refunds to covered entities in the event that there is an overcharge by the manufacturers, including the following:

(I) Providing the Secretary with an explanation of why and how the overcharge occurred, how the refunds will be calculated, and to whom the refunds will be issued.

(II) Oversight by the Secretary to ensure that the refunds are issued accurately and within a reasonable period of time, both in routine instances of retroactive adjustment to relevant pricing data and exceptional circumstances such as erroneous or intentional overcharging for covered outpatient drugs.

(iii) The provision of access through the Internet website of the Department of Health and Human Services to the applicable ceiling prices for covered outpatient drugs as calculated and verified by the Secretary in accordance with this section, in a manner (such as through the use of password protection) that limits such access to covered entities and adequately assures security and protection of privileged pricing data from unauthorized re-disclosure.

(iv) The development of a mechanism by which--

(I) rebates and other discounts provided by manufacturers to other purchasers subsequent to the sale of covered outpatient drugs to covered entities are reported to the Secretary; and

(II) appropriate credits and refunds are issued to covered entities if such discounts or rebates have the effect of lowering the applicable ceiling price for the relevant quarter for the drugs involved.

(v) Selective auditing of manufacturers and wholesalers to ensure the integrity of the drug discount program under this section.

**(vi)** The imposition of sanctions in the form of civil monetary penalties, which--

**(I)** shall be assessed according to standards established in regulations to be promulgated by the Secretary not later than 180 days after March 23, 2010;

**(II)** shall not exceed $5,000 for each instance of overcharging a covered entity that may have occurred; and

**(III)** shall apply to any manufacturer with an agreement under this section that knowingly and intentionally charges a covered entity a price for purchase of a drug that exceeds the maximum applicable price under subsection (a)(1).

**(2) Covered entity compliance**

**(A) In general**

From amounts appropriated under paragraph (4), the Secretary shall provide for improvements in compliance by covered entities with the requirements of this section in order to prevent diversion and violations of the duplicate discount provision and other requirements specified under subsection (a)(5).

**(B) Improvements**

The improvements described in subparagraph (A) shall include the following:

**(i)** The development of procedures to enable and require covered entities to regularly update (at least annually) the information on the Internet website of the Department of Health and Human Services relating to this section.

**(ii)** The development of a system for the Secretary to verify the accuracy of information regarding covered entities that is listed on the website described in clause (i).

**(iii)** The development of more detailed guidance describing methodologies and options available to covered entities for billing

A10

covered outpatient drugs to State Medicaid agencies in a manner that avoids duplicate discounts pursuant to subsection (a)(5)(A).

**(iv)** The establishment of a single, universal, and standardized identification system by which each covered entity site can be identified by manufacturers, distributors, covered entities, and the Secretary for purposes of facilitating the ordering, purchasing, and delivery of covered outpatient drugs under this section, including the processing of chargebacks for such drugs.

**(v)** The imposition of sanctions, in appropriate cases as determined by the Secretary, additional to those to which covered entities are subject under subsection (a)(5)(D), through one or more of the following actions:

**(I)** Where a covered entity knowingly and intentionally violates subsection (a)(5)(B), the covered entity shall be required to pay a monetary penalty to a manufacturer or manufacturers in the form of interest on sums for which the covered entity is found liable under subsection (a)(5)(D), such interest to be compounded monthly and equal to the current short term interest rate as determined by the Federal Reserve for the time period for which the covered entity is liable.

**(II)** Where the Secretary determines a violation of subsection (a)(5)(B) was systematic and egregious as well as knowing and intentional, removing the covered entity from the drug discount program under this section and disqualifying the entity from re-entry into such program for a reasonable period of time to be determined by the Secretary.

**(III)** Referring matters to appropriate Federal authorities within the Food and Drug Administration, the Office of Inspector General of Department of Health and Human Services, or other Federal agencies for consideration of appropriate action under other Federal statutes, such as the Prescription Drug Marketing Act (21 U.S.C. 353).

A11

**(3) Administrative dispute resolution process**

**(A) In general**

Not later than 180 days after March 23, 2010, the Secretary shall promulgate regulations to establish and implement an administrative process for the resolution of claims by covered entities that they have been overcharged for drugs purchased under this section, and claims by manufacturers, after the conduct of audits as authorized by subsection (a)(5)(C), of violations of subsections[2] (a)(5)(A) or (a)(5)(B), including appropriate procedures for the provision of remedies and enforcement of determinations made pursuant to such process through mechanisms and sanctions described in paragraphs (1)(B) and (2)(B).

**(B) Deadlines and procedures**

Regulations promulgated by the Secretary under subparagraph (A) shall--

**(i)** designate or establish a decision-making official or decision-making body within the Department of Health and Human Services to be responsible for reviewing and finally resolving claims by covered entities that they have been charged prices for covered outpatient drugs in excess of the ceiling price described in subsection (a)(1), and claims by manufacturers that violations of subsection (a)(5)(A) or (a)(5)(B) have occurred;

**(ii)** establish such deadlines and procedures as may be necessary to ensure that claims shall be resolved fairly, efficiently, and expeditiously;

**(iii)** establish procedures by which a covered entity may discover and obtain such information and documents from manufacturers and third parties as may be relevant to demonstrate the merits of a claim that charges for a manufacturer's product have exceeded the applicable ceiling price under this section, and may submit such documents and information to the administrative official or body responsible for adjudicating such claim;

A12

**(iv)** require that a manufacturer conduct an audit of a covered entity pursuant to subsection (a)(5)(C) as a prerequisite to initiating administrative dispute resolution proceedings against a covered entity;

**(v)** permit the official or body designated under clause (i), at the request of a manufacturer or manufacturers, to consolidate claims brought by more than one manufacturer against the same covered entity where, in the judgment of such official or body, consolidation is appropriate and consistent with the goals of fairness and economy of resources; and

**(vi)** include provisions and procedures to permit multiple covered entities to jointly assert claims of overcharges by the same manufacturer for the same drug or drugs in one administrative proceeding, and permit such claims to be asserted on behalf of covered entities by associations or organizations representing the interests of such covered entities and of which the covered entities are members.

### (C) Finality of administrative resolution

The administrative resolution of a claim or claims under the regulations promulgated under subparagraph (A) shall be a final agency decision and shall be binding upon the parties involved, unless invalidated by an order of a court of competent jurisdiction.

### (4) Authorization of appropriations

There are authorized to be appropriated to carry out this subsection, such sums as may be necessary for fiscal year 2010 and each succeeding fiscal year.

## (e) Exclusion of orphan drugs for certain covered entities

For covered entities described in subparagraph (M) (other than a children's hospital described in subparagraph (M)), (N), or (O) of subsection (a)(4), the term "covered outpatient drug" shall not include a drug designated by the Secretary under section 360bb of Title 21 for a rare disease or condition.