**ORAL ARGUMENT NOT YET SCHEDULED**
Nos. 25-5177, 25-5179, 25-5220, 25-5221, 25-5236

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA

---

NOVARTIS PHARMACEUTICALS CORPORATION, *et al.*,

*Plaintiffs-Appellants*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States Department of Health and Human Services, *et al.*,

*Defendants-Appellees*,

v.

340B HEALTH, *et al.*,

*Intervenor Defendants-Appellees*.

---

On Appeal from the United States District Court for the District of Columbia Nos. 21-cv-2608, 24-cv-3220, 24-cv-3337, 25-cv-117 (District Judge Dabney L. Friedrich) and No. 24-cv-3188 (District Judge Rudolph Contreras)

---

### BRIEF FOR INTERVENORS

WILLIAM SCHULTZ
MARGARET DOTZEL
COURTNEY CHRISTENSEN
ZUCKERMAN SPAEDER LLP
2100 L Street, NW, Suite 400
Washington, D.C. 20037
(202) 637-4881
wschultz@zuckerman.com
mdotzel@zuckerman.com
cchristensen@zuckerman.com
*Counsel for 340B Health,*
*UMass Memorial Medical Center, and*
*Genesis HealthCare System*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### (A) Parties and Amici

All parties, intervenors, and *amici* appearing before the district courts and in this Court are listed in the Brief for Appellant Johnson & Johnson Healthcare Systems, Inc. (J&J), and the Brief for Appellants Bristol Myers Squibb Company (BMS), Novartis Pharmaceuticals, Inc. (Novartis), Eli Lilly and Company and Eli Lilly USA (Lilly), and Kalderos.

340B Health, UMass Memorial Medical Center (UMass), and Genesis HealthCare Systems (Genesis) (together, Intervenors), certify that there are no parent companies, subsidiaries or affiliates of 340B Health, UMass, and Genesis, which have any outstanding securities in the hands of the public.

### (B) Rulings Under Review

BMS, Novartis, Lilly, and Kalderos (the *Lilly* Plaintiffs) appeal an Order and Memorandum Opinion issued on May 15, 2025, by District Judge Dabney L. Friedrich. (Dkt No. 24-cv-3337-DLF ECF Nos. 57 & 58; Dkt. No. 25-cv-117-DLF ECF Nos. 50 & 51; Dkt. No. 24-cv-3320-DLF ECF Nos. 50 & 51; Dkt. No. 21-cv-2608-DLF ECF Nos. 66 & 67). The District Court's opinion and order denied the *Lilly* Plaintiffs' Motions for Summary Judgment, granted in part and denied in part Intervenor' Cross Motion for Summary Judgment, and granted the Government

i

Defendants' Cross Motion for Summary Judgment. The District Court's opinion is not reported but is available at 2025 WL 1423630.

Plaintiff J&J appeals an Order and Memorandum Opinion issued on May 15, 2025, by District Judge Rudolph Contreras. (Dkt. No. 24-cv-3188 ECF Nos. 58 & 59). The District Court's order and opinion denied J&J's Motion for Summary Judgment and granted the Intervenor' and Government Defendants' Cross Motions for Summary Judgment. The District Court's opinion is not reported but is available at 2025 WL 1783901.

**(C) Related Cases**

*Sanofi U.S. LLC v. Kennedy et. al*, 24-cv-3496 (DLF).

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY ......................................................................................... ix

INTRODUCTION ...............................................................................1

ISSUES PRESENTED..........................................................................3

STATUTES AND REGULATIONS.......................................................4

STATEMENT OF THE CASE...............................................................4

   I.    The 340B Program ....................................................................4

   II.   340B Hospitals' Product Replenishment Inventory Management
       System.................................................................................9

   III.  Plaintiffs' Proposals to Unilaterally Impose Rebates and HRSA's
       Response ...........................................................................11

   IV.  Plaintiffs' Rational for Rebates: Claims of Alleged Abuse......................13

   V.   Proceedings Below ...............................................................18

STANDARD OF REVIEW ..................................................................20

SUMMARY OF THE ARGUMENT .....................................................20

ARGUMENT ....................................................................................21

   I.    The 340B Statute Does Not Permit Rebates.............................................21

     A.   The Plain Language of the Statute Requires Up-Front Price
         Reductions. .....................................................................21

        i.   *The "Shall Offer" Provision Requires the Ceiling Price to be Offered
           at the Time of Purchase*...................................................21

ii.   *Intervenors' interpretation does not render the word "rebate" surplusage.* .................................................................27

iii.  *ADAPs use of a rebate model does not violate the "Shall Offer" provision.* ........................................................................30

B.   The Statute Lacks Guardrails That Prevent Abuses under Plaintiffs' Rebate Plans. ...................................................................31

C.   Plaintiffs' Rebate Plan Requirements are Inconsistent with The Audit Structure Adopted by Congress. ..........................................36

II.   If the Statute Permits Rebates, HRSA Properly Exercised its Pre-Approval Authority. ....................................................................40

CONCLUSION ....................................................................................42

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

iv

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Portland Retail Druggists Ass'n*,
  425 U.S. 1 (1976) ...................................................................................11

*Am. Hosp. Ass'n v. Becerra*,
  596 U.S. 724 (2022) .................................................................................6

*Boechler, P.C. v. Comm'r of Internal Revenue*,
  596 U.S. 199 (2022) ...............................................................................25

*Chickasaw Nation v. United States*,
  534 U.S. 84 (2001) .................................................................................26

*City of Clarksville v. FERC*,
  888 F.3d 477 (D.C. Cir. 2018) ...............................................................21

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
  541 U.S. 246 (2004) ...............................................................................21

*Griffin v. Oceanic Contractors, Inc.*,
  458 U.S. 564 (1982) ...............................................................................31

*Johnson & Johnson Health Care Sys. Inc. v. Kennedy*,
  No. CV 24-3188 (RC), 2025 WL 1411076 (D.D.C. May 15, 2025) ...................34

*Mapes v. Reed*,
  487 F. Supp. 3d 20 (D.D.C. 2020) .........................................................37

*Moss by Mutakabbir v. Smith*,
  794 F. Supp. 11 (D.D.C. 1992) ..............................................................37

*Novartis Pharms. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024) ...................................................... 6, 10, 24

*Oregon Health & Sci. Univ. v. Engels*,
  No. CV 24-2184 (RC), 2025 WL 1707630 (D.D.C. June 17, 2025) ........... 39, 40

*Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*,
  43 F. Supp. 3d 28 (D.D.C. 2014) ...........................................................35

*Sanofi v. Kennedy,*
No. 24-cv-3496 (DLF) (D.D.C. Dec. 16, 2024)...................................11

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs,*
985 F.3d 1032 (D.C. Cir. 2021) ........................................................42

## STATUTES

42  U.S.C. § 256b(a)(2)(A) ...................................................................24

42 C.F.R. § 10.10 .................................................................................28

42 U.S.C § 1396r-8 (j)(1)(A) ..............................................................17

42 U.S.C. § 1396r-8 ................................................................ 14, 15, 28

42 U.S.C. § 1396r-8(c) ..........................................................................5

42 U.S.C. § 256 (d)(1)(B)(vi) ..............................................................29

42 U.S.C. § 256b(a)(1)............................................................. 24, 27, 29

42 U.S.C. § 256b(a)(2)(B) ....................................................................25

42 U.S.C. § 256b(a)(5) .........................................................................15

42 U.S.C. § 256b(a)(5)(A) ....................................................................25

42 U.S.C. § 256b(a)(5)(d) .....................................................................40

42 U.S.C. § 256b(d)(1)(B)(i)(I) ...........................................................29

42 U.S.C. §256b(a)(1)......................................................................4, 20

5 U.S.C. § 706......................................................................................42

## OTHER AUTHORITIES

Allen Dobson et al., *340B DSH Hospitals Serve Higher Share of Patients with Low
Incomes* (Dobson DaVanzo Health Economics Consulting (Sept. 26, 2022)........8

B. Garner, Modern English Usage 1020 (4th ed. 2016) ...........................26

Clarification on the Use of Medicaid Exclusion File (Dec. 12, 2014),
    https://www.hrsa.gov/sites/default/files/hrsa/opa/clarification-medicaid-
    exclusion.pdf............................................................................................. 14, 15, 16

*Drugmakers pulling $8 Billion Out of Safety-Net Hospitals*, 340B Health, (July
    2023) (last accessed Feb. 27, 2025) ...................................................................11

Federal Trade Commission, University of Michigan Advisory Opinion (Apr. 9,
    2010)..........................................................................................................................11

HRSA Program Integrity, FY 22 Audit Results,
    https://www.hrsa.gov/opa/program-integrity/fy-22-audit-results .......................17

HRSA, 340B Rebate Model Pilot Program,
    https://www.hrsa.gov/opa.....................................................................................32

HRSA, 340B Rebate Model Pilot Program,
    https://www.hrsa.gov/opa.....................................................................................42

J&J Summary Judgment Reply, 24-cv-3188 (Dkt. No. 52) ...................................38

KNG Health Consulting, *340B Hospitals Increased Contributions to
    Uncompensated and Unreimbursed Care During the Pandemic* (February 2025),
    340B Health ..............................................................................................................8

Public Law 111-1148, 124 Stat. 119 (a) ..................................................................8

Report to Congressional Committees, GAO-11-836, *Manufacturer Discounts in
    the 340B Program Offer Benefits, but Federal Oversight Needs Improvement*,
    GAO (Sept. 2011).......................................................................................................6

*Setting the Record Straight on 340B: Fact vs. Fiction*,
    Am. Hosp. Ass'n (Jan. 2025) ..................................................................................8

U.S. Gov't Accountability Off., GAO-20-212, *340B Drug Discount Program:
    Oversight of the Intersection with the Medicaid Drug Rebate Program Needs
    Improvement* (Jan. 27, 2020), Appendix III, https://bit.ly/3ZG0ctH. .................16

*UPDATED: Drugmakers Cutting 340B Discounts Reported Record Revenues in
    2021*, 340B Health (Jan. 13, 2023) (last accessed Feb. 27, 2025) .......................11

**REGULATIONS**

42 C.F.R. § 10.10(b) ................................................................29

42 C.F.R. § 10.10(b) (March 6, 2017) .....................................28

42 C.F.R. § 438.3(s)(3) ...........................................................18

61 Fed. Reg. 43459, 43554 (Aug. 23, 1996) .............................9

61 Fed. Reg. 65,406 (Dec. 12, 1996) .......................................40

63 Fed. Reg. 35,239 (June 29, 1998) .......................................30

82 Fed. Reg. 1,210 (Jan. 5, 2017) ...........................................30

82 Fed. Reg. 1210 (Jan. 5, 2017) .............................................28

82 Fed. Reg. 1210 (Jan. 5, 2017) .............................................28

340B Drug Pricing Program; Administrative Dispute Resolution Regulation,
89 Fed. Reg. 28,643 (Apr. 19, 2024)....................................39

Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate
Option, 62 Fed. Reg. 45823 (Aug. 29, 1997)........................5

Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992—
Rebate Option, 63 Fed. Reg. 35,239 (June 29, 1998) .....................5, 38

HRSA, Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed.
Reg, 65,406 (Dec. 12, 1996) ................................................39

**LEGISLATIVE MATERIAL**

137 Cong. Rec. E3,138-02 (daily ed. Sept. 24, (1991)..............................4

H.R. Rep. No. 102-384(II) (1992), 1992 WL 239341 ..............................6

# GLOSSARY

ADAP: AIDS Drug Assistance Program

ADR: Administrative Dispute Resolution Process

AMP: Average manufacturer price

CMS: Centers for Medicare and Medicaid Services

HHS: U.S. Department of Health and Human Services

HRSA: Health Resources and Services Administration

MDRP: Medicaid Drug Rebate Program

MEF: Medicaid Exclusion File

PPA: Pharmaceutical Pricing Agreement

## INTRODUCTION

This case presents a narrow question of statutory interpretation concerning how drug manufacturers, including Plaintiffs, fulfill their obligations under Section 340B of the Public Health Service Act (42 U.S.C. § 256b), the statute that established the 340B Drug Discount Program (the 340B Program). The 340B Program requires drug manufacturers that choose to participate in Medicaid and Medicare Part B to provide a discount on outpatient drugs to certain public and not-for-profit hospitals, community health centers, and other federally funded clinics that serve a disproportionate number of low-income patients (340B Providers, described in the statute as "covered entities"). 340B Providers use the cost savings from those discounts to support a variety of critical healthcare services to the communities they serve, including programs that provide free prescription drugs to low-income patients and community health clinics.

Since the inception of the 340B Program in 1992, drug manufacturers have complied with their obligations under the 340B statute by allowing 340B Providers to purchase 340B drugs at the statutorily prescribed discount, which is what the law requires. In the fall of 2024, Plaintiffs suddenly announced that providing the 340B discount upfront was unworkable. They claimed that providing back-end rebates would address abuses in the payment system and were necessary to comply with

their obligations under the Inflation Reduction Act. Some Plaintiffs claimed that 340B discounts violated their constitutional rights.

Plaintiffs proposed to switch to a rebate model, under which Plaintiffs would require 340B Providers to purchase their drugs at full price, collect and report data on each patient-dispensed drug, submit claims for rebates, and then wait for an unguaranteed amount of time that varies under each manufacturer's proposed rebate plan, until the manufacturer (or a third-party administrator employed by the manufacturer) determines whether the rebate claims are valid. If the drug company decides the claim is valid, 340B Providers must wait again for an unguaranteed period to receive reimbursement in the form of a rebate representing the difference between the drug's full price and the 340B price.

A rebate model will thwart the 340B Program's goal of generating money that can be used to serve low-income patients and communities. Delaying access to up-front discounts and allowing drug companies the discretion to reject those claims means that 340B Hospitals would have to spend significantly more to maintain their drug inventory and float Plaintiffs, whose annual profits are in the billions, the difference between the full price of the 340B drug and the 340B discount price. In other words, Plaintiffs would require financially strapped 340B Providers to give highly lucrative drug manufacturers interest-free loans. The financial consequences could be devasting to these non-profit hospitals and public health centers. Many

340B Providers will be unable to take on the extra financial burden and will have to cut critical health services, and low-income patients and communities will suffer.

The question at issue here is whether the text of the 340B statute permits the use of rebates in place of a discount. It does not. The relevant provision of section 340B (a)(1) contains only two sentences. The first sentence sets the maximum price that a manufacturer may charge for its drug (the "ceiling price" or the "340B discount price"), and the second requires that the manufacturers permit 340B Providers to purchase 340B drugs at or below the ceiling price. The case ends there.

Plaintiffs obviously dislike the 340B statute and spend pages on topics that have no legal relevance to this case, including unsupported claims about abuses in the 340B program. Even if their claims were valid, the proper audience for their policy grievances is Congress, not this Court. This Court should apply the plain language of the 340B statute and hold that it requires manufacturers to sell 340B drugs upfront at the statutory discount price, in line with the way the 340B Program has functioned since its inception in 1992.

## ISSUES PRESENTED

I.  Whether the 340B statue permits drug manufacturers to unilaterally impose a rebate model on 340B Providers.

II. Whether HRSA violated the Administrative Procedure Act by refusing to allow Plaintiff's proposed rebate models.

# STATUTES AND REGULATIONS

Except for 42 U.S.C. § 1396r-8, which is reprinted in the Addendum to this brief, all pertinent statutes and regulations are reprinted in the Government's brief.

# STATEMENT OF THE CASE

## I.    The 340B Program

In 1992, Congress enacted the 340B Program to require manufacturers to pass on the value of the new Medicaid rebates to safety net hospitals, community clinics, and other public and nonprofit health providers. 137 Cong. Rec. E3,138-02 (daily ed. Sept. 24, (1991)) (statement of Rep. Wyden), 137 Cong Rec E 3,138-02, at *E3,138-02 (Westlaw). Pursuant to the 340B statute, manufacturers are required to offer 340B Providers outpatient drugs for purchase at a discounted price, known as the 340B price or ceiling price. *See* 42 U.S.C. §256b(a)(1). Under the 340B Program, drug manufacturers enter into agreements with the Secretary of Health & Human Services (HHS) known as Pharmaceutical Pricing Agreements (PPAs). *Id.* PPAs reiterate the statutory formula used to calculate the price of 340B drugs. Under section 340B(a)(2), that formula begins with the average manufacturer price (AMP), which is defined in the Social Security Act, then subtracts a rebate percentage, which is calculated by a formula set out in the Medicaid statute that itself relies on calculations made in the prior quarter under the Medicaid Drug Rebate Program

(MDRP). 42 U.S.C. §§ 256b(a)(1), (a)(2)(A).[1] Since the inception of the 340B Program more than 30 years ago, drug manufacturers have met their obligation to provide price reductions under the 340B statute and PPAs by giving 340B Providers a discount at the time of purchase. JA1139; Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45823, 45824 (Aug. 29, 1997).

The Health Resources and Services Administration (HRSA), the Department of HHS agency responsible for overseeing the 340B Program, has permitted one exception to this practice for state AIDS Drug Assistance Programs (ADAPs). JA1139. Because most ADAPS do not purchase 340B drugs directly from drug manufacturers, they are unable to access 340B discounts. Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option, 63 Fed. Reg. 35,239, 35,242 (June 29, 1998). To remedy this, HRSA allows ADAPS to voluntarily utilize rebates as "an optional alternate means of accessing section 340B discount pricing"; however, HRSA permitted optional rebates to meet "the unique

---

[1]    The minimum amount of the discount is the greater of: (a) the "minimum [statutory] rebate percentage," currently either 23.1, 17.1 or 13 percent depending on the type of drug; or (b) the difference between AMP and "the lowest price" the drug company has charged during the "rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity," whichever is greater. The discount is further increased when manufacturers increase prices faster than the consumer price index for all urban consumers. 42 U.S.C. § 1396r-8(c)(1), (2).

needs" of these organizations and stated that it was not authorizing a rebate option beyond ADAPs. *Id.*

Congress's intent in creating the 340B Program was to "reduce the costs of operations" for 340B Providers and to allow them to "stretch scarce Federal funding as far as possible" so that they could reach more eligible patients. H.R. Rep. No. 102-384(II), at 12 (1992), 1992 WL 239341. As a unanimous Supreme Court recently noted, "340B hospitals perform valuable services for low-income and rural communities but have to rely on limited federal funding for support." *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 738 (2022).

The 340B Program has met those goals. The Program funds the provision of care to low-income and underserved communities by allowing 340B Providers to purchase necessary drugs at discounted prices but still receive the full reimbursement for those drugs from insurers. *See Novartis. v. Johnson,* 102 F.4th 452, 460 (D.C. Cir. 2024). As the U.S. General Accountability Office (GAO) found, "the up-front savings [340B Providers] realized on the cost of drugs, allowed [340B Providers] to support their missions by maintaining services and lowering medication costs for patients, which is consistent with the purpose of the program." Report to Congressional Committees, GAO-11-836, *Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement*, GAO 17–18 (Sept. 2011), https://www.gao.gov/assets/gao-11-836.pdf (2011 GAO Report).

Moreover, the GAO found that 340B Providers "used the 340B revenue generated by certain patients to offset losses incurred from other patients, which helped support the financial stability of the organization and allowed them to maintain services." *Id.* at 17. As a result, 340B Providers "serve more patients and . . . provide services that they might not have otherwise provided." *Id.*

340B Providers use 340B savings to expand patient access to services, such as providing patient transportation to critical services, free health screenings for low-income and unhoused populations, translation services, community health programs, and supporting specialty care programs. *Id.* at 17-18; JA929; JA931; JA987; JA1137. That is, they are not required to use 340B funds to provide drug discounts to patients, although many 340B Providers do so. JA1137. The 340B Program is successful because it empowers 340B Providers—those best suited to understanding the patients that they serve and the communities in which they operate—to determine how best to use the savings generated by the 340B Program to serve their patients and communities. *See id.* As a result, 340B Providers are able to create a critical safety net for low-income and other vulnerable patients. *E.g.,* JA929; JA931; JA987.

Because of the financial support from the 340B Program, 340B Hospitals have *increased* the amount of net patient revenue spent on uncompensated and unreimbursed care when compared to non-340B hospitals, with the gap widening from 17.5% higher for 340B Hospitals in 2019, to 29.1% higher in 2022. KNG

Health Consulting, *340B Hospitals Increased Contributions to Uncompensated and Unreimbursed Care During the Pandemic* (February 2025), 340B Health, https://tinyurl.com/29dfbbky. Similarly, in 2020 alone, 340B Hospitals provided nearly $85 billion in community benefits, an increase of nearly 25% from 2019. *Setting the Record Straight on 340B: Fact vs. Fiction*, Am. Hosp. Ass'n, 2 (Jan. 2025), https://www.aha.org/system/files/2018-02/340BFactsvsFiction.pdf.; Steven Heath et al., *340B DSH Hospitals Increased Uncompensated Care in 2020 Despite Significant Financial Stress*, Dobson DaVanzo Health Economics Consulting (2022), https://tinyurl.com/2skct63s. Compared to their non-340B counterparts, 340B Hospitals offer significantly more un- or under-reimbursed essential community services, including those that address broader health, wellness, and social needs. Allen Dobson et al., *340B DSH Hospitals Serve Higher Share of Patients with Low Incomes* (Dobson DaVanzo Health Economics Consulting (Sept. 26, 2022)), https://tinyurl.com/4vxkvxrm at 14. 340B Hospitals further account for 80% of hospitals offering burn care and transplants of lung, liver, and bone marrow, all of which are relatively unprofitable services. *Id.* at 15.

Recognizing its value, Congress expanded the 340B Program as part of the 2010 Affordable Care Act (ACA) to include additional 340B Providers. Public Law 111-1148, 124 Stat. 119 (a). In addition, the ACA added a provision that the PPAs "shall require that the manufacturer offer each covered entity covered outpatient

drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." 42 U.S.C. § 256b(a)(1).

## II.    340B Hospitals' Product Replenishment Inventory Management System

Only outpatient drugs, which are dispensed through pharmacies, prescribed to patients of 340B Providers are eligible to be purchased at the 340B discount price. Most pharmacies maintain a single inventory for drugs, as opposed to maintaining two separate inventories—one for 340B drugs and one for non-340B drugs. 61 Fed. Reg. 43459, 43554 (Aug. 23, 1996). That single inventory is replenished by purchasing drugs at the full price if they were used for non 340B patients and the discounted price if they were used for 340B patients. This is known as the "product replenishment" model. As noted by the district court in *J&J*, HRSA has blessed this practice since at least 1996. JA1140 (citing 61 Fed. Reg. at 43554 (describing the requirement of a separate inventory as a "wasteful concept with respect to time, space and money")). Product replenishment functions differently for in-house and contract pharmacies. *Compare* JA455 *with* JA377.

For in-house pharmacies, 340B Providers make an initial purchase of a drug at its full price and add that to their single inventory. JA455, JA1140. Some of the purchased drugs may be used for non-340B patients and some for 340B patients. After the pharmacy has dispensed a full package of that drug to 340B patients, it replenishes (or re-stocks) the supply of that drug by purchasing a package of that

drug at the 340B-discounted price. JA376. Going forward, every time the equivalent of a full package is dispensed to 340B patients it will be replenished at the 340B price. JA376; JA455. Similarly, once the pharmacy has dispensed the equivalent of a full package of the drug to non-340B patients, it purchases that package at the full price to replenish it stock.

Many 340B patients purchase their drugs at a local community pharmacy that has a contract with the 340B provider (referred to as a "contract pharmacy"). In those situations, 340B Providers also rely on the product replenishment model to manage drug inventory, but it functions slightly differently. The contract pharmacy dispenses a drug to a patient from its regular inventory, which has been purchased by the pharmacy at market price. JA376; *see also Novartis*, 102 F.4th at 457. Then, the covered entity or a third-party administrator that it employs identifies the patients who received drugs that are eligible for the 340B discount. *Id.* Once the pharmacy has dispensed a full package of the drug to 340B patients, the 340B Hospital purchases the drugs at the 340B discounted price and ships the drugs to the contract pharmacy that dispensed the drug, replenishing the pharmacy's stock for the drug it dispensed to 340B patients. *Id.*

The replenishment method of inventory control is used across industries. Both the Federal Trade Commission and the Supreme Court blessed this accounting mechanism. *Abbott Laboratories v. Portland Retail Druggists Ass'n*, 425 U.S. 1, 20

(1976); Federal Trade Commission, University of Michigan Advisory Opinion, at 1

(Apr. 9, 2010) https://tinyurl.com/bddasrpa.

### III. Plaintiffs' Proposals to Unilaterally Impose Rebates and HRSA's Response

Ignoring HRSA's prior instruction that rebates beyond ADAPs were not

allowed, in July 2024, J&J informed HRSA that it intended to utilize rebates instead

of the up-front discounts on covered drugs it (and every other drug manufacturer)

has provided since the inception of the 340B Program in 1992. JA1113. Soon after,

Plaintiffs Lilly, BMS, Novartis, and non-party Sanofi Pharmaceuticals U.S. LLC,

announced that they would also convert to rebates. JA115 (Lilly); JA146 (BMS);

JA261 (Novartis); *Sanofi v. Kennedy,* No. 24-cv-3496 (DLF) (D.D.C. Dec. 16,

2024), Dkt. No. 1-6.[2] Plaintiffs' claim that their plans to switch to rebates is in

response to "massive documented abuse," (Pl. Br. 11) which is discussed *infra* in

Section IV.

---

[2] If this Court determines that rebates are lawful, more drug manufacturers will almost certainly follow suit, as occurred five years ago when Lilly announced it would restrict the number of pharmacies that 340B Providers could contract with to distribute 340B drugs. While that restriction was initially limited to a single drug, Lilly subsequently expanded the limitation to cover all of its 340B drugs, and thirty-eight additional drug companies followed with similar restrictions. *Drugmakers pulling $8 Billion Out of Safety-Net Hospitals*, 340B Health, (July 2023) https://tinyurl.com/y767zwh7(last accessed Feb. 27, 2025); *UPDATED: Drugmakers Cutting 340B Discounts Reported Record Revenues in 2021*, 340B Health (Jan. 13, 2023) https://tinyurl.com/2s48z683 (last accessed Feb. 27, 2025).

Although each of Plaintiffs' proposed rebate plans differ, they all require 340B Hospitals to initially purchase drug products at full price. JA109 (Lilly); JA146 (BMS); JA226 (Novartis); JA1110 (J&J). That means that 340B Hospitals pay significantly more to maintain their drug inventory, hampering 340B Providers' ability to continue providing the type of services to low-income patients and communities discussed above. JA929-30; JA957-58; JA984; JA989-90; JA992. After dispensing a 340B drug, the 340B Provider is then able to apply for a rebate, representing the difference between the 340B price and the wholesale acquisition price. JA109 (Lilly); JA146 (BMS); JA227 (Novartis); JA1110 (J&J). In order to claim the rebate, 340B Hospitals would be required to collect and provide claims data to the drug manufacturers. JA109 (Lilly); JA146 (BMS); JA227 (Novartis); JA1110 (J&J). The drug manufacturer and the third-party administrator it employs would then determine whether the 340B Provider is entitled to a rebate, JA109 (Lilly); JA146 (BMS); JA227 (Novartis), JA1110 (J&J), essentially conditioning the 340B price on whether the manufacturer believes that a 340B Provider has complied with its obligations under the statute. If a manufacturer approves a rebate, there is no legal requirement for timely payment.

If the manufacturer and/or their third-party administrator determines that a 340B Provider is not entitled to a rebate, under some plans there is no right to an appeal and the plans that do offer an appeal use a process that is completely within

the manufacturer's control. For example, Lilly states only that the 340B Provider will be able to "ask questions and raise concerns, and to resubmit the claim, if necessary, after corrections are made." JA109. The 340B Provider may be able to seek redress through the statutorily created Administrative Dispute Resolution (ADR) Process implemented by HRSA and then appeal an unfavorable ADR decision to a federal court. However, that process is lengthy and costly, representing another expense that 340B Providers will bear should the proposed rebates be permitted. Because 340B Providers operate on razor thin (often negative) margins, these additional costs will be financially devastating to many 340B Providers and the patients and communities they serve. JA927; JA929-30; JA957-58; JA984; JA989-90; JA992.

In response to Plaintiffs' announcements regarding their intention to utilize rebates, HRSA notified Plaintiffs that because the Secretary had not yet approved Plaintiffs' proposed rebate models, imposing them on 340B Providers would result in termination of their PPAs, and, as a result, their ability to participate in Medicare Part B. JA450-52 (J&J); JA460-62 (Lilly); JA466-68 (BMS); JA473-75 (Novartis).

## IV.    Plaintiffs' Rational for Rebates: Claims of Alleged Abuse

Plaintiffs' claims that the 340B Program is subject to "massive documented abuse," (Pl. Br. 11) rest largely on HRSA's issuance of "duplicate discount" findings during its annual audits. A review of HRSA's duplicate discounts program, however,

demonstrates that Plaintiffs' claims of abuse, which in any event are irrelevant to the statutory interpretation question at issue in this case, depend on a serious misunderstanding of what a "duplicate discount" audit finding actually represents.

When a 340B Provider purchases a drug at the 340B discount price and dispenses that drug to a 340B patient, the Provider then bills the insurer. If the 340B drug is prescribed to a Medicaid patient, the insurer is a state Medicaid agency. Under the Medicaid Drug Rebate Program (MDRP), States are entitled to collect a rebate from manufacturers on certain Medicaid drugs. 42 U.S.C. § 1396r-8. Although not the model of clarity, the duplicate discount provision in the 340B statute is designed to ensure that manufacturers are not stuck providing both a 340B discount (to the 340B Provider) and a Medicaid Rebate (to the State Medicaid Agency). 42 U.S.C. § 1396r-8; 42 U.S.C. § 256b(a)(5)(A)(i). [3] If the manufacturer were to pay a rebate to the state under the MDRP for a drug that had been purchased at the 340B discount price, then it will have paid a "duplicate discount." *See id.*[4]

---

[3] The 340B statute states that a 340B Provider "shall not request payment from Medicaid for a 340B drug "if the drug is subject to" a Medicaid rebate. U.S.C. § 256b(a)(5)(A)(i). As interpreted by HRSA since the beginning of the program, this provision means that drugs can either be subject to the 340B discount or to the Medicaid rebate, but not both. *See* HRSA, Clarification of the Use of the Medicaid Exclusion File (Dec. 12, 2014) at https://www.hrsa.gov/sites/default/files/hrsa/opa/clarification-medicaid-exclusion.pdf (December 2014 MEF Clarification).

[4] It is not true that 340B Providers sometimes receive the benefit of two discounts because 340B Providers never receive a Medicaid Rebate; state Medicaid agencies

The statute directs the Secretary to establish a mechanism to ensure that 340B Providers comply with the statutory directive aimed at preventing duplicate discounts. 42 U.S.C. § 256b(a)(5)(A)(ii). Per that directive, the Secretary has established a mechanism that requires 340B Providers to list their Medicaid billing number on HRSA's 340B Medicaid Exclusion File (MEF) if they use 340B drugs for Medicaid Fee-for-Service (FFS) patients.[5] *See* Clarification on the Use of Medicaid Exclusion File (Dec. 12, 2014) at https://www.hrsa.gov/sites/default/files/hrsa/opa/clarification-medicaid-exclusion.pdf (December 2014 MEF Clarification). The MEF serves as reference for states to help them determine whether they should seek a Medicaid Rebate on a drug claim. *Id.* If the claim is made by a 340B Provider listed on the MEF (meaning they bought the drug at the 340B discount), then the state may not invoice or receive a Medicaid rebate from the manufacturer. *Id.* At least twenty-two states have created alternative methods to ensure that manufacturers are not providing duplicate discounts and do not rely on the MEF. U.S. Gov't Accountability Off., GAO-20-212, *340B Drug Discount Program: Oversight of the Intersection with the Medicaid*

---

do. 42 U.S.C. § 1396r-8. The duplicate discounts occur when the manufacturer is both selling a drug at a discount and providing the state a rebate. 42 U.S.C. § 256b(a)(5).

[5]    As discussed below, the process for preventing duplicate discounts on 340B drugs used for Medicaid managed care organization (MCO) patients is different and does not involve HRSA or 340B Providers.

*Drug Rebate Program Needs Improvement* (Jan. 27, 2020), Appendix III, https://bit.ly/3ZG0ctH.

HRSA audits 340B Providers' compliance with this mechanism. *See* December 2014 MEF Clarification. These audits review the MEF, and if that review shows that a 340B Provider made an error when listing their billing number on their MEF, even a typographical error, HRSA issues a "duplicate discount" finding against the 340B Provider. *See id.* This does not mean that duplicate discounts have been paid – it merely means that there was a listing error. *See id.* Unfortunately, that is where HRSA's role ends: HRSA does not investigate whether the state Medicaid agency actually invoiced the manufacturer for a Medicaid rebate for a 340B drug, *see id.,* and HRSA does not investigate whether a manufacturer paid the rebate, even if billed by the state Medicaid agency. If the 340B Provider wants the duplicate discount finding cleared from the record, it must investigate whether a duplicate discount has actually occurred, and Providers do investigate. That is why over two-thirds of the "duplicate discount findings" issued in 2022 were changed to an "MEF" error after a covered entity challenged the audit finding with letters from Medicaid agencies confirming that manufacturers did not actually pay a duplicate discount, despite an error appearing on the 340B Provider's MEF. *See* HRSA Program Integrity, FY 22 Audit Results, https://www.hrsa.gov/opa/program-integrity/fy-22-

16

audit-results. And that number would likely be even higher if all state Medicaid programs responded to the 340B Providers request for information.

In support of their claim that duplicate discounting is widespread (Pls. Br. 14), Plaintiffs cite a report by the Government Accountability Office. But this report also relies on HRSA's audit findings and, as explained above, those findings identify errors in listing drugs in the MEF, and not necessarily duplicate discounts. All this means that Plaintiffs' interpretations of HRSA's audit findings are overstated.

Plaintiffs assert that the *Lilly* court acknowledged that the duplication and diversion abuses in the 340B Program have been "widely documented." Pl. Br. 31. Not so. The *Lilly* court said that such documentation pertains to "*potential* abuses," JA397 (emphasis added), a description more consistent with what "duplicate discount" audit findings actually represent—or fail to represent—as discussed above. Further, contrary to Plaintiffs' mischaracterization or misunderstanding, for states that use Medicaid managed care organizations (MCOs) to administer their Medicaid programs, 340B Providers have no role in preventing the MCO from improperly claiming rebates on 340B claims. Instead, pursuant to the Medicaid statute, the Centers for Medicare & Medicaid Services (CMS) directs the states to exclude 340B MCO claims from their rebate requests. 42 U.S.C § 1396r-8 (j)(1)(A);

17

42 C.F.R. § 438.3(s)(3); *see also* JA379 ("[t]he responsibility for preventing duplications for managed care organizations falls to state Medicaid agencies").

In sum, Plaintiffs have provided no valid support for their claims about systemic compliance issues nor shared their own data, analyses, or methodology, which they claim to have.

## V.    Proceedings Below

Plaintiffs filed suit in the District Court for the District of Columbia against the Secretary of HHS and other Government Defendants, claiming that HRSA's refusal to approve the proposed rebate model violates the Administrative Procedure Act. JA88 (Lilly); JA130 (BMS); JA203 (Novartis); JA1082 (J&J). Intervenors moved to intervene because of the significant impact the proposed rebates would have on 340B Providers, and both the *J&J* and *Lilly* courts granted Intervenors' Motions. JA269; JA1133.

Both the *Lilly* and *J&J* courts denied Plaintiffs' Motions for Summary Judgment and accepting the Government's legal arguments, awarded judgment to the Defendants, JA369 (*Lilly* court); JA1134 (*J&J* court). First, both courts held that the Secretary has authority to require pre-approval of a rebate model and rejected Plaintiffs' contention that any pre-approval must be included in the PPA. JA392 (*Lilly* court); JA1150 (*J&J* court). Second, both courts found that the Government had not violated the APA when it declined to approve Plaintiffs' rebate plans. JA399

18

(*Lilly* court); JA1163 (*J&J* court). The courts further found that, contrary to Plaintiffs' arguments, there were distinct differences between Plaintiffs' proposed rebate plans and the replenishment model and rebate models used by ADAPs. JA395-956 (*Lilly* Court); JA1157-60 (*J&J* court).

The *Lilly* court concluded that Plaintiffs' remaining claims under the APA—namely that HRSA had not adequately addressed whether the proposed rebates would combat claimed program abuse and help manufacturers comply with their obligations under the Inflation Reduction Act—were not ripe because HRSA had not yet made a final decision regarding the rebates and was expected to provide new guidance for stakeholders within 30 days. JA399.

The *J&J* court found that HRSA had adequately explained its legal authority to support its proposed "'Secretarial approval' policy," and therefore denied J&J's Motion for Summary Judgment. JA1162.

Both the *Lilly* and *J&J* courts rejected Intervenors' argument that rebates are impermissible under the 340B statute. JA389 (*Lilly* court); JA1150 (*J&J* court).

19

## STANDARD OF REVIEW

Intervenors adopt the Government Defendants' statement of the Standard of Review. Gov. Br. 23.

## SUMMARY OF THE ARGUMENT

This case presents a straightforward question of statutory interpretation: whether the 340B statute permits rebate models. It does not. First, the statute's plain language requires manufacturers "to offer" 340B Providers covered drugs "for purchase" at or below the ceiling price. *See* 42 U.S.C. §256b(a)(1). Thus, the statutory language mandates an upfront discount. Plaintiffs' reading of the statute fails at the outset because it erases one half of section 340B(a)(1)'s text. Intervenors are the only parties in this case that give meaning to each word in the relevant portion of the 340B statute.

Second, the 340B statute lacks the guardrails that would prevent abuses under Plaintiffs' proposed rebate plans.

Third, Plaintiffs' proposed rebate models are inconsistent with the audit provision in the 340B statute and as such cannot operate within the 340B Program as Congress designed it.

Alternatively, if this Court determines that rebates are permissible, it should affirm the district courts' findings that HRSA did not violate the APA by refusing to allow manufacturers' rebate models, JA399 (*Lilly* court); JA1163 (*J&J* court), and

20

that HRSA adequately differentiated Plaintiffs' rebate models from ADAPs and the product replenishment inventory management system. JA395-96 (*Lilly* Court); JA1157-60 (*J&J* court). Furthermore, HRSA appropriately considered the harm that the rebate plans would cause 340B Providers, and neither Plaintiffs' claims about any inadequacies in HRSA program integrity oversight nor their concerns about the implementation of the Inflation Reduction Act provide a basis for overturning HRSA's decision.

## ARGUMENT

### I.   The 340B Statute Does Not Permit Rebates

#### A. The Plain Language of the Statute Requires Up-Front Price Reductions.

##### i.   The "Shall Offer" Provision Requires the Ceiling Price to be Offered at the Time of Purchase.

"In addressing a question of statutory interpretation, we begin with the text." *City of Clarksville v. FERC*, 888 F.3d 477, 482-83 (D.C. Cir. 2018) (citing *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004)). By its plain terms, the 340B statute requires up-front price reductions from manufacturers when 340B Providers purchase covered drugs. The relevant provision of the 340B statute contains only two sentences. Contrary to Plaintiffs' approach, this Court must review both sentences of the provision to determine whether the statute permits a rebate model.

21

The first sentence states that:

> The Secretary shall enter into an agreement with each
> manufacturer of covered outpatient drugs under which the
> amount required to be paid (taking into account any rebate
> or discount, as provided by the Secretary) to the
> manufacturer for covered outpatient drugs . . . purchased
> by a covered entity . . . does not exceed an amount equal
> to the average manufacturer price for the drug . . . reduced
> by the rebate percentage described in paragraph (2).

42 U.S.C. § 256b(a)(1). The very next sentence of the statute, known as the "shall

offer" provision, *Sanofi*, 58 F.4th at 703, reads:

> Each such agreement shall require that the manufacturer
> furnish the Secretary with reports. . . and shall require that
> the manufacturer offer each covered entity covered
> outpatient drugs for purchase at or below the applicable
> ceiling price if such drug is made available to any other
> purchaser at any price.

42 U.S.C. § 256b(a)(1). Under the statute, "ceiling price" means "the maximum

price that covered entities may permissibly be required to pay for the drug." *Id.*

These two sentences work in tandem. The first sentence establishes the

maximum price for 340B drugs. JA389. Standing alone, that sentence says nothing

about *how* the "amount required to be paid" is effectuated. Instead, it simply

describes how much the manufacturer may charge. *See* 42 U.S.C. § 256b(a)(1). In

contrast, the "shall offer" provision determines how the price is effectuated: it must

be offered "for purchase at or below the ceiling price." *Id.*

22

The 340B statute makes clear that the operative time that the ceiling price must be offered is at the time of purchase. The "shall offer" provision requires that drug manufacturers "offer"—that is, "present for acceptance or rejection," [6]— covered drugs at or below the ceiling price when covered entities "purchase"—that is, "obtain by paying money or its equivalent, buy"[7]—covered drugs. No one disputes that under the proposed rebate models, 340B Providers will obtain covered drugs only when they pay the full price. And no one disputes that the full price for covered drugs is *above* the ceiling price. The proposed rebate models therefore necessarily violate the plain language of the statute. In other words, the "shall offer" provision means that manufacturers must provide up-front price reductions that keep covered drugs under the ceiling price at the time those drugs are purchased by 340B Providers.

Consistent with this statutory language, courts have recognized that the statute requires an up-front price reduction rather than a post-transaction refund. For example, courts have highlighted that the "shall offer" provision requires of manufacturers what its plain language demands: that "[i]f drug makers make drugs

---

[6]  *Offer*, American Heritage Dictionary, https://bit.ly/4jZThmZ (last accessed Feb. 17, 2025); *Offer*, Merriam-Webster, https://bit.ly/42V6kA3 (last accessed Feb. 17, 2025).

[7]  *Purchase*, Merriam-Webster https://www.merriam-webster.com/dictionary/purchase (last accessed July 11, 2025).

available to anyone at any price, they must 'offer' those drugs to 'covered entities' at a discount." *Sanofi*, 58 F.4th at 703 (emphases added); *see also Novartis*, 102 F.4th at 460 (interpreting the "shall offer" provision to require "manufacturers to propose to sell covered drugs to covered entities *at or below* a specified monetary amount") (emphasis added).

As explained below, the district courts (with whom the Government agrees) failed to put forward a rational explanation for how a rebate model—which would require covered entities to *purchase* covered drugs at a price far *above* the ceiling price—can comply with the plain language of the 340B statute. Plaintiffs have not even tried.

In their brief to this Court, Plaintiffs fail to even mention the "shall offer" provision. Plaintiffs and the Government hinge their legal support for a rebate model on the word "rebate" in a parenthetical in the first sentence of 340B(a)(1). Plaintiffs also refer to other uses of the word "rebate" in the statute but decline to acknowledge that nearly all references to "rebate" in the statute refer to Medicaid drug rebates, and not to rebates effectuating the ceiling price under the 340B statute. 42 U.S.C. § 256b(a)(1) ("amount required to be paid" is reduced by a "rebate percentage" which is determined based on the "average total rebate" required by section 1927(c) of the Social Security Act); *id.* § 256b(a)(2)(A) (describing how to generally calculate the Medicaid rebate percentage under section 1927(c) of the Social Security Act); *id.* §

256b(a)(2)(B) (describing how to calculate the Medicaid rebate percentage under section 1927(c) of the Social Security Act for over-the-counter drugs); *id.* § 256b(a)(5)(A) (directing the Secretary to implement a mechanism pertaining to the billing of 340B drugs to Medicaid when such drugs are subject to a Medicaid rebate).

Moreover, the plain language of the parenthetical in the first sentence does not describe how the ceiling price is effectuated, as both Plaintiffs and the Government suggest. Plaintiffs' theory requires this Court to transform the language of the statute from "the amount required to be paid (*taking into account any* rebate or discount, as *provided by the Secretary*)" to "the amount required to by paid (*by* rebate or discount, as determined by the *manufacturer*)." The Government states that the "340B ceiling price must 'tak[e] into account any rebate or discount, as provided by the Secretary'… any rebate or discount, therefore, must be accorded for in the manner the Secretary stipulates." Gov. Br. 24. But the ceiling price does not *have* to take into account a rebate or discount that the manufacturer provides; it is set by a statutory formula, which includes Medicaid rebates, but which is fully independent from whether a manufacturer effectuates the ceiling price through a discount or rebate. And, importantly, an argument that the parenthetical dictates how the discount is effectuated cannot be reconciled with the "shall offer" provision, which spells out how manufacturers must offer drugs for purchase at the ceiling price. *See Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 206 (2022) (noting

that a phrase "found in a parenthetical . . . is typically used to convey an 'aside' or 'afterthought'") (quoting B. Garner, Modern English Usage 1020 (4th ed. 2016))); *see also Chickasaw Nation v. United States*, 534 U.S. 84, 89 (2001) ("The use of parentheses emphasizes the fact that that which is within is meant simply to be illustrative, hence redundant.").

Finally, Plaintiffs' disregard of the fact that the "shall offer" provision was added to the statute in 2010 is another strike against their interpretations of the statute. Legislative history from the 1990s indicating that that the Secretary may permit manufacturers to use rebates is not useful in interpreting the statute because those statements were issued well before the "shall offer" provision was added in 2010.[8]

Contrary to the Government's suggestion, Intervenors are not "contend[ing] that Congress implicitly repealed" the parenthetical in § 256b(a)(1) through the passage of the ACA in 2010. Gov. Br. 38. As discussed below, that parenthetical describes how the ceiling price is calculated. It had the exact same meaning prior to

---

[8] And even if the pre-2010 legislative history were relevant to whether the Secretary has authority to allow rebates after 2010, it states that Congress anticipated that the Secretary would "use the mechanism that is the most effective and most efficient from the standpoint of each type of 'covered entity'" because a "mechanism that is appropriate to one type of 'covered entity,' such as community health centers, may not be appropriate to another type, such as State AIDS drug purchasing programs." House Report 102-384 Part 2 to accompany H.R 2890, (Sept 22, 1992). For all of the reasons stated above, the rebate plans Plaintiffs seek to adopt would not qualify under the standard in the 1992 legislative history.

2010 and after. However, in 2010, Congress made changes to the statute that require manufacturers to offer the ceiling price through an upfront discount. And Congress's codification of the status quo is consistent with labeling the change as a "conforming amendment" to those designed to improve program integrity. Intervenors thus do not need to clear any heightened burden to prove that the plain language of the statute means exactly what it says.

> ii. *Intervenors' interpretation does not render the word "rebate" surplusage.*

Instead of engaging with the plain language of the "shall offer" provision, both the *Lilly* and *J&J* courts rejected Intervenors' argument by relying on the parenthetical in the first sentence of the relevant provision, which says that the amount to be paid "tak[es] into account any rebate or discount, as provided by the Secretary." 42 U.S.C. § 256b(a)(1). The *J&J* court further stated that Intervenors interpretation of the statute renders the word "rebate" in the parenthetical surplusage. JA1150. That is not so.

The first sentence of section 340B(a)(1) binds the manufacturer to the "amount required to be paid" in the Pharmaceutical Pricing Agreement (PPA) (the ceiling price), which is based on the price calculated for the Medicaid Drug Rebate Program. The parenthetical phrase gives the Secretary authority to adjust the Medicaid rebate calculation (the "amount required to be paid") through a "rebate" or a "discount" when the Medicaid formula cannot be used.

For example, new drugs have no Medicaid "rebate percentage," because that percentage is calculated after the drugs have been on the market for at least a quarter of the calendar year. 42 U.S.C. § 1396r-8(k)(8). Because there is no Medicaid "rebate percentage," there is no means by which to calculate the ceiling price using that percentage. In this event, the statute provides the Secretary the authority to set the ceiling price by reducing the drug's wholesale price by the minimum percentage required under the Medicaid rebate formula. 42 C.F.R. § 10.10(c); *see also* 82 Fed. Reg. 1210, 1214–17 (Jan. 5, 2017). In other words, in this situation the Secretary may set the ceiling price by discounting the drug's price by a certain percentage. *Id.* The ceiling price therefore "tak[es] into account… [a] discount… as provided by the Secretary." 42 U.S.C. 256b(a)(1).

Similarly, the Secretary adjusts the 340B price whenever the Medicaid rebate amount is higher than or equal to the drug's AMP, which happens when a drug manufacturer raises its prices faster than the rate of inflation, triggering a statutory inflation penalty. Under the calculation set forth in the 340B statute, the inflation penalty can cause the ceiling price to be zero—or even a negative amount. 42 C.F.R. § 10.10(b) (March 6, 2017); 82 Fed. Reg. 1210, 1214–17 (Jan. 5, 2017). A negative ceiling price would mean that manufacturers would actually pay 340B Providers that purchase their drugs, creating "operational challenges" unique to the 340B Program. 82 Fed. Reg. 1210, 1214–17 (Jan. 5, 2017). To remedy these challenges that arise

from rebates provided in other statutes he administers, such as the Medicaid Drug Rebate Program and the Inflationary Penalty, the Secretary sets the ceiling price at $0.01. *Id.*; 42 C.F.R. § 10.10(b). Again, the ceiling price "tak[es] into account . . . any rebate . . . as provided by the Secretary." 42 U.S.C. § 256b(a)(1).

Plaintiffs have argued that the Secretary's authority to adjust the ceiling price comes from section 340B(d)(1)(B)(i)(1), added in 2010, which directs the Secretary to "[d]evelop[] and publish[] through an appropriate policy or regulatory issuance, precisely defined standards and methodology for the calculation of ceiling prices." 42 U.S.C. § 256b(d)(1)(B)(i)(I). But Plaintiffs fail to recognize that the Secretary has been adjusting the ceiling price for new drugs and drugs that would have a zero or negative ceiling price since the beginning of the 340B Program.[9] The provision Plaintiffs refer to was enacted in the same amendment to the 340B statute that gave the HHS Office of Inspector General (OIG) the authority to impose civil penalties on drug manufacturers that overcharged 340B entities. 42 U.S.C. § 256 (d)(1)(B)(vi). With the addition of civil penalties, Congress appropriately directed HRSA to clarify how the Secretary sets the ceiling price so that drug manufacturers would know how

---

[9] 60 Fed. Reg. 51488 (Oct. 2, 1995) (discussing calculation of the ceiling price for new drugs); Dept. of HHS, Office of the Inspector General, Review of 340B Prices, https://oig.hhs.gov/documents/evaluation/2359/OEI-05-02-00073-Complete%20Report.pdf (July 2006) (OIG Report) 14 (HRSA's penny price policy "has been a routine practice since the program started"); 82 Fed. Reg. 1,215 (Jan. 5, 2017) (noting HRSA's penny policy "long standing.").

to comply with their statutory obligations. 82 Fed. Reg. 1,210-11 (Jan. 5, 2017) (explaining the connection between the imposition of civil penalties and the need for clarification of ceiling prices); *see also id.* ("HHS is also finalizing this rule to provide increased clarity … as to the calculation of the ceiling price").

### iii. ADAPs use of a rebate model does not violate the "Shall Offer" provision.

Contrary to Plaintiffs' claims in the court below, Intervenors' interpretation of the "shall offer" provision of the 340B statute would not render rebates for ADAPs unlawful. The ADAPs' purchasing model can continue for a simple reason: ADAP rebates are voluntary. The "shall offer" provision of the 340B statute requires *manufacturers* to offer upfront discounts to 340B Providers. 42 U.S.C. § 256b(a)(1). However, it does not require 340B Providers to accept those discounts. HRSA has determined that ADAPs, which face unique operational challenges, may *choose* to access the 340B pricing though a rebate model. 63 Fed. Reg. 35,239, 35,240 (June 29, 1998) (noting that some state ADAPs are unable to access upfront discounts and may therefore "*elect* to access [340B] pricing through a rebate mechanism while other ADAP components may develop systems to access a direct discount.") (emphasis added).

30

### B. The Statute Lacks Guardrails That Prevent Abuses under Plaintiffs' Rebate Plans.

"[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). Yet Plaintiffs' interpretation of the statute could lead to a host of abuses that would follow the imposition of Plaintiffs' rebate plans, essentially upending the 340B program. These consequences further demonstrate that the statute was not designed to accommodate Plaintiffs' rebate plans.

As is clear from Plaintiffs' briefs, the form of the rebate program Plaintiffs propose would be controlled by Plaintiffs. The drug companies, not HRSA, nor the Secretary, nor Congress, decide *when* 340B Providers are in fact given post-purchase refunds following those entities' submission of whatever information and data Plaintiffs demand. Plaintiffs claim that 340B Providers will receive post-purchase refunds promptly, perhaps not more than a few days after submission of whatever voluminous information Plaintiffs will require. But nothing guarantees this will occur other than Plaintiffs' word. On Plaintiffs' reading of the statute, they could evidently give post-purchase refunds a week, or two weeks, or even months after 340B Providers purchase 340B drugs. What is to stop Plaintiffs from giving post-purchase refunds six months after 340B Providers make a 340B purchase? Or even years later? Nothing in the 340B statute constrains these results. And there is no

31

mechanism in the 340B statute that would allow 340B Providers to demand faster payment of the refunds. Nor does anything in the statute provide any sanction for a prolonged delay; for example, nothing in the 340B statute requires that manufacturers pay interest on a delayed payment. Such mechanisms are missing because the statute as written does not contemplate such post-purchase rebates in the first place.

Plaintiffs, the Government, and the courts below rely on legislative history to support their interpretation that the statute permits rebates. JA390 (*Lilly* court); JA1152 (*J&J* court); Gov. Br. 25; Pl. Br. 29. To the extent that Plaintiffs or the Government rely on that same legislative history to refute the argument that the structure of the statute did not contemplate rebates, a review of the language of the statute demonstrates that the statute did not address some of the pitfalls of a rebate option which may be why HRSA has been reluctant to allow rebates and why, to address issues raised with regard to the Inflation Reduction Act, HRSA has decided to implement only a pilot. HRSA, 340B Rebate Model Pilot Program, https://www.hrsa.gov/opa (last visited Aug. 6, 2025).

J&J "anticipates" functionality of its rebate model that would permit it to issue rebates within seven to ten days of receiving purchase data up to a certain "cap." JA1158-59. But this prediction rings hollow for several reasons: (1) J&J itself admits there is no guarantee that this is how the rebate model will function, it merely

"anticipates" that it will; (2) J&J provides no information about how large (or how small) the "cap" will be; (3) as discussed repeatedly, there is nothing in the 340B statute to stop J&J from changing the cap, the time frame, or even completely eliminating the deadline altogether. The *J&J* court recognized other flaws with this promise, stating that "the availability of this functionality on a wide scale would seem to defeat the stated necessity of a rebate model" and that exception "runs contrary to J&J's own explanation of its [rebate] model… which entitles covered entities to rebate "immediately upon dispensing." *Id.*

Likewise, the *Lilly* court correctly found that under a rebate model, 340B Providers would "effectively float manufacturers the 340B discount value," and "[t]hat financial burden on providers has factored into HRSA's preference for up-front discounts since the 340B program's inception." JA395. The court explained that the "higher carrying costs" "would 'reduce[] the [340B] hospitals' resources available for other patient care,' and 'smaller covered entities that already are operating on razor thin margins would be unable to handle these upfront costs.'" *Id.* These harms are anathema to 340B's purpose, as discussed.

Plaintiffs cannot rebut the harm that 340B Providers would face by paying the full price for 340B drugs upfront by promising to pay rebates within a certain timeframe. Even if the manufacturers abided by this self-imposed commitment for paying rebates, as the *J&J* court recognized, there is a gap in their logic: "its

33

arguments hinges on the assumption that the drugs are dispensed with enough time to submit a rebate claim for processing," *Johnson & Johnson Health Care Sys. Inc. v. Kennedy*, No. CV 24-3188 (RC), 2025 WL 1411076, at *4 (D.D.C. May 15, 2025), which is very unlikely to actually occur.

Plaintiffs incorrectly assume that 340B Providers control and can easily speed up the time between purchase and dispense, but this completely misunderstands drug inventory management and insurers' billing rules. Drugs sit on the pharmacy shelf until they are needed—a timeline that is not always easy to predict, and often quite long. Hospitals also often do not have the physical space to store unused drugs that they may have to purchase in advance of a patients' need for that drug in order to receive the rebate. Further, standard hospital operations do not permit hospitals to immediately provide claims data after dispense, and in any event, there is no evidence in the record that supports this assumption. The harms imposed on 340B Providers, coupled with the lack of any statutorily prescribed guidance related to Plaintiffs' rebate plans also leads to other serious problems. Given that Plaintiffs would evidently be allowed to give the post-purchase refunds whenever they want, or to deny the rebates based on the drug company's determination, the enforcement and compliance provisions of the 340B statute lose all meaning.

J&J has suggested that the ADR process and federal courts may provide some relief if a 340B Provider disagrees with a determination that J&J has made about the

validity of a claim that they are entitled to the 340B discount. But the ADR process and any appeal to the federal courts is far too time consuming and expensive to provide meaningful relief to a 340B Provider whose rebate claims have been wrongfully denied. 340B Providers, which often operate at a loss, most likely will not have the funds necessary to make an ADR challenge or pursue repeated action in the federal courts. Furthermore, a 340B Provider may be precluded from claiming in the ADR or elsewhere that it has not received the 340B price because a manufacturer can respond that it has not yet given the post-purchase refund or is still evaluating whether the rebate claim is valid. How long this process could last—with absolutely no recourse available to 340B Providers—is not spelled out by the 340B statute.

Finally, nothing other than Plaintiffs' good faith prevents them from demanding various other conditions, information, and data before they provide a post-purchase refund under their rebate models. And HRSA would have no ability to prevent consequences that will follow from Plaintiffs' rebate plans because HRSA and HHS lack rule-making authority under the 340B statute. *See, e.g.*, *Pharm. Rsch. & Manufacturers of Am. v. United States Dep't of Health & Hum. Servs.*, 43 F. Supp. 3d 28, 42–43 (D.D.C. 2014).

These severe consequences are plainly not consistent with the goals of the 340B. If permitted to adopt rebates under the manufacturers' plans, manufacturers

could, and Intervenors believe likely will, abuse the 340B Program, which is designed to provide drug discounts to 340B Providers so that the entities may continue to provide necessary care to vulnerable patient populations. This approach is misguided as a policy matter; fortunately, it is also barred by the 340B statute.

### C. Plaintiffs' Rebate Plan Requirements are Inconsistent with The Audit Structure Adopted by Congress.

The manufacturers proposed data requirements, if permitted, would render the audit provisions in the 340B statute meaningless. The 340B statute provides that:

> AUDITING—A covered entity *shall permit the Secretary and the manufacturer* of a covered outpatient drug that is subject to an agreement under this subsection with the entity . . . to audit at the Secretary's or the manufacturer's expense *the records of the entity that directly pertain to the entity's compliance* with the requirements [prohibiting duplicate discounts and diversion to non-340B patients].

42 U.S.C. § 256b(a)(5)(C) (emphasis added). The statute further provides that:

> If the Secretary finds, after audit . . . and after notice and hearing, *that a covered entity is in violation of a requirement* [prohibiting duplicate discounts and diversion], *the covered entity shall be liable to the manufacturer* of the covered outpatient drug that is the subject of the violation in an amount equal to the reduction in the price of the drug . . . under the agreement between the entity and the manufacturer under this paragraph.

*Id.* § 256b(a)(5)(D) (emphasis added). Plaintiffs' rebate plans are entirely at odds with this statutory structure.

36

The claims-data requirements in Plaintiffs' rebate plans render the audit provision useless. Plaintiffs insist that the claims-data requirements are necessary to give teeth to the audit provision because they need the data to demonstrate that there is cause to audit, but, as explained below, this is not only incorrect, it also understates what the proposed rebate plans accomplish. If Plaintiffs' rebate plans are permitted, drug manufacturers will have the leverage to require 340B Providers to turn over all claim-level data necessary to validate 340B claims. Yet this type of information is the same information the audit provision contemplates. Congress gave manufacturers an explicit mechanism to seek this information and to ensure compliance with the statute. Plaintiffs' interpretation of the statute, which they rely on as justification for their rebate plans, thus renders nugatory the audit provision and is an end-run around the proper procedure. *See e.g.*, *Moss by Mutakabbir v. Smith*, 794 F. Supp. 11, 13 (D.D.C. 1992) (declining to bless a course of action that "would be a complete end-run around the procedures established by the statute"); *Mapes v. Reed*, 487 F. Supp. 3d 20, 25 (D.D.C. 2020) (a litigant "is not permitted to 'end-run'" statutory procedures when those procedures provide the proper recourse). At best, the audit provision, like the "shall offer" provision, is superfluous under Plaintiffs' incorrect reading of the 340B statute.

J&J has claimed that its rebate model does not replace the audit process because of the differences between data collected during an audit and the data

collected under its proposed rebate model. J&J Summary Judgment Reply, 24-cv-3188 (Dkt. No. 52) 18. Any claimed differences in the data collection does not solve this structural issue because, as discussed below, nothing in the 340B statute provides any limitation on the data J&J could request from 340B Providers if it is permitted to condition rebates on data submission. And nothing prevents J&J from imposing heightened data requirements on 340B Providers for any reason it chooses. Nothing prevents J&J from asking for the same information it requests in an audit before issuing a rebate.

J&J further maintains that audits serve a different purpose from the rebate model because an audit is an historical analysis of payments, whereas a rebate dictates whether a payment may be issued in the future. But J&J misses the point; the statue already includes a compliance mechanism—audits—and, in any event, J&J's rebate plan requirements run afoul of the 340B system's principles that manufacturers may not condition payment on compliance with the statute. Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option, 63 Fed. Reg. 35,239, 35,242 (June 29, 1998). Critically, when HRSA approved the rebate model for ADAPs, HRSA cautioned manufacturers that they may not "condition a rebate contract or agreement upon…  entities' compliance with the provisions of section 340B." *Id.* at 35,239.

38

Moreover, the statute envisions Secretarial oversight of audits. *See* 42 U.S.C. § 256b(a)(5)(C); *see also* HRSA, Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996); 340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28,643, 28,646 (Apr. 19, 2024). In rejecting an effort by providers to sue manufacturers for overcharges, the Supreme Court reasoned that "Congress placed the Secretary (acting through her designate, HRSA) in control of § 340B's drug-price prescriptions" and that allowing 340B Providers to take matters into their own hands would frustrate the statutory scheme. 563 U.S. at 114, 116. Because HRSA is best suited to oversee all aspects of the 340B program and to take appropriate compliance actions when necessary, Congress "assigned no auxiliary enforcement role to covered entities." *Id.* at 117. But the Plaintiffs data requirement conditions for receiving a rebate effectively remove HRSA from the auditing and compliance process.

In arguing that the audit system is ineffective, Plaintiffs have pointed out that 340B Providers have sued HRSA to block manufacturers' audits. Those suits by six out of tens of thousands of 340B Providers were recently dismissed. *Oregon Health & Sci. Univ. v. Engels*, No. CV 24-2184 (RC), 2025 WL 1707630, at *1 (D.D.C. June 17, 2025), and would not be a justification for such a sweeping change to the 340B Program, even if that change were consistent with the statute, which it is not.

Nor do manufacturers need claims data to establish reasonable cause to initiate an audit, which can be established by showing significant changes in quantities of specific drugs ordered by a 340B Provider and complaints from patients/other manufacturers about activities of a 340B Provider. 61 Fed. Reg. 65,406 (Dec. 12, 1996). Intervenors are not aware of HRSA ever denying a manufacturer's audit request.

Finally, when a manufacturer withholds a rebate, or finds it "invalid," the manufacturer is effectively imposing a financial sanction on a 340B Provider. To be sure, "[n]oncompliance with the prohibitions against duplicate discounts and diversions is sanctionable, including with liability to the manufacturer for underpayment for the drugs." *Oregon Health,* 2025 WL 1707630, at *2. But those sanctions may only be levied by HRSA after an audit and a notice and hearing. *Id.* (citing 42 U.S.C. § 256b(a)(5)(d)).

Through the rebate model, Plaintiffs seek to short-circuit these processes and take matters into their own hands, imposing *their* view of compliance. This is plainly at odds with the text and structure of 340B.

## II.    If the Statute Permits Rebates, HRSA Properly Exercised its Pre-Approval Authority

Should this Court determine that the statute permits rebates, Intervenors agree with the Government that the Secretary has the authority to pre-approve any rebate plans and that the pre-approval need not be included in the PPA. Gov. Br. 25-30.

Additionally, for the reasons discussed in the Government's brief, Intervenors agree that the Secretary adequately explained why he was not approving the manufacturers' proposed rebate plans, and adequately differentiated rebates from the product replenishment system (Gov. Br. 34-37) and ADAPs (Gov. Br. 32-34).[10]

HRSA also adequately considered the harm that Plaintiffs' rebate plans will cause 340B Providers; the record is replete with letters from 340B Providers that give concrete examples of the impact that the rebate plans will have on the patients and communities they serve. JA927; JA929-30; JA 957-58; JA984; JA989-90; JA992. As both district courts recognized, HRSA was entitled to consider that harm while it evaluated Plaintiffs' rebate plans. JA395 (*Lilly*) JA1159-60 (*J&J*). Plaintiffs' claimed justifications for the rebate plans are centered on alleged duplicate discount findings and concerns about the implementation of the Inflation Reduction Act. As discussed above, there is nothing to support Plaintiffs' arguments about duplicate discounts. And any concern they may have claimed to have about compliance with the Inflation Reduction Act is being addressed separately by HRSA in the rebate pilot program it recently announced. HRSA, 340B Rebate Model Pilot Program,

---

[10] Contrary to J&J's assertions, the *J&J* court did not disregard "extensive record evidence of program abuse" (J&J Br. 23) in reaching this conclusion but, in fact, addressed J&J's claims regarding program integrity within 340B and the Inflation Reduction Act. Instead, the J&J court stated that it "struggles to understand the necessity of J&J's rebate model as it relates to program integrity." JA1163. Intervenors maintain program integrity concerns are overstated.

https://www.hrsa.gov/opa. As such, those claims certainly cannot justify the magnitude of harm the rebate plans will have on providers.

Should this Court determine that HRSA's decision was arbitrary and capricious, the appropriate relief would be to set aside of the policy letters and to remand to HRSA to reconsider Plaintiffs' requests and further explain its decision. 5 U.S.C. § 706(2) (empowering a reviewing court to "set aside agency action, findings, and conclusions").

Moreover, because any deficiencies in HRSA's decision are remedial and allowing Plaintiffs to disrupt the 30 years of effectuating the 340B price through discounts will cause immediate harm and disruption, this Court should leave HRSA's letters in effect while giving HRSA an opportunity to further explain its decision-making if it finds deficiencies in HRSA's decision. *See, e.g.*, *Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 985 F.3d 1032, 1051 (D.C. Cir. 2021) ("The decision whether to vacate depends on the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.").

## CONCLUSION

For the foregoing reasons, the Court should affirm on the ground that the 340B statute does not permit the imposition of mandatory rebates.

Dated: August 8, 2025                    Respectfully submitted,


                                         */s/ William B. Schultz*
                                         William B. Schultz (D.C. Bar No. 218990)
                                         Margaret M. Dotzel (D.C. Bar No. 425431)
                                         Courtney Christensen
                                         ZUCKERMAN SPAEDER LLP
                                         2100 L Street NW, Suite 400
                                         Washington, DC 20037
                                         Tel: (202) 778-1800
                                         Fax: (202) 822-8106
                                         wschultz@zuckerman.com
                                         mdotzel@zuckerman.com

                                         *Attorneys for Intervenor Defendants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,415 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word Microsoft Office 365 in Times New Roman 14-point font, a proportionally spaced typeface.

*/s/ William B. Schultz*
William B. Schultz

**ADDENDUM**

# TABLE OF CONTENTS

42 U.S.C. § 1396r-8 ...........................................................................................Add. 1

## 42 U.S.C. § 1396r-8

### § 1396r-8. Payment for covered outpatient drugs

### (a)Requirement for rebate agreement

### (1)In general

In order for payment to be available under section 1396b(a) of this title or under part B of subchapter XVIII for covered outpatient drugs of a manufacturer, the manufacturer must have entered into and have in effect a rebate agreement described in subsection (b) with the Secretary, on behalf of States (except that, the Secretary may authorize a State to enter directly into agreements with a manufacturer), and must meet the requirements of paragraph (5) (with respect to drugs purchased by a covered entity on or after the first day of the first month that begins after November 4, 1992) and paragraph (6). Any agreement between a State and a manufacturer prior to April 1, 1991, shall be deemed to have been entered into on January 1, 1991, and payment to such manufacturer shall be retroactively calculated as if the agreement between the manufacturer and the State had been entered into on January 1, 1991. If a manufacturer has not entered into such an agreement before March 1, 1991, such an agreement, subsequently entered into, shall become effective as of the date on which the agreement is entered into or, at State option, on any date thereafter on or before the first day of the calendar quarter that begins more than 60 days after the date the agreement is entered into.

### (2)Effective date

Paragraph (1) shall first apply to drugs dispensed under this subchapter on or after January 1, 1991.

### (3)Authorizing payment for drugs not covered under rebate agreements

Paragraph (1), and section 1396b(i)(10)(A) of this title, shall not apply to the dispensing of a single source drug or innovator multiple source drug if (A)(i) the State has made a determination that the availability of the drug is essential to the health of beneficiaries under the State plan for medical assistance; (ii) such drug has been given a rating of 1-A by the Food and Drug Administration; and (iii)(I) the physician has obtained approval for use of the drug in advance of its dispensing in accordance with a prior authorization program described in subsection (d), or

Add. 1

(II) the Secretary has reviewed and approved the State's determination under subparagraph (A); or (B) the Secretary determines that in the first calendar quarter of 1991, there were extenuating circumstances. The preceding sentence shall not apply to a single source drug or innovator multiple source drug of a manufacturer for any period described in section 5000D(c)(1) of the Internal Revenue Code of 1986 with respect to the manufacturer.

**(4)Effect on existing agreements**

In the case of a rebate agreement in effect between a State and a manufacturer on November 5, 1990, such agreement, for the initial agreement period specified therein, shall be considered to be a rebate agreement in compliance with this section with respect to that State, if the State agrees to report to the Secretary any rebates paid pursuant to the agreement and such agreement provides for a minimum aggregate rebate of 10 percent of the State's total expenditures under the State plan for coverage of the manufacturer's drugs under this subchapter. If, after the initial agreement period, the State establishes to the satisfaction of the Secretary that an agreement in effect on November 5, 1990, provides for rebates that are at least as large as the rebates otherwise required under this section, and the State agrees to report any rebates under the agreement to the Secretary, the agreement shall be considered to be a rebate agreement in compliance with the section for the renewal periods of such agreement.

**(5)Limitation on prices of drugs purchased by covered entities**

**(A)Agreement with Secretary**

A manufacturer meets the requirements of this paragraph if the manufacturer has entered into an agreement with the Secretary that meets the requirements of section 256b of this title with respect to covered outpatient drugs purchased by a covered entity on or after the first day of the first month that begins after November 4, 1992.

**(B)"Covered entity" defined**

In this subsection, the term "covered entity" means an entity described in section 256b(a)(4) of this title.

**(C)Establishment of alternative mechanism to ensure against duplicate discounts or rebates**

If the Secretary does not establish a mechanism under section 256b(a)(5)(A) of this title within 12 months of November 4, 1992, the following requirements shall apply:

**(i)Entities**

Each covered entity shall inform the single State agency under section 1396a(a)(5) of this title when it is seeking reimbursement from the State plan for medical assistance described in section 1396d(a)(12) of this title with respect to a unit of any covered outpatient drug which is subject to an agreement under section 256b(a) of this title.

**(ii)State agency**

Each such single State agency shall provide a means by which a covered entity shall indicate on any drug reimbursement claims form (or format, where electronic claims management is used) that a unit of the drug that is the subject of the form is subject to an agreement under section 256b of this title, and not submit to any manufacturer a claim for a rebate payment under subsection (b) with respect to such a drug.

**(D)Effect of subsequent amendments**

In determining whether an agreement under subparagraph (A) meets the requirements of section 256b of this title, the Secretary shall not take into account any amendments to such section that are enacted after November 4, 1992.

**(E)Determination of compliance**

A manufacturer is deemed to meet the requirements of this paragraph if the manufacturer establishes to the satisfaction of the Secretary that the manufacturer would comply (and has offered to comply) with the provisions of section 256b of this title (as in effect immediately after November 4, 1992) and would have entered into an agreement under such section (as such section was in effect at such time), but for a legislative change in such section after November 4, 1992.

**(6)Requirements relating to master agreements for drugs procured by Department of Veterans Affairs and certain other Federal agencies**

**(A)In general**

A manufacturer meets the requirements of this paragraph if the manufacturer complies with the provisions of section 8126 of Title 38, including the requirement of entering into a master agreement with the Secretary of Veterans Affairs under such section.

**(B)Effect of subsequent amendments**

In determining whether a master agreement described in subparagraph (A) meets the requirements of section 8126 of Title 38, the Secretary shall not take into account any amendments to such section that are enacted after November 4, 1992.

**(C)Determination of compliance**

A manufacturer is deemed to meet the requirements of this paragraph if the manufacturer establishes to the satisfaction of the Secretary that the manufacturer would comply (and has offered to comply) with the provisions of section 8126 of Title 38, (as in effect immediately after November 4, 1992) and would have entered into an agreement under such section (as such section was in effect at such time), but for a legislative change in such section after November 4, 1992.

**(7)Requirement for submission of utilization data for certain physician administered drugs**

**(A)Single source drugs**

In order for payment to be available under section 1396b(a) of this title for a covered outpatient drug that is a single source drug that is physician administered under this subchapter (as determined by the Secretary), and that is administered on or after January 1, 2006, the State shall provide for the collection and submission of such utilization data and coding (such as J-codes and National Drug Code numbers) for each such drug as the Secretary may specify as necessary to identify the manufacturer of the drug in order to secure rebates under this section for drugs administered for which payment is made under this subchapter.

**(B)Multiple source drugs**

**(i)Identification of most frequently physician administered multiple source drugs**

Not later than January 1, 2007, the Secretary shall publish a list of the 20 physician administered multiple source drugs that the Secretary determines have the highest dollar volume of physician administered drugs dispensed under this subchapter. The Secretary may modify such list from year to year to reflect changes in such volume.

**(ii)Requirement**

In order for payment to be available under section 1396b(a) of this title for a covered outpatient drug that is a multiple source drug that is physician administered (as determined by the Secretary), that is on the list published under clause (i), and that is administered on or after January 1, 2008, the State shall provide for the submission of such utilization data and coding (such as J-codes and National Drug Code numbers) for each such drug as the Secretary may specify as necessary to identify the manufacturer of the drug in order to secure rebates under this section.

**(C)Use of NDC codes**

Not later than January 1, 2007, the information shall be submitted under subparagraphs (A) and (B)(ii) using National Drug Code codes unless the Secretary specifies that an alternative coding system should be used.

**(D)Hardship waiver**

The Secretary may delay the application of subparagraph (A) or (B)(ii), or both, in the case of a State to prevent hardship to States which require additional time to implement the reporting system required under the respective subparagraph.

**(b)Terms of rebate agreement**

**(1)Periodic rebates**

**(A)In general**

A rebate agreement under this subsection shall require the manufacturer to provide, to each State plan approved under this subchapter, a rebate for a rebate period in an amount specified in subsection (c) for covered outpatient drugs of the manufacturer

dispensed after December 31, 1990, for which payment was made under the State plan for such period, including such drugs dispensed to individuals enrolled with a medicaid managed care organization if the organization is responsible for coverage of such drugs. Such rebate shall be paid by the manufacturer not later than 30 days after the date of receipt of the information described in paragraph (2) for the period involved.

**(B)Offset against medical assistance**

Amounts received by a State under this section (or under an agreement authorized by the Secretary under subsection (a)(1) or an agreement described in subsection (a)(4)) in any quarter, including amounts received by a State under subsection (c)(4), shall be considered to be a reduction in the amount expended under the State plan in the quarter for medical assistance for purposes of section 1396b(a)(1) of this title.

**(C)Special rule for increased minimum rebate percentage**

**(i)In general**

In addition to the amounts applied as a reduction under subparagraph (B), for rebate periods beginning on or after January 1, 2010, during a fiscal year, the Secretary shall reduce payments to a State under section 1396b(a) of this title in the manner specified in clause (ii), in an amount equal to the product of--

**(I)** 100 percent minus the Federal medical assistance percentage applicable to the rebate period for the State; and

**(II)** the amounts received by the State under such subparagraph that are attributable (as estimated by the Secretary based on utilization and other data) to the increase in the minimum rebate percentage effected by the amendments made by subsections (a)(1), (b), and (d) of section 2501 of the Patient Protection and Affordable Care Act, taking into account the additional drugs included under the amendments made by subsection (c) of section 2501 of such Act.

The Secretary shall adjust such payment reduction for a calendar quarter to the extent the Secretary determines, based upon subsequent utilization and other data, that the reduction for such quarter was greater or less than the amount of payment reduction that should have been made.

**(ii)Manner of payment reduction**

The amount of the payment reduction under clause (i) for a State for a quarter shall be deemed an overpayment to the State under this subchapter to be disallowed against the State's regular quarterly draw for all Medicaid spending under section 1396b(d)(2) of this title. Such a disallowance is not subject to a reconsideration under section 1316(d) of this title.

**(2)State provision of information**

**(A)State responsibility**

Each State agency under this subchapter shall report to each manufacturer not later than 60 days after the end of each rebate period and in a form consistent with a standard reporting format established by the Secretary, information on the total number of units of each dosage form and strength and package size of each covered outpatient drug dispensed after December 31, 1990, for which payment was made under the plan during the period, including such information reported by each medicaid managed care organization, and shall promptly transmit a copy of such report to the Secretary.

**(B)Audits**

A manufacturer may audit the information provided (or required to be provided) under subparagraph (A). Adjustments to rebates shall be made to the extent that information indicates that utilization was greater or less than the amount previously specified.

**(3)Manufacturer provision of price and drug product information**

**(A)In general**

Each manufacturer with an agreement in effect under this section shall report to the Secretary--

**(i)** not later than 30 days after the last day of each rebate period under the agreement--

**(I)** on the average manufacturer price (as defined in subsection (k)(1)) for covered outpatient drugs for the rebate period under the agreement (including for all such

drugs that are sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act); and

**(II)** for single source drugs and innovator multiple source drugs (including all such drugs that are sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act), on the manufacturer's best price (as defined in subsection (c)(1)(C)) for such drugs for the rebate period under the agreement;

**(ii)** not later than 30 days after the date of entering into an agreement under this section on the average manufacturer price (as defined in subsection (k)(1)) as of October 1, 1990 for each of the manufacturer's covered outpatient drugs (including for such drugs that are sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act);

**(iii)** for calendar quarters beginning on or after January 1, 2004, in conjunction with reporting required under clause (i) and by National Drug Code (including package size)--

**(I)** the manufacturer's average sales price (as defined in section 1395w-3a(c) of this title) and the total number of units specified under section 1395w-3a(b)(2)(A) of this title;

**(II)** if required to make payment under section 1395w-3a of this title, the manufacturer's wholesale acquisition cost, as defined in subsection (c)(6) of such section; and

**(III)** information on those sales that were made at a nominal price or otherwise described in section 1395w-3a(c)(2)(B) of this title;

for a drug or biological described in subparagraph (C), (D), (E), or (G) of section 1395u(o)(1) of this title or section 1395rr(b)(14)(B) of this title, and, for calendar quarters beginning on or after January 1, 2007 and only with respect to the information described in subclause (III), for covered outpatient drugs;

**(iv)** not later than 30 days after the last day of each month of a rebate period under the agreement, on the manufacturer's total number of units that are used to calculate the monthly average manufacturer price for each covered outpatient drug; and

**(v)** not later than 30 days after the last day of each month of a rebate period under the agreement, such drug product information as the Secretary shall require for each of the manufacturer's covered outpatient drugs.

Information reported under this subparagraph is subject to audit by the Inspector General of the Department of Health and Human Services. Beginning July 1, 2006, the Secretary shall provide on a monthly basis to States under subparagraph (D)(iv) the most recently reported average manufacturer prices for single source drugs and for multiple source drugs and shall, on at least a quarterly basis, update the information posted on the website under subparagraph (D)(v) (relating to the weighted average of the most recently reported monthly average manufacturer prices). For purposes of applying clause (iii), for calendar quarters beginning on or after January 1, 2022, a drug or biological described in the flush matter following such clause includes items, services, supplies, and products that are payable under part B of subchapter XVIII as a drug or biological.

### (B)Verification surveys of average manufacturer price and manufacturer's average sales price

The Secretary may survey wholesalers and manufacturers that directly distribute their covered outpatient drugs, when necessary, to verify manufacturer prices and manufacturer's average sales prices (including wholesale acquisition cost) if required to make payment reported under subparagraph (A). The Secretary may impose a civil monetary penalty in an amount not to exceed $100,000 on a wholesaler, manufacturer, or direct seller, if the wholesaler, manufacturer, or direct seller of a covered outpatient drug refuses a request for information about charges or prices by the Secretary in connection with a survey under this subparagraph or knowingly provides false information. The provisions of section 1320a-7a of this title (other than subsections (a) (with respect to amounts of penalties or additional assessments) and (b)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply to a penalty or proceeding under section 1320a-7a(a) of this title.

### (C)Penalties

### (i)Failure to provide timely information

In the case of a manufacturer with an agreement under this section that fails to provide information required under subparagraph (A) on a timely basis, the amount of the penalty shall be increased by $10,000 for each day in which such information has not been provided and such amount shall be paid to the Treasury, and, if such information is not reported within 90 days of the deadline imposed, the agreement shall be suspended for services furnished after the end of such 90-day period and until the date such information is reported (but in no case shall such suspension be for a period of less than 30 days).

**(ii)False information**

Any manufacturer with an agreement under this section that knowingly provides false information, including information related to drug pricing, drug product information, and data related to drug pricing or drug product information, is subject to a civil money penalty in an amount not to exceed $100,000 for each item of false information. Such civil money penalties are in addition to other penalties as may be prescribed by law. The provisions of section 1320a-7a of this title (other than subsections (a), (b), (f)(3), and (f)(4)) shall apply to a civil money penalty under this subparagraph in the same manner as such provisions apply to a penalty or proceeding under section 1320a-7a(a) of this title.

**(iii)Misclassified drug product or misreported information**

**(I)In general**

Any manufacturer with an agreement under this section that knowingly (as defined in section 1003.110 of title 42, Code of Federal Regulations (or any successor regulation)) misclassifies a covered outpatient drug, such as by knowingly submitting incorrect drug product information, is subject to a civil money penalty for each covered outpatient drug that is misclassified in an amount not to exceed 2 times the amount of the difference between--

**(aa)** the total amount of rebates that the manufacturer paid with respect to the drug to all States for all rebate periods during which the drug was misclassified; and

**(bb)** the total amount of rebates that the manufacturer would have been required to pay, as determined by the Secretary using drug product information provided by

the manufacturer, with respect to the drug to all States for all rebate periods during which the drug was misclassified if the drug had been correctly classified.

**(II)Other penalties and recovery of underpaid rebates**

The civil money penalties described in subclause (I) are in addition to other penalties as may be prescribed by law and any other recovery of the underlying underpayment for rebates due under this section or the terms of the rebate agreement as determined by the Secretary.

**(iv)Increasing oversight and enforcement**

Each year the Secretary shall retain, in addition to any amount retained by the Secretary to recoup investigation and litigation costs related to the enforcement of the civil money penalties under this subparagraph and subsection (c)(4)(B)(ii)(III), an amount equal to 25 percent of the total amount of civil money penalties collected under this subparagraph and subsection (c)(4)(B)(ii)(III) for the year, and such retained amount shall be available to the Secretary, without further appropriation and until expended, for activities related to the oversight and enforcement of this section and agreements under this section, including--

**(I)** improving drug data reporting systems;

**(II)** evaluating and ensuring manufacturer compliance with rebate obligations; and

**(III)** oversight and enforcement related to ensuring that manufacturers accurately and fully report drug information, including data related to drug classification.

**(D)Confidentiality of information**

Notwithstanding any other provision of law, information disclosed by manufacturers or wholesalers under this paragraph or under an agreement with the Secretary of Veterans Affairs described in subsection (a)(6)(A) (other than the wholesale acquisition cost for purposes of carrying out section 1395w-3a of this title) is confidential and shall not be disclosed by the Secretary or the Secretary of Veterans Affairs or a State agency (or contractor therewith) in a form which discloses the identity of a specific manufacturer or wholesaler, prices charged for drugs by such manufacturer or wholesaler, except--

**(i)** as the Secretary determines to be necessary to carry out this section, to carry out section 1395w-3a of this title (including the determination and implementation of the payment amount and the rebate), or to carry out section 1395w-3b of this title, section 1320f-1(f) of this title, including rebates under paragraph (4) of such section, or section 1395w-114b of this title,

**(ii)** to permit the Comptroller General to review the information provided,

**(iii)** to permit the Director of the Congressional Budget Office to review the information provided,

**(iv)** to States to carry out this subchapter,

**(v)** to the Secretary to disclose (through a website accessible to the public) the weighted average of the most recently reported monthly average manufacturer prices and the average retail survey price determined for each multiple source drug in accordance with subsection (f),

**(vi)** in the case of categories of drug product or classification information that were not considered confidential by the Secretary on the day before April 18, 2019, and

**(vii)** to permit the Executive Director of the Medicare Payment Advisory Commission and the Executive Director of the Medicaid and CHIP Payment and Access Commission to review the information provided.

The previous sentence shall also apply to information disclosed under section 1395w-102(d)(2) or 1395w-104(c)(2)(G) of this title and drug pricing data reported under the first sentence of section 1395w-141(i)(1) of this title. Any information disclosed to the Executive Director of the Medicare Payment Advisory Commission or the Executive Director of the Medicaid and CHIP Payment and Access Commission pursuant to this subparagraph shall not be disclosed by either such Executive Director in a form which discloses the identity of a specific manufacturer or wholesaler or prices charged for drugs by such manufacturer or wholesaler. Such information also shall not be disclosed by either such Executive Director to individual Commissioners of the Medicare Payment Advisory Commission or of the Medicaid and CHIP Payment and Access Commission in a form which discloses the identity of a specific manufacturer or wholesaler or prices charged for drugs by such manufacturer or wholesaler.

**(4)Length of agreement**

**(A)In general**

A rebate agreement shall be effective for an initial period of not less than 1 year and shall be automatically renewed for a period of not less than one year unless terminated under subparagraph (B).

**(B)Termination**

**(i)By the Secretary**

The Secretary may provide for termination of a rebate agreement for violation of the requirements of the agreement or other good cause shown. Such termination shall not be effective earlier than 60 days after the date of notice of such termination. The Secretary shall provide, upon request, a manufacturer with a hearing concerning such a termination, but such hearing shall not delay the effective date of the termination.

**(ii)By a manufacturer**

A manufacturer may terminate a rebate agreement under this section for any reason. Any such termination shall not be effective until the calendar quarter beginning at least 60 days after the date the manufacturer provides notice to the Secretary.

**(iii)Effectiveness of termination**

Any termination under this subparagraph shall not affect rebates due under the agreement before the effective date of its termination.

**(iv)Notice to States**

In the case of a termination under this subparagraph, the Secretary shall provide notice of such termination to the States within not less than 30 days before the effective date of such termination.

**(v)Application to terminations of other agreements**

The provisions of this subparagraph shall apply to the terminations of agreements described in section 256b(a)(1) of this title and master agreements described in section 8126(a) of Title 38.

**(C)Delay before reentry**

In the case of any rebate agreement with a manufacturer under this section which is terminated, another such agreement with the manufacturer (or a successor manufacturer) may not be entered into until a period of 1 calendar quarter has elapsed since the date of the termination, unless the Secretary finds good cause for an earlier reinstatement of such an agreement.

**(c)Determination of amount of rebate**

**(1)Basic rebate for single source drugs and innovator multiple source drugs**

**(A)In general**

Except as provided in paragraph (2), the amount of the rebate specified in this subsection for a rebate period (as defined in subsection (k)(8)) with respect to each dosage form and strength of a single source drug or an innovator multiple source drug shall be equal to the product of--

**(i)** the total number of units of each dosage form and strength paid for under the State plan in the rebate period (as reported by the State); and

**(ii)** subject to subparagraph (B)(ii), the greater of--

**(I)** the difference between the average manufacturer price and the best price (as defined in subparagraph (C)) for the dosage form and strength of the drug, or

**(II)** the minimum rebate percentage (specified in subparagraph (B)(i)) of such average manufacturer price,

for the rebate period.

**(B)Range of rebates required**

**(i)Minimum rebate percentage**

For purposes of subparagraph (A)(ii)(II), the "minimum rebate percentage" for rebate periods beginning--

**(I)** after December 31, 1990, and before October 1, 1992, is 12.5 percent;

**(II)** after September 30, 1992, and before January 1, 1994, is 15.7 percent;

**(III)** after December 31, 1993, and before January 1, 1995, is 15.4 percent;

**(IV)** after December 31, 1994, and before January 1, 1996, is 15.2 percent;

**(V)** after December 31, 1995, and before January 1, 2010  1 is 15.1 percent; and

**(VI)** except as provided in clause (iii), after December 31, 2009,  2 23.1 percent.

**(ii) Temporary limitation on maximum rebate amount**

In no case shall the amount applied under subparagraph (A)(ii) for a rebate period beginning--

**(I)** before January 1, 1992, exceed 25 percent of the average manufacturer price; or

**(II)** after December 31, 1991, and before January 1, 1993, exceed 50 percent of the average manufacturer price.

**(iii) Minimum rebate percentage for certain drugs**

**(I) In general**

In the case of a single source drug or an innovator multiple source drug described in subclause (II), the minimum rebate percentage for rebate periods specified in clause (i)(VI) is 17.1 percent.

**(II) Drug described**

For purposes of subclause (I), a single source drug or an innovator multiple source drug described in this subclause is any of the following drugs:

**(aa)** A clotting factor for which a separate furnishing payment is made under [section 1395u(o)(5)](#) of this title and which is included on a list of such factors specified and updated regularly by the Secretary.

**(bb)** A drug approved by the Food and Drug Administration exclusively for pediatric indications.

**(C) "Best price" defined**

For purposes of this section--

**(i) In general**

The term "best price" means, with respect to a single source drug or innovator multiple source drug of a manufacturer (including the lowest price available to any

entity for any such drug of a manufacturer that is sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act), the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States, excluding--

**(I)** any prices charged on or after October 1, 1992, to the Indian Health Service, the Department of Veterans Affairs, a State home receiving funds under section 1741 of Title 38, the Department of Defense, the Public Health Service, or a covered entity described in subsection (a)(5)(B) (including inpatient prices charged to hospitals described in section 256b(a)(4)(L) of this title);

**(II)** any prices charged under the Federal Supply Schedule of the General Services Administration;

**(III)** any prices used under a State pharmaceutical assistance program;

**(IV)** any depot prices and single award contract prices, as defined by the Secretary, of any agency of the Federal Government;

**(V)** the prices negotiated from drug manufacturers for covered discount card drugs under an endorsed discount card program under section 1395w-141 of this title; and

**(VI)** subject to clause (ii)(V), any prices charged which are negotiated by a prescription drug plan under part D of subchapter XVIII, by an MA-PD plan under part C of such subchapter with respect to covered part D drugs or by a qualified retiree prescription drug plan (as defined in section 1395w-132(a)(2) of this title) with respect to such drugs on behalf of individuals entitled to benefits under part A or enrolled under part B of such subchapter, or any discounts provided by manufacturers under the Medicare coverage gap discount program under section 1395w-114a of this title or under the manufacturer discount program under section 1395w-114c of this title.

**(ii)Special rules**

The term "best price"--

**(I)** shall be inclusive of cash discounts, free goods that are contingent on any purchase requirement, volume discounts, and rebates (other than rebates under this section, section 1395w–3a(i) of this title, or section 1395w–114b of this title);

**(II)** shall be determined without regard to special packaging, labeling, or identifiers on the dosage form or product or package;

**(III)** shall not take into account prices that are merely nominal in amount  3

**(IV)** in the case of a manufacturer that approves, allows, or otherwise permits any other drug of the manufacturer to be sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act, shall be inclusive of the lowest price for such authorized drug available from the manufacturer during the rebate period to any manufacturer, wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States, excluding those prices described in subclauses (I) through (IV) of clause (i); and

**(V)** in the case of a rebate period and a covered outpatient drug that is a selected drug (as referred to in section 1320f–1(c) of this title) during such rebate period, shall be inclusive of the maximum fair price (as defined in section 1320f(c)(3) of this title) for such drug with respect to such period.

### (iii)Application of auditing and recordkeeping requirements

With respect to a covered entity described in section 256b(a)(4)(L) of this title, any drug purchased for inpatient use shall be subject to the auditing and recordkeeping requirements described in section 256b(a)(5)(C) of this title.

### (D)Limitation on sales at a nominal price

### (i)In general

For purposes of subparagraph (C)(ii)(III) and subsection (b)(3)(A)(iii)(III), only sales by a manufacturer of covered outpatient drugs at nominal prices to the following shall be considered to be sales at a nominal price or merely nominal in amount:

**(I)** A covered entity described in section 256b(a)(4) of this title.

**(II)** An intermediate care facility for the mentally retarded.

Add. 17

**(III)** A State-owned or operated nursing facility.

**(IV)** An entity that--

**(aa)** is described in [section 501(c)(3) of the Internal Revenue Code of 1986](#) and exempt from tax under section 501(a) of such Act  4 or is State-owned or operated; and

**(bb)** would be a covered entity described in [section 256b(a)(4)](#) of this title insofar as the entity provides the same type of services to the same type of populations as a covered entity described in such section provides, but does not receive funding under a provision of law referred to in such section;

**(V)** A public or nonprofit entity, or an entity based at an institution of higher learning whose primary purpose is to provide health care services to students of that institution, that provides a service or services described under [section 300(a)](#) of this title.

**(VI)** Any other facility or entity that the Secretary determines is a safety net provider to which sales of such drugs at a nominal price would be appropriate based on the factors described in clause (ii).

**(ii)Factors**

The factors described in this clause with respect to a facility or entity are the following:

**(I)** The type of facility or entity.

**(II)** The services provided by the facility or entity.

**(III)** The patient population served by the facility or entity.

**(IV)** The number of other facilities or entities eligible to purchase at nominal prices in the same service area.

**(iii)Nonapplication**

Clause (i) shall not apply with respect to sales by a manufacturer at a nominal price of covered outpatient drugs pursuant to a master agreement under [section 8126 of Title 38](#).

**(iv)Rule of construction**

Nothing in this subparagraph shall be construed to alter any existing statutory or regulatory prohibition on services with respect to an entity described in clause (i)(IV), including the prohibition set forth in section 300a-6 of this title.

**(2)Additional rebate for single source and innovator multiple source drugs**

**(A)In general**

The amount of the rebate specified in this subsection for a rebate period, with respect to each dosage form and strength of a single source drug or an innovator multiple source drug, shall be increased by an amount equal to the product of--

**(i)** the total number of units of such dosage form and strength dispensed after December 31, 1990, for which payment was made under the State plan for the rebate period; and

**(ii)** the amount (if any) by which--

**(I)** the average manufacturer price for the dosage form and strength of the drug for the period, exceeds

**(II)** the average manufacturer price for such dosage form and strength for the calendar quarter beginning July 1, 1990 (without regard to whether or not the drug has been sold or transferred to an entity, including a division or subsidiary of the manufacturer, after the first day of such quarter), increased by the percentage by which the consumer price index for all urban consumers (United States city average) for the month before the month in which the rebate period begins exceeds such index for September 1990.

**(B)Treatment of subsequently approved drugs**

In the case of a covered outpatient drug approved by the Food and Drug Administration after October 1, 1990, clause (ii)(II) of subparagraph (A) shall be applied by substituting "the first full calendar quarter after the day on which the drug was first marketed" for "the calendar quarter beginning July 1, 1990" and "the month prior to the first month of the first full calendar quarter after the day on which the drug was first marketed" for "September 1990".

**(C)Treatment of new formulations**

**(i)In general**

In the case of a drug that is a line extension of a single source drug or an innovator multiple source drug that is an oral solid dosage form, the rebate obligation for a rebate period with respect to such drug under this subsection shall be the greater of the amount described in clause (ii) for such drug or the amount described in clause (iii) for such drug.

**(ii)Amount 1**

For purposes of clause (i), the amount described in this clause with respect to a drug described in clause (i) and rebate period is the amount computed under paragraph (1) for such drug, increased by the amount computed under subparagraph (A) and, as applicable, subparagraph (B) for such drug and rebate period.

**(iii)Amount 2**

For purposes of clause (i), the amount described in this clause with respect to a drug described in clause (i) and rebate period is the amount computed under paragraph (1) for such drug, increased by the product of--

**(I)** the average manufacturer price for the rebate period of the line extension of a single source drug or an innovator multiple source drug that is an oral solid dosage form;

**(II)** the highest additional rebate (calculated as a percentage of average manufacturer price) under this paragraph for the rebate period for any strength of the original single source drug or innovator multiple source drug; and

**(III)** the total number of units of each dosage form and strength of the line extension product paid for under the State plan in the rebate period (as reported by the State).

In this subparagraph, the term "line extension" means, with respect to a drug, a new formulation of the drug, such as an extended release formulation, but does not include an abuse-deterrent formulation of the drug (as determined by the Secretary), regardless of whether such abuse-deterrent formulation is an extended release formulation.

**(D)Maximum rebate amount**

In no case shall the sum of the amounts applied under paragraph (1)(A)(ii) and this paragraph with respect to each dosage form and strength of a single source drug or an innovator multiple source drug for a rebate period beginning after December 31, 2009, and before January 1, 2024, exceed 100 percent of the average manufacturer price of the drug.

**(3)Rebate for other drugs**

**(A)In general**

Except as provided in subparagraph (C), the amount of the rebate paid to a State for a rebate period with respect to each dosage form and strength of covered outpatient drugs (other than single source drugs and innovator multiple source drugs) shall be equal to the product of--

**(i)** the applicable percentage (as described in subparagraph (B)) of the average manufacturer price for the dosage form and strength for the rebate period, and

**(ii)** the total number of units of such dosage form and strength dispensed after December 31, 1990, for which payment was made under the State plan for the rebate period.

**(B)"Applicable percentage" defined**

For purposes of subparagraph (A)(i), the "applicable percentage" for rebate periods beginning--

**(i)** before January 1, 1994, is 10 percent,

**(ii)** after December 31, 1993, and before January 1, 2010, is 11 percent;  5 and

**(iii)** after December 31, 2009, is 13 percent.

**(C)Additional rebate**

**(i)In general**

The amount of the rebate specified in this paragraph for a rebate period, with respect to each dosage form and strength of a covered outpatient drug other than a single source drug or an innovator multiple source drug of a manufacturer, shall be

increased in the manner that the rebate for a dosage form and strength of a single source drug or an innovator multiple source drug is increased under subparagraphs (A) and (D) of paragraph (2), except as provided in clause (ii).

**(ii)Special rules for application of provision**

In applying subparagraphs (A) and (D) of paragraph (2) under clause (i)--

**(I)** the reference in subparagraph (A)(i) of such paragraph to "1990" shall be deemed a reference to "2014";

**(II)** subject to clause (iii), the reference in subparagraph (A)(ii) of such paragraph to "the calendar quarter beginning July 1, 1990" shall be deemed a reference to "the calendar quarter beginning July 1, 2014"; and

**(III)** subject to clause (iii), the reference in subparagraph (A)(ii) of such paragraph to "September 1990" shall be deemed a reference to "September 2014";

**(IV)** the references in subparagraph (D) of such paragraph to "paragraph (1)(A)(ii)", "this paragraph", and "December 31, 2009" shall be deemed references to "subparagraph (A)", "this subparagraph", and "December 31, 2014", respectively; and

**(V)** any reference in such paragraph to a "single source drug or an innovator multiple source drug" shall be deemed to be a reference to a drug to which clause (i) applies.

**(iii)Special rule for certain noninnovator multiple source drugs**

In applying paragraph (2)(A)(ii)(II) under clause (i) with respect to a covered outpatient drug that is first marketed as a drug other than a single source drug or an innovator multiple source drug after April 1, 2013, such paragraph shall be applied--

**(I)** by substituting "the applicable quarter" for "the calendar quarter beginning July 1, 1990"; and

**(II)** by substituting "the last month in such applicable quarter" for "September 1990".

**(iv)Applicable quarter defined**

In this subsection, the term "applicable quarter" means, with respect to a drug described in clause (iii), the fifth full calendar quarter after which the drug is marketed as a drug other than a single source drug or an innovator multiple source drug.

**(4)Recovery of unpaid rebate amounts due to misclassification of covered outpatient drugs**

**(A)In general**

If the Secretary determines that a manufacturer with an agreement under this section paid a lower per-unit rebate amount to a State for a rebate period as a result of the misclassification by the manufacturer of a covered outpatient drug (without regard to whether the manufacturer knowingly made the misclassification or should have known that the misclassification would be made) than the per-unit rebate amount that the manufacturer would have paid to the State if the drug had been correctly classified, the manufacturer shall pay to the State an amount equal to the product of--

**(i)** the difference between--

**(I)** the per-unit rebate amount paid to the State for the period; and

**(II)** the per-unit rebate amount that the manufacturer would have paid to the State for the period, as determined by the Secretary, if the drug had been correctly classified; and

**(ii)** the total units of the drug paid for under the State plan in the period.

**(B)Authority to correct misclassifications**

**(i)In general**

If the Secretary determines that a manufacturer with an agreement under this section has misclassified a covered outpatient drug (without regard to whether the manufacturer knowingly made the misclassification or should have known that the misclassification would be made), the Secretary shall notify the manufacturer of the misclassification and require the manufacturer to correct the misclassification in a timely manner.

**(ii)Enforcement**

If, after receiving notice of a misclassification from the Secretary under clause (i), a manufacturer fails to correct the misclassification by such time as the Secretary shall require, until the manufacturer makes such correction, the Secretary may do any or all of the following:

**(I)** Correct the misclassification, using drug product information provided by the manufacturer, on behalf of the manufacturer.

**(II)** Suspend the misclassified drug and the drug's status as a covered outpatient drug under the manufacturer's national rebate agreement, and exclude the misclassified drug from Federal financial participation in accordance with section 1396b(i)(10)(E) of this title.

**(III)** Impose a civil money penalty (which shall be in addition to any other recovery or penalty which may be available under this section or any other provision of law) for each rebate period during which the drug is misclassified not to exceed an amount equal to the product of--

**(aa)** the total number of units of each dosage form and strength of such misclassified drug paid for under any State plan during such a rebate period; and

**(bb)** 23.1 percent of the average manufacturer price for the dosage form and strength of such misclassified drug.

**(C)Reporting and transparency**

**(i)In general**

The Secretary shall submit a report to Congress on at least an annual basis that includes information on the covered outpatient drugs that have been identified as misclassified, any steps taken to reclassify such drugs, the actions the Secretary has taken to ensure the payment of any rebate amounts which were unpaid as a result of such misclassification, and a disclosure of expenditures from the fund created in subsection (b)(3)(C)(iv), including an accounting of how such funds have been allocated and spent in accordance with such subsection.

**(ii)Public access**

The Secretary shall make the information contained in the report required under clause (i) available to the public on a timely basis.

Add. 24

**(D)Other penalties and actions**

Actions taken and penalties imposed under this clause shall be in addition to other remedies available to the Secretary including terminating the manufacturer's rebate agreement for noncompliance with the terms of such agreement and shall not exempt a manufacturer from, or preclude the Secretary from pursuing, any civil money penalty under this subchapter or subchapter XI, or any other penalty or action as may be prescribed by law.

**(d)Limitations on coverage of drugs**

**(1)Permissible restrictions**

**(A)** A State may subject to prior authorization any covered outpatient drug. Any such prior authorization program shall comply with the requirements of paragraph (5).

**(B)** A State may exclude or otherwise restrict coverage of a covered outpatient drug if--

**(i)** the prescribed use is not for a medically accepted indication (as defined in subsection (k)(6));

**(ii)** the drug is contained in the list referred to in paragraph (2);

**(iii)** the drug is subject to such restrictions pursuant to an agreement between a manufacturer and a State authorized by the Secretary under subsection (a)(1) or in effect pursuant to subsection (a)(4); or

**(iv)** the State has excluded coverage of the drug from its formulary established in accordance with paragraph (4).

**(2)List of drugs subject to restriction**

The following drugs or classes of drugs, or their medical uses, may be excluded from coverage or otherwise restricted:

**(A)** Agents when used for anorexia, weight loss, or weight gain.

**(B)** Agents when used to promote fertility.

**(C)** Agents when used for cosmetic purposes or hair growth.

**(D)** Agents when used for the symptomatic relief of cough and colds.

**(E)** Prescription vitamins and mineral products, except prenatal vitamins and fluoride preparations.

**(F)** Nonprescription drugs, except, in the case of pregnant women when recommended in accordance with the Guideline referred to in section 1396d(bb)(2)(A) of this title, agents approved by the Food and Drug Administration under the over-the-counter monograph process for purposes of promoting, and when used to promote, tobacco cessation.

**(G)** Covered outpatient drugs which the manufacturer seeks to require as a condition of sale that associated tests or monitoring services be purchased exclusively from the manufacturer or its designee.

**(H)** Agents when used for the treatment of sexual or erectile dysfunction, unless such agents are used to treat a condition, other than sexual or erectile dysfunction, for which the agents have been approved by the Food and Drug Administration.

**(I), (J)** Repealed.Pub.L. 111-148, Title II, § 2502(a)(1)(A), Mar. 23, 2010, 124 Stat. 310

**(K)** Redesignated (H)

**(3)Update of drug listings**

The Secretary shall, by regulation, periodically update the list of drugs or classes of drugs described in paragraph (2) or their medical uses, which the Secretary has determined, based on data collected by surveillance and utilization review programs of State medical assistance programs, to be subject to clinical abuse or inappropriate use.

**(4)Requirements for formularies**

A State may establish a formulary if the formulary meets the following requirements:

**(A)** The formulary is developed by a committee consisting of physicians, pharmacists, and other appropriate individuals appointed by the Governor of the State (or, at the option of the State, the State's drug use review board established under subsection (g)(3)).

**(B)** Except as provided in subparagraph (C), the formulary includes the covered outpatient drugs of any manufacturer which has entered into and complies with an agreement under subsection (a) (other than any drug excluded from coverage or otherwise restricted under paragraph (2)).

**(C)** A covered outpatient drug may be excluded with respect to the treatment of a specific disease or condition for an identified population (if any) only if, based on the drug's labeling (or, in the case of a drug the prescribed use of which is not approved under the Federal Food, Drug, and Cosmetic Act but is a medically accepted indication, based on information from the appropriate compendia described in subsection (k)(6)), the excluded drug does not have a significant, clinically meaningful therapeutic advantage in terms of safety, effectiveness, or clinical outcome of such treatment for such population over other drugs included in the formulary and there is a written explanation (available to the public) of the basis for the exclusion.

**(D)** The State plan permits coverage of a drug excluded from the formulary (other than any drug excluded from coverage or otherwise restricted under paragraph (2)) pursuant to a prior authorization program that is consistent with paragraph (5).

**(E)** The formulary meets such other requirements as the Secretary may impose in order to achieve program savings consistent with protecting the health of program beneficiaries.

A prior authorization program established by a State under paragraph (5) is not a formulary subject to the requirements of this paragraph.

**(5)Requirements of prior authorization programs**

A State plan under this subchapter may require, as a condition of coverage or payment for a covered outpatient drug for which Federal financial participation is available in accordance with this section, with respect to drugs dispensed on or after July 1, 1991, the approval of the drug before its dispensing for any medically accepted indication (as defined in subsection (k)(6)) only if the system providing for such approval--

**(A)** provides response by telephone or other telecommunication device within 24 hours of a request for prior authorization; and

**(B)** except with respect to the drugs on the list referred to in paragraph (2), provides for the dispensing of at least 72-hour supply of a covered outpatient prescription drug in an emergency situation (as defined by the Secretary).

**(6)Other permissible restrictions**

A State may impose limitations, with respect to all such drugs in a therapeutic class, on the minimum or maximum quantities per prescription or on the number of refills, if such limitations are necessary to discourage waste, and may address instances of fraud or abuse by individuals in any manner authorized under this chapter.

**(7)Non-excludable drugs**

The following drugs or classes of drugs, or their medical uses, shall not be excluded from coverage:

**(A)** Agents when used to promote smoking cessation, including agents approved by the Food and Drug Administration under the over-the-counter monograph process for purposes of promoting, and when used to promote, tobacco cessation.

**(B)** Barbiturates.

**(C)** Benzodiazepines.

**(D)** Drugs and biological products described in subsection (ee)(1)(A) of section 1396d of this title that are furnished as medical assistance in accordance with subsection (a)(29) of such section and section 1396a(a)(10)(A) of this title.

**(E)** Drugs and biological products to which section 1396d(a)(4)(F) of this title and subclause (XVIII) in the matter following subparagraph (G) of section 1396a(a)(10) of this title apply that are furnished as medical assistance in accordance with such section or clause, respectively, for the treatment or prevention, of COVID-19, as described in such subparagraph or subclause, respectively, and section 1396a(a)(10)(A) of this title.

**(e)Treatment of pharmacy reimbursement limits**

**(1)In general**

During the period beginning on January 1, 1991, and ending on December 31, 1994--

**(A)** a State may not reduce the payment limits established by regulation under this subchapter or any limitation described in paragraph (3) with respect to the ingredient cost of a covered outpatient drug or the dispensing fee for such a drug below the limits in effect as of January 1, 1991, and

**(B)** except as provided in paragraph (2), the Secretary may not modify by regulation the formula established under sections 447.331 through 447.334 of title 42, Code of Federal Regulations, in effect on November 5, 1990, to reduce the limits described in subparagraph (A).

**(2)Special rule**

If a State is not in compliance with the regulations described in paragraph (1)(B), paragraph (1)(A) shall not apply to such State until such State is in compliance with such regulations.

**(3)Effect on State maximum allowable cost limitations**

This section shall not supersede or affect provisions in effect prior to January 1, 1991, or after December 31, 1994, relating to any maximum allowable cost limitation established by a State for payment by the State for covered outpatient drugs, and rebates shall be made under this section without regard to whether or not payment by the State for such drugs is subject to such a limitation or the amount of such a limitation.

**[(4)]** 6**Establishment of upper payment limits**

Subject to paragraph (5), the Secretary shall establish a Federal upper reimbursement limit for each multiple source drug for which the FDA has rated three or more products therapeutically and pharmaceutically equivalent, regardless of whether all such additional formulations are rated as such and shall use only such formulations when determining any such upper limit.

**(5)Use of AMP in upper payment limits**

The Secretary shall calculate the Federal upper reimbursement limit established under paragraph (4) as no less than 175 percent of the weighted average

(determined on the basis of utilization) of the most recently reported monthly average manufacturer prices for pharmaceutically and therapeutically equivalent multiple source drug products that are available for purchase by retail community pharmacies on a nationwide basis. The Secretary shall implement a smoothing process for average manufacturer prices. Such process shall be similar to the smoothing process used in determining the average sales price of a drug or biological under section 1395w-3a of this title.

**(f)Survey of retail prices; State payment and utilization rates; and performance rankings**

**(1)Survey of retail prices**

**(A)Use of vendor**

The Secretary may contract services for--

**(i)** with respect to a retail community pharmacy, the determination on a monthly basis of retail survey prices for covered outpatient drugs that represent a nationwide average of consumer purchase prices for such drugs, net of all discounts and rebates (to the extent any information with respect to such discounts and rebates is available); and

**(ii)** the notification of the Secretary when a drug product that is therapeutically and pharmaceutically equivalent and bioequivalent becomes generally available.

**(B)Secretary response to notification of availability of multiple source products**

If contractor notifies the Secretary under subparagraph (A)(ii) that a drug product described in such subparagraph has become generally available, the Secretary shall make a determination, within 7 days after receiving such notification, as to whether the product is now described in subsection (e)(4).

**(C)Use of competitive bidding**

In contracting for such services, the Secretary shall competitively bid for an outside vendor that has a demonstrated history in--

**(i)** surveying and determining, on a representative nationwide basis, retail prices for ingredient costs of prescription drugs;

Add. 30

**(ii)** working with retail community pharmacies, commercial payers, and States in obtaining and disseminating such price information; and

**(iii)** collecting and reporting such price information on at least a monthly basis.

In contracting for such services, the Secretary may waive such provisions of the Federal Acquisition Regulation as are necessary for the efficient implementation of this subsection, other than provisions relating to confidentiality of information and such other provisions as the Secretary determines appropriate.

**(D)Additional provisions**

A contract with a vendor under this paragraph shall include such terms and conditions as the Secretary shall specify, including the following:

**(i)** The vendor must monitor the marketplace and report to the Secretary each time there is a new covered outpatient drug generally available.

**(ii)** The vendor must update the Secretary no less often than monthly on the retail survey prices for covered outpatient drugs.

**(iii)** The contract shall be effective for a term of 2 years.

**(E)Availability of information to States**

Information on retail survey prices obtained under this paragraph, including applicable information on single source drugs, shall be provided to States on at least a monthly basis. The Secretary shall devise and implement a means for providing access to each State agency designated under [section 1396a(a)(5)](#) of this title with responsibility for the administration or supervision of the administration of the State plan under this subchapter of the retail survey price determined under this paragraph.

**(2)Annual State report**

Each State shall annually report to the Secretary information on--

**(A)** the payment rates under the State plan under this subchapter for covered outpatient drugs;

**(B)** the dispensing fees paid under such plan for such drugs; and

**(C)** utilization rates for noninnovator multiple source drugs under such plan.

**(3)Annual State performance rankings**

**(A)Comparative analysis**

The Secretary annually shall compare, for the 50 most widely prescribed drugs identified by the Secretary, the national retail sales price data (collected under paragraph (1)) for such drugs with data on prices under this subchapter for each such drug for each State.

**(B)Availability of information**

The Secretary shall submit to Congress and the States full information regarding the annual rankings made under subparagraph (A).

**(4)Appropriation**

Out of any funds in the Treasury not otherwise appropriated, there is appropriated to the Secretary of Health and Human Services $5,000,000 for each of fiscal years 2006 through 2010 to carry out this subsection.

**(g)Drug use review**

**(1)In general**

**(A)** In order to meet the requirement of section 1396a(a)(54) of this title, a State shall provide for a drug use review program described in paragraph (2) for covered outpatient drugs in order to assure that prescriptions (i) are appropriate, (ii) are medically necessary, and (iii) are not likely to result in adverse medical results. The program shall be designed to educate physicians and pharmacists to identify and reduce the frequency of patterns of fraud, abuse, gross overuse, excessive utilization, inappropriate or medically unnecessary care, or prescribing or billing practices that indicate abuse or excessive utilization, among physicians, pharmacists, and patients, or associated with specific drugs or groups of drugs, as well as potential and actual severe adverse reactions to drugs including education on therapeutic appropriateness, overutilization and underutilization, appropriate use of generic products, therapeutic duplication, drug-disease contraindications, drug-drug interactions, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse/misuse.

**(B)** The program shall assess data on drug use against predetermined standards, consistent with the following:

**(i)** compendia which shall consist of the following:

**(I)** American Hospital Formulary Service Drug Information;

**(II)** United States Pharmacopeia-Drug Information (or its successor publications); and

**(III)** the DRUGDEX Information System; and

**(ii)** the peer-reviewed medical literature.

**(C)** The Secretary, under the procedures established in section 1396b of this title, shall pay to each State an amount equal to 75 per centum of so much of the sums expended by the State plan during calendar years 1991 through 1993 as the Secretary determines is attributable to the statewide adoption of a drug use review program which conforms to the requirements of this subsection.

**(D)** States shall not be required to perform additional drug use reviews with respect to drugs dispensed to residents of nursing facilities which are in compliance with the drug regimen review procedures prescribed by the Secretary for such facilities in regulations implementing section 1396r of this title, currently at section 483.60 of title 42, Code of Federal Regulations.

**(2)Description of program**

Each drug use review program shall meet the following requirements for covered outpatient drugs:

**(A)Prospective drug review**

**(i)** The State plan shall provide for a review of drug therapy before each prescription is filled or delivered to an individual receiving benefits under this subchapter, typically at the point-of-sale or point of distribution. The review shall include screening for potential drug therapy problems due to therapeutic duplication, drug-disease contraindications, drug-drug interactions (including serious interactions with nonprescription or over-the-counter drugs), incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical

abuse/misuse. Each State shall use the compendia and literature referred to in paragraph (1)(B) as its source of standards for such review.

**(ii)** As part of the State's prospective drug use review program under this subparagraph applicable State law shall establish standards for counseling of individuals receiving benefits under this subchapter by pharmacists which includes at least the following:

**(I)** The pharmacist must offer to discuss with each individual receiving benefits under this subchapter or caregiver of such individual (in person, whenever practicable, or through access to a telephone service which is toll-free for long-distance calls) who presents a prescription, matters which in the exercise of the pharmacist's professional judgment (consistent with State law respecting the provision of such information), the pharmacist deems significant including the following:

**(aa)** The name and description of the medication.

**(bb)** The route, dosage form, dosage, route of administration, and duration of drug therapy.

**(cc)** Special directions and precautions for preparation, administration and use by the patient.

**(dd)** Common severe side or adverse effects or interactions and therapeutic contraindications that may be encountered, including their avoidance, and the action required if they occur.

**(ee)** Techniques for self-monitoring drug therapy.

**(ff)** Proper storage.

**(gg)** Prescription refill information.

**(hh)** Action to be taken in the event of a missed dose.

**(II)** A reasonable effort must be made by the pharmacist to obtain, record, and maintain at least the following information regarding individuals receiving benefits under this subchapter:

**(aa)** Name, address, telephone number, date of birth (or age) and gender.

**(bb)** Individual history where significant, including disease state or states, known allergies and drug reactions, and a comprehensive list of medications and relevant devices.

**(cc)** Pharmacist comments relevant to the individual's drug therapy.

Nothing in this clause shall be construed as requiring a pharmacist to provide consultation when an individual receiving benefits under this subchapter or caregiver of such individual refuses such consultation, or to require verification of the offer to provide consultation or a refusal of such offer.

**(B)Retrospective drug use review**

The program shall provide, through its mechanized drug claims processing and information retrieval systems (approved by the Secretary under section 1396b(r) of this title) or otherwise, for the ongoing periodic examination of claims data and other records in order to identify patterns of fraud, abuse, gross overuse, excessive utilization, inappropriate or medically unnecessary care, or prescribing or billing practices that indicate abuse or excessive utilization, among physicians, pharmacists and individuals receiving benefits under this subchapter, or associated with specific drugs or groups of drugs.

**(C)Application of standards**

The program shall, on an ongoing basis, assess data on drug use against explicit predetermined standards (using the compendia and literature referred to in subsection 7 (1)(B) as the source of standards for such assessment) including but not limited to monitoring for therapeutic appropriateness, overutilization and underutilization, appropriate use of generic products, therapeutic duplication, drug-disease contraindications, drug-drug interactions, incorrect drug dosage or duration of drug treatment, and clinical abuse/misuse and, as necessary, introduce remedial strategies, in order to improve the quality of care and to conserve program funds or personal expenditures.

**(D)Educational program**

The program shall, through its State drug use review board established under paragraph (3), either directly or through contracts with accredited health care educational institutions, State medical societies or State pharmacists

associations/societies or other organizations as specified by the State, and using data provided by the State drug use review board on common drug therapy problems, provide for active and ongoing educational outreach programs (including the activities described in paragraph (3)(C)(iii) of this subsection) to educate practitioners on common drug therapy problems with the aim of improving prescribing or dispensing practices.

**(3)State drug use review board**

**(A)Establishment**

Each State shall provide for the establishment of a drug use review board (hereinafter referred to as the "DUR Board") either directly or through a contract with a private organization.

**(B)Membership**

The membership of the DUR Board shall include health care professionals who have recognized knowledge and expertise in one or more of the following:

**(i)** The clinically appropriate prescribing of covered outpatient drugs.

**(ii)** The clinically appropriate dispensing and monitoring of covered outpatient drugs.

**(iii)** Drug use review, evaluation, and intervention.

**(iv)** Medical quality assurance.

The membership of the DUR Board shall be made up at least 1/3 but no more than 51 percent licensed and actively practicing physicians and at least 1/3 * * * 8 licensed and actively practicing pharmacists.

**(C)Activities**

The activities of the DUR Board shall include but not be limited to the following:

**(i)** Retrospective DUR as defined in section  7 (2)(B).

**(ii)** Application of standards as defined in section  7 (2)(C).

**(iii)** Ongoing interventions for physicians and pharmacists, targeted toward therapy problems or individuals identified in the course of retrospective drug use reviews

performed under this subsection. Intervention programs shall include, in appropriate instances, at least:

**(I)** information dissemination sufficient to ensure the ready availability to physicians and pharmacists in the State of information concerning its duties, powers, and basis for its standards;

**(II)** written, oral, or electronic reminders containing patient-specific or drug-specific (or both) information and suggested changes in prescribing or dispensing practices, communicated in a manner designed to ensure the privacy of patient-related information;

**(III)** use of face-to-face discussions between health care professionals who are experts in rational drug therapy and selected prescribers and pharmacists who have been targeted for educational intervention, including discussion of optimal prescribing, dispensing, or pharmacy care practices, and follow-up face-to-face discussions; and

**(IV)** intensified review or monitoring of selected prescribers or dispensers.

The Board shall re-evaluate interventions after an appropriate period of time to determine if the intervention improved the quality of drug therapy, to evaluate the success of the interventions and make modifications as necessary.

**(D)Annual report**

Each State shall require the DUR Board to prepare a report on an annual basis. The State shall submit a report on an annual basis to the Secretary which shall include a description of the activities of the Board, including the nature and scope of the prospective and retrospective drug use review programs, a summary of the interventions used, an assessment of the impact of these educational interventions on quality of care, and an estimate of the cost savings generated as a result of such program. The Secretary shall utilize such report in evaluating the effectiveness of each State's drug use review program.

**(h)Electronic claims management**

**(1)In general**

In accordance with chapter 35 of Title 44 (relating to coordination of Federal information policy), the Secretary shall encourage each State agency to establish, as its principal means of processing claims for covered outpatient drugs under this subchapter, a point-of-sale electronic claims management system, for the purpose of performing on-line, real time eligibility verifications, claims data capture, adjudication of claims, and assisting pharmacists (and other authorized persons) in applying for and receiving payment.

**(2)Encouragement**

In order to carry out paragraph (1)--

**(A)** for calendar quarters during fiscal years 1991 and 1992, expenditures under the State plan attributable to development of a system described in paragraph (1) shall receive Federal financial participation under section 1396b(a)(3)(A)(i) of this title (at a matching rate of 90 percent) if the State acquires, through applicable competitive procurement process in the State, the most cost-effective telecommunications network and automatic data processing services and equipment; and

**(B)** the Secretary may permit, in the procurement described in subparagraph (A) in the application of part 433 of title 42, Code of Federal Regulations, and parts 95, 205, and 307 of title 45, Code of Federal Regulations, the substitution of the State's request for proposal in competitive procurement for advance  9planning and implementation documents otherwise required.

**(i)Omitted**

**(j)Exemption of organized health care settings**

**(1)** Covered outpatient drugs are not subject to the requirements of this section if such drugs are--

**(A)** dispensed by health maintenance organizations, including Medicaid managed care organizations that contract under section 1396b(m) of this title; and

**(B)** subject to discounts under section 256b of this title.

**(2)** The State plan shall provide that a hospital (providing medical assistance under such plan) that dispenses covered outpatient drugs using drug formulary systems,

and bills the plan no more than the hospital's purchasing costs for covered outpatient drugs (as determined under the State plan) shall not be subject to the requirements of this section.

**(3)** Nothing in this subsection shall be construed as providing that amounts for covered outpatient drugs paid by the institutions described in this subsection should not be taken into account for purposes of determining the best price as described in subsection (c).

**(k)Definitions**

In this section--

**(1)Average manufacturer price**

**(A)In general**

Subject to subparagraph (B), the term "average manufacturer price" means, with respect to a covered outpatient drug of a manufacturer for a rebate period, the average price paid to the manufacturer for the drug in the United States by--

**(i)** wholesalers for drugs distributed to retail community pharmacies; and

**(ii)** retail community pharmacies that purchase drugs directly from the manufacturer.

**(B)Exclusion of customary prompt pay discounts and other payments**

**(i)In general**

The average manufacturer price for a covered outpatient drug shall exclude--

**(I)** customary prompt pay discounts extended to wholesalers;

**(II)** bona fide service fees paid by manufacturers to wholesalers or retail community pharmacies, including (but not limited to) distribution service fees, inventory management fees, product stocking allowances, and fees associated with administrative services agreements and patient care programs (such as medication compliance programs and patient education programs);

**(III)** reimbursement by manufacturers for recalled, damaged, expired, or otherwise unsalable returned goods, including (but not limited to) reimbursement for the cost

of the goods and any reimbursement of costs associated with return goods handling and processing, reverse logistics, and drug destruction;

**(IV)** payments received from, and rebates or discounts provided to, pharmacy benefit managers, managed care organizations, health maintenance organizations, insurers, hospitals, clinics, mail order pharmacies, long term care providers, manufacturers, or any other entity that does not conduct business as a wholesaler or a retail community pharmacy, unless the drug is an inhalation, infusion, instilled, implanted, or injectable drug that is not generally dispensed through a retail community pharmacy  3

**(V)** discounts provided by manufacturers under section 1395w-114a of this title or under section 1395w-114c of this title;

**(VI)** any reduction in price paid during the rebate period to the manufacturer for a drug by reason of application of part E of subchapter XI;

**(VII)** rebates paid by manufacturers under section 1395w-3a(i) of this title; and

**(VIII)** rebates paid by manufacturers under section 1395w-114b of this title.

**(ii)Inclusion of other discounts and payments**

Notwithstanding clause (i), any other discounts, rebates, payments, or other financial transactions that are received by, paid by, or passed through to, retail community pharmacies shall be included in the average manufacturer price for a covered outpatient drug.

**(C)section 505(c)**

In the case of a manufacturer that approves, allows, or otherwise permits any drug of the manufacturer to be sold under the manufacturer's new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act, such term shall be exclusive of the average price paid for such drug by wholesalers for drugs distributed to retail community pharmacies.

**(2)Covered outpatient drug**

Subject to the exceptions in paragraph (3), the term "covered outpatient drug" means--

**(A)** of those drugs which are treated as prescribed drugs for purposes of section 1396d(a)(12) of this title, a drug which may be dispensed only upon prescription (except as provided in paragraph (4)), and--

**(i)** which is approved for safety and effectiveness as a prescription drug under section 505 or 507 of the Federal Food, Drug, and Cosmetic Act or which is approved under section 505(j) of such Act;

**(ii)** (I) which was commercially used or sold in the United States before October 10, 1962, or which is identical, similar, or related (within the meaning of section 310.6(b)(1) of title 21 of the Code of Federal Regulations) to such a drug, and (II) which has not been the subject of a final determination by the Secretary that it is a "new drug" (within the meaning of section 201(p) of the Federal Food, Drug, and Cosmetic Act) or an action brought by the Secretary under section 301, 302(a), or 304(a) of such Act to enforce section 502(f) or 505(a) of such Act; or

**(iii)** (I) which is described in section 107(c)(3) of the Drug Amendments of 1962 and for which the Secretary has determined there is a compelling justification for its medical need, or is identical, similar, or related (within the meaning of section 310.6(b)(1) of title 21 of the Code of Federal Regulations) to such a drug, and (II) for which the Secretary has not issued a notice of an opportunity for a hearing under section 505(e) of the Federal Food, Drug, and Cosmetic Act on a proposed order of the Secretary to withdraw approval of an application for such drug under such section because the Secretary has determined that the drug is less than effective for some or all conditions of use prescribed, recommended, or suggested in its labeling; and

**(B)** a biological product, other than a vaccine which--

**(i)** may only be dispensed upon prescription,

**(ii)** is licensed under section 262 of this title, and

**(iii)** is produced at an establishment licensed under such section to produce such product; and

**(C)** insulin certified under section 506 of the Federal Food, Drug, and Cosmetic Act.

**(3)Limiting definition**

The term "covered outpatient drug" does not include any drug, biological product, or insulin provided as part of, or as incident to and in the same setting as, any of the following (and for which payment may be made under this subchapter as part of payment for the following and not as direct reimbursement for the drug):

**(A)** Inpatient hospital services.

**(B)** Hospice services.

**(C)** Dental services, except that drugs for which the State plan authorizes direct reimbursement to the dispensing dentist are covered outpatient drugs.

**(D)** Physicians' services.

**(E)** Outpatient hospital services.

**(F)** Nursing facility services and services provided by an intermediate care facility for the mentally retarded.

**(G)** Other laboratory and x-ray services.

**(H)** Renal dialysis.

Such term also does not include any such drug or product for which a National Drug Code number is not required by the Food and Drug Administration or a drug or biological [FN10] used for a medical indication which is not a medically accepted indication. Any drug, biological product, or insulin excluded from the definition of such term as a result of this paragraph shall be treated as a covered outpatient drug for purposes of determining the best price (as defined in subsection (c)(1)(C)) for such drug, biological product, or insulin.

### (4)Nonprescription drugs

If a State plan for medical assistance under this subchapter includes coverage of prescribed drugs as described in section 1396d(a)(12) of this title and permits coverage of drugs which may be sold without a prescription (commonly referred to as "over-the-counter" drugs), if they are prescribed by a physician (or other person authorized to prescribe under State law), such a drug shall be regarded as a covered outpatient drug.

### (5)Manufacturer

The term "manufacturer" means any entity which is engaged in--

**(A)** the production, preparation, propagation, compounding, conversion, or processing of prescription drug products, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis, or

**(B)** in the packaging, repackaging, labeling, relabeling, or distribution of prescription drug products.

Such term does not include a wholesale distributor of drugs or a retail pharmacy licensed under State law.

### (6)Medically accepted indication

The term "medically accepted indication" means any use for a covered outpatient drug which is approved under the Federal Food, Drug, and Cosmetic Act or the use of which is supported by one or more citations included or approved for inclusion in any of the compendia described in subsection (g)(1)(B)(i).

### (7)Multiple source drug; innovator multiple source drug; noninnovator multiple source drug; single source drug

### (A)Defined

### (i)Multiple source drug

The term "multiple source drug" means, with respect to a rebate period, a covered outpatient drug, including a drug product approved for marketing as a non-prescription drug that is regarded as a covered outpatient drug under paragraph (4), for which there  2 at least 1 other drug product which--

**(I)** is rated as therapeutically equivalent (under the Food and Drug Administration's most recent publication of "Approved Drug Products with Therapeutic Equivalence Evaluations"),

**(II)** except as provided in subparagraph (B), is pharmaceutically equivalent and bioequivalent, as defined in subparagraph (C) and as determined by the Food and Drug Administration, and

**(III)** is sold or marketed in the United States during the period.

### (ii)Innovator multiple source drug

The term "innovator multiple source drug" means a multiple source drug that is marketed under a new drug application approved by the Food and Drug Administration, unless the Secretary determines that a narrow exception applies (as described in [section 447.502 of title 42, Code of Federal Regulations](#) (or any successor regulation)).

### (iii)Noninnovator multiple source drug

The term "noninnovator multiple source drug" means a multiple source drug that is not an innovator multiple source drug.

### (iv)Single source drug

The term "single source drug" means a covered outpatient drug, including a drug product approved for marketing as a non-prescription drug that is regarded as a covered outpatient drug under paragraph (4), which is produced or distributed under a new drug application approved by the Food and Drug Administration, including a drug product marketed by any cross-licensed producers or distributors operating under the new drug application unless the Secretary determines that a narrow exception applies (as described in [section 447.502 of title 42, Code of Federal Regulations](#) (or any successor regulation)). Such term also includes a covered outpatient drug that is a biological product licensed, produced, or distributed under a biologics license application approved by the Food and Drug Administration.

### (B)Exception

Subparagraph (A)(i)(II) shall not apply if the Food and Drug Administration changes by regulation the requirement that, for purposes of the publication described in subparagraph (A)(i)(I), in order for drug products to be rated as therapeutically equivalent, they must be pharmaceutically equivalent and bioequivalent, as defined in subparagraph (C).

### (C)Definitions

For purposes of this paragraph--

**(i)** drug products are pharmaceutically equivalent if the products contain identical amounts of the same active drug ingredient in the same dosage form and meet compendial or other applicable standards of strength, quality, purity, and identity; and

**(ii)** drugs are bioequivalent if they do not present a known or potential bioequivalence problem, or, if they do present such a problem, they are shown to meet an appropriate standard of bioequivalence.

### (8) Rebate period

The term "rebate period" means, with respect to an agreement under subsection (a), a calendar quarter or other period specified by the Secretary with respect to the payment of rebates under such agreement.

### (9) State agency

The term "State agency" means the agency designated under section 1396a(a)(5) of this title to administer or supervise the administration of the State plan for medical assistance.

### (10) Retail community pharmacy

The term "retail community pharmacy" means an independent pharmacy, a chain pharmacy, a supermarket pharmacy, or a mass merchandiser pharmacy that is licensed as a pharmacy by the State and that dispenses medications to the general public at retail prices. Such term does not include a pharmacy that dispenses prescription medications to patients primarily through the mail, nursing home pharmacies, long-term care facility pharmacies, hospital pharmacies, clinics, charitable or not-for-profit pharmacies, government pharmacies, or pharmacy benefit managers.

### (11) Wholesaler

The term "wholesaler" means a drug wholesaler that is engaged in wholesale distribution of prescription drugs to retail community pharmacies, including (but not limited to) repackers, distributors, own-label distributors, private-label distributors, jobbers, brokers, warehouses (including distributor's warehouses, chain drug warehouses, and wholesale drug warehouses) independent wholesale

drug traders, and retail community pharmacies that conduct wholesale distributions.

**CERTIFICATE OF SERVICE**

I certify that on August 8, 2025, I filed the foregoing with the Clerk of the Court using the ECF System, which will send notification of such filing to the registered participants identified on the Notice of Electronic Filing.

*/s/ William B. Schultz*

_____

William B. Schultz