# In the United States Court of Appeals for the District of Columbia Circuit

NOVARTIS PHARMACEUTICALS CORPORATION, ET AL.,
*Plaintiffs-Appellants*,

*v.*

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,
*Defendants-Appellees*,
340B HEALTH, ET AL.,
*Intervenors-Defendants.*

---

JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC.,
*Plaintiff-Appellant*,

*v.*

ROBERT F. KENNEDY, JR., IN HIS OFFICIAL CAPACITY AS SECRETARY, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL.,
*Defendants-Appellees*,
340B HEALTH, ET AL.,
*Intervenors-Defendants.*

---

On Appeal from the United States District Court for the District of Columbia,
Nos. 21-cv-2608, 24-cv-3220, 24-cv-3337, 25-cv-117 (Hon. Dabney L. Friedrich),
No. 24-cv-3188 (Hon. Rudolph Contreras)

---

## REPLY BRIEF FOR PLAINTIFF-APPELLANT
## JOHNSON & JOHNSON HEALTH CARE SYSTEMS INC.

Paula R. Ramer
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
Tel: (212) 836-8000

Jeffrey L. Handwerker
Samuel I. Ferenc
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
jeffrey.handwerker@arnoldporter.com

*Counsel for Appellant Johnson & Johnson Health Care Systems Inc.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

GLOSSARY................................................................................................iv

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

ARGUMENT .................................................................................................2

I.    The 340B Statute Does Not Authorize HRSA to Require Pre-Approval for Rebate Models ............................................................................2

    A.    Any HRSA Authority to Bar Rebate Models May Be Exercised Exclusively Through the PPA .................................................3

    B.    These Appeals Are Ripe........................................................................9

II.    Intervenors' Arguments Are Misleading and Meritless ...............................11

    A.    Intervenors' Statutory Interpretation Contradicts the Plain Text and Congress's Intent ...........................................................11

    B.    Intervenors' Further Objections to Rebate Models Should Be Rejected ................................................................16

CONCLUSION ............................................................................................25

CERTIFICATE OF COMPLIANCE....................................................................26

CERTIFICATE OF SERVICE .........................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amalgamated Transit Union v. Skinner*,
  894 F.2d 1362 (D.C. Cir. 1990) .......................................................................8

*Amerijet Int'l, Inc. v. Pistole*,
  753 F.3d 1343 (D.C. Cir. 2014) .......................................................................9

*Astra USA, Inc. v. Santa Clara County*,
  563 U.S. 110 (2011) ........................................................................................7

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*,
  799 F.3d 202 (2d Cir. 2015) .........................................................................12

*Christensen v. Harris County*,
  529 U.S. 576 (2000) ........................................................................................8

*Eagle Pharms., Inc. v. Azar*,
  952 F.3d 323 (D.C. Cir. 2020) ...................................................................4, 14

*Genus Med. Techs. LLC v. FDA*,
  994 F.3d 631 (D.C. Cir. 2021) .......................................................................8

*Landstar Express Am., Inc. v. Fed. Mar. Comm'n*,
  569 F.3d 493 (D.C. Cir. 2009) .......................................................................4

*Nat'l Chicken Council v. EPA*,
  687 F.3d 393 (D.C. Cir. 2012) .....................................................................10

*Novartis Pharms. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024) ..............................................8, 12, 18, 19, 21

*PhRMA v. David*,
  510 F. Supp. 3d 891 (E.D. Cal. 2021) .........................................................12

*Sanofi Aventis U.S. LLC v. HHS*,
  58 F.4th 696 (3d Cir. 2023) ...........................................................................8

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ........................................................................................8

**Statutes**

42 U.S.C.
  § 256b(a)(1) ..............................................................4, 6, 8, 12, 14, 15
  § 256b(a)(2)(A)(i) ........................................................................15
  § 256b(d)(1)(B)(i)(I) ....................................................................15

**Regulations**

60 Fed. Reg. 51,488 (Oct. 2, 1995)..........................................................15

61 Fed. Reg. 43,549 (Aug. 23, 1996) ........................................................17

62 Fed. Reg. 45,823 (Aug. 29, 1997) ........................................................16

63 Fed. Reg. 35,239 (June 29, 1998) .............................................15, 16, 21

82 Fed. Reg. 1,210 (Jan. 5, 2017) ............................................................15

90 Fed. Reg. 36,163 (Aug. 1, 2025)............................................................2

**Legislative Materials**

138 Cong. Rec. 34279 (1992) ..................................................................13

H.R. Rep. No. 102-384, pt. 2 (1992) .....................................11, 12, 13, 16

**Other Authorities**

GAO, GAO-20-212, *340B Drug Discount Program, Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* (Jan. 2020), http://bit.ly/4fI1eLJ...................................24

GAO, GAO-21-107, *HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements* (Dec. 2020), https://bit.ly/3V4chFz ............................................................24

HRSA, *Program Integrity: FY22 Audit Results*, https://bit.ly/3JmKFsI.................23

# GLOSSARY

| | |
|---|---|
| **ADAP** | AIDS Drug Assistance Program |
| **Amicus Br.** | Brief of Johnson & Johnson Health Care Systems Inc. as Amicus Curiae in Support of Reversal, *Novartis Pharms. Corp. v. Kennedy*, No. 25-5177 (D.C. Cir. June 25, 2025) |
| **GAO** | Government Accountability Office |
| **Gov't Br.** | Brief for Federal Appellees, *Novartis Pharms. Corp. v. Kennedy*, No. 25-5177 (D.C. Cir. Aug. 1, 2025) |
| **HHS** | U.S. Department of Health and Human Services |
| **HRSA** | Health Resources and Services Administration |
| **Intervenor Br.** | Brief for Intervenors, *Novartis Pharms. Corp. v. Kennedy*, No. 25-5177 (D.C. Cir. Aug. 8, 2025) |
| **IRA** | Inflation Reduction Act, Pub. L. No. 117-169, 136 Stat. 1818 (2022) |
| **J&J Br.** | Brief for Plaintiff-Appellant as Proposed Joinder in Brief for Plaintiffs-Appellants in No. 25-5177 and Consolidated Appeals, *Johnson & Johnson Health Care Systems Inc. v. Kennedy*, No. 25-5236 (D.C. Cir. July 8, 2025) |
| **PPA** | Pharmaceutical Pricing Agreement |
| **Section 340B** | 42 U.S.C. § 256b |

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Court should reverse the decisions below. Section 340B does not require pharmaceutical manufacturers to seek pre-approval for rebate models from the HHS Secretary. The government's contrary position misreads the statute, and all of the government's additional statutory arguments fail for that reason. That includes the government's mistaken claim that the Secretary need not amend manufacturers' pricing agreements ("PPAs") to bar manufacturers from using their preferred pricing mechanism. The text, structure, purpose, and history of Section 340B make clear that the Secretary may exercise any authority the statute grants to prohibit rebate models exclusively through the PPA. Nor is the government correct that these consolidated appeals are unripe. As the government concedes, the Health Resources and Services Administration's ("HRSA's") letters to J&J and the other manufacturer Plaintiffs definitively stated the agency's position on its pre-approval authority and threatened severe sanctions if manufacturers adopted a rebate model without HRSA permission.

Intervenors, for their part, offer an alternative interpretation of the text that untenably excises the word "rebate" right out of the statute. The courts below properly rejected this interpretation. Intervenors also mischaracterize material facts, ignore glaring contradictions and inconsistencies in their position, and effectively admit their true objection to rebate models: that greater transparency could limit their

ability to apply 340B pricing to ineligible purchases. The Court should reject Intervenors' arguments, and the government's, and reverse the decisions below.

## ARGUMENT

### I. The 340B Statute Does Not Authorize HRSA to Require Pre-Approval for Rebate Models

J&J disagrees with the government's statutory analysis for the reasons described in Plaintiffs' opening briefs, as discussed in more detail below. First, however, recent regulatory developments merit discussion. As described in the *Novartis* Plaintiffs' opening brief (at 15-16), manufacturers face a September 1, 2025 deadline to submit to the Centers for Medicare and Medicaid Services a written plan for meeting their 2026 obligations under the Medicare Drug Price Negotiation Program established by the Inflation Reduction Act ("IRA"). Among other things, the IRA requires manufacturers to de-duplicate 340B and IRA price reductions.

On August 1, 2025, HRSA announced a rebate model pilot program that will allow manufacturers to test rebate models for drugs selected for the Medicare Drug Price Negotiation Program for 2026. 90 Fed. Reg. 36,163 (Aug. 1, 2025); *see* Intervenor Br. 41 (indicating that the pilot is a proper manner of "address[ing]" manufacturers' "concern … about compliance with the Inflation Reduction Act"). Though J&J does not agree that HRSA's pre-approval is necessary to implement a rebate model—and notes that the pilot does not currently permit collection of all data elements necessary for identifying duplicate discounts—J&J looks forward to

participating in the pilot and appreciates HRSA's willingness to explore practical solutions to ensure greater program integrity and address challenges manufacturers face in implementing their overlapping statutory obligations.

As noted, however, J&J disagrees with an interpretation of the 340B statute that does not permit rebate models without pre-approval by the Secretary. Much of the government's case turns on that proposition being true and fails because it is not. Moreover, even if the Secretary does have pre-approval authority, restrictions on manufacturer discretion to select pricing mechanisms may be imposed only through manufacturers' PPAs with the Secretary. Further, the manufacturers' disputes with the government on these questions are ripe. Setting aside HRSA's threadbare reasoning in its rejections of Plaintiffs' proposed rebate models, the core question presented is whether HRSA's assertion of pre-approval authority to block those proposals was lawful and consistent with the 340B statute. It was not, so the Court should reverse.

## A. Any HRSA Authority to Bar Rebate Models May Be Exercised Exclusively Through the PPA

The 340B statute does not provide the Secretary or his delegee HRSA with authority to prohibit manufacturers from using pricing mechanisms of their choice. The key disputed statutory language—the parenthetical "(taking into account any rebate or discount, as provided by the Secretary)"—empowers the government only to require specific accounting mechanisms or recordkeeping practices in order to

ensure that the "amount required to be paid" by covered entities does not exceed the 340B ceiling price.  42 U.S.C. § 256b(a)(1).

The government's reading of the text as granting the Secretary discretion to pre-approve pricing mechanisms is erroneous.  The chief flaw in the government's approach is that it cannot be squared with the undisputed meaning of "ceiling price." *Id*.  The government (at 7) concedes that the ceiling price is set by a statutory formula, but then argues that the 340B statute grants the Secretary pre-approval authority by providing that "the 340B ceiling price must 'tak[e] into account any rebate or discount, as provided by the Secretary.'"  Gov't Br. 24 (emphasis omitted).  The contradiction is plain.  The ceiling price is a fixed figure; nothing the Secretary could "provide[]" for could modify it.  *Id.* at 25.  The government's interpretation thus comes up short, failing to bridge the gap between what the plain text says and what HRSA might want it to say.  Agencies may not "rewrite a statute's plain text" to make it correspond with a particular policy preference.  *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 335 (D.C. Cir. 2020) (quoting *Landstar Express Am., Inc. v. Fed. Mar. Comm'n*, 569 F.3d 493, 498 (D.C. Cir. 2009) (Kavanaugh, J.)).

The better reading is that the Secretary, at most, may provide in the PPA how a *manufacturer* should "tak[e] into account" its chosen pricing mechanism to ensure that the "amount required to be paid" by the covered entity does not exceed the fixed ceiling price.  42 U.S.C. § 256b(a)(1); *see* J&J Br. 12.  For example, the PPA could

provide that manufacturers using rebate mechanisms must obtain claims information from purchasers to confirm that the rebates paid will effectuate the ceiling price, or that rebates must be paid within a certain period of time after the drug was dispensed. As for discounts, the Secretary could "provide[]" in the PPA that manufacturers using discount mechanisms must maintain certain accounting records to document discounts and ensure they result in the ceiling price. *Id.*

But even if the Secretary has authority to bar manufacturers from adopting unapproved rebate models, the Secretary may exercise it only in the PPA, which he has not done to date. The government's counterarguments that the Secretary can act outside the PPA are misplaced. The government first contends that the PPA is a form agreement with terms that "are not modified for each manufacturer." Gov't Br. 26. But HRSA could have provided in the PPA, for example, that rebate models are barred except with the Secretary's approval, and listed prerequisites for obtaining it  The government acknowledges that the PPA's manufacturer responsibilities section includes a general list of statutory requirements for products that not all manufacturers may produce. *Id.* (citing JA438). Nothing prevents the PPA from including similar general terms with respect to rebate models that apply for manufacturers for which they are relevant and do not apply for others.

The government next distinguishes the first and second sentences of 42 U.S.C. § 256b(a)(1), stating that the latter directs certain terms for the PPA expressly, while

the first sentence, containing the key parenthetical, does not "mandat[e] *how* the Secretary shall provide for rebates or discounts." Gov't Br. 26-27. The government reads that contrast as showing that Congress did not intend for the Secretary to address rebates only through the PPA. *See id.* But that conclusion does not follow. The 340B statute in fact *does* direct *how* the Secretary shall provide for rebates or discounts: "under" the Secretary's "agreement with each manufacturer." 42 U.S.C. § 256b(a)(1). The government also argues that Congress "would have said so" if it meant to authorize Secretarial pre-approval only through the PPA. Gov't Br. 27. In fact, it did say so, in the plain text of the statute.

As for structure, the government maintains that the Court should not treat 42 U.S.C. § 256b(a) as focusing solely on the PPA, because section (a) also contains paragraphs that do not relate to the agreement. Gov't Br. 28. But the government ignores the title of § 256b(a)(1), "In general," along with the critical first words of that paragraph: "*The Secretary shall enter into an agreement* with each manufacturer … under which the amount required to be paid (taking into account any rebate or discount, as provided by the Secretary) to the manufacturer … does not exceed" the ceiling price. 42 U.S.C § 256b(a)(1) (emphasis added). The statute's text thus makes clear that the Secretary may provide how "the amount required to be paid" should "tak[e] into account any rebate or discount" only "under" the "agreement" that "[t]he Secretary shall enter." *Id.*

The government also protests that the statute is "[m]issing … any verb directing the Secretary to regulate rebates and discounts in the agreement or any preposition linking the agreement to the rebates and discounts." Gov't Br. 29. But the prepositional phrase "under which" and the verbal phrase "taking into account" do exactly that work. Nor is the government right that, if the statute allowed specification of a pricing mechanism only in the PPA, the phrase "as provided by the Secretary" would be superfluous "because the Secretary is the one preparing the agreement in the first place." *Id.* Of course, the government is correct that the agency drafts the PPA, but it must do so pursuant to the authority Congress delegated and the limitations it imposed. "[A]s provided by the Secretary," to the extent it empowers the government to prohibit pricing mechanisms (which J&J contests), would be necessary language to enable the Secretary to exercise that authority.

Citing *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011), the government next asserts that it is irrelevant in which form the Secretary exercises pre-approval authority because "the statutory and contractual obligations" under the 340B program "are one and the same." Gov't Br. 29 (quoting *Astra USA, Inc.*, 563 U.S. at 118). But this is a non-sequitur. Even if "[t]he Secretary has authority to approve rebates and discounts," *id.*, Congress channeled that authority through the PPA in the words it chose and in the structure it enacted. As J&J has explained, *see* J&J Br. 9, "[w]here Congress prescribes the form in which an agency may exercise

its authority … [courts] cannot elevate the goals of an agency's action, however reasonable, over that prescribed form." *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990). In 42 U.S.C. § 256b(a)(1), Congress prescribed the exclusive form through which HRSA may exercise any authority it has: the PPA. And it strains credulity to argue that Congress would bury language establishing an independent source of agency authority to act on pricing mechanisms within a paragraph that otherwise exclusively addresses the structure and contents of the PPA. *See Genus Med. Techs. LLC v. FDA*, 994 F.3d 631, 643 (D.C. Cir. 2021) (explaining that Congress "does not … hide elephants in mouseholes" (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 467-68 (2001))).

The government lastly argues that, even if it may regulate rebate models only through the PPA, the PPA does not currently provide for the use of rebates to effectuate the ceiling price, so manufacturers may not do so. Gov't Br. 31. That has it "exactly backwards." *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 704 (3d Cir. 2023) (quoting *Christensen v. Harris County*, 529 U.S. 576, 588 (2000)). Because HRSA and the Secretary have not acted to "prohibit[]" rebate models through the PPA, manufacturers currently remain free to select the mechanism of their choice. *Id.* (emphasis omitted) (quoting *Christensen*, 529 U.S. at 588); *see also Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460-61 (D.C. Cir. 2024) (holding that the

340B statute "preserves" manufacturers' ability to impose "reasonable conditions," including "request[ing] standard information" from covered entities).[1]

## B.    These Appeals Are Ripe

Because the Secretary lacks authority to prohibit manufacturers from using their chosen pricing mechanisms (at least without modifying the PPA), the Secretary's letters to Plaintiffs rejecting their rebate models violated the 340B statute.  The government does not dispute that "[t]he Secretary's letters to plaintiffs are premised on the understanding that Section 340B prohibits manufacturers from adopting a rebate model to satisfy the Program's pricing requirements without the Secretary's approval."  Gov't Br. 31.  But because "the statute" does *not* "dictate[]" that conclusion"—and certainly does not permit the exercise of such authority outside of the PPA—the letters were unlawful.  *Id.*

For the same reason, these appeals are ripe.  The government concedes that it has "acknowledged the finality of the agency's position with respect to the need for pre-approval."  Gov't Br. 45.  It thus follows that the questions whether the Secretary may prohibit rebate models and, if he can, whether he can do so other than through the PPA, are "fit[] … for judicial decision," and that "withholding court consideration" creates "hardship to the parties."  *Amerijet Int'l, Inc. v. Pistole*, 753

---

[1] J&J also maintains that amending the PPA to permanently regulate pricing mechanisms would require notice-and-comment rulemaking. *See* J&J Br. 12-13.

F.3d 1343, 1353 (D.C. Cir. 2014) (citation omitted). There are no other obstacles to review.

The government's assertions that the Secretary "is presently considering plaintiffs' proposals" and "will issue a reasoned decision" "when he reaches a determination" are irrelevant to the core questions presented. Gov't Br. 43-44. The government concedes its primary position is that "plaintiffs' obligation to obtain the Secretary's approval arises from Section 340B itself, not from the letters the Secretary sent to plaintiffs." *Id.* at 44. As a result, there is more than a "'substantial probability'" that this Court's rejection of that position, or clarification that the Secretary may prohibit rebate models only through the PPA, would provide Plaintiffs with "effective relief." *Id.* (quoting *Nat'l Chicken Council v. EPA*, 687 F.3d 393, 396 (D.C. Cir. 2012)). Indeed, the government maintains that "[i]f a manufacturer implements a rebate model without the Secretary's approval," that would result in "forc[ing] a covered entity to pay prices above the 340B ceiling price," authorizing the Secretary to "terminate the manufacturer's 340B agreement" and "impose other sanctions without prior warning." Gov't Br. 45. J&J strenuously disagrees that manufacturer implementation of a rebate model without pre-approval would cause covered entities to pay more than the ceiling price. This Court's resolution of that issue would provide Plaintiffs with "effective relief," rendering these appeals ripe. Gov't Br. 44.

## II.    Intervenors' Arguments Are Misleading and Meritless

The Court should also reject Intervenors' arguments.  Intervenors advance a plainly untenable reading of the 340B statute that would impermissibly excise the word "rebate" and destabilize the longstanding rebate model for state AIDS Drug Assistance Programs (ADAPs).  Intervenors also paint a misleading picture of the 340B program, minimizing the long record of abuse and the fervent resistance that J&J has faced to audits that Intervenors claim obviate the need for a rebate model.

### A.    Intervenors' Statutory Interpretation Contradicts the Plain Text and Congress's Intent

At the outset, Intervenors concede that their aim is to protect a broken system in which the function of the 340B program is "generating money" for covered entities.  Intervenor Br. 2.  But that was never "the 340B Program's goal." *Id.* Congress's aim with Section 340B, as the primary Committee report on the bill makes clear, was restoring the status quo before the 1990 Medicaid Drug Rebate Program disincentivized manufacturers from voluntarily offering reduced pricing to safety net providers.  H.R. Rep. No. 102-384, pt. 2, at 11-12 (1992).  That shift "reduced the level of services and the number of individuals that [public] hospitals and [federally funded] clinics [were] able to provide with the same level of resources." *Id.* at 11.  Congress responded with Section 340B, directing new "price reductions" to "enable these entities to stretch scarce Federal resources as far as possible," while "assur[ing] the [program's] integrity." *Id.* at 12, 16.  Stated another

way, the point of Section 340B was to reinstate lower acquisition costs for the small number of providers that previously received voluntary discounts so they could resume their prior level of federally funded services with the "*same* level of resources." *Id.* at 11; *see id.* at 13 (noting only approximately 90 hospitals were initially eligible, in contrast to the more than 1,200 now participating). The goal was decidedly *not* to generate a *new* channel of resources extracted from manufacturers totaling tens of billions of dollars annually.

Turning to text, as the government explains as well, Gov't Br. 38-40, Intervenors' claim (at 21-23) that Section 340B "requires up-front price reductions" and prohibits rebate models is untenable on its face. For one thing, nothing in the requirement that manufacturers "offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price" compels up-front discounts. 42 U.S.C. § 256b(a)(1). It is common knowledge that "[t]he transaction price of a prescription drug … includes discounts and rebates," *PhRMA v. David*, 510 F. Supp. 3d 891, 898 (E.D. Cal. 2021), and that manufacturers routinely "*offer*[] lower *prices* … through *rebates* or discounts." *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 206 (2d Cir. 2015) (emphases added). An offer to purchase a drug and then receive a rebate is an offer to purchase the drug at the net price after the rebate is taken into account. Intervenors' contrary claims distort those words' plain meaning, *see Novartis Pharms.*, 102 F.4th at 460-61 (discussing

definitions of "offer," "purchase," and "price" under the 340B statute), and nothing in this Court's *Novartis* decision or the Third Circuit's *Sanofi* decision counsels otherwise, Intervenors' misreading of those cases (at 23-24) notwithstanding.

Section 340B's legislative history also makes clear that Congress was agnostic on the pricing mechanism to be used. The key Committee report explained that the bill "does not specify whether 'covered entities' would receive these favorable prices through a point-of-purchase discount, through a manufacturer rebate, or through some other mechanism." H.R. Rep. No. 102-384, pt. 2, at 16. And the bill's Senate sponsor repeatedly explained that the bill would require manufacturers to enter agreements "to provide rebates or discounts" to covered entities. 138 Cong. Rec. 34279, 34293 (1992) (statement of Sen. Alan Cranston); *see id.* at 34294 (similar).

Intervenors' appeal to legislative history fails because their own sources only confirm that Congress intended rebates to be an option. Intervenors (at 4) point to floor statements by the sponsor of a 340B precursor bill that mirrored the final statute in several ways—except that the sole mechanism it proposed for effectuating price reductions to covered entities was a *rebate*. *See* H.R. 3405, 102d Cong. (1991), https://bit.ly/43HEhEF. A companion Senate bill would have established the same rebate structure for effectuating reduced pricing for Public Health Service clinics. *See* S. 1729, 102d Cong. (1991), https://bit.ly/3EmVCZ1. The legislation of course

13

evolved before Section 340B was enacted, but the fact that Congress initially proposed making rebates the program's *only* pricing mechanism leaves no doubt that Congress meant for post-purchase rebates to be an option when it directed ceiling prices to be furnished through "rebate[s] or discount[s]." 42 U.S.C. § 256b(a)(1).

In any event, the Court need not resort to legislative history to reject Intervenors' plainly untenable reading of the statute. *See Eagle Pharms., Inc. v. Azar*, 952 F.3d at 338-39. Because their position is that Section 340B prohibits rebate models—despite the statute expressly providing for "any rebate or discount"—Intervenors effectively argue that Congress impliedly removed the word "rebate" from the first sentence of 42 U.S.C. § 256b(a)(1) when it added the second sentence in 2010. The government has thoroughly explained why that claim fails, Gov't Br. 38-40, and none of Intervenors' responses are persuasive.

Intervenors first argue (at 24, 26) that the word "rebate" in the parenthetical in the statute's first sentence refers to the Medicaid rebate to be used for calculating the ceiling price. But that squarely contradicts the text. The "rebate" described in the parenthetical and the "rebate percentage" identified later in the same sentence, which figures in the calculation of the ceiling price, are not the same. When Congress intended to reference the Medicaid rebate, it used the term "rebate percentage," for which it specifically defined "rebate" as "the average total rebate required under section 1927(c) of the Social Security Act," *i.e.*, the Medicaid rebate

statute.  *See* 42 U.S.C. § 256b(a)(2)(A)(i).  Intervenors' conflation of 340B rebates and Medicaid rebates is plainly mistaken.

Intervenors next insist (at 27-29) their interpretation does not deprive "rebate" of a plausible meaning because the "any rebate or discount" parenthetical authorizes HRSA to modify the ceiling price formula for drugs with insufficient historical pricing data or for which the formula produces a negative price.  But HRSA has never based its policies for those scenarios, known as "provisional pricing" and "penny pricing," on § 256b(a)(1).  As Intervenors recognize (at 29 n.9), HRSA first adopted provisional pricing in 1995 guidance that deferred to manufacturers to estimate a ceiling price until sufficient pricing data became available, invoking no statutory authority.  60 Fed. Reg. 51,488, 51,489 (Oct. 2, 1995).  And HRSA's penny pricing guidance was codified only in a 2017 rulemaking after a statutory change specifically authorizing that rulemaking.  82 Fed. Reg. 1,210, 1,216 (Jan. 5, 2017).  To be sure, there are arguments that HRSA's use of both policies actually exceeded its statutory authority until Congress adopted 42 U.S.C. § 256b(d)(1)(B)(i)(I), the provision authorizing HRSA to issue the 2017 rule.  Regardless, Intervenors are simply wrong that HRSA's source of authority to act is the (a)(1) language that HRSA has never cited.

Intervenors finally have no answer to the fact that their reading would undermine the ADAP rebate model that HRSA recognized in 1998.  63 Fed. Reg.

35,239 (June 29, 1998). Intervenors claim (at 30) that the difference between Plaintiffs' rebate models and ADAPs' are that "ADAP rebates are voluntary," but that is beside the point. Either the 340B statute authorizes rebate models or it does not. Whether covered entities welcome or resist them is irrelevant. And Intervenors take no issue with HRSA's ADAP guidance, which recognized ADAP rebate models on the express premise that "section 340B does not specify whether entities should receive the section 340B pricing 'through a point of purchase discount, through a manufacturer rebate, or through some other mechanism.'" 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997) (quoting H.R. Rep. No. 102-384, pt. 2, at 16). Intervenors cannot resolve the obvious tension between their reading of the statute and the undisputed legality of ADAP rebates.[2]

## B. Intervenors' Further Objections to Rebate Models Should Be Rejected

Intervenors offer a handful of other groundless objections to rebate models that misstate key elements of the 340B program's regulatory and enforcement history and the record in these appeals and related cases.

---

[2] Intervenors also claim that the final ADAP guidance instructed that "rebates beyond ADAPs were not allowed." Intervenor Br. 11; *see id.* at 5-6. But the guidance stopped well short of claiming HRSA has exclusive authority to pre-approve manufacturer rebate models. The guidance stated only that "[a]t this time, [HRSA] agree[s]" with commenters that rebate models are not appropriate for other types of covered entities and that "[t]his notice" accordingly "only recognizes a rebate option for [ADAPs]." 63 Fed. Reg. at 35,241-42.

*Replenishment Models*.  Citing an erroneous statement in the J&J decision below, Intervenors claim that HRSA "has blessed" covered entities' unilaterally adopted replenishment models "since at least 1996."  Intervenor Br. 9 (citing JA1140).  Not so.  Although early HRSA guidance noted that some pharmacies contracted with covered entities were using a single inventory for dispensing 340B and non-340B drugs at that time, 61 Fed. Reg. 43,549, 43,554 (Aug. 23, 1996), that inventory management practice was not a replenishment model.  Rather, as HRSA confirmed in a recent filing, only as of 2013 did HRSA "become aware through its program integrity initiatives" that "covered entities [had] beg[u]n using [a] product replenishment model."  Mem. of P. & A. in Supp. of Defs.' Cross-Mot. Summ. J. & Opp'n to Pls.' Mot. Summ. J. 10, 16, *Premier, Inc. v. HRSA*, No. 1:24-cv-03116, (D.D.C. May 9, 2025), ECF No. 15-1.[3]

*J&J's Rebate Model.*  Intervenors next misstate the scope of J&J's rebate model, claiming it requires rebates "on covered drugs" purchased by "340B Hospitals."  Intervenor Br. 11-12.  J&J's proposed rebate model, however, would apply only to purchases of two J&J drugs that have been selected for the Medicare Drug Price Negotiation Program under the IRA.  JA1110-11; *see* JA608-10.

---

[3] The government's brief errs even more significantly on this issue, claiming that "Johnson & Johnson … acknowledges that the product-replenishment model 'has been blessed by HRSA since at least 1996.'"  Gov't Br. 35 (quoting JA1140).  J&J has never acknowledged that, as it is not consistent with HRSA guidance.

Intervenors also protest their supposed burden to submit "whatever voluminous information Plaintiffs will require" for their rebate models. Intervenor Br. 31. But that purported concern ignores the record, which well documents the claims and purchase data required for J&J's rebate model. The record also demonstrates that those data elements are commercially standard and that covered entities already collect and provide them to third parties in the normal course of business. JA491; JA496; JA612-14; JA633; JA1062-63.

*Limitations on Timing for Payments.* One of Intervenors' chief concerns is that rebate models will require covered entities to "wait an unguaranteed amount of time" for rebate payments after they submit the required data. Intervenor Br. 2. But J&J has committed to HRSA that payments will be made within seven to ten days. JA1064; *see* JA494. Intervenors ask (at 31-32) "[w]hat is to stop Plaintiffs from giving post-purchase refunds six months" after a purchase or "even years later," but the answer is the 340B statute itself, which this Court has interpreted to require manufacturers to make "a bona fide offer" to purchase their products at the reduced price. *Novartis Pharms.*, 102 F.4th at 462. Though this Court confirmed that manufacturers may establish conditions on 340B offers, the Court also clarified that certain conditions "may be onerous enough to effectively increase the contract 'price,' thus perhaps nudging it above the statutory ceiling." *Id.*

The 340B statute, per *Novartis*, thus requires prompt payments to effectuate the ceiling price—a direct limiting principle on manufacturers' design and operation of their rebate models. *See id.* Intervenors' claims (at 33, 35) that "nothing in the 340B statute" prevents manufacturers from "eliminating" their deadlines for rebate payments or from "demanding various other conditions" before making payments ignore this on-point case law. And Intervenors' complaint (at 35) that HRSA's administrative dispute resolution process is "too time consuming and expensive" to address alleged wrongful denials of rebates is a policy issue for Congress, not a basis for the Court to uphold rejection of manufacturer rebate models.

*J&J's Purchase-Data-Only Payments*. Intervenors also take issue (at 32-34) with the feature of J&J's proposed rebate model that would allow some rebate payments to be made based only on purchase data, without requiring the claims data that is not generated until the drug is dispensed. JA1064. Intervenors complain that the administrative record contains limited information about purchase-data-only rebate payments. Intervenor Br. 33. But this is simply a result of when J&J filed suit, at which time the functionality was still under development. That aspect of the rebate model, which is now developed, substantially mitigates any concerns about the impacts of a lag between a covered entity's purchasing and dispensing of J&J drugs. *See* J&J Br. 5-6.

*Audits*.  Nor are Intervenors correct that rebate models clash with or nullify Section 340B's audit provisions.  Intervenor Br. 36-38.  For one thing, a rebate model is neither an audit nor a substitute for one.  By definition, audits are backward-looking, address a very narrow subset of historical claims, take months or years to complete, and have not required covered entities to change policies or procedures that led to violations.  *See, e.g.*, Compl. Ex. 2, *Or. Health & Sci. Univ. v. Johnson*, No. 1:24-cv-02184-RC (D.D.C. July 24, 2024), ECF No. 1-2 (letter to covered entity concerning HRSA-approved J&J audit plan); *see also* JA636; JA640.  J&J's rebate model uses a smaller set of data elements, applies prospectively to purchases of two J&J products, and employs real-time data validation to confirm merely that the units of drug were purchased and dispensed by a 340B-eligible entity.  *See* JA612-14; JA1062-63 (identifying required data elements for J&J's rebate model); JA1050-51 (HRSA analysis of availability of this data).

Intervenors protest that, even if the scope of data used for rebate models is different from audits, "nothing in the 340B statute provides any limitations on the data J&J could request from 340B Providers if it is permitted to condition rebates on data submission."  Intervenor Br. 38.  Rebate models present a "structural issue," Intervenors continue, because "nothing prevents J&J from imposing heightened data requirements on 340B Providers for any reason it chooses," nor from "asking for the same information it requests in an audit before issuing a rebate."  *Id.*  Setting aside

that the information sought in a retrospective audit is unsuitable for validating new claims—and that certain elements reviewed in an audit (such as claim reversals) are not available at the time a drug is dispensed—this Court's decision in *Novartis* addressed each of Intervenors' supposed concerns by holding that the statute requires manufacturers to make "a bona fide offer," and that conditions on 340B sales "onerous enough to effectively increase the contract price" could result in unlawful overcharging. *Novartis Pharms.*, 102 F.4th at 463; *see* JA1163 (district court decision noting *Novartis* holds that "manufacturers can require standard claims data from covered entities without violating their bona fide offer obligation").

Intervenors themselves also identify two other meaningful limitations: HRSA's longstanding policy that manufacturers may not condition price reductions on an entity's assurance of compliance with the statute, Intervenor Br. 38 (citing 63 Fed. Reg. at 35,242); and "Secretarial oversight," *id.* at 39. The record in this case leaves no doubt that HRSA is strongly committed to overseeing manufacturer efforts to implement rebate models, as does HRSA's new rebate model pilot program.

Intervenors' real objection, by their own admission, is that if rebate models proceed, "manufacturers will have the leverage to require 340B Providers to turn over all claim-level data necessary to validate 340B claims." *Id.* at 37. But if covered entities are currently obtaining 340B pricing only on eligible purchases, then rebate models should have no overall effect on the scope of purchases for which

reduced pricing is available. To the extent Intervenors believe increased visibility into their claims data will materially affect the number of reduced-price purchases they can make—suggesting that hospitals are currently obtaining 340B pricing on *ineligible* purchases—that only heightens the need for rebate models.

Finally, Intervenors' insistence that rebate models are unnecessary because "the statue [sic] already includes a compliance mechanism[,] audits," is thoroughly belied by the record. *Id.* at 38. Intervenors admit (at 39) that six covered entities recently *sued HRSA* to block its approvals of J&J audits. Those suits have effectively prevented J&J's independent auditor from conducting a single audit step for more than a year, despite HRSA's approval of J&J's audits multiple times over, covered entities' statutory duty to comply with audits, and J&J's statutory right to conduct them. *See* Br. of Johnson & Johnson Health Care Sys. Inc. as Amicus Curiae in Supp. of Reversal ("Amicus Br.") at 2, 4, 10-12, *Novartis Pharms.*, No. 25-5177 (D.C. Cir. June 25, 2025).

Seeking to diminish the severe impact of the coordinated campaign of obstruction and delay waged by the covered entities J&J sought to audit, *see* JA1039-40, Intervenors assert that lawsuits were brought by only "six out of tens of thousands of 340B Providers." Intervenor Br. 39. But this ignores that J&J sought to audit only a dozen covered entities with significant recent increases in 340B-priced purchasing (which Intervenors concede is sufficient basis for an audit,

Intervenor Br. 40)—and *half* of those entities responded with lawsuits and claimed they had no duty to comply with audits until the cases were resolved. The district court correctly dismissed all six suits, but four of the plaintiff entities have filed appeals and moved to stay the district court's decisions pending appeal. *See* Nos. 25-5297, 25-5298, 25-5299, No. 25-5300 (D.C. Cir.). The result is that more than one year has elapsed and J&J's independent auditor has not been able to start any of the audits. The record shows that audits alone are clearly insufficient to address 340B program integrity concerns. *See* Amicus Br. 12.

*Past Program Integrity Violations*. Intervenors try to minimize the well-documented history of abuse in the 340B program, asserting that accounts of program integrity violations "rest largely on HRSA's issuance of 'duplicate discount' findings during its annual audits," which Intervenors assert are misleading. Intervenor Br. 13-16. Yet for nearly half of the findings that Intervenors criticize, HRSA required covered entities to repay manufacturers for improper price reductions they obtained, which is the remedy HRSA imposes for substantiated duplicate discounting violations. *See* HRSA, *Program Integrity: FY22 Audit Results* (last updated July 24, 2025), https://bit.ly/3JmKFsI.

Intervenors further claim (at 17) that Government Accountability Office ("GAO") reports discussing HRSA audits can be disregarded because they rely on the same supposedly flawed data. But the GAO reports Intervenors appear to

reference are focused on identifying persistent issues and deficiencies with HRSA's oversight of the program, including as to audits. *See* GAO, GAO-21-107, *HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements* 20-21 (Dec. 2020), https://bit.ly/3V4chFz ("we remain concerned that HRSA lacks reasonable assurance that the audits are appropriately identifying" incidents of noncompliance). GAO has also reported that "HRSA's audits do not provide the agency with reasonable assurance that covered entities are taking the necessary steps to prevent duplicate discounts," leaving "drug manufacturers … at risk of being required to erroneously provide duplicate discounts for Medicaid drugs." GAO, GAO-20-212, *340B Drug Discount Program, Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* 25 (Jan. 2020), http://bit.ly/4fI1eLJ.

Accordingly, even if Intervenors were right that HRSA's findings overstate duplicate discounts among the data audited, GAO's analysis makes clear that HRSA is failing to detect substantial further abuse. Indeed, as one of the district courts below correctly remarked at a summary judgment hearing, "[t]here's a long history of these duplication problems, diversion problems, and HRSA has been aware of them for a long time." JA332. In any event, as Intervenors concede (at 14), these issues are "irrelevant to the statutory interpretation question at issue in this case."

Intervenors' answer to that question is refuted by Section 340B's text, structure, purpose, and history.

## CONCLUSION

For the foregoing reasons, the Court should reverse the decisions below.

Dated: August 29, 2025

Respectfully submitted,

/s/ *Jeffrey L. Handwerker*

| | |
|---|---|
| Paula R. Ramer | Jeffrey L. Handwerker |
| ARNOLD & PORTER | Samuel I. Ferenc |
|   KAYE SCHOLER LLP | ARNOLD & PORTER |
| 250 West 55th Street |   KAYE SCHOLER LLP |
| New York, NY 10019-9710 | 601 Massachusetts Ave., NW |
| Tel: (212) 836-8000 | Washington, DC 20001-3743 |
| | Tel: (202) 942-5000 |
| | jeffrey.handwerker@arnoldporter.com |

*Counsel for Plaintiff-Appellant Johnson & Johnson Health Care Systems Inc.*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 5,741 words, excluding the parts exempted by Fed. R. App. P. 32(f) and Cir. R. 32(e)(1). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

Dated: August 29, 2025         */s/ Jeffrey L. Handwerker*
                                              Jeffrey L. Handwerker

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2025, pursuant to Fed. R. App. P. 25(d) and Cir. R. 25, I caused the foregoing Brief to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter who are registered with the Court's CM/ECF system.

Dated: August 29, 2025

*/s/ Jeffrey L. Handwerker*
Jeffrey L. Handwerker