**ORAL ARGUMENT NOT YET SCHEDULED**

Nos. 25-5177, 25-5179, 25-5220, 25-5221, 25-5236

Iɴ Tʜᴇ

# United States Court of Appeals
# for the District of Columbia Circuit

NOVARTIS PHARMACEUTICALS CORPORATION, *et al.*,

*Plaintiffs-Appellants*,

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary, United States
Department of Health and Human Services, *et al.*,

*Defendants-Appellees*,

340B HEALTH, *et al.*,

*Intervenors for Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Columbia

## REPLY BRIEF FOR NOVARTIS PHARMACEUTICALS CORPORATION, BRISTOL MYERS SQUIBB COMPANY, ELI LILLY AND COMPANY, LILLY USA, LLC, AND KALDEROS, INC.

Jᴏʜɴ C. O'Qᴜɪɴɴ
Mᴇɢᴀɴ McGʟʏɴɴ
Kɪʀᴋʟᴀɴᴅ & Eʟʟɪs LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000
john.oquinn@kirkland.com

*Counsel for Eli Lilly and
Company and Lilly USA, LLC*

August 29, 2025

Cᴀᴛʜᴇʀɪɴᴇ E. Sᴛᴇᴛsᴏɴ
Sᴜsᴀɴ Cᴏᴏᴋ
Sᴇᴀɴ Mᴀʀᴏᴛᴛᴀ
Hᴏɢᴀɴ Lᴏᴠᴇʟʟs US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

*Counsel for Novartis Pharmaceuticals
Corporation, Bristol Myers Squibb
Company, Eli Lilly and Company, and
Lilly USA, LLC*

(Additional counsel on inside cover)

Additional counsel:

PAUL J. ZIDLICKY
MADELEINE JOSEPH
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
pzidlicky@sidley.com

TREVOR L. WEAR
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

*Counsel for Kalderos, Inc.*

KEENAN ROARTY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004

JACKSON B. SKEEN
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110

*Counsel for Novartis Pharmaceuticals Corporation, Bristol Myers Squibb Company, Eli Lilly and Company, and Lilly USA, LLC*

## TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES ............................................................. iii

GLOSSARY ................................................................................. viii

INTRODUCTION AND SUMMARY OF ARGUMENT ......................... 1

ARGUMENT ............................................................................... 4

   I.   SECTION 340B DOES NOT PERMIT HRSA'S
      "PREAPPROVAL" APPROACH ............................................... 4

      A.   The 340B Statute Does Not Require Preapproval ................ 4

      B.   Any Restrictions On Rebates Or Discounts Must Be
          Implemented Through The PPAs ...................................... 6

      C.   Section 340B(a) Explicitly Contemplates Rebate Models ............... 11

   II.   HRSA'S UNPRECEDENTED ASSERTION OF
      PREAPPROVAL POWERS WAS ARBITRARY AND
      CAPRICIOUS ........................................................................ 14

      A.   The Government Effectively Concedes HRSA Did Not
          Acknowledge It Was Changing Position ........................... 14

      B.   HRSA Failed To Explain Its Choice To Require Preapproval
          For Plaintiffs' Models But Not Others ............................. 16

          1.   *The Government Cannot Rewrite ADAP History* ............ 16

          2.   *The Government Cannot Justify HRSA's Different
              Treatment Of The Product-Replenishment Model* ............ 18

   III.   HRSA'S REJECTION OF PLAINTIFFS' REBATE MODELS
       WAS ARBITRARY AND CAPRICIOUS .................................. 22

       A.   The Agency's Disapproval Is Final And Ripe .................... 23

       B.   HRSA's Failure To Consider The Benefits Of Plaintiffs'
           Rebate Models Requires Reversal .................................... 27

i

**TABLE OF CONTENTS—Continued**

Page

CONCLUSION ..........................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

*Amalgamated Transit Union v. Skinner,
  894 F.2d 1362 (D.C. Cir. 1990) .........................................................................10

American Bankers Ass'n v. National Credit Union Admin.,
  934 F.3d 649 (D.C. Cir. 2019) ...........................................................................26

American Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.,
  24 F.4th 666 (D.C. Cir. 2022) .....................................................................15, 16

American Trucking Ass'ns, Inc. v. Federal Motor Carrier Safety
  Admin.,
  724 F.3d 243 (D.C. Cir. 2013) ...........................................................................14

Appalachian Power Co. v. EPA,
  208 F.3d 1015 (D.C. Cir. 2000) .........................................................................24

Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy,
  548 U.S. 291 (2006) ............................................................................................11

Astra USA, Inc. v. Santa Clara County,
  563 U.S. 110 (2011) ..............................................................................................9

Cash & Henderson Drugs, Inc. v. Johnson & Johnson,
  799 F.3d 202 (2d Cir. 2015) ...............................................................................12

Collins v. Yellen,
  594 U.S. 220 (2021) ..............................................................................................8

Consumer Fed'n of Am. & Pub. Citizen v. HHS,
  83 F.3d 1497 (D.C. Cir. 1996) ...........................................................................17

*Cummings v. Premier Rehab Keller, P.L.L.C.,
  596 U.S. 212 (2022) ......................................................................................11, 21

\* Authorities upon which we chiefly rely are marked with an asterisk.

iii

## TABLE OF AUTHORITIES—Continued

Page

*Encino Motorcars, LLC v. Navarro,
   579 U.S. 211 (2016)....................................................................... 14-16

Friedman v. FAA,
   841 F.3d 537 (D.C. Cir. 2016)...........................................................25

Grand Canyon Tr. v. FAA,
   290 F.3d 339 (D.C. Cir. 2002).............................................................6

Loving v. IRS,
   742 F.3d 1013 (D.C. Cir. 2014)...........................................................6

Lujan v. National Wildlife Fed'n,
   497 U.S. 871 (1990).........................................................................24

Nasdaq Stock Mkt. LLC v. SEC,
   38 F.4th 1126 (D.C. Cir. 2022)..........................................................24

National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs,
   417 F.3d 1272 (D.C. Cir. 2005)....................................................22, 24

Novartis Pharms. Corp. v. Johnson,
   102 F.4th 452 (D.C. Cir. 2024)......................................................8, 11

Ohio Forestry Ass'n, Inc. v. Sierra Club,
   523 U.S. 726 (1998).........................................................................24

Pharmaceutical Rsch. & Mfrs. of Am. v. David,
   510 F. Supp. 3d 891 (E.D. Cal. 2021) ...............................................12

Pharmaceutical. Rsch. & Mfrs. of Am. v. HHS,
   43 F. Supp. 3d 28 (D.D.C. 2014).........................................................8

Solondz v. Federal Aviation Admin.,
   141 F.4th 268 (D.C. Cir. 2025)s .......................................................22

Teva Pharms. USA, Inc. v. Sebelius,
   595 F.3d 1303 (D.C. Cir. 2010).........................................................24

iv

## TABLE OF AUTHORITIES—Continued

Page

*United Parcel Serv., Inc. v. Postal Regul. Comm'n,*
955 F.3d 1038 (D.C. Cir. 2020) ........................................................................27

*United States v. Picciotto,*
875 F.2d 345 (D.C. Cir. 1989) ..........................................................................10

*Westar Energy, Inc. v. FERC,*
473 F.3d 1239 (D.C. Cir. 2007) ..................................................................16, 21

*Whitman v. Am. Trucking Associations,*
531 U.S. 457 (2001) ............................................................................................9

STATUTES:

21 U.S.C. § 355(a) ................................................................................................5

42 U.S.C. § 1395w-114c(b)(1)(A) ......................................................................29

42 U.S.C. § 1395w-114c(g)(4)(A) ......................................................................29

42 U.S.C. § 1396a(b) ............................................................................................5

42 U.S.C. § 1396b(a) ............................................................................................5

42 U.S.C. § 1396r-1a(b)(3)(A)(IV) ......................................................................5

42 U.S.C. § 1396r-8(a)(1) ..................................................................................29

42 U.S.C. § 1396r-8(b)(1)(A) ............................................................................29

42 U.S.C. § 1396u(a)(6) ........................................................................................5

42 U.S.C. § 2297h-4(5) ........................................................................................5

42 U.S.C. § 256b(a)(1) ............................................................................... 4-7, 12

42 U.S.C. § 256b(a)(5)(A)(ii) ..............................................................................7

42 U.S.C. § 256b(a)(8) ..........................................................................................7

## TABLE OF AUTHORITIES—Continued

Page

42 U.S.C. § 256b(d)(1)(B)(i)(I) ........................................................8

42 U.S.C. § 256b(d)(1)(B)(vi)(I) ......................................................8

42 U.S.C. § 256b(d)(3)(A) ...............................................................8

42 U.S.C. § 256b (1992) ..................................................................8

42 U.S.C. § 6506(a)(i)(1) .................................................................5

**REGULATIONS:**

340B Program Notice,
  90 Fed. Reg. 36,163 (Aug. 1, 2025) ...........................................26

Agency Information Collection Activities,
  80 Fed. Reg. 63,560 (Oct. 20, 2015) .......................................7, 10

Agency Information Collection Activities,
  81 Fed. Reg. 20,649 (Apr. 8, 2016) ...........................................10

Final Notice Regarding Section 602 of the Veterans Health Care Act of
  1992 Entity Guidelines,
  59 Fed. Reg. 25,110 (May 13, 1994) ..........................................19

Guidance Regarding Section 602 of the Veterans Health Care Act of
  1992,
  58 Fed. Reg. 27,289 (May 7, 1993) ............................................15

Notice Regarding Section 602 of the Veterans Health Care Act of 1992,
  61 Fed. Reg. 43,549 (Aug. 23, 1996) ..........................................18

Notice Regarding Section 602 of the Veterans Health Care Act of 1992—
  Rebate Option,
  62 Fed. Reg. 45,823 (Aug. 29, 1997) .....................................15, 17

## TABLE OF AUTHORITIES—Continued

Page

Notice Regarding Section 602 of the Veterans Health Care Act of 1992—
    Rebate Option,
    63 Fed. Reg. 35,239 (June 29, 1998)...........................................................13, 29

LEGISLATIVE MATERIALS:

Gov't Accountability Off., GAO-18-480, Drug Discount Program:
    Federal Oversight of Compliance at 340B Contract Pharmacies
    Needs Improvement (June 2018), https://perma.cc/TWH9-HG26....................27

H.R. Rep. No. 102-384(II) ........................................................................................9

Pub. L. No. 111-148, 124 Stat 119 (2010)............................................................7, 8

EXECUTIVE MATERIALS:

HRSA, Program Integrity: FY24 Audit Results (last updated Aug. 26,
    2025), https://www.hrsa.gov/opa/program-integrity/fy-24-audit-
    results ..................................................................................................................28

Memorandum from June Gibbs Brown, Inspector Gen., HHS, to Claude
    E. Fox, Acting Adm'r, HRSA (Jan. 2, 1998), https://perma.cc/T5JE-
    F44Q ...................................................................................................17, 18, 28

OTHER AUTHORITIES:

*Price*, Black's Law Dictionary (12th ed. 2024)......................................................12

*Provide*, American Heritage Dictionary of the English Language (3d
    ed. 1992) ..............................................................................................................4

*Rebate*, Oxford English Dictionary (2024)............................................................12

## GLOSSARY

ADAP:                              AIDS Drug Assistance Program

GAO:                              Government Accountability Office

HRSA:                              Health Resources and Services Administration

PPA:                              Pharmaceutical Pricing Agreement

## INTRODUCTION AND SUMMARY OF ARGUMENT

This case involves how pharmaceutical manufacturers offer reduced prices on their medicines in the federal 340B Program. Plaintiffs want to offer that price through cash rebates. The Government and Intervenors strongly object to that approach, even though rebates are a routine way for pharmaceutical manufacturers—and all businesses—to offer price reductions.

The proposed system is simple: A purchaser buys medicine at list price, dispenses it to a patient, and submits basic information to the seller. The seller promptly validates the purchase's eligibility for a rebate. The seller then pays what is owed. No company—and no government program, for that matter—would give away billions of dollars in price concessions without validating eligibility first.

Covered entities participate in rebate processes like these without complaint inside and outside of the 340B Program, and the Government similarly uses rebates in Medicaid, Medicare Part B, and Medicare Part D. Those rebate programs work just fine. But when it comes to 340B, covered entities contend this standard business practice would cause the sky to fall. That simply is not true. Manufacturers will review the data and pay the rebates promptly, and HRSA itself retains the power to impose severe penalties on companies that make the process unduly burdensome. Covered entities' created black-box, post-purchase eligibility system has no parallel to any other program, ever, and results in billions in unlawful 340B

price reductions each year. The government has chronicled this year in, year out, in report after report, but has not taken any meaningful steps to address it.

Plaintiffs therefore informed HRSA that they intended for covered entities to use rebates to access the 340B price. That shift from covered entities' opaque and fraud-riddled product-replenishment approach to a system where covered entities would provide basic data—which they already collect—would be a simple and transparent way to ensure that covered entities receive every 340B price reduction they are entitled to and no more. Claiming a heretofore unprecedented authority to "pre-approve" 340B rebate or discount systems, HRSA said "no."

Never before in the 340B Program's 30-plus-year history has HRSA claimed the authority to preapprove any rebate or discount model. Yet the Government now insists that Section 340B affirmatively *requires* the Secretary to approve any such models before they can be implemented. Gov't Br. 23-24. The Government's appellate position goes far beyond the District Court's decision. And it is demonstrably wrong.

Section 340B's text, structure, and history all confirm that there is no statutory preapproval requirement. Rather, as Plaintiffs explained in their opening brief, Congress authorized the Secretary to "account" for manufacturers' discounts and rebates—but only through the Pharmaceutical Pricing Agreements (PPA). That choice was intentional. Unlike other federal healthcare programs, the Secretary

lacks general rulemaking authority over the 340B Program. The PPA is therefore HRSA's only way to notify manufacturers of legally binding program requirements or prohibitions before they opt into the Program—something particularly important here, given that the 340B Program is an exercise of Congress's Spending Clause powers. Because the Secretary has not included in the PPAs any restrictions on rebates or discounts, HRSA had no authority to prohibit Plaintiffs' models.

The Government also cannot justify the agency's decision to require preapproval of *these* particular pricing models, when it has never required preapproval of any other pricing model. The Government contends that Plaintiffs' rebate models differ from every other model offered over the last 30-plus years, but its position rests on an easily refuted revisionist history—one never advanced until its brief in this Court. And the Government's newfound distinctions fail even on their own terms.

Finally, the Government's ripeness argument should be rejected. Having already taken six years to evaluate Kalderos's rebate model, the Government evidently believes that HRSA can take all the time it wants to deliberate. In the meantime, according to the Government, Plaintiffs may not adopt standard business practices to rein in the 340B Program's rampant abuses. HRSA therefore has affirmatively forbidden manufacturers from implementing their announced rebate

models without preapproval.  Plaintiffs are entitled to judicial review setting that action aside.

## ARGUMENT

### I.    SECTION 340B DOES NOT PERMIT HRSA'S "PREAPPROVAL" APPROACH.

The District Court held that Section 340B grants HRSA free-floating discretion to subject manufacturers' rebate models to preapproval.  JA391.  The Government now disavows that ruling, claiming instead that Section 340B *requires* Secretarial preapproval—meaning that "until the Secretary provides for rebates, manufacturers cannot use them."  Gov't Br. 24.  The reason for the Government's change in position is obvious: it allows HRSA to avoid giving a reasoned explanation for requiring preapproval for the first time in the Program's history.  But the Government's new reading is just as flawed as the District Court's; the statute and 30-plus years of agency practice confirm as much.

### A.    The 340B Statute Does Not Require Preapproval.

Congress required that the Secretary enter into agreements with manufacturers under which the amount to be paid by covered entities "tak[es] into account any rebate or discount, as provided by the Secretary."  42 U.S.C. § 256b(a)(1).  The Government interprets "provided" as if it means "allowed."  Gov't Br. 23-24.  But, as its own brief shows (at 24-25), contemporaneous dictionaries define "provide[]" to mean only "a stipulation or condition."  *Provide*, American Heritage Dictionary

of the English Language 1458 (3d ed. 1992). And Section 340B further makes clear that this power is exercised only "*as* provided" by the Secretary, not "until" provided. 42 U.S.C. § 256b(a)(1) (emphasis added). The Government's contrary reading would require the Court to read into the statutory text a phantom word: Rebates or discounts are invalid *unless* provided by the Secretary.

Congress knows how to write preapproval requirements when it wants to. For example, as Plaintiffs observed (at 32-33), Congress prohibits the "introduction into interstate commerce" of new drugs "unless" the Secretary grants "approval." 21 U.S.C. § 355(a). Congress requires that the Secretary "approve" state Medicaid plans. 42 U.S.C. §§ 1396a(b), 1396b(a). And Congress regularly uses "as approved by the Secretary" to create preauthorization regimes. *See, e.g.*, *id.* § 1396r-1a(b)(3)(A)(IV); *id.* § 1396u(a)(6); *id.* § 2297h-4(5); *id.* § 6506a(i)(1). The Government never reconciles these examples with Section 340B's different text.

Longstanding agency practice likewise supports Plaintiffs' plain reading. The Government cites no example of HRSA previously demanding preapproval for any discount or rebate model. And HRSA has never before even hinted that it viewed itself as having preapproval power—much less being *required* to preapprove any rebate or discount—until now. "In light of the text, history, structure, and context of the statute, it becomes apparent that [HRSA has] never before adopted its current

interpretation for a reason:  It is incorrect." *Loving v. IRS,* 742 F.3d 1013, 1021 (D.C. Cir. 2014).

### B.    Any Restrictions On Rebates Or Discounts Must Be Implemented Through The PPAs.

The phrase "as provided by" gives HRSA some role in regulating rebate or discount models, but only within the constraints of the statute.  As Plaintiffs have explained, the PPAs are the only permissible means for HRSA to impose any requirements on these models.  Opening Br. 26-30.

1. Section 340B(a)(1)'s plain text states that the Secretary must "enter into an agreement with each manufacturer," and "*under*" *that agreement* may "provide[]" for how to take "into account any rebate or discount."   42 U.S.C. § 256b(a)(1) (emphasis added).  The language the Government touts is thus directly tied to the PPA.  To find some free-floating preapproval power as the Government proposes would require "ignor[ing] the rest of the sentence" around the parenthetical.  *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 346 (D.C. Cir. 2002).

And it is not just that sentence.  Everything else in subsection (a)(1) is similarly devoted to the "requirements for" PPAs.  42 U.S.C. § 256b(a)(1).  Under the Government's reading, everything in subsection (a)(1) must appear in the PPAs—*except* for rebates or discounts.  That defies logic.  Congress sensibly tied the Secretary's regulatory authority to the PPAs' terms, so that manufacturers entering into the Program would have advance notice of the rules of the road.

6

HRSA itself used to follow that approach.  When Congress expanded Section 340B(a)(1) to add the Affordable Care Act's "shall offer" provision, the Secretary incorporated that language into the PPAs through notice-and-comment procedures, confirming that the PPA was the appropriate vehicle for effectuating subsection (a)(1)'s provisions.  *See* Pub. L. No. 111-148, 124 Stat 119, 823-825 (2010); Agency Information Collection Activities, 80 Fed. Reg. 63,560, 63,560-61 (Oct. 20, 2015); JA446 (incorporating this requirement).

The Government's examples of the Secretary acting outside the PPAs to implement *other* provisions of Section 340B(a) only prove Plaintiffs' point.  Gov't Br. 28.  In each of those instances, Congress used express statutory language requiring that the Secretary "establish" certain additional procedures—such as anti-duplication mechanisms for covered entities or a prime vendor program.  42 U.S.C. § 256b(a)(5)(A)(ii), (a)(8).[1]  This same pattern is repeated in other parts of Section 340B, where Congress explicitly authorized the Secretary to act through policy or other guidance.  *Id.* § 256b(d)(1)(B)(i)(1).  Congress did not use equivalent language in Section 340B(a)(1)—it did the opposite, requiring that any Secretarial action be "under" the "agreement."  *Id.* § 256b(a)(1).  Congress therefore did not give the

---

[1] Further, as the Government notes, the prime vendor program "is discussed in the manufacturer pricing agreement."  Gov't Br. 28 (citing JA439).  So are the covered-entity requirements the Government cites.  *Id.*; *see* JA439-441.  That, too, is appropriate; the PPA binds the Secretary as well as manufacturers.

Secretary authority to "tak[e] into account any rebate or discount" *except* through the PPA. *Id.*; *see Collins v. Yellen*, 594 U.S. 220, 248 (2021) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (citation omitted).

Requiring the Secretary to regulate rebates through the PPAs would not render any part of Section 340B(a)(1) superfluous. *Cf.* Gov't Br. 29. The fact that "the Secretary is the one preparing the agreement," *id.*, is precisely *why* the PPA provides the proper mechanism for the Secretary to implement his statutory "as provided by" authority. Congress pointedly did not grant the Secretary general rulemaking authority over the 340B Program. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 456 (D.C. Cir. 2024). Indeed, when it enacted Section 340B(a), Congress did not give the Secretary any rulemaking authority at all. *See* 42 U.S.C. § 256b (1992). And the limited rulemaking authority Congress later authorized did not extend to Section 340B(a)(1). *See* Pub. L. No. 111-148, 124 Stat 119, 823-825 (2010) (codified at 42 U.S.C. § 256b(d)(3)(A) (establishing dispute resolution process)); *id.* § 256b(d)(1)(B)(i)(I) (methodological standards regarding calculation of ceiling prices); *id.* § 256b(d)(1)(B)(vi)(I) (imposition of civil monetary penalties); *see also Pharm. Rsch. & Manufacturers of Am. v. HHS*, 43 F. Supp. 3d 28, 41-44 (D.D.C. 2014) (discussing HRSA's limited rulemaking authority).

It therefore makes sense that HRSA should have to impose any restrictions on manufacturers' rebates through properly amended PPAs: That is the only way HRSA can provide manufacturers with fair notice of the conditions of their participation in the 340B Program. The Government's theory, in contrast, would give HRSA carte-blanche discretion far *broader* than the rulemaking authority it lacks. But we all know Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).

For much the same reason, the Government's observation that the PPAs "simply incorporate statutory obligations" does not change the calculus. Gov't Br. 25-26 (quoting *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113, 117-118 (2011)). Congress expected the Secretary to "develop[] these agreements" based on his judgment about the "most effective and most efficient" mechanism for delivering price reductions to covered entities. H.R. Rep. No. 102-384(II) at *16. That is precisely why the PPAs are the only way for the Secretary to "develop" any restrictions it wishes to impose on rebates. Plaintiffs explained all of this. *See* Opening Br. 34-35. The Government did not meaningfully respond.

2. The Government calls it "inconsequential" whether the Secretary uses PPAs or *ad hoc* decision letters to effectuate its statutory charge. Gov't Br. 30. That is wrong: "When Congress prescribes the form in which an agency may exercise its authority, . . . we cannot elevate the goals of an agency's action, however reasonable,

over that prescribed form." *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990).

Requiring HRSA to follow the statutory text furthers the 340B Program's design in crucial ways. Regulation of rebate and discount models through PPAs gives manufacturers advance notice of HRSA's legal positions and an opportunity to participate in the process—a particularly important guarantee where the agency purports to substantively alter the rights of private parties. *See United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989) (emphasizing the "importance" of "policy goals of maximum participation and full information") (quotation omitted). For that reason, HRSA has consistently recognized the importance of crafting PPA provisions with the benefit of manufacturer and public input. *See, e.g.*, Agency Information Collection Activities, 80 Fed. Reg. 63,560 (Oct. 20, 2015); Agency Information Collection Activities, 81 Fed. Reg. 20,649 (Apr. 8, 2016). Such notice provides all stakeholders a means to voice their objections and persuade the agency about the appropriate balance of interests. And it allows them to do all this *without* being subjected to a prior restraint—or stuck in a perpetual limbo, like Plaintiffs.

These dynamics exist anytime a federal agency sets out to alter the rights and obligations of a regulated entity, but they are particularly consequential here. *Cf.* Gov't Br. 30. Congress created the 340B Program pursuant to its Spending Clause powers, requiring manufacturers to provide 340B discounts as a condition of

receiving reimbursement from Medicaid and Medicare Part B. *Novartis*, 102 F.4th at 455. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent: 'in return for federal funds, the [recipients] agree to comply with federally imposed conditions.'" *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (citations omitted). But "[r]ecipients cannot 'knowingly accept' the deal with the Federal Government unless they 'would clearly understand . . . the obligations' that would come along with doing so." *Id.* (quoting *Arlington Cent. Sch. Dist. Bd. of Ed. v. Murphy*, 548 U.S. 291, 296 (2006)). Requiring restrictions on rebate models to be included in PPAs is part-and-parcel of the 340B Program's unique role in transferring funds from one regulated entity to another.

## C.  Section 340B(a) Explicitly Contemplates Rebate Models.

For their part, Intervenors assert that the Secretary may *never* provide for a rebate, even though the statute expressly allows just that. Intervenors' Br. 21-40. As the Government correctly explains, Intervenors' argument is foreclosed by the strong presumption against implied repeals. Gov't Br. 38-40. Other basic statutory-interpretation principles similarly render Intervenors' reading meritless.

Intervenors' reliance (at 21-27) on the statute's "shall offer" provision gets them nowhere. That provision requires manufacturers to provide covered outpatient drugs to covered entities at or below the ceiling price, and prevents manufacturers

from refusing to sell to covered entities at the ceiling price.  Nothing in that statutory language requires the ceiling price be offered as an upfront discount.  "Price" means "[t]he cost of acquiring or producing something." *Price*, Black's Law Dictionary (12th ed. 2024).  A covered entity that receives a rebate for a covered drug "acquires" a drug at the "cost" of the ceiling price. *See, e.g.*, *Pharmaceutical Rsch. & Mfrs. of Am. v. David*, 510 F. Supp. 3d 891, 898 (E.D. Cal. 2021) ("The transaction price of a prescription drug . . . includes discounts and rebates.").  And manufacturers routinely "*offer*[] lower *prices* . . . through *rebates* or discounts." *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 206 (2d Cir. 2015) (emphases added).  An offer to purchase medicine and then receive a rebate is an offer to purchase the medicine at the price after the rebate.

Intervenors argue that the Secretary's power to "provide[]" for "any rebate," 42 U.S.C. § 256b(a)(1), merely gives the Secretary the power to make adjustments to the ceiling price when the normal formula would drop 340B prices below a penny per unit.  Intervenors' Br. 28-29.  But a rebate is a "deduction from a sum of money to be paid . . . *esp*. . . . one given retrospectively." *Rebate*, Oxford English Dictionary (2024).  Adjusting a price *upward* to avoid a negative 340B price can hardly be described as a "rebate."  And even assuming "rebate" could be stretched that far, Intervenors offer no reason why the term should carry their bizarre meaning rather than the far-more-common meaning of a post-sale price reduction.

12

Intervenors' theory would also make the long-established AIDS Drug Assistance Program (ADAP) rebate and product-replenishment models unlawful. Intervenors contend (at 30) that ADAP rebates are "voluntary," but that would be irrelevant if, as Intervenors argue, the statute forbids them.  Moreover, ADAP rebates are mandatory for manufacturers: they are *required* to "honor appropriate section 340B rebate requests from covered entities."  Notice Regarding Section 602 of the Veterans Health Care Act of 1992—Rebate Option, 63 Fed. Reg. 35,239, 35,240 (June 29, 1998).  As for the product-replenishment model, Intervenors concede that covered entities or their contract pharmacies must pay market price at least once.  Intervenors' Br. 9.  But under Intervenors' discount-only reading of the statute, even one time would be too many.

Finally, Intervenors contend that Plaintiffs' models requiring claims data would make the statute's audit provisions "meaningless."  Intervenors' Br. 36-40. But statutory language is not surplusage simply because it need not be invoked in all circumstances, and no one has claimed Plaintiffs' models can or will prevent all potential statutory violations.  In any event, the audit process also seeks to stop diversion, while Plaintiffs' models target unlawful duplication. *See* Opening Br. 16-17.  So the audit process retains meaning even if all manufacturers were to adopt the cash-rebate model for all products.

13

## II.    HRSA'S UNPRECEDENTED ASSERTION OF PREAPPROVAL POWERS WAS ARBITRARY AND CAPRICIOUS.

Even assuming HRSA has some free-floating preapproval power, exercising that power for the first time to block Plaintiffs' rebate models was arbitrary and capricious.  *See* Opening Br. 37-49.  For 30-plus years, HRSA never claimed authority to preapprove a manufacturer's use of a rebate or discount model, never set up a process for manufacturers to submit the issue for agency consideration, and never preapproved any of the discount or rebate models that are in use today.

In asserting preapproval power for rebates, HRSA did not "display awareness" that it was doing something new—textbook arbitrary action.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (citation omitted); Opening Br. 38-40.  HRSA also offered no adequate explanation why it failed to require preapproval for the ADAP-rebate and product-replenishment models, yet required preapproval here.  Opening Br. 41-49; *American Trucking Ass'ns, Inc. v. Federal Motor Carrier Safety Admin.*, 724 F.3d 243, 250 (D.C. Cir. 2013).

The Government effectively concedes the first point.  Its post hoc justifications cannot save the second.

### A.    The Government Effectively Concedes HRSA Did Not Acknowledge It Was Changing Position.

The Government does not dispute that HRSA never acknowledged that it was instituting a preapproval requirement for the first time.  *See Encino Motorcars*, 579

U.S. at 221-222. Nor does the Government cite a single example of HRSA requiring Secretarial preapproval in the past. Instead, it obliquely states that HRSA's initial 1993 guidance "described only a discount process." Gov't Br. 10 (quoting 62 Fed. Reg. at 45,824). But "describing" and "preapproving" a process are different. And the guidance provided for the use of "rebate[s] (or credit[s])" "to account for sales between" Section 340B's effective date and the date manufacturers signed their PPAs. Guidance Regarding Section 602 of the Veterans Health Care Act of 1992, 58 Fed. Reg. 27,289, 27,291 (May 7, 1993). The Secretary thus contemplated the use of both rebates and discounts—and did not "preapprove" discounts any more than she did rebates. Because an "unexplained inconsistency in agency policy is a reason for holding an interpretation to be . . . arbitrary and capricious," the District Court's decision should be reversed on this independent ground. *Encino Motorcars*, 579 U.S. at 222 (quotation omitted).

The Government contends that the Secretary need not give a "detailed explanation of his decision" because the statute purportedly compels HRSA's interpretation. Gov't Br. 31-32. This fails multiple times over. For one thing, an agency's obligation to engage in reasoned decisionmaking is not lessened just because it purports to be complying with a statutory mandate. *See, e.g.*, *American Fed'n of Gov't Emps., AFL-CIO v. Fed. Lab. Rels. Auth.*, 24 F.4th 666, 674 (D.C. Cir. 2022) (vacating agency decision because it provided no "non-arbitrary reason"

why a certain statutory interpretation was correct). For another, HRSA gave *no* explanation for why it was imposing a new obligation; its letters suggested no awareness even that it was doing so, and thus lacked the "minimal level of analysis" to support an agency change in practice. *Encino Motorcars*, 579 U.S. at 221 (citation omitted). And for a third, the Government is wrong that preapproval is statutorily required. *Supra* pp. 4-6.

### B. HRSA Failed To Explain Its Choice To Require Preapproval For Plaintiffs' Models But Not Others.

HRSA also failed to "point to a relevant distinction" as to why Plaintiffs' cash-rebate models needed preapproval when past discount and rebate models had not. *Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007); Opening Br. 41-49. The Government's appeal brief purports to offer that explanation, but courts "may not accept appellate counsel's *post hoc* rationalizations for agency action." *American Fed'n of Gov't Emps.*, 24 F.4th at 674 (citation omitted).

#### 1. The Government Cannot Rewrite ADAP History.

The Government does not dispute that cash rebates have worked successfully for ADAPs, which receive the 340B Program's benefits through rebates and use standard business practices to manage their cashflow. *See* Opening Br. 44; *see also* CF United Amicus Br. 14-15 (ADAPs supporting a rebate model). The Government's brief instead goes all-in on a new effort to distinguish them,

16

contending for the first time on appeal that pre-1998 ADAP rebates did not need preapproval because they were outside the 340B Program.  Gov't Br. 32-33.

The Government's current theory is predicated on a 1998 audit report that HRSA never referenced in this proceeding before now.  *See* Gov't Br. 32-33 (citing Memorandum from June Gibbs Brown, Inspector Gen., HHS, to Claude E. Fox, Acting Adm'r, HRSA 7 (Jan. 2, 1998), https://perma.cc/T5JE-F44Q (1998 Audit)). But "review of [agency] action can be based only on the administrative record, not some new record made initially in the reviewing court"—much less the court reviewing the reviewing court.  *Consumer Fed'n of Am. & Pub. Citizen v. HHS*, 83 F.3d 1497, 1506-07 (D.C. Cir. 1996).

The Government's new reading is wrong anyway.  HRSA "recognized" in 1997 that these "rebates obtained by the State ADAPs" were a "method of accessing the 340B program."  Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Rebate Option, 62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997).  In recognizing the rebate model for ADAPs, HRSA was acknowledging the existing status quo— not changing it to bring rebates into the Program.  *Contra* Gov't Br. 33.[2]

---

[2] The Government also suggests that the "voluntary" rebates were outside of 340B because they fell short of the full statutory amount.  Gov't Br. 33.  The audit report itself rebuts that position.  *See* 1998 Audit, *supra*, at Ex. 3 (HRSA proposal would generate more rebate revenue because of "additional rebates to be obtained . . . from manufacturers not already providing voluntary rebates"); *id.* at iii, 13 (voluntary rebates insufficient to bring the amount paid down to the 340B ceiling price because

More fundamentally, nothing in the newly cited audit report suggests that the use of a rebate *required HRSA preapproval*.  HRSA's focus in the audit report was on whether ADAPs could maximize their access to 340B price savings through multiple pharmacy providers, contrary to the guidance then in effect.  1998 Audit, *supra*, at app. 4.  HRSA's answer:  Yes, but only if a rebate model is used, given the risk of diversion, *id.*—a concern that HRSA has apparently forgotten as the product-replenishment model proliferates.  *See* Opening Br. 13-14.

### 2. The Government Cannot Justify HRSA's Different Treatment Of The Product-Replenishment Model.

The Government and Intervenors both contend that HRSA has "blessed" the product-replenishment model.  Gov't Br. 35; Intervenors' Br. 9-10.  But in the guidance they cite, HRSA stated only that maintaining "a separate inventory of 340B drugs is unnecessary."  Notice Regarding Section 602 of the Veterans Health Care Act of 1992, 61 Fed. Reg. 43,549, 43,554 (Aug. 23, 1996).  That is nowhere close to preapproving the product-replenishment model.  The guidance, in fact, does not even mention the model; it merely acknowledges that covered entities need not physically segregate 340B-priced medicines from commercial-priced medicines.

---

ADAPs chose to rely on third-party pharmacies to procure the drugs, rather than by purchasing those drugs directly).

The Government attempts to equate the product-replenishment model with commingling 340B-priced and non-340B-priced drugs, stating—again for the first time on appeal—that the product-replenishment model is merely a "type[] of inventory-control system[]" that " 'need[ed] no prior approval.' "  Gov't Br. 35 (quoting 59 Fed. Reg. at 25,111).  But the guidance cited by the Government for that proposition (again) says nothing about the product-replenishment model.  It was directed at a comment requesting "preclearance of all safeguard systems."  Final Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Entity Guidelines, 59 Fed. Reg. 25,110, 25,111 (May 13, 1994).  The product-replenishment model is not simply a shelving system.  *See* Opening Br. 12-16, 46-47.  To quote the Government's own brief, the replenishment model is the byzantine process of retroactively claiming 340B discounts through proprietary "virtual inventory tracking software," which retroactively "identifies how many units went to 340B patients," whereupon covered entities "purchase[] replacement packages at the 340B ceiling price."  Gov't Br. 10-11; Intervenors' Br. 9-10; JA126-129.  Inherent in the replenishment model is the claim—based on a black-box algorithm, *see* JA100-101, 676—that some previously dispensed drug merits the 340B price.  That same retroactivity is the defining characteristic of the rebate models *Plaintiffs* have proposed—rebates in cash, rather than in kind—except that Plaintiffs' models will foster transparency and integrity rather than opacity and fraud.  *See* Opening Br.

16-17, 55-57; *see also* JA672-673 (Lilly); JA710-711, 718-720, 722-723 (BMS); JA817-819, 821 (Novartis).  HRSA owes Plaintiffs a non-arbitrary explanation why *their* models require "preapproval" while the product-replenishment model—which has facilitated billions in program-integrity violations—does not.  HRSA's letters never say.

In other litigation, the Government has made clear that the product-replenishment model *is* a type of rebate system.  Opening Br. 47.  After covered entities argued that a certain statutory interpretation would harm their use of the product replenishment model, HRSA responded that covered entities could "opt[] for a purchasing model other than the product replenishment model," such as "by obtaining the 340B discount upfront."  Defs.' Cross-Mot. for Summ. J. and Opp. to Pls.' Mot. for Summ. J. at 16, *Premier, Inc. v. HRSA*, No. 1:24-cv-3116-LLA (D.D.C.), ECF No. 16.   HRSA explained that, in contrast to the product replenishment model, it had "long envisioned upfront discounts as the preferred 340B price reduction mechanism."  *Id.*  The Government tries to explain this contradiction away with references to "context," Gov't Br. 37, but context only confirms the Government meant what it said.  The Government cannot argue contradictory positions in parallel litigation.

The Government argues on appeal that the product-replenishment model is not "meaningful[ly]" a rebate either.  *See* Gov't Br. 35-36.  This argument appears

premised on the Government's unfounded assumption that covered entities only pay full price for a drug once and receive every subsequent drug at 340B prices. *Id.* That is not so. For instance, if a covered entity expands its patient base, it will need to purchase additional units at the wholesale price before "replenishing" them at the 340B price. Further—and more to the point—if the Government were correct that product replenishment is neither a system of discounts nor rebates, then it would be an impermissible method of effectuating the 340B price that Section 340B does not contemplate at all. *See* Opening Br. 46 n.6. Yet the product-replenishment model somehow did not require preapproval, while Plaintiffs' rebate models—which the Government agrees (at 38-40) are "explicitly contemplate[d]" by the statute, JA389 n.11—somehow do. That makes no sense.

The Government's alternative explanation (at 36-37) that *covered entities* "voluntarily opted to use" the product-replenishment model is no explanation at all. The 340B Program is supposed to operate with manufacturers' consent as well. *See Cummings*, 596 U.S. at 219. And manufacturers did not consent to the product-replenishment model. The parties' positions are merely flipped for rebate models. *See* Opening Br. 46. HRSA, like all agencies, must "treat like cases alike." *Westar Energy*, 473 F.3d at 1241.

The Government's contrary view rests on the apparent assumption that HRSA is entitled to prefer the interests of covered entities over that of manufacturers. That

is flatly wrong. Opening Br. 48-49. HRSA must ensure that both manufacturers and covered entities play by the rules; it cannot allow covered entities to impose a fraud-riddled pricing model on manufacturers without agency oversight while denying manufacturers the ability to adopt a statutorily compliant pricing model without agency preapproval. The 340B Program struck a careful balance between covered entities and manufacturers—requiring significant price concessions, tempered by important statutory safeguards. By unilaterally favoring covered entities over manufacturers, HRSA therefore "relied on factors which Congress has not intended it to consider," the very definition of arbitrary action. *Solondz v. Federal Aviation Admin.*, 141 F.4th 268, 276 (D.C. Cir. 2025).

## III. HRSA'S REJECTION OF PLAINTIFFS' REBATE MODELS WAS ARBITRARY AND CAPRICIOUS.

HRSA indisputably failed to weigh the benefits of Plaintiffs' rebate models before indefinitely prohibiting their implementation. The Government maintains that this demand that manufacturers "adjust their conduct immediately" was just a preliminary position, but HRSA's order that Plaintiffs not implement their rebate models, on pain of ruinous penalties, is plainly final agency action. *National Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1283 (D.C. Cir. 2005). That determination is ripe for review and should be reversed.

## A.      The Agency's Disapproval Is Final And Ripe.

1.   Like the District Court, the Government rests its finality and ripeness objections on its claim that HRSA "has not yet determined" whether to disallow Plaintiffs' models.  Gov't Br. 41.  But, as the Government acknowledges (at 44), these justiciability arguments turn on its merits position that Section 340B prohibits Plaintiffs from implementing their rebate models *without agency approval*.  That assertion is wrong for all the reasons detailed above.  *See supra* pp. 4-6.

Once the statutory misreading is resolved, the Government's procedural objections drop away.  HRSA's letters deny manufacturers the ability to implement their rebate models *today*.  *See* JA460-462 (Lilly); JA466-468 (BMS); JA473-475 (Novartis).  Even considered by itself, that bar will persist until—at best—some indefinite time in the future.  But, as Plaintiffs explained, their models were functionally indistinguishable from Johnson & Johnson's and Sanofi's—models that HRSA refused to approve outright.  JA812; JA455.  The District Court correctly recognized that this disapproval rendered those manufacturers' arbitrary-and-capricious claims ripe.  JA399-401.  Yet Plaintiffs are situated no differently—and so the same conclusion should have extended to them.

The Government now argues that the District Court's Sanofi holding was mistaken.  Gov't Br. 47-48.  But the Government does not—and cannot—dispute that its legal position required all manufacturers "to adjust their conduct

23

immediately" or face imminent penalties, including termination of their existing PPA. *National Ass'n of Home Builders*, 417 F.3d at 1283. That renders the agency's decision "ripe for review at once." *Id.* (quoting *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 891 (1990)); *see also Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1310 (D.C. Cir. 2010) (dispute ripe where "we know precisely what the [agency] thinks the answer is").

HRSA's decision not to evaluate the benefits of Plaintiffs' models before blocking their adoption is "intertwined" with this overall decision—and is therefore also immediately reviewable. *Nasdaq Stock Mkt. LLC v. SEC*, 38 F.4th 1126, 1144-45 (D.C. Cir. 2022); Opening Br. 57-58. The agency may have believed it did not *need* to conduct that analysis because it viewed preapproval as required by the statute. Gov't Br. 44. But that in itself reflects "the agency's settled position" of what was required of it and of the regulated parties. *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000). No "further factual development would 'significantly advance' " the Court's ability to evaluate whether HRSA should have conducted that further analysis or make for a more concrete controversy. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998) (citation omitted).

For these same reasons, the Government's argument that HRSA's delay tactic does not amount to a "constructive denial" of Plaintiffs' models is wrong but also beside the point. Gov't Br. 48-50. Plaintiffs' problem is that HRSA's decision to

subject their models to preapproval has imposed immediate "obligations" on them—and made clear that the agency will "not reach a determination" on the benefits of those models before requiring manufacturers to forgo their use. *Friedman v. FAA*, 841 F.3d 537, 542 (D.C. Cir. 2016). Under any standard, "the impact of" the agency's "order is sufficiently final to warrant review." *Id.* (quotes and citations omitted).

2. A contrary result would be untenable. Allowing HRSA to prohibit Plaintiffs from implementing their models without weighing those models' benefits would trap manufacturers in purgatory, forced to give unlawful discounts indefinitely. Opening Br. 12-17. The agency has already spent more than *six years* evaluating the details of Kalderos's rebate model—revealing just how slowly the agency can drag out its deliberations when it does not expect to face judicial review. JA848. Plaintiffs cannot be required to continue to give away billions in unlawful 340B price concessions while the Government purports to continue to study the matter.

By the same token, the Government is wrong to suggest that the remedy Plaintiffs seek on this claim is meaningless. Gov't Br. 43-44. The Government argues that if the Court were to find that the Secretary "provided insufficient reasoning in support of [his] decision" to prohibit Plaintiffs from implementing their models pending his further review, "the correct result would be to remand to the

Secretary." *Id.* at 44. Not so. Because the agency entirely failed to consider the merits of Plaintiffs' rebate models, the default remedy is for the Secretary's actions to be set aside. *American Bankers Ass'n v. National Credit Union Admin.*, 934 F.3d 649, 673 (D.C. Cir. 2019) ("When a rule is contrary to law" or "arbitrary and capricious," the "ordinary practice is to vacate it") (cleaned up).

3. HRSA's recent announcement of a limited rebate pilot program does not alter these conclusions. As the Government acknowledges (at 18, 42), the pilot program is available only for medicines imminently subject to price controls under the Medicare Drug Price Negotiation Program. 340B Program Notice, 90 Fed. Reg. 36,163, 36,164 (Aug. 1, 2025). And even the limited pilot program elsewhere reaffirms HRSA's unlawful preapproval barrier, because it continues to maintain that manufacturers "may not implement [their rebate] plans without first receiving" the Secretary's approval. *Id.* The Government is thus correct that the "pilot program does not render this litigation moot." Gov't Br. 42 n.6. Those are the same reasons why Plaintiffs' challenge to all aspects of HRSA's decisions remain ripe. So long as HRSA can keep denying manufacturers the ability to implement their models without even considering why those models are necessary, judicial intervention is Plaintiffs' only recourse.

26

**B.    HRSA's Failure To Consider The Benefits Of Plaintiffs' Rebate Models Requires Reversal.**

Apart from its ripeness objection, the Government offers no substantive defense to Plaintiffs' claim that HRSA failed to consider the benefits of Plaintiffs' rebate models.  *See* Opening Br. 55-58.  As the Government below conceded—and the District Court found—"there isn't a specific spot in the administrative record where [the agency] talk[s] about" the concerns Plaintiffs raised over unlawful duplications and diversion.  JA400 (citing JA330).  And because the anti-duplication and anti-diversion safeguards are fundamental components of the statutory scheme, they are "by definition" an important factor that HRSA had to—but did not—consider.  *United Parcel Serv., Inc. v. Postal Regul. Comm'n*, 955 F.3d 1038, 1050 (D.C. Cir. 2020).

Manufacturers proposed the rebate model for good reason.  Without effective oversight, the 340B Program has exploded in size, with noncompliance running rampant.  JA215-216; Opening Br. 14.  The Government's own watchdog has "widely documented" the Program's abuses.  JA397; *see* JA214-215, 379, 818-819; *see also* Gov't Accountability Off. (GAO), *GAO-18-480, Drug Discount Program:*

*Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 15-16, 23-26 (June 2018), https://perma.cc/TWH9-HG26.[3]

The rebate model is currently the only practicable tool manufacturers have to combat the abuses of the product-replenishment system. *See* Opening Br. 12-17. Indeed, even the Government's belatedly unearthed 1998 audit report shows that HRSA has long recognized that a rebate model is "the only feasible system" that can accommodate "multiple pharmacy service providers" while "safeguard[ing] against diversion." 1998 Audit, *supra*, at app. 4. And the District Court credited Plaintiffs' legitimate concerns of unlawful duplication and diversion, JA397-398, which Plaintiffs' rebate models would help address, JA672-673; JA722-723; JA820-821. Plaintiffs' proposed models require only standard claims data that covered entities already "collect, report, and maintain in the normal course of business," JA821, and will greatly enhance program integrity without imposing onerous requirements on covered entities.

---

[3] Intervenors suggest (at 16-17) that the widely documented fraud and abuse in the 340B Program is merely the result of "typographical error[s]" in the "listing [of] billing numbers." But HRSA's audits distinguish between such typographical inaccuracies that caused "[d]uplicate [d]iscounts" and those for which "[i]t was determined that duplicate discounts did not occur as a result." *E.g.*, HRSA, *Program Integrity: FY24 Audit Results* (last updated Aug. 26, 2025), https://www.hrsa.gov/opa/program-integrity/fy-24-audit-results (compare the entry for "Aultman Orrville Hospital" with that for "Baptist Hospital").

Neither the Government nor Intervenors have identified any other program—public or private—where sellers are compelled to offer billions in price concessions without providing even basic data proving the recipient's eligibility. Indeed, the Government regularly uses rebates in requiring price concessions on drugs in Medicaid, Medicare Part B, and Medicare Part D. *See* 42 U.S.C. § 1396r-8(a)(1), (b)(1)(A); *id.* § 1395w-114c(b)(1)(A), (g)(4)(A). Covered entities, like ADAPs, can use "standard business practices" to manage their cashflow in the short window between wholesale purchases and manufacturers' rebates. *See* 63 Fed. Reg. at 35,239-42; JA669, 687. And manufacturers will pay rebates promptly, and can be subject to severe penalties from HRSA if they do not. HRSA should have considered these issues before it prohibited manufacturers from implementing their rebate models.

## CONCLUSION

For these reasons and those in the opening brief, the District Court's judgment should be reversed and the case remanded with instructions to vacate HRSA's disapprovals of Plaintiffs' cash-rebate models.

Respectfully submitted,

/s/ Catherine E. Stetson
CATHERINE E. STETSON
SUSAN COOK
SEAN MAROTTA
KEENAN ROARTY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com

JOHN C. O'QUINN
MEGAN MCGLYNN
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

*Counsel for Eli Lilly and
Company and Lilly USA, LLC*

PAUL J. ZIDLICKY
MADELEINE JOSEPH
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
(202) 736-8000
pzidlicky@sidley.com

JACKSON B. SKEEN
HOGAN LOVELLS US LLP
125 High Street
Suite 2010
Boston, MA 02110

*Counsel for Novartis Pharmaceuticals
Corporation, Bristol Myers Squibb
Company, Eli Lilly and Company, and
Lilly USA, LLC*

TREVOR L. WEAR
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603

*Counsel for Kalderos, Inc.*

August 29, 2025

30

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,492 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

/s/ Catherine E. Stetson
Catherine E. Stetson

## CERTIFICATE OF SERVICE

I certify that on August 29, 2025, the foregoing brief was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

/s/ Catherine E. Stetson
Catherine E. Stetson